# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

2015 MAY 19  P 4: 19

HD

FILED IN CLERKS OFFICE
U. ...  . APPEALS
FOR the First Circuit

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF MASSACHUSETTS | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| *ex rel.* | : | |
| | : | **FILED UNDER SEAL** PURSUANT TO |
| [UNDER SEAL], | : | **31 U.S.C. § 3730(b)(2)** |
| | : | |
| Plaintiff-Relator, | : | **JURY TRIAL DEMANDED** |
| | : | |
| v. | : | |
| | : | |
| [UNDER SEAL], | : | |
| | : | |
| Defendants. | : | |
| | : | |

**FILED IN CAMERA AND UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF MASSACHUSETTS | : : : : | |
| Plaintiffs, *ex rel.* | : : : | |
| LISA WOLLMAN, M.D. | : : | **COMPLAINT** |
| Plaintiff-Relator, | : : | **FILED UNDER SEAL** PURSUANT TO **31 U.S.C. § 3730(b)(2)** |
| v. | : : | **JURY TRIAL DEMANDED** |
| MASSACHUSETTS GENERAL HOSPITAL INC., THE MASSACHUSETTS GENERAL HOSPITAL'S PHYSICIAN'S ORGANIZATION and PARTNERS HEALTHCARE SYSTEM, INC., | : : : : : : | |
| Defendants. | : : : | |

**FILED IN CAMERA AND UNDER SEAL**

## INTRODUCTION

This case involves some of the most fundamental promises physicians make to their patients: to be present when they say they are and to assure that there is proper oversight of the care when they are not available.

Patients who come to the Massachusetts General Hospital pass through its doors with no lower expectation. Indeed, given the international reputation of this Boston hospital and its claim to unique expertise, resources and talent, patients are often comforted by the belief that the MGH attending physician in whom they have entrusted their care will be with them as they face delicate and tough surgeries. They do not expect that when an attending physician assures them that he will be present, what he means is that he will be somewhere on the MGH campus, perhaps in his office, perhaps seeing patients in the clinic or actively involved in one or even two other surgical procedures when the patient lies in the operating room under anesthesia. Yet too often that is exactly what happens.

Patients reasonably expect candor from attending physicians in charge of their care in the operating room and they expect their active presence during a procedure; the government expects no less of that same physician and the institution of which he/she is a part when he/she bills for his/her services and expects the government to pay.

MGH fails to meet this basic promise to its patients and then files, or causes to be filed, false claims with the government, improperly charging for the presence of attending physicians who often are only briefly present and not readily available for the procedures that occur under their name. This practice is not, unfortunately, limited to the rogue actions of a single surgeon, nor is concern about it unknown to the leadership of MGH. Rather, the practice has continued stubbornly and across divisions at the MGH as a willful violation of patient trust and federal law.

In order to redress the violations, on behalf of the United States of America and the Commonwealth of Massachusetts, Relator Lisa Wollman, M.D. brings this *qui tam* Complaint against Defendants Massachusetts General Hospital Inc. ("MGH"), the Massachusetts General Physicians' Organization ("MGPO") and Partners Healthcare System, Inc. ("Partners")(collectively "Defendants") alleging federal and state false claims act violations arising from improper billing and record keeping related to orthopedic and vascular surgical services provided to patients at MGH who are/were eligible to receive health care coverage provided by publicly funded insurance plans, including Medicare, Medicaid, Tricare and state employee health care plans (collectively "government payors" or "government health plans"). From at least 2006 to the present, numerous surgeons performing work at MGH have knowingly submitted or caused to be submitted false claims to government payors for surgeries that were not eligible for reimbursement under Medicare and Medicaid rules. Defendants are aware of the false claims and have concealed the unlawful conduct from regulators while conspiring to cause the false claims to be submitted for payment. This unlawful conduct is continuing.

## PARTIES

1.      Plaintiff-Relator Lisa Wollman, M.D., is a citizen of the Commonwealth of Massachusetts. She is a graduate of the University of Pennsylvania and  of the Albert Einstein College of Medicine of Yeshiva University, in Bronx, New York, and is licensed to practice medicine in Massachusetts. She is board-certified in Anesthesiology and has practiced medicine as an anesthesiologist since 1990. Relator was in residency training from 1990 to 1993. In 1995, Dr. Wollman received a Certificate of Added Qualifications in Critical Care Medicine. She is the sole or contributing author of several peer-reviewed published papers and book chapters in the area of anesthesiology.  From 1993 until February 2015, she was employed as an anesthesiologist by Defendant MGH, in Boston, Massachusetts, and served as faculty (from 1995

4

to 2015).  Among her duties as an attending physician at MGH and a member of the Harvard Medical School ("HMS") faculty, Dr. Wollman trained Harvard medical students, MGH/HMS residents, and fellows in anesthesia.  From 1993 to 2010, Dr. Wollman primarily provided anesthesia services to patients undergoing cardiac, thoracic or out-patient surgery performed by MGH surgeons.  In 2010, Dr. Wollman was selected, along with other anesthesiologists, to work on a dedicated floor providing in-patient anesthesia for surgical patients in the MGH Department of Orthopaedic Surgery.  During her tenure working as an anesthesiologist along side surgeons in the Orthopaedics Department, Dr. Wollman gained first-hand knowledge of MGH's deliberate strategy and willful conspiracy to engage in and then cover up violations of billing rules and regulations established by Government payors, including Medicare and Medicaid, with regard to orthopedic surgeries  performed at MGH.  She reported such violations to MGH but was reprimanded, silenced and marginalized for her efforts.  Dr. Wollman decided to resign her employment at MGH this year to take a position at another healthcare institution in the Boston area.  Relator disclosed the allegations to the government alleged herein prior to filing this Complaint.

2.  Defendant Massachusetts General Hospital Inc. is a non-profit corporation, and a Harvard-affiliated teaching hospital, with a "commitment to advancing care through pioneering research and educating future health care professionals."  MGH is "the largest teaching hospital of Harvard Medical School" and it touts its work to "prepare[] future health care professionals and train[] providers in innovative therapies."  It offers "specialized residencies in each of its multidisciplinary care centers and clinical departments."[1]  As for its clinical work, MGH states that it "offers sophisticated diagnostic and therapeutic care in virtually every specialty and

---

[1] *See* www.massgeneral.org/education/default.aspx.

subspecialty of medicine and surgery ...in four health centers in the Boston area."[2]  For many

decades, MGH has held itself out to the public as a center of excellence.  Its website notes that

MGH has been consistently ranked as one of the top hospitals in the United States, including in

2014 by the U.S. News & World Report's "Best Hospital's Honor Roll," which ranked it number

two in the nation based upon "quality of care, patient safety and reputation in 16 clinical

specialties."  *Id.*  MGH works with its physician's organization, the Massachusetts General

Physicians Organization ("MGPO"), to bill for clinical services and compensate members of its

Medical Staff, who often are technically employed by the MGPO.  MGH's principal address is

55 Fruit Street, Boston, Massachusetts 02114 and its registered agent for service of process is CT

Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

3.      Defendant Partners Healthcare System, Inc. is a non-profit corporation, with a  a

principal address at 800 Boylston Street, Suite 1150, Boston, Massachusetts 02199.  According

to its 2013 filing with the Massachusetts Health Policy Commission, Partners is the parent

organization of an integrated health system founded by Brigham and Women's Hospital and

Massachusetts General Hospital.  In addition to these two academic medical centers, Partners

includes community and specialty hospitals, a managed care organization, community health

centers, a physician network, home health and long-term care services, and other health-related

entities.  Relevant here, Partners Office of Graduate Medical Education oversees residency

programs, including the Orthopedics residency program, at MGH.  Partners registered agent for

service of process is The Corporation Company, located at 124 West Capitol Avenue, Suite

1900, Little Rock, Arkansas 72201.

---

[2] http://www.massgeneral.org/about/overview.aspx

4.     Defendant The Massachusetts General Physicians Organization ("MGPO") is a private corporation organized under the laws of the Commonwealth of Massachusetts, located at 55 Fruit Street, Boston, Suffolk County, Massachusetts and, at times relevant to this action, David Torchiana, M.D. served as its Chairman and Chief Executive Officer.  On information and belief, working with MGH, the MGPO was involved in billing for medical services and compensating members of the Medical Staff at MGH.  The Defendants hereinafter may be collectively referred to as "the Hospital" or "MGH."

## JURISDICTION AND VENUE

5.     Relator brings this action on behalf of herself and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 and on behalf of the Commonwealth of Massachusetts, pursuant to Mass. Gen. Laws Ch. 12, § 5B *et seq.*

6.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts relating to Mass. Gen. Laws Ch. 12, § 5B *et seq.* pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

7.     This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District.  In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

8.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

9.     Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or

other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).[3]

10.     To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *Id.*

**SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS**

11.     Partners and MGH serve as the institutional sponsors for a number of residency programs accredited by the Accreditation Council of Graduate Medical Education ("ACGME"). Relevant here, the ACGME lists MGH as the institutional sponsor for the  Harvard Combined Orthopedics Residency Program ("HCORP"), and Partners and MGH provide salary and benefits to HCORP residents. At any given time, a total of 50 resident physicians train through HCORP. MGH's attending physicians, who hold HMS faculty appointments, are charged with the training of HCORP residents and with supervising the care residents give MGH patients.

12.     As a provider of Graduate Medical Education ("GME"), Defendants receive substantial payments from the United States government for resident physician[4] training and

---

[3] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act may be applicable (*i.e.,* 31 U.S.C. § 3730(e), as amended, October 27, 1986, and May 20, 2009).

[4] A resident is a medical school graduate engaged in in-depth training in a medical specialty, which may last from 3-5 years depending upon the specialty. Residents are to be supervised by teaching physicians, also called "attending physicians," who approve their decision-making. *See generally* http://en.wikipedia.org/wiki/Residency_(medicine). According to the ACGME, a "resident" is "[a]ny physician in an accredited graduate medical education program, including interns, residents, and fellows." The ACGME defines a  "fellow" as
 a "physician in a program of graduate medical education accredited by the ACGME
who has completed the requirements for eligibility for first board certification in the specialty.

salaries though direct and indirect graduate medical education payments under Medicare Part A and funding from other federal payors including the Departments of Defense and Veterans' Affairs, and some state Medicaid programs.[5]

13.     The funds received from federal sources for graduate medical education is significant. In 2010, for example, Medicare contributed $9.5 billion to teaching hospitals in the United States to support the training of about 100,000 residents.[6] In addition to receiving public money to cover the cost of salaries and other overhead associated with resident training, MGH may bill Medicare Part B for the services (such as surgeries) rendered by teaching physicians on its faculty incident to the instruction of residents, provided that Medicare and Medicaid rules are followed.

14.     Medicare and Medicaid regulations prohibit teaching hospitals, or those who submit bills on their behalf such as MGPO here,  from billing for the services of teaching physicians, here members of MGH's Medical Staff who hold faculty appointments at Harvard Medical School, where a resident performed the surgery without appropriate supervision by a teaching physician during the "key or critical" portions of the surgery and/or where the teaching physician was not immediately available to assist the surgery by the resident(s).   A teaching hospital seeking reimbursement must assure that the teaching physician  accurately accounts for the portions of the surgery performed by him/her and any portions of the surgery in which the resident performed, but were supervised by the teaching physician. If the "key or critical" parts

The term 'subspecialty residents' is also applied to such physicians. Other uses of the term "fellow" require modifiers for precision and clarity, e.g., research fellow." *See* AGME Glossary Of Terms (Glossary of Terms, July 1, 2013); http://acgme.org/acgmeweb/Portals/0/PFAssets/ ProgramRequirements/ab_ACGMEglossary.pdf.
[5]Medicare Financing of Graduate Medical Education, Intractable Problems, Elusive Solutions, Rich, Eugene C. et al., J. Gen. Inter. Med., 17; 283-292 (2002).
[6] *The Uncertain Future of Medicare and Graduate Medical Education*, John K. Ingelhart, John K., New Eng. J. of Med., 365; 14, p. 1340 (2011).

of the surgery were not personally performed by the teaching physician or appropriately supervised when performed by a resident or if the teaching physician is not immediately available to assist the resident's surgery, the teaching hospital may not bill for the teaching physician's services.

15.   From at least 2006 to the present, Defendants, in conspiracy with a core group of orthopedic and vascular surgeons working at MGH,[7] caused the submission of false claims for reimbursement to government payors and have engaged in efforts to conceal the true facts from regulators.   Defendants carried out this scheme through numerous policies and practices including, but not limited to:

●      encouraging and/or failing to discipline teaching or attending physicians who bill government payors (or cause other entities to bill on their behalf) -- as if the surgery was in conformance with Medicare and Medicaid rules – when they are not present during the majority of the surgery  nor  readily available when residents or fellows are performing the surgery.

●      encouraging, ignoring and/or failing to audit patient charts for false attestations by teaching physicians, used to support false billing statements;

●      violating patient consent rules concerning the identity of the physician(s) performing the surgery, which would expose the Defendants' submission of false claims to government payors for reimbursement of orthopedic surgeries;

●      adopting hospital rules in 2012, which were purportedly designed to address the concerns expressed by members of the Medical Staff about the practice of booking concurrent surgeries and leaving trainees without appropriate supervision by a teaching surgeon and to curb billing abuses, but which instead largely ratified the unlawful practices;

●      ignoring, marginalizing, retaliating against or forcing out physicians, including Relator, who complained about MGH's practice of double or triple booking, including patient harm caused by such practices;

●      suppressing an internal investigation conducted by MGH with regard to the above unlawful practices; and

---

[7] On information and belief, MGH orthopedic surgeons currently engaged in concurrent bookings are:  Drs. R. Malcolm Smith, David D. Lhowe, Mark S. Vrahas, Jon J.P. Warner, Kirkham B. Wood and Matthew T. Provencher.

•    failing to reimburse government payors for false claims for surgeries that did not comply with Medicare and Medicaid rules.

16.    In or about 2010, MGH assigned Relator to provide in-patient anesthesia services to surgical patients in its Department of Orthopaedic Surgery ("Orthopaedic Surgery"). In the course of providing anesthesia to patients undergoing surgery, Relator became aware of the practice within Orthopaedic Surgery of booking two or three surgeries to occur at the same time ("concurrent surgeries" also "double booking" and "triple booking") with the same attending surgeon listed as the lead on each surgery. The practice requires that those in training at the MGH, its residents,[8] to conduct all or most of the surgery outside of the presence of the teaching physician.

17.    Over time, Relator came to understand that certain orthopedic surgeons regularly booked two surgeries concurrently in the morning and then two surgeries concurrently in the afternoon. At the time she became aware of this practice, it was not uncommon for a single orthopedic surgeon at MGH to schedule three surgeries concurrently, including two or more complicated or high risk procedures, such as total shoulder replacement; cervical, lumbar and spine surgeries and the surgical repair of non-emergent fractures.

---

[8] Medicare defines a "resident" as an individual who is "formally participating in an organized, standardized, structured course of study" and "*needs* the training in order to meet board certification requirements in that specialty." Emphasis in original. *See* 75 Fed. Reg. 50042-01, 2010 WL 3207689. For this reason, this Complaint uses the word "resident" to mean any individual who meets the definition of the Medicare billing regulations pertaining to teaching hospitals. Critical to this discussion, fellows in training at MGH often are participating in ACGME accredited programs and thus fall under the definition offered by the ACGME and Medicare of "resident," *see supra* at n. 4; *see also* 42 C.F.R. § 415.152 ("Definitions"). Moreover, even where fellows may be in training programs that are not accredited ACGME programs and may have received unlimited licenses to practice medicine from the Commonwealth of Massachusetts, such fellows are *generally are not credentialed at MGH* to perform complicated surgical procedures without the oversight of members of the MGH Medical Staff. For that reason medical records generally list such attending physicians as present for complicated procedures, with the fellow listed as the assistant. This is so whether or not the attending physician actually appeared in the operating room or ever scrubbed in to participate in the procedure.

18.     The procedures did not merely overlap on their margins; they were instead scheduled at or about the same time, making it impossible for the teaching physician to assure the he could be physically present and ready to participate in the key or critical parts of each surgical procedure.   In practice, problems arose, as patients needed prompt attention from a surgeon who was otherwise engaged.

19.     As the Relator discovered this practice, she realized it was largely, if not entirely, unknown to the patients – and certainly not obvious from the patient records.

20.     She became concerned about the ethics of the practice, about the quality of the care delivered and about the accuracy of the medical records.

21.     The patients for whom these risks were – and are still – most acute are patients over the age of sixty-five.  The risks of complications in surgery increases for patients over 65 years of age (i.e. patients eligible for Medicare).

22.     Because Relator was routinely assigned to work with orthopedic surgeons who scheduled concurrent surgeries, she witnessed first-hand compromised clinical care resulting from the practice of concurrent booking.

23.     Even where there were no major complications,  otherwise healthy patients were put to sleep for an unnecessarily prolonged period of time awaiting surgery, needlessly risking their health and increasing costs to government payors, which reimburse anesthesiologists by the amount of time spent with patients under anesthesia.

24.     Dr. Wollman asked colleagues about the practice and learned that prior efforts to address the problem had not been well-received.  For instance, when Neelakatan Sunder, M.D., who held a post of administrative leadership within the Department of Anesthesia, raised concerns, he was removed from that post.  Moreover, when Dennis Burke, M.D. a renowned

orthopedic surgeon at MGH, similarly tried to address the issue, he was marginalized and rebuffed. Dr. Wollman added her voice, asking questions about the practice and its impact within her own Department. She joined an unheard chorus.

25.     Then, in the Spring of 2012, Relator felt obliged to raise her concerns to more senior leadership.

26.     In May of 2012, focusing in on the conduct of a particular surgeon, Surgeon "A"[9], Relator communicated by email to several high ranking administrators at the Defendant institutions, including David Torchiana, M.D., former Chairman and Chief Executive Officer of the MGPO (who recently left that position to become the President and Chief Executive Officer of Partners); Peter Slavin, M.D., President and Chief Executive Officer of MGH; Keith Lillemoe, M.D., MGH's Chief of Surgery; and Ann Prestipino, M.D., MGH Senior Vice President for Surgical Anesthesia Services and Clinical Business Development.   The Chief of Orthopaedics, Harry Rubash, M.D., was made aware of her complaint.

27.     Relator reported that she was in the process of preparing Surgeon A's patient for surgery.   The patient asked to see Surgeon A prior to the procedure and to being given anesthesia.   Relator sought out Surgeon A and learned that another patient had already been sedated in another operating room, also awaiting surgery by the same Surgeon A. While both patients awaited surgery (one already under anesthesia), Surgeon A was in another building on MGH's campus seeing yet other patients.   Relator wrote, "I am aware of at least one and possibly several cases where this same surgeon [Surgeon A] never scrubbed into the case; in one particular case, the patient was the wife of a surgeon who came from the west coast specifically

---

[9] Relator has substituted the names of the surgeons with an alias, such as Surgeon A, and provided the true names to the Government in a Disclosure Statement pursuant to the federal and state false claims statutes. Relator has done so to protect the interests of patients until the Government has conducted its investigation.

for ... [his] surgical abilities."  In response to Relator's email, Dr. Torchiana admitted that "[a]ttending surgeons, including .... [Surgeon A] are obligated to be present for the critical parts of their cases" and -- seeking to assuage Relator -- noted that MGH had begun an internal investigation of concurrent booking to address concerns voiced by numerous MGH physicians.

28.     Relator hoped that this process would address the problem quickly, as  she believed "this issue of surgeon availability and presence in the OR [operating room] is not something that can wait for a committee to resolve or can be ignored.  Patients deserve honesty and the surgical and anesthesia team should not be asked to participate in the deception that the surgeon is present for the 'critical parts' of the case."

29.     The "deception" to which Relator referred was MGH's role in concealing the identity of the physicians actually performing the surgery – by failing to inform patients undergoing surgery that their attending physician *would not* necessarily be in the room during most of the procedure -- and by too often falsifying the medical records to indicate that an attending physician was present when he in fact was not.

30.     Dr. Wollman learned that the investigation into the practices about which she had expressed concern concluded in the spring of 2012; yet the results were not disclosed.  And little changed.  While triple bookings were officially banned by a new written policy,[10] MGH did nothing to ensure that teaching surgeons were  present for key and critical parts of their cases, that they were immediately available to residents needing assistance, as is required by the Medicare rules, or that the surgical records accurately reflected who participated in the surgical procedure.

---

[10] Relator is in possession of an MGH internal document entitled, "2012 MGH Policy:  Criteria for Concurrent Staffing of Two Operating Rooms," which was initially announced in or around June 2012 and which purported to address the concerns about concurrent booking.  The policy, however, had no such effect.

31.     In fact, Dr. Wollman was obliged to report a triple booking by Surgeon A on June 28, 2012 to MGH supervisors. She wrote, "I thought that a surgeon could not be in three rooms under any circumstances; I am not sure how this was able to be booked this way … and [I] continue to not be comfortable being put in this position."

32.     Rather than disciplining Surgeon A or enforcing supervision rules hospital-wide, MGH informed Relator that she would no longer be permitted to work on cases with Surgeon A.   When Relator questioned her supervisor, Robert Peloquin, M.D., MGH's Director of Orthopaedic Anesthesia, he informed her that because of the "history of poor communications" between Relator and Surgeon A, she was excluded from providing anesthesia to his patients. Yet, the only "poor communication" between the two members of the Medical Staff occurred when Surgeon A screamed at Relator for having him paged to meet his patient before surgery. Relator's exclusion was merely pretext for keeping concurrent surgeries from further scrutiny.

33.     Relator addressed her concern about MGH's decision to exclude her from working with Surgeon A to Peter Dunn, M.D., MGH's Director of the Operating Rooms ("OR Director"). She asked "what, if anything, has been done to date, to address … [Surgeon A's] behavior and responses in the OR … [?]" Dr. Dunn never responded, nor did MGH.  By excluding Relator from working with Surgeon A, Defendants assured that no other complaints by Relator – at least with regard to Surgeon A–would surface.

34.     Notwithstanding MGH's 2012 investigation, safety problems arising from concurrent bookings persisted.

35.     For instance, on April 22, 2013, Relator reported an incident where a patient had a serious bronchospasm (a sudden constriction of air ways in the lungs) during ankle surgery, occurring at the end of the day. Relator was the physician in charge of the patient's anesthesia

and noted that the surgery took over an hour longer than projected because the teaching surgeon, Surgeon B never appeared in the room.   A fellow performed all of the procedures even though they were  scheduled to be performed by Surgeon B.  Relator's email to the OR Director asked, "isn't he [Surgeon B] obligated to be there?"

36.     Relator's supervisors, Jeanine Weiner-Kronish, M.D., the Chief of Anesthesia and Critical Care, and James Rathmell, M.D., the Vice Chair, Department of Anesthesia and Critical Care, did not follow up on Dr. Wollman's concerns, except to threaten her by suggesting that she had violated patient privacy and could face legal action.  When she raised concerns to Dr. Dunn, he too questioned Dr. Wollman's motivation in reviewing charts when serving as a block attending, raising the possibility that the hospital could accuse her of violating HIPPAA and take disciplinary action against her.[11]

37.     The charge was specious.  As part of Dr. Wollman's job duties, on a rotating basis,  she served as the "blocking attending," that is, as the member of the Anesthesia Department who administered the regional blocks for all the patients undergoing orthopedic surgery. When an anesthesiologist serves as the "block attending," she required to review patient charts before administering the anesthetic block and in order to appropriately schedule the 10-12 patients under her care.

38.     To be sure, while Dr. Wollman discharged her duties, she grew concerned about the unnecessary prolonging of the anesthesia administered to a patient while waiting for a surgeon who had booked more than one surgery concurrently.   Dr. Wollman's expression of concern certainly did not implicate HIPPAA or constitute a failure to comply with its requirements.

---

[11] *See generally* Health Insurance Portability and Accountability Act of 1996 (HIPPA) privacy regulations, 45 C.F.R. Part 160 and Subparts A and E of Part 164.

39.     Dr. Wollman understood that her supervisors wanted her to silence her; yet she remained concerned not only about patient safety but also about patient consent and the falsification of records. She was disturbed that patients undergoing complex orthopedic surgery were largely unaware that their care was too often left in the hands of residents, without appropriate supervision from the surgical attending charged with their training. Unfortunately, the deception that concerned Relator remained a problem for years thereafter.

40.     In fact, until 2014, the informed consent forms at MGH – which are to be reviewed and signed by patients before surgery – indicated only that the teaching surgeon was performing the surgery even when that physician was not planning on participating actively in the procedure.

41.     And it was only last year that MGH revised some of the consent forms for physicians who concurrently booked surgeries to include an exhaustive list of all the physicians who may be involved in a patient's surgery, including residents, and the extent of a teaching surgeon's presence. This kitchen sink approach to a consent form contained the list of physicians in fine print but is not effective notice to patients, especially when presented to them at a time when they are too ill or too worried about their impending surgeries to realize that they are consenting to a revolving door approach to the surgery they reasonably believe will be done by the attending physician who scheduled it and had examined them.

42.     The practice stands in violation of well-established ethical rules binding surgeons.

43.     The American Medical Association ("AMA") Code of Medical Ethics states that "[a] surgeon who allows a substitute to operate on his or her patient *without the patient's knowledge or consent is deceitful*. The patient is entitled to choose his or her own doctor and should be permitted to acquiesce or *refuse* the substitution." (Emphasis added). *See* AMA Code

17

of Medical Ethics at E-8.16 "Substitution of Surgeon without Patient's Knowledge or Consent."

The Code of Ethics goes on to state:

> Under the normal and customary arrangement with patients ... the operating surgeon is obligated to perform the operation but may be assisted by residents or other surgeons. With consent of the patient, it is not unethical for the operating to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, i.e., the surgeon must scrub. If a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement in the consent. Under these circumstances, it is the resident or other physician who becomes the operating surgeon.

*Id.*[12]

44.     Relator's concerns were mirrored by other well-respected health care professionals including Dennis Burke, M.D., an orthopedic surgeon on MGH's Medical Staff and a member of the HMS faculty who specializes in arthroplasty (total joint replacement) who has been honored by the institution itself for his commitment to excellence in patient care.

45.     Over time, Dr. Burke had made sure senior leadership within the Department of Orthopedic Surgery and within MGH, more generally, were aware of the practice, its implications for patient care, and the integrity of MGH's medical records and billings.

46.     On February 2, 2011, Dr. Burke reported his concerns to the MGH leadership, writing Dr. Torchiana about a 91 year-old patient who bled to death shortly after having an elective surgical procedure. The attending orthopedic surgeon in charge was listed as the

---

[12] *See also* Ghost Surgery: *The Ethical and Legal Implications of Who Does the Operation*, Mininder S. Kocher, MD, MPH, J Bone Joint Surg. Am. 84: 148-150 (2002). Among other things, Dr. Kocher concluded that "[t]he substitution of an authorized surgeon by an unauthorized surgeon or the allowance of unauthorized surgical trainees to operate without adequate supervision constitutes 'ghost surgery.' These practices are legally and ethically iniquitous. Ghost surgery flies in the face of case law and violates an individual's right to control his or her own body and violates that person's right to information needed to make an informed decision."

attending in another operating room at the very same time. He also reported to Dr. Torchiana his concern about a patient who had required emergency surgery, following an unsuccessful surgery by another orthopedic surgeon at the hospital. Dr. Burke reported, the attending physician in charge of the patient's first surgical procedure had also been listed as the attending in charge of patients in three operating rooms concurrently.   According to the anesthesiologist involved in the first procedure, the attending surgeon was not immediately present for the critical stage of the surgery nor did he respond to repeated pages. It was only upon the insistence of the treating anesthesiologist that the attending physician in charge of the patient's care appeared in the room. When a resident involved in the procedure suggested that materials to be used needed to be mixed again, given the time lapse, the surgeon rebuffed the concern and proceeded.

47.     At the time Dr. Burke reported these events to Dr. Torchiana, he did so because he had not received any indication from his own Department of Orthopedics that the problems posed by concurrent surgeries were being considered.

48.     In addition to detailing certain specific cases where patient harm appeared to result from the practice of concurrent surgery, on February of 2011, Dr. Burke reported that there was also a troubling pattern involving the "apparent falsification of records by nursing and house staff that made it appear that a surgeon scheduled simultaneously in two rooms performed both operations."

49.     Dr. Burke noted that the records were not remotely accurate and that there existed cases where the attending physician listed as the surgeon in charge of the procedure "apparently never entered the second theater, no less performed that operation."

50.     Dr. Burke specifically warned Dr. Torchiana "not [to] rely on medical records for compliance measure," as it was a "running joke among some of us that the phrase – 'I was

present for the critical part of the operation and Dr So and So was immediately available' are cynical code words from the inattentive surgeon absent from his post." Dr. Burke also argued that lying on patient records about the presence of surgeons "is unacceptable from an ethical and moral perspective and bad behavior, when it is tolerated and encouraged becomes normative and pervasive."

51.    Like Relator, Dr. Burke also repeatedly raised the lack of informed consent inherent in concurrent bookings, telling MGH administrators that patients would be shocked if they knew that concurrent surgeries primarily or exclusively conducted by residents were allowed to occur at MGH.   At one meeting where Dr. Burke questioned the problems of informed consent, an MGH official scoffed and told him not to worry because consent forms "weren't worth the paper they were printed on."

52.    That the leadership of MGH and its physicians group, the MGPO, disregarded concerns raised by Relator and others was not surprising: Routine concurrent surgery was part of the plan for increasing surgical volume when Dr. Rubash came on as the Chief of Orthopaedics at MGH in 2000, bringing along colleagues of his from  the University of Pittsburgh's Medical School where the business model of concurrently booking surgeries was mainstreamed for the purpose of increasing revenues to the university and individual physicians.  Dr. Rubash, who remains the Chief of Orthopaedic Surgery at MGH and an endowed chaired professor at Harvard Medical School, implemented a similar program at MGH by creating strong economic incentives for attending MGH surgeons to increase their own compensation based, in  part, on the number of surgical procedures performed under their names, for which the Hospital received reimbursement.

53.     Before Dr. Rubash's plan, surgeons were paid a salary, which was not specifically and directly tied to billing or grants. That changed under Dr. Rubash. The Harvard Business School chronicled the financial success of Dr. Rubash's physician incentive plan in a case study published on October 31, 2005, entitled "Performance Pay for MGOA Physicians (B)." The case study chronicles a significant rise in hospital revenues tied to the shift in compensation through volume incentives for orthopedic surgeons. The case study demonstrates the sharp monetary remuneration that certain orthopedic surgeons enjoyed as a result of their surgical volume. On information and belief, in large measure, this increase was a result of concurrent surgeries. It appears from the study that certain orthopedic surgeons currently book surgeries to increase their own compensation while not in fact increasing their personal workload, as they leave residents to handle procedures under their name. For example, one orthopedic surgeon at MGH earned approximately $1.9 million in one year at least, in part, as a result of routinely conducting concurrent surgeries.

54.     In short, it appears from that early snapshot that the practice of running concurrently multiple surgical rooms under the name (and the billing) of a single attending physician has substantially enriched MGH and certain orthopedic surgeons, at the expense of taxpayers who are footing the bill for surgeries that were purportedly performed or appropriately supervised by teaching physicians, but in fact were done by residents who had little or no supervision and no teaching.

55.     Given Defendants' scheduling practices, it is not possible for attending surgeons to be physically present for all key or critical portions of their surgeries and to be immediately available to assist a resident during the entire procedure. Sometimes, attending physicians are also not available because they are taking breaks, conducting rounds or seeing patients in their

offices. As a consequence of concurrent surgeries, MGH's claims for the unreduced physician fee schedule do not reflect the actual service performed by MGH's attending or teaching surgeons.

56. MGH's orthopedic operating schedules make clear that numerous surgeons are performing concurrent surgeries in the morning and afternoon hours. Relator reviewed these schedules frequently when providing anesthesia to patients who were concurrently booked with the same surgeon and when she provided regional block services for all patients undergoing surgery on days when she served on rotation as the attending anesthesiologist.

57. For example, on October 27, 2011, Relator observed that Surgeon A scheduled a removal of a right shoulder prosthesis at 9:45 A.M. and a total shoulder joint replacement at 10:00 A.M. Each of these surgeries requires about 3 hours. On this day, Relator observed that both patients went to sleep about the same time and Relator's patient (patient 1) was on medication the entire time to sustain his blood pressure. Surgeon A did not even scrub for patient 1's surgery until an hour and a half *after* patient 1 was put to sleep. Surgeon A participated in patient 1's surgery for about hour and fifteen minutes, but was not immediately available for patient 2's surgery during that time. Relator Wollman noticed that Surgeon A attested that he participated in the entire surgery for patient 1 even though it was false. Relator reported this to the compliance department at MGH. The attestation was corrected but Surgeon A was never reprimanded to Relator's knowledge.

58. Likewise on April 12, 2012, Surgeon A concurrently scheduled the right shoulder scope acromionplasty of a 65 year old woman whom Relator was providing anesthesia (Patient 1) and a shoulder replacement of another woman (Patient 2) in another room. Patient 2's procedure took approximately four hours and fifteen minutes to perform and Surgeon A was

seeing other patients, so Patient 1's surgery was essentially performed by a fellow. Relator noted that Surgeon A scrubbed for nine minutes of Patient 1's surgery. Patient 1 was asleep for an excessive time waiting for Surgeon A to arrive.

59.    Weeks later on May 3, 2012, Surgeon A had concurrent surgeries running while he was seeing patients in his office in another building on MGH's campus. This is the incident in which Relator complained to high level officials about his conduct in an email.

60.    There are other examples over the years – it is suffices to note that the practice has not stopped and instead has continued into 2015.

61.    For instance, on January 15, 2015, Surgeon C had two fracture repair surgeries on two separate patients that both began around noon and lasted for three hours. Both patients were in their seventies. In short, it was impossible for Surgeon C to be immediately available for both surgeries and, here, the likelihood of complications for elderly patients is increased.

62.    MGH's operating room schedules make clear that MGH orthopedic surgeons often perform multiple major surgeries simultaneously. For example, Relator observed that MGH's orthopedic operating schedule for numerous dates in 2011 through 2013 shows at least the following instances of surgeons covering multiple surgeries at once.[13]

| Date | Surgeon | Schedule |
|------|---------|----------|
| July 7, 2011 | Surgeon C | 9:53 a.m., Room 21, Right Total Knee Arthroplasty/Replacement; Duration: 3:07 hours.<br><br>10:25 a.m., Room 22, Right Femur Trochanteric nail insertion; Duration: 2:32 hours. |
| May 19, 2011 | Surgeon A | 9:45 a.m., Room 20; Left Total Shoulder Joint Replacement, Primary, Uncomplicated Duration 4:15 hours |

[13] The information in this chart is derived from internal MGH Operating Room Schedules.

| | | |
|---|---|---|
| | | 9:45 a.m.; Room Unknown; Left Shoulder Anatomic Inverse Arthroplasty; Duration 4:45 hours<br><br>2:00 p.m., Room 20; Left Total Shoulder Joint Replacement; Duration 4:00 hours.<br><br>3:30 p.m., Room 23, Left Proximal Humerus Fracture Orif |
| October 3, 2011 | Surgeon D | 8:08 a.m.; Room 72, Lumbar Laminectomy Less than 3 Levels – Laminectomy L3-4; Duration 2:52 hours;<br><br>8:15 a.m., Room 64; Cervical Posterior Decompression and Fusion – Cervical Posterior Spinal Fusion and Decomp C2-C-5 (Latex Allergy); Duration 4:51.<br><br>11:57 a.m., Room 72, Removal Lumbar Spine Hardware – 1) Post Hardware Removal 2) ANT L5 CORP. 3) PSF T10-ILIUM; Duration: 8:03 hours.<br><br>2:08 p.m., Room 64; Coccygectomy; Duration 1:35 hours |
| October 27, 2011 | Surgeon A | 9:49 a.m.; Room 67; Right Shoulder Reverse Prosthesis Hardware Removal – Right Shoulder Open Removal of Prosthesis, Prostalac Placement; Duration 6:34 hours.<br><br>9:50 a.m.; Room 66; Right Total Shoulder Joint Replacement, Primary, Uncomplicated; Duration 3:44 hours.<br><br>2:42 p.m.; Room 66; Left Total Shoulder Joint Replacement, Primary, Uncomplicated; Duration 4:14 hours. |
| October 31, 2011 | Surgeon B | 8:04 a.m.; Room 69; Left Elbow Fracture Orif – Hardware Removal Left Elbow; Duration 3:18 hours<br><br>8:35 a.m.; Room 70; Incision & Drainage (I&D) |

| | | – Right Leg/Wound VAC Dressing Change -- Duration 1:10 hours |
|---|---|---|
| November 3, 2011 | Surgeon A | 9:47 a.m.;  Room 66, Right Total Shoulder Joint Replacement, Primary, Uncomplicated; Duration 4:48 hours<br><br>9:57 a.m.; Room 67, Left Total Shoulder Joint Replacement, Primary, Uncomplicated; Duration: 3:46 hours.<br><br>2:31 p.m.; Room 67, Right Should Hardware Removal – Right Shoulder I&D, Hardware Removal, Antibiotic Spacer Placement; Duration 3:32 hours.<br><br>4:25 p.m.; Room 66; Left Pectorals Major Transfer:  Duration:  3:03 hours |
| November 7, 2011 | Surgeon A | 7:35 a.m.; Room 69;  Right Shoulder Excisional Debridement; Duration 2:21 hours<br><br>8:00 a.m.; Room 67; Left Pectoralis Major Transfer; duration 3:52 hours.<br><br>10:41 a.m.; Room 69; Right Total Shoulder Joint Replacement, Primary, Uncomplicated Duration 4:44 hours<br><br>12:15 p.m.; Room 67; Right Shoulder Anatomic Inverse Arthroplasty; Duration 4:45 hours |
| November 8, 2011 | Surgeon E | 7:40 a.m.; Room 70; Left Distal Radius Fracture Closed Reduction vs. Orif; Duration 1:52 hours.<br><br>8:47 a.m., Room 69, Left Revision of Total Hip Arthroplasty All Components Possible Autograft or Allograt (27134); Duration 5:32 hours.<br><br>11:55 a.m.; Room 70; Right Total Hip Arthroplasty Revision; duration 4:34 hours.<br><br>4:20 p.m.; Room 69; Right Ankle Fracture Orif; Duration 2:35 hours |

| November 22, 2011 | Surgeon E | 7:50 a.m.; Room 69; Right Hamstring Repair – Right Proximal Hamstring Repair; Duration: 2:05 hours.<br><br>8:00 a.m.; room 70; Left Total Hip Arthroplasty Revision; Duration: 4:39 hours. |
|---|---|---|
| March 5, 2012 | Surgeon D | 7:43 a.m.; Room 64; Lumbar Posterior Decompression with Fusion FSF& Decompression L2-S1; Duration 8:53 hours.<br><br>7:40 a.m.; Room 72; Lumbar Posterior Decompression with Fusion FSF& Decompression L4-S1; Duration 4:56 hours.<br><br>1:25 p.m.; Room 72; Lumbar Posterior Decompression with Fusion FSF& Decompression L4-S1; Duration: 4:23 hours. |
| March 5, 2012 | Surgeon B | 4:14 p.m.; Room 70; Left Open Reduction Internal Fixation of Intertrochanteric/Subtrochanteric Femoral Fracture with Intramedullary Implant, Possible Interlocking Screws and/or Cerclage; Duration 1:51 hours.<br><br>4:36 p.m.; Room 69, Left Open Reduction Internal Fixation of Trochanteric Fractures with Intramedullary Implant Possible Plate/Screw or Cerclage (27245) – Short TFN; Duration: 1:55 hours. |
| March 27, 2012 | Surgeon E | 11:48 a.m.; Room 70; Right Open Reduction Internal Fixation of Trochanteric Fractures with Intramedullary Implant Possible Plate/Screw or Cerclage (27245); Duration 2:45 hours.<br><br>12:04 p.m.; Room 69; Right Open Reduction Internal Fixation of Femoral Supracondylar/Transcondylar Fracture without Intercondylar Extension with Possible External Fixation (27511); Duration: 3:27 hours.<br><br>6:15 p.m.; Room 70; Left Hemiarthroplasty Hip (27125); Duration 2:36 hours. |

| | | |
|---|---|---|
| | | 7:20 p.m.; Room 69; Left Open internal Fixation of Shoulder Dislocation With Neck Fracture with Possible External Fixation (23680) vs. a Right Hemiarthroplasty (23616); Duration 3:10 hours. |
| April 12, 2012 | Surgeon D | 9:35 a.m., Room 73; Lumbar Posterior Decompression with Fusion – PSF & Decompression; Duration: 4:10<br><br>9:40 a.m.; Room 72; Lumbar Anterior Posterior Fusion – ASF L5-S1 FSP L5-S1; Duration 5:57 hours. |
| May 29, 2012 | Surgeon E | 1:21 p.m.; Room 70; Left Femur Fracture Orif; Duration 4:13 hours.<br><br>2:00 p.m.; Room 65; Left Leg Hardware Removal – Screw Removal at Tib Fib; Duration: 51 minutes. |
| August 6, 2012 | Surgeon D | 7:42 a.m.; Room 64; Lumbar Anterior Fusion – ASF L5-S1 Removal of Lumbar Hardware L2-L5; Duration: 7:20 hours.<br><br>8:00 a.m.; Room 72; Cervical Anterior Corpectomy – Cervical Anterior Corpectomy C3-C6 Cervical PSF & Decompression C2-C6; Duration 11:26 hours. |
| August 13, 2012 | Surgeon D | 7:53 a.m.; Room 72; Lumbar Anterior Fusion – ASF L4-S1 PSF & Decompression L2-S1 Lumb Lamin l2-l3; Duration 10:27 hours.<br><br>8:16 a.m.; Room 73; Thoracic Posterior Fusion – PSF T2-ILIUM; Duration 9:25 hours. |
| March 12, 2013 | Surgeon E | 7:33 a.m.; Room 70, Right Open Reduction Internal Fixation of Intertrochanteric/Pertrochanteric/Subtrochanteric Femoral Facture with Intramedullary Implant, Possible interlocking Screws and/or Cerclage; Duration 1:51 hours.<br><br>7:45 a.m.; Room 63; Left Ankle Fracture Orif (27816); Duration 1:42 hours. |

63.     These are but a few examples of a practice that continues on a daily basis at MGH. These examples are from the Department of Orthopaedic Surgery under the leadership of Dr. Rubash.   Dr. Wollman has learned that the practice, however, is not isolated to the Department of Orthopaedic Surgery.  For example, in recent months, a vascular surgeon engaged in concurrent booking resulting in patient harm, and when a resident filed a safety report, she was chastised for so doing.    The practice has occurred recently in the Department of Neurosurgery as well as in other Departments over time.  The examples are numerous.  Realtor estimates that Defendants have submitted many thousands of false claims to the United States and the Commonwealth of Massachusetts over the time period covered by this Complaint.

64.     Because of Defendants' unlawful billing and recordkeeping arising out of concurrently scheduled surgeries at MGH, federal, state, and government sponsored employee health care programs, have been fraudulently induced to pay for surgical procedures that were not eligible for reimbursement from at least 2006 to the present.  Had federal, state, and other government sponsored employee health care programs known that such surgical procedures were not eligible for reimbursement, they would not have reimbursed Defendants for such procedures.

## STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ALLEGATIONS

### GOVERNMENT HEALTH CARE PROGRAMS

65.     The federal and state governments, through their Medicare and Medicaid programs, are among the principal payors responsible for reimbursing Defendants for surgical services.  Medicare is a federal government health program that primarily benefits the elderly and the disabled.  It was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

28

66.     Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

67.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services. CMS establishes rules for the day-to-day administration of Medicare.   CMS contracts with private companies to handle day-to-day administration of Medicare.

68.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services.  These schedules specify the amounts payable for defined types of medical services and procedures.

69.     Hospitals generally are reimbursed under Medicare Part A on a reasonable cost basis for services provided to Medicare beneficiaries.  Resident salaries are included among the costs for which hospitals are reimbursed under Part A.  Thus, services provided by residents typically cannot be billed under Medicare Part B.

70.     As a Harvard-affiliated teaching hospital, engaged in the training of medical students, residents and fellows ("trainees"), MGH is eligible to be reimbursed for the teaching activities of clinical faculty physicians (also referred to herein as "attending physicians" or "teaching physicians").  Teaching hospitals may also properly bill under Medicare Part B for medical services of attending physicians in limited circumstances where the attending physician is directly involved in providing patient services.

71.     Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that

provides payment of medical expenses primarily for low-income patients.  Funding for Medicaid is shared between the federal and the state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.  In particular, Medicaid has broad coverage for prescription drugs.  Nearly every state has opted to include basic prescription drug coverage in its Medicaid plan.  According to CMS, "[w]hen services are furnished through institutions that must be certified for Medicare, the institutional standards must be met for Medicaid as well"[14]

72.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including Blue Cross and Blue Shield plans, Government Employees Hospital Association, and Rural Carrier Benefit Plan.  FEHBP plans are managed by the U.S. Office of Personnel Management.

73.     TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families.  TRICARE is administered by the Department of Defense and funded by the federal government.

74.     At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.  Medicare, Medicaid, and TRICARE, FEHBP and other similar federal and state medical insurance programs are referred to collectively herein as "government payors."

---

[14] *See* http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/
CertificationandCompliance/index.html

## MEDICARE/MEDICAID PROVIDER AND REIMBURSEMENT CERTIFICATIONS

75.    To participate in the Medicare Program, hospitals enter into "provider agreements" with the HHS Secretary. See 42 U.S.C. § 1395cc. The Medicare Program pays the hospital directly for covered inpatient and outpatient services provided to Medicare beneficiaries except for any deductible or coinsurance, which are collected from the beneficiaries. *Id.*

76.    When submitting claims for reimbursement to the Medicare or Medicaid Programs the provider is required to furnish a Certificate of Medical Necessity and Program Compliance which certifies: (1) that the services and procedures claimed were medically necessary; (2) that the services claimed were actually provided by the provider making the claim; and (3) that the services and procedures claimed were adequately documented in the patient's medical treatment records.

77.    CMS (formerly HCFA) policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. See Medicare Carriers Manual, Part 3, and CMS (formerly HCFA) Pub. 14-3, § 15016C; 42 C.F.R. § 415.172 et seq.; 60 Fed. Reg. 63124-01, 1995 WL 723389 (F.R.).

78.    To that end, the form submitted for Medicare and Medicaid reimbursement provides the following certification: "SIGNATURE OF PHYSICIAN OR SUPPLIER: I certify that the services shown on this form were medically indicated and necessary for the health of the patient and *were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision.*" (emphasis added). *See* CMS (formerly HCFA) Form 1500. The Medicare Carriers Manual provisions expressly limit payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. *See* Hal. 42 U.S.C. § 1320c-5(a)(1); Medicare Carriers Manual, Part 3;

CMS (formerly HCFA) Pub. 14-3, § 15016C.1. Medicare and Medicaid providers are required to make restitution when overpayments are identified. *See* 42 U.S.C. §1320a-7b (a)(3).

79.     Medicare and Medicaid providers are required to make restitution to the Medicare and Medicaid Programs when overpayments are identified unless the provider is without fault. *See* 42 U.S.C. § 1320a-7b(a)(3); Medicare Hospital Manual § 485; *see also* 42 C.F.R. 405.350 et seq.; 42 C.F.R. § 489.20(b); Medicare Carriers Manual § 7120.2; OIG Compliance Guidelines for Hospitals, 63 Fed. Reg. 8987, 8998 (February 23, 1998).

## THE FALSE CLAIMS ACT AND THE MASSACHUSETTS FALSE CLAIMS LAW

80.     The Federal False Claims Act and the Massachusetts False Claims Law provide that any person who (1) knowingly presents or causes another to present a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty of between $5,500 and $11,000[15] for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B); M.G.L. c.12, §§ 5B(a)(1) and (a)(2).

## MEDICARE'S PAYMENT FOR SERVICES OF ATTENDING PHYSICIAN SURGEONS IN A TEACHING SETTING

81.     In order to receive payment for services performed by physicians in a teaching setting, the service must meet one of the following two criteria: (a) the services are personally furnished by a physician who is not a resident; or (b) the services are furnished by a resident in the presence of a fully-licensed, teaching physician. 42 C.F.R. § 415.170.

---

[15] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410 section 5, 104 Stat. 891.

82.     If a resident participates in a service furnished in a teaching setting, the service is eligible for a physician fee schedule payment "only if a teaching physician is present during the key portion of any service or procedure for which payment is sought." 42 C.F.R. § 415.172.

83.     In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. *Id.* According to the Medicare Claims Processing Manual, "[d]uring non-critical or non-key portions of the surgery, if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, i.e., *he/she cannot be performing another procedure*." Medicare Claims Processing Manual, 100.1.2-A Surgical Procedures at 153-155 (Jan. 4, 2010) (emphasis added).

84.     When a teaching physician is not present during non-critical or non-key portions of the procedure and is participating in another surgical procedure, he/she must arrange for another qualified surgeon to immediately assist the resident in the other case. *Id.* In the case of three concurrent surgical procedures, "the role of the teaching surgeon (but not anesthesiologist) in each of the cases is classified as a supervisory service to the hospital rather than a physician service to an individual patient and is not payable under the physician fee schedule." *Id.*

85.     Further, the claimant must maintain medical records that "document the teaching physician was present at the time the service is furnished." 42 C.F. R. § 415.172. For example, the presence of the teaching physician during procedures may be demonstrated by the notes in the medical records made by a physician, resident, or nurse. *Id.* In the case of evaluation and management procedures, the teaching physician must personally document his or her participation in the service in the medical records. *Id.*

## COUNTS

COUNT I
SCHEME TO SUBMIT FRAUDULENT CLAIMS
(31 U.S.C. § 3729(a)(1)(A))[16]

86.     All of the preceding allegations are incorporated herein.

87.     Defendants are engaged in a scheme to defraud the United States Government into approving or paying false claims.

88.     Defendants submit fraudulent claims to the United States Government for health care services provided to beneficiaries of federal health care insurance programs, for among other things, physician services performed by teaching/attending physicians when in fact such services were performed by unsupervised medical residents.

89.     Defendants' claims submitted during the subject time period in support of this fraudulent scheme and continuing through the resolution of this lawsuit are false or fraudulent claims.

90.     Defendants present and/or cause to be presented such claims for payment to the United States despite having knowledge of their falsity.

91.     The United States Government would not have paid these false or fraudulent claims, had it known that Defendants were improperly submitting false claims for health care services provided to beneficiaries of federal health care insurance programs.

92.     These fraudulent submissions are presently being made by Defendants, and absent action by the Court, will continue during the pendency of this action.

---

[16] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1) (1986).

,

## COUNT II
## SUBMISSION OF CLAIMS CONTAINING
## FALSE EXPRESS OR IMPLIED CERTIFICATIONS
### (31 U.S.C. § 3729(a)(1)(A))[17]

93.     All of the preceding allegations are incorporated herein.

94.     Defendants submit false claims for health care services provided to beneficiaries of federal health care insurance programs, for among other things, physician services performed by teaching/attending physicians when in fact such services were performed by unsupervised medical residents.

95.     Defendants' claims for payment contain an express certification that Defendants' claims conform to federal law.   For all such claims, Defendants submit a claim form to the Federal government, which includes the following certified language:

> This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact may be prosecuted under applicable Federal or State laws.

96.     Defendants expressly certify that their claims conform to federal law despite Defendants having knowledge that they do not conform to federal law.

97.     Thus, Defendants knowingly (1) have presented or caused to be presented, and (2) continue to present or cause to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval.

98.     In any event, Defendants' submission of claims to the United States Government constitutes an implied certification that Defendants' claims conform to federal law.

99.     Defendants implicitly certify that their performance conforms to federal law despite Defendants having knowledge that they do not conform to federal law.

---

[17] *Id.*

100. Thus, Defendants knowingly (1) have presented or caused to be presented, and (2) continue to present or cause to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval.

101. These fraudulent submissions are presently being made by Defendants, and absent action by the Court, will continue during the pendency of this action.

COUNT III
FALSE RECORDS FOR PAYMENT
(31 U.S.C. § 3729(a)(1)(B))[18]

102. All of the preceding allegations are incorporated herein.

103. Every document that Defendants have provided to the Government that makes representations about health care services provided to beneficiaries of federal health insurance programs is a false record or statement that is material to Defendants' claims for payment and approval under such programs.

104. Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for health care services provided to beneficiaries of federal health insurance programs, including, among other things, physician services performed by teaching/attending physicians when in fact such services were performed by unsupervised medical residents.

105. All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

106. Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

---

[18] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

### COUNT IV
### FALSE CLAIMS CONSPIRACY
(31 U.S.C. § 3729(a)(1)(C))[19]

107.    All of the preceding allegations are incorporated herein.

108.    Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for health care services provided to beneficiaries of federal health insurance programs, for among other things, physician services performed by teaching/attending physicians when in fact such services were performed by unsupervised medical residents.

109.    Defendants also conspired through their member physicians, officers, and employees to omit disclosing or to actively conceal facts which, if known, would have reduced the federal government's obligations to pay them or would have required them to repay the federal government.

### COUNT V
### FALSE RECORDS TO AVOID REFUND
(31 U.S. C. § 3729(a)(1)(G))[20]

110.    All of the preceding allegations are incorporated herein.

111.    By virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the Government.

---

[19] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(3).
[20] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(7).

## COUNT VI
### MASSACHUSETTS FALSE CLAIMS LAW
M.G.L. c. 12 § 5B (a)(1)

112.    All of the preceding allegations are incorporated herein.

113.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Commonwealth Government for payment or approval.

114.    The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

115.    By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

116.    Pursuant to M.G.L. c. 12 § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT VII
### MASSACHUSETTS FALSE CLAIMS LAW
M.G.L. c. 12, § 5B (a)(2)

117.    All of the preceding allegations are incorporated herein.

118.    Every document that Defendants have provided to the Massachusetts Commonwealth Government that makes representations about health care services provided to beneficiaries of federal health insurance programs is a false record or statement that is material to Defendants' claims for payment and approval under such programs.

119.    Defendants submitted false records or statements to the Massachusetts Commonwealth Government representing that Defendants were entitled to payment and approval for health care services provided to beneficiaries of federal health insurance programs, including, among other things, physician services performed by teaching/attending physicians when in fact such services were performed by unsupervised medical residents.

120.    All such false records or statements were knowingly made to the Massachusetts Commonwealth Government to get false or fraudulent claims paid or approved by the Massachusetts Commonwealth Government.

121.    Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Massachusetts Commonwealth Government.

COUNT VIII
MASSACHUSETTS FALSE CLAIMS LAW
M.G.L. 12, § 5B (a)(3)

122.    All of the preceding allegations are incorporated herein.

123.    Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees to defraud the Massachusetts Commonwealth Government by submitting and obtaining approval and payment for false and fraudulent claims for health care services provided to beneficiaries of commonwealth health insurance programs, for among other things, physician services performed by teaching/attending physicians when in fact such services were performed by unsupervised medical residents.

124.    Defendants also conspired through their member physicians, officers, and employees to omit disclosing or to actively conceal facts which, if known, would have reduced

the federal government's obligations to pay them or would have required them to repay the Massachusetts Commonwealth Government.

COUNT IX
MASSACHUSETTS FALSE CLAIMS LAW
M.G.L. c. 12, § 5B (a)(9)

125.    All of the preceding allegations are incorporated herein.

126.    By virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the Government.

**PRAYER FOR RELIEF**

WHEREFORE, for each of these claims, the Qui Tam Relator requests the following relief from each of the Defendants, jointly and severally, as to the federal and state claims:

A.      Three times the amount of damages that the federal and state governments sustain because of the acts of Defendants;

B.      A civil penalty of $11,000 for each violation;

C.      An award to the Qui Tam Relator for collecting the civil penalties and damages;

D.      Award of an amount for reasonable expenses necessarily incurred;

E.      Award of the Qui Tam Relator's reasonable attorneys' fees and costs pursuant 31 U.S.C. § 3730(d) and Mass. Gen Laws CH. 12 §§ 5F (3);

F.      Interest; and

H.      Such further relief as the Court deems just and proper.

## JURY DEMAND

Relator hereby demands a trial by jury.

Respectfully submitted,
Plaintiff-Relator
Lisa Wollman, M.D.
By her attorneys

Ellen J. Zucker (BBO #568051)
ezucker@burnslev.com
BURNS & LEVINSON, LLP
125 Summer Street
Boston, MA 02110
Tel: (617)345-3000


Reuben A. Guttman*
rguttman@whistleblowerlaws.com
Traci L. Buschner*
tbuschner@whistleblowerlaws.com
Justin S. Brooks*
jbrooks@whistleblowerlaws.com
GUTTMAN BUSCHNER & BROOKS
1625 Massachusetts Avenue, N.W., Suite 500
Washington, D.C. 20036
Tel:  (202) 800-3001


*Not admitted to practice in this district, but will
file *pro hac vice* motions shortly.


Dated: May 19, 2015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff-Relator's Complaint was served upon the following persons, this _____ day of May 2015, via first class mail, certified, return receipt requested.

Ellen J. Zucker

| The United States of America | |
|---|---|
| United States Attorney General Loretta Lynch<br>United States Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, DC 20530<br><br>Carmen M. Ortiz<br>United States Attorney for the District of<br>Massachusetts<br>John Joseph Moakley U.S. Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210 | United States Attorney General Loretta<br>Lynch<br>c/o Ms. Joyce R. Branda<br>Deputy Director, Commercial Litigation<br>Branch - Fraud Section<br>U.S. Department of Justice<br>Ben Franklin Station<br>950 Pennsylvania Avenue<br>P.O. Box 261<br>Washington, DC 20530<br>(202) 307-0231<br>(202) 616-3085 |

| Massachusetts | |
|---|---|
| Attorney General Maura Healey<br>Office of the Attorney General<br>One Ashburton Place<br>Boston, MA 02108-1698<br>(617) 727-2200<br>(617) 727-3251 (fax) | |

4813-3512-6564.1