# EXHIBIT A

## 60 FR 63124

Vol. 60, No. 236, Part II, Friday, December 8, 1995

Rules and Regulations

**Reporter**

60 FR 63124 *

*Federal Register > 1995 > December > Friday, December 8, 1995 > Rules and Regulations > DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) -- Health Care Financing Administration (HCFA)*

## Notice

⚑ *Part 1 of 6.* You are viewing a very large document that has been divided into parts.

**Title: Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1996**

**Action:** Final rule with comment period.

## Agency

DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) > Health Care Financing Administration (HCFA)

**Identifier: [BPD-827-FC] > RIN 0938-AG96**

## Administrative Code Citation

**42 CFR Parts 400, 405, 410, 411, 412, 413, 414, 415, 417, and 489**

## Synopsis

 **[*63124] SUMMARY:** This final rule revises various policies affecting payment for physician services including Medicare payment for physician services in teaching settings, the relative value units (RVUs) for certain existing procedure codes, and establishes interim RVUs for new and revised procedure codes. The rule also includes the final revised 1996 geographic practice cost indices.

The rule redesignates current regulations on teaching hospitals, on the services of physicians to providers, on the services of physicians in providers, and on the services of interns and residents. This redesignation consolidates related rules affecting a specific audience in a separate part and, thereby, makes them easier to use.

## Text

60 FR 63124

**SUPPLEMENTARY INFORMATION:** In this final rule, we provide background on the statutory authority for and development of the physician fee schedule. We also explain in detail the process by which certain interim work RVUs are reviewed and, in some cases, revised.

Section 1848(c)(2)(B) of the Social Security Act (the Act) provides that adjustments in RVUs resulting from an annual review of those RVUs may not cause total physician fee schedule payments to differ by more than $ 20 million from what they would have been had the adjustments not been made. Thus, the statute allows a $ 20 million tolerance for increasing or reducing total expenditures under the physician fee schedule. We have determined that net increases because of changes in RVUs for codes reviewed as part of a refinement process, the addition of new codes to the fee schedule, and the revisions in payment policies would have added to projected expenditures in calendar year 1996 by approximately $ 140 million. Therefore, it is necessary to adjust the physician fee schedule conversion factors (CFs). We have made the adjustments in such a manner as to achieve budget neutrality as we were best able to estimate. As a result, the total projected expenditures from the revised fee schedule are estimated to be the same as they would have been had we not changed the RVUs for any individual codes or added new codes to the fee schedule. We have adjusted all CFs by a uniform adjustment factor of 0.9964, which results in a uniform reduction of 0.36 percent to the CFs for all services.

The CF is a national value that converts RVUs into payment amounts. There are three separate CFs: one for surgical services, one for primary care services, and one for nonsurgical services other than primary care. The CFs are updated annually.

Anesthesia services are paid differently from other physicians' services under the fee schedule. Payment for anesthesia services is based on base unit RVUs that are assigned to each service and on time units that can vary by procedure. The base and time units are multiplied by an anesthesia-specific CF, not the CFs used for surgical, nonsurgical, or primary care services.

This final rule also contains the second half of the revisions to the geographic practice cost indices (GPCIs). Section 1848(e)(1)(c) of the Act requires that the GPCIs be reviewed and, if necessary, revised at least every 3 years. The first review was required by 1995. The first-half of the revision was implemented in 1995. The second half, **[*63125]** published in Addendum D, is effective January 1, 1996.

Addenda to this rule provide the following information:

Addendum A-Explanation and Use of Addenda B through E.

Addendum B-1996 Relative Value Units and Related Information Used in Determining Medicare Payments for 1996.

Addendum C-Codes with Interim Relative Value Units.

Addendum D-1996 Geographic Practice Cost Indices by Medicare Carrier and Locality.

Addendum E-Procedure Codes Subject to the Site-of-Service Differential.

The RVUs and revisions to payment policies in this final rule apply to physicians' services furnished on or after January 1, 1996.

For those codes identified in Addendum C of this final rule as new or revised codes, the RVUs and update indicators are considered to be interim as they have not been published before this final rule. Therefore, we will accept comments on these interim RVUs and update indicators if they are received no later than 5 p.m. February 6, 1996. The RVUs for the remaining codes are final.

To assist readers in referencing sections contained in this final rule, we are providing the following table of contents. Some of the issues discussed in this final rule affect the payment policies but do not require changes to the regulations in the Code of Federal Regulations.

### Table of Contents

### VIII.Response to Comments

Text of the Final Regulations

Addenda

Addendum A-Explanation and Use of Addenda B through E

**Addendum B-1996** Relative Value Units and Related Information Used in Determining Medicare Payments for 1996

Addendum C-Codes with Interim Relative Value Units

**Addendum D-1996** Geographic Practice Cost Indices by Medicare Carrier and Locality

Addendum E-Procedure Codes Subject to the Site-of-Service Differential

In addition, because of the many organizations and terms to which we refer by acronym in this final rule, we are listing these acronyms and their corresponding terms in alphabetical order below:

ASC Ambulatory surgical center

CF Conversion factor

CFR Code of Federal Regulations

CPT [Physicians'] Current Procedural Terminology [4th Edition, 1994, copyrighted by the American Medical Association] DEFRA Deficit Reduction Act

EKG Electrocardiogram

GPCI Geographic Practice Cost Index

GME Graduate Medical Education

HCFA Health Care Financing Administration

HCPCS HCFA Common Procedure Coding System

OBRA Omnibus Budget Reconciliation Act

ORA Omnibus Reconciliation Act

RUC [American Medical Association Specialty Society] Relative [Value] Update Committee

RVU Relative Value Unit

TEFRA Tax Equity and Fiscal Responsibility Act

### I. Background

***A. Legislative Requirements*** The Medicare program was established in 1965 by the addition of title XVIII to the Social Security Act (the Act). Since January 1, 1992, Medicare pays for physician services under section 1848 of the Act, "Payment for Physicians' Services." This section contains three major elements: (1) A fee schedule for the payment of physician services; (2) a Medicare volume performance standard for the rates of increase in Medicare expenditures for physician services; and (3) limits on the amounts that nonparticipating physicians can charge beneficiaries. The Act requires that payments under the fee schedule be based on national uniform relative value units (RVUs) based on the resources used in furnishing a service. Section 1848(c) of the Act requires that national RVUs be established for physician work, practice expense, and malpractice expense.

Section 1848(e)(1)(c) of the Act requires us to review and, if necessary, adjust the geographic practice cost indices at least every 3 years. This section of the Act also requires us to phase in the adjustment over 2 years and implement only one half of any **[*63126]** adjustment if more than 1 year has elapsed since the last geographic practice cost index revision. The geographic practice cost indices were first implemented in 1992 and were not reviewed until 1994. We implemented one half of the adjustment in 1995 and will implement the second half of the adjustment in 1996.

60 FR 63124

The Act requires that payments vary among fee schedule areas according to geographic indices. In general, the fee schedule areas that existed under the prior reasonable charge system were retained under the fee schedule. A detailed discussion of fee schedule areas can be found in the June 5, 1991 proposed rule *(56 FR 25832)* and in the November 25, 1991 final rule *(56 FR 59514)*. We are required by section 1848(e)(1)(A) of the Act to develop separate indices to measure relative cost differences among fee schedule areas compared to the national average for each of the three fee schedule components. While requiring that the practice expense geographic practice cost indices and malpractice geographic practice cost indices reflect the full relative cost differences, the Act requires that the work indices reflect only one-quarter of the relative cost differences compared to the national average.

***B. Published Changes to the Fee Schedule***We published a final rule on November 25, 1991, *(56 FR 59502)* to implement section 1848 of the Act by establishing a fee schedule for physician services furnished on or after January 1, 1992. In the November 1991 final rule *(56 FR 59511),* we stated our intention to update RVUs for new and revised codes in the American Medical Association's Physicians' Current Procedural Terminology (CPT) through an "interim RVU" process every year. The updates to the RVUs and fee schedule policies follow:

- November 25, 1992, as a final notice with comment period on new and revised RVUs only *(57 FR 55914).*

- December 2, 1993, as a final rule with comment period *(58 FR 63626)* announcing revised payment policies and RVUs for 1994. (We solicited comments on new and revised RVUs only.)

- December 8, 1994, as a final rule with comment period *(59 FR 63410)* to revise the geographic adjustment factor values, fee schedule payment areas, and payment policies and RVUs for 1995. The final rule also discussed the process for periodic review and adjustment of RVUs not less frequently than every 5 years as required by section 1848(c)(2)(B)(I) of the Act.

Prior Federal Register Documents

The information in this final rule with comment period updates information in the following **Federal Register** documents:

- June 5, 1991, proposed rule entitled "Fee Schedule for Physicians' Services" *(56 FR 25792).*

- November 25, 1991, final rule entitled "Fee Schedule for Physicians' Services" *(56 FR 59502).*

- September 15, 1992, correction notice for the 1992 fee schedule *(57 FR 42491).*

- November 25, 1992, final notice with comment period entitled "Fee Schedule for Physicians' Services for CY 1993" *(57 FR 55914).*

- June 7, 1993, correction notice for the 1993 fee schedule *(58 FR 31964).*

- July 14, 1993, proposed rule entitled "Revisions to Payment Policies Under the Physician Fee Schedule" *(58 FR 37994).*

- December 2, 1993, final rule with comment period entitled "Revisions to Payment Policies and Adjustments to the Relative Value Units under the Physician Fee Schedule for Calendar Year 1994" *(58 FR 63626).* (There were two correction notices published for the 1994 physician fee schedule (July 15, 1994, *59 FR 36069)* and (August 4, 1994, *59 FR 39828).)*

- June 24, 1994, proposed rule entitled "Refinements to Geographic Adjustment Factor Values and Other Policies Under the Physician Fee Schedule" *(58 FR 32754).*

- December 8, 1994, final rule with comment period entitled "Refinements to Geographic Adjustment Factor Values, Revisions to Payment Policies, Adjustments to the Relative Value Units (RVUs) Under the Physician Fee Schedule for Calendar Year 1995, and the 5-Year

60 FR 63124

Refinement of RVUs" *(59 FR 63410).* (There were two correction notices published for the 1995 physician fee schedule (January 3, 1995, *60 FR 46)* and (July 18, 1995, *60 FR 36733).)*

• July 26, 1995, proposed rule entitled "Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 1996 *(60 FR 38400).*

This final rule would affect the regulations set forth at 42 CFR part 400, which consists of an introduction to, and definitions for, the Medicare and Medicaid programs; part 405, which encompasses regulations on Federal health insurance for the aged and disabled; part 410, which consists of regulations on supplementary medical insurance benefits; part 414, which covers regulations on payment for Part B medical and other health services; and new part 415, which contains regulations on services of physicians in providers, supervising physicians in teaching settings, and residents in certain settings. We are making technical and conforming amendments to parts 411, 412, 413, 417, and 489.

***C. Components of the Fee Schedule Payment Amounts***Under the formula set forth in section 1848(b)(1) of the Act, the payment amount for each service paid for under the physician fee schedule is the product of three factors: (1) A nationally uniform relative value for the service; (2) a geographic adjustment factor for each physician fee schedule area; and (3) a nationally uniform conversion factor for the service. There are three conversion factors (CFs)-one for surgical services, one for nonsurgical services, and one for primary care services. The conversion factors convert the relative values into payment amounts.

For each physician fee schedule service, there are three relative values: (1) An RVU for physician work; (2) an RVU for practice expense; and (3) an RVU for malpractice expense. For each of these components of the fee schedule there is a geographic practice cost index for each fee schedule area. The geographic practice cost indices reflect the relative costs of practice expenses, malpractice insurance, and physician work in an area compared to the national average.

The general formula for calculating the Medicare fee schedule amount for a given service in a given fee schedule area can be expressed as:

Payment=[(RVU[work] x GPCI[work]) + (RVU[practice expense] x GPCI[practice expense]) + (RVU[malpractice]) x GPCI[malpractice])] x CF

The conversion factors for calendar year 1996 appear in Addendum A. The RVUs for calendar year 1996 are in Addendum B. The GPCIs are in Addendum D.

Section 1848(e) of the Act requires the Secretary to develop geographic adjustment factors for all physician fee schedule areas. The total geographic adjustment factor for a fee schedule area is equal to a weighted average of the individual GPCIs for each of the three components of the service. Thus, the geographic practice cost indices reflect the relative costs of practice expenses, malpractice insurance, and physician work in an area compared to the national average. In accordance with the law, however, the geographic adjustment factor for the physician's **[*63127]** work reflects one-quarter of the relative cost of physician's work compared to the national average.

For the first year of the fee schedule, the law required a base-year CF that was budget-neutral relative to 1991 estimated expenditures. The Secretary is required to recommend to the Congress updates to the CFs by April 15 of each year as part of the Medicare volume performance standards and annual fee schedule update process. The Congress may choose to enact the Secretary's recommendation, enact another update amount, or not act at all. If Congress does not act, the annual fee schedule update is set according to a "default" mechanism in the law. Under this mechanism, the update will equal the Medicare Economic Index adjusted by the amount actual expenditures for the second previous fiscal year (FY) were greater or less than the performance standard rate of increase for that FY. (The Medicare Economic Index is a physician input price index, in which the annual percent changes for the direct-labor price component are adjusted by an annual percent change in a 10-year moving average index of labor productivity in the nonfarm business sector.) The Medicare volume performance standard for FY 1996 and the physician fee

60 FR 63124

schedule update for CY 1996 are published elsewhere in this **Federal Register** issue as a final notice (BPD-828-FN).

### D. Summary of the Development of the Relative Value Units

**1.** Work Relative Value Units

Approximately 7,500 codes represent services included in the physician fee schedule. The work RVUs established for the implementation of the fee schedule in January 1992 were developed with extensive input from the physician community. The original work RVUs for most codes were developed by a research team at the Harvard School of Public Health in a cooperative agreement with us. In constructing the vignettes for the original RVUs, Harvard worked with panels of expert physicians and obtained input from physicians from numerous specialties.

The RVUs for radiology services are based on the American College of Radiology (ACR) relative value scale, which we integrated into the overall physician fee schedule. The RVUs for anesthesia services are based on RVUs from a uniform relative value guide. We established a separate CF for anesthesia services because we continue to recognize time as a factor in determining payment for these services.

Proposed RVUs for services were published in a proposed rule in the **Federal Register** on June 5, 1991 *(56 FR 25792).* We responded to the comments in the November 1991 final rule. Since many of the RVUs were published for the first time in the final rule, we considered the RVUs to be interim during the first year of the fee schedule and gave the public 120 days to comment on all work RVUs. In response to the final rule, we received comments on approximately 1,000 services. We responded to those comments and listed the new RVUs in the November 1992 notice for the 1993 fee schedule for physicians' services. We considered these RVUs to be final and did not request comments on them.

The November 1992 notice *(57 FR 55914)* also discussed the process used to establish work RVUs for codes that were new or revised in 1993. The RVUs for these codes, which were listed in Addendum C of the November 1992 notice, were considered interim in 1993 and open to comment through January 26, 1993.

We responded to comments received on RVUs listed in Addendum C of the November 1992 notice *(57 FR 56152)* in the December 1993 final rule *(58 FR 63647)* for the 1994 physician fee schedule. The December 1993 final rule discussed the process used to establish RVUs for codes that were new or revised for 1994. The RVUs for these codes, which are listed in Addendum C of the December 1993 final rule *(58 FR 63842),* were considered interim in 1994 and open to comment through January 31, 1994. We proposed RVUs for some non-Medicare and carrier-priced codes in our June 1994 proposed rule *(59 FR 32760).* Codes listed in Table 1 of the June 1994 proposed rule were open to comment. These comments, in addition to comments on RVUs published as interim in the December 1993 final rule were addressed in the December 1994 final rule *(59 FR 63432).* In addition, the December 1994 final rule discussed the process used to establish RVUs for codes that were new or revised for 1995. Interim RVUs for new or revised procedure codes were open to comment. Comments were also accepted on all RVUs considered under the 5-year refinement process. The comment period closed on February 6, 1995.

**2.** Practice Expense and Malpractice Expense Relative Value Units

Section 1848(c)(2)(C) of the Act requires that the practice expense and malpractice expense RVUs equal the product of the base allowed charges and the practice expense and malpractice percentages for the service. Base allowed charges are defined as the national average allowed charges for the service furnished during 1991, as estimated using the most recent data available. For most services, we used 1989 charge data "aged" to reflect the 1991 payment rules, since those were the most recent data available for the 1992 fee schedule.

60 FR 63124

If charge data were unavailable or insufficient, we imputed the practice expense and malpractice expense RVUs from the work RVUs. For example, if a procedure has work RVUs of 6.00, and the specialty practice cost percentages for the specialty furnishing the service is 60 percent work, 30 percent practice expense, and 10 percent malpractice expense, then the total RVUs would be 10.00 (6.00/.60), the practice expense RVUs would be 3.00 (10 x .30), and the malpractice expense RVUs would be 1.00 (10 x .10).

## II. Specific Proposals for Calendar Year 1996 and Responses to Public Comments

In response to the publication of the July 26, 1995 proposed rule, we received approximately 9,500 comments. We received comments from individual physicians and health care workers and professional associations and societies. The majority of the comments addressed two proposals: (1) Revising Medicare payment for physician services in teaching settings; and (2) paying for only one interpretation of an electrocardiogram or an x-ray procedure furnished to an emergency room patient except in unusual circumstances.

The proposed rule discussed policies that affect the number of RVUs on which payment for certain services would be based. Any changes implemented through this final rule are subject to the $ 20 million limitation on annual adjustments as contained in section 1848(c)(2)(B) of the Act.

After reviewing the comments and determining the policies we will implement, we have estimated the costs and savings of these policies and added those costs and savings to the estimated costs associated with any other changes in RVUs for 1996, including RVU changes necessitated by the 1995 CPT coding changes. We discuss in detail the effects of these changes in the Regulatory Impact Analysis (section IX).

In the July 1995 proposed rule *(60 FR 38416),* we invited public comments on a proposal to calculate the Medicare volume performance standard for fiscal year 1996 and all future years based on estimates of the average volume and intensity growth specific to each category of physician service. We are **[*63128]** responding to the comments we received on this issue in the final notice entitled "Physician Fee Schedule Update for Calendar Year 1996 and Physician Volume Performance Standard Rates of Increase for Federal Fiscal Year 1996 (BPD-828-FN) published elsewhere in this **Federal Register** issue.

For the convenience of the reader, the headings for the policy issues in sections II, III, and IV, for the most part, correspond to the headings used in the July 1995 proposed rule. More detailed background information for each issue can be found in the July 1995 proposed rule *(60 FR 38400).*

### A. Budget-Neutrality Adjustments for Relative Value Units

We make annual adjustments to RVUs for the physician fee schedule to reflect changes in CPT codes and changes in estimated physician work. The statute requires that these revisions may not change physician expenditures by more than $ 20 million compared to estimated expenditures that would have occurred if the RVU adjustments had not been made. In the past, we have made an adjustment across all RVUs in the physician fee schedule to maintain this statutorily-mandated budget neutrality.

We recognize that many other payers, including several Medicaid programs, use the Medicare physician fee schedule. To reduce the number of system changes required by the annual revisions to the physician fee schedule, we proposed to apply these budget-neutrality adjustments to the physician fee schedule conversion factors (CFs) rather than across all RVUs.

The impact of this proposal on payment amounts would be minimal (slight differences could be caused by rounding). This alternative approach would be administratively simpler for Medicare and other payers that base payment on the Medicare RVUs, including many State Medicaid programs. In addition, this change would provide for consistent RVUs from year to year (for those codes with no other changes), thus making it easier to analyze payment and policy changes.

*Comment:* An overwhelming majority of commenters strongly supported our decision to apply the annual budget-neutrality adjustments to the physician fee schedule CFs rather than across all RVUs, beginning with the publication of this final rule in the **Federal Register**; however, a few

60 FR 63124

commenters suggested that we apply this change retroactively by converting all RVUs, which were altered for budget-neutrality reasons, back to their original 1992 levels.

*Response:* For the sake of administrative simplicity, we will not readjust RVUs from periods before the current period. In addition, we believe that retroactively adjusting the RVUs would cause unnecessary programming costs for those who electronically maintain systems containing the RVU data.

*Comment:* A few commenters suggested the use of a separate budget-neutrality factor rather than the adjustment of the physician fee schedule CFs to achieve budget neutrality. They stated that private payers who use the Medicare fee schedule CFs would then be able to decide whether to apply the budget neutrality adjustment. This particularly could be an issue for any adjustments needed for the five-year review of all work RVUs, depending on the magnitude of the adjustments.

*Response:* We prefer to adjust the existing CFs rather than add an additional factor to adjust for budget neutrality. Because we explicitly identify the magnitude of the annual budget-neutrality adjustment, other payers can decide whether to apply the adjustment to their CFs. However, we may reconsider this issue in the future for issues such as the 5-year review of RVUs or congressional action.

*Final Decision:* Beginning with the publication of this final rule, we will apply annual budget-neutrality adjustments to physician fee schedule CFs rather than across all RVUs. However, if the Congress explicitly sets a conversion factor at a fixed dollar amount for a given year, we will consider establishing a separate budget-neutrality adjustor.

### B. Bundled Services

**1.** Hydration Therapy and Chemotherapy

We proposed not paying separately for hydration therapy infusion (CPT codes 90780 and 90781) when billed on the same day as chemotherapy infusion, CPT codes 96410, 96412, and 96414). Frequently, hydration therapy and chemotherapy are performed at the same time. We believe paying for both would be duplicative. We would continue to pay separately for both the hydration therapy solution and the chemotherapy drug. This reflects a policy change that is not explicitly addressed in our regulations.

*Comment:* Commenters objected to our proposal stating that the administration of saline for hydration therapy infusion at the same time as chemotherapy infusion requires significant additional work and supplies.

*Response:* We disagree. The saline and the chemotherapy drug are usually administered through the same port or site. In some cases, the solutions may even be mixed. We see no significant additional work or expense involved in these cases, and we believe that paying separately for hydration therapy infusion administered at the same time as chemotherapy infusion represents duplicate payment.

*Comment:* A commenter agreed with our proposal stating that the same access port or site is used for administering the chemotherapy drug and the hydration therapy solution. The commenter requested clarification as to whether the policy would apply to other drugs, such as antiemetics and corticosteroids, which are often administered with chemotherapy and, like hydration therapy, billed using CPT codes 90780 and 90781. The commenter suggested that a logical extension of our proposal is to cover the administration of these drugs as well as hydration therapy.

*Response:* We agree with this comment. CPT codes 90780 and 90781 for the administration of saline or drugs such as antiemetics and corticosteriods will not be paid separately when furnished at the same time as CPT codes 96410, 96412, and 96414 for chemotherapy infusion. However, we will pay separately for the drugs.

*Comment:* Most commenters agreed that for any given segment of time it would be duplicative to pay for both chemotherapy infusion and hydration therapy infusion. These commenters noted that the course of treatment for many chemotherapy drugs, for example, cisplatin, ifosmamide, and methotrexate, require hydration therapy or the infusion of an antiemetic on the same day, but either before or after the chemotherapy. The commenters believed that in these cases, the work is not duplicative, and they should be allowed to bill for the infusion of the saline or antiemetic.

*Response:* We agree. We are revising our proposal to allow payment for hydration therapy or the infusion of an antiemetic or other nonchemotherapy drug on the same day as chemotherapy infusion when the nonchemotherapy drug is administered sequentially rather than at the same time as the chemotherapy infusion.

*Final Decision:* We will not pay for the infusion of saline, an antiemetic, or any other nonchemotherapy drug under CPT codes 90780 and 90781 when these drugs are administered at the same time as chemotherapy infusion (CPT codes **[*63129]** 96410, 96412, or 96414). However, we will pay for the infusion of saline, antiemetics, or any other nonchemotherapy drug under CPT codes 90780 and 90781 when these drugs are administered on the same day but sequentially to rather than at the same time as chemotherapy infusion, under CPT codes 96410, 96412, and 96414. Physicians should use the new modifier "-GB" to indicate when CPT codes 90780 and 90781 are provided sequentially rather than contemporaneously with CPT codes 96410, 96412, and 96414.

This policy change is not explicitly addressed in our regulations.

**2.** Evaluation of Psychiatric Records and Reports and Family Counseling Services

At present, we allow separate payment for CPT codes 90825 and 90887. However, we believe that the activities described by these codes are generally performed as part of the prework and postwork of other physician services. The RVUs for psychiatric services (CPT codes 90801 and 90835 through 90857) include the prework and postwork activities described by CPT codes 90825 and 90887. Thus, continuing to allow separate payment for these codes, in addition to payment for other psychiatric services, results in duplicate payments and is inconsistent with our policy for other services.

Counseling of the family is part of the work of all other evaluation and management services. Medicare has a long-standing policy of covering these services if they relate to the management of the beneficiary's problems and not to the problems of the family member. We believe it is appropriate to bundle covered family counseling procedures into the other psychiatric codes so that our policy is consistent with our policy on services furnished by other physician specialties.

Therefore, we proposed to change the status indicator for CPT codes 90825 and 90887 to "B" to show that payment for these codes is bundled into the payment for another service, and separate payment would not be allowed. We proposed to implement this change in a budget-neutral manner by redistributing the RVUs for CPT codes 90825 and 90887 across the following psychiatric codes: 90801, 90820, 90835, 90842 through 90847, and 90853 through 90857.

*Comment:* Several commenters questioned our claim that the work involved in CPT codes 90825 and 90887 is a fundamental element of the pre- and postwork of other physician or other psychiatric services, stating that medical psychotherapy is a specific procedure, distinct from evaluation and management, and that these procedures (CPT codes 90825 and 90887) are characteristically excluded from psychotherapy. Some commenters believed this payment change would be inherently unfair to providers who furnish services under CPT codes 90825 and 90887.

*Response:* In addressing the concern that CPT codes 90825 and 90887 are excluded from psychotherapy and represent distinct and different services, we note that in the CPT chapter on

Justin Brooks

Psychiatry, General Clinical Psychiatric Diagnostic or Evaluative Interview Procedures, CPT code 90801 (Psychiatric Interview) refers to both communication with family or other sources, as well as the ordering and medical interpretation of laboratory or other medical diagnostic studies. Further, the definition includes the history and the exchange of information with family members and other informants. Additionally, the final report by Harvard researchers ("Refinement of the Development of a Resource-Based Relative Value Scale for Psychiatrist Services; National Institute of Mental Health Contract No. 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") defines physician work as encompassing work while with the patient and work before and after the service, defined as reviewing records as well as communicating with the patient, the patient's family, and other professionals. We believe these definitions clearly indicate that the evaluation of other records and family counseling fall within the scope of medical psychotherapy and, thus, do not represent distinct services. Therefore, we believe it is appropriate to bundle payment for these services.

*Comment:* Several commenters specifically addressed CPT code 90887. One commenter agreed that the services encompassed by CPT code 90825 are usually performed as part of the pre- and postwork for other physician services, but expressed concern this was not true for CPT code 90887, which is typically the exclusive service being furnished. Another commenter questioned the redistribution of the RVUs for CPT code 90887. The commenter believed that if, as stated, family counseling is part of the postwork of evaluation and management services, the RVUs for this service should be distributed across all evaluation and management codes, not just the psychiatric codes.

*Response:* Family counseling must be related to the patient. The fact that this service occurs on different days or times does not preclude it from being part of the pre- and postwork. Although we recognize that the services described by CPT code 90887 may be provided on different dates of service from when the patient received psychiatric service, they are still considered part of the postwork service associated with that code. We note, also, that the evaluation and management services cannot be billed by clinical psychologists and, thus, have been included in other service codes.

If the RVUs for CPT code 90887 were distributed across all evaluation and management codes as well as the psychiatric codes for this service, the impact would be negligible. That is, the amount to be distributed is not of sufficient magnitude to have any noticeable effect.

*Comment:* One commenter requested that we also consider changing the status indicator for CPT code 90862 (Pharmacologic management) to "B" because, according to the commenter, pharmacological management is part of evaluation and management services.

*Response:* Separate payment for pharmacological management is not permitted on the same day as psychotherapy as this service is already included in the codes for psychotherapy. To distinguish services to Medicare beneficiaries for the sole purpose of drug management from those that include some psychotherapy, HCFA developed HCPCS code M0064. This code is defined as a brief office visit for the sole purpose of monitoring or changing drug prescriptions used in the treatment of mental, psychoneurotic, and personality disorders.

*Comment:* According to one commenter, since the original survey of psychiatric work conducted by Harvard researchers, managed care has increased. With the rise in managed care, there is a decrease in mental health benefits. Therefore, the patients that psychiatrists treat, especially in the fee-for-service setting, are much more complex. The commenter believed this additional work is not currently included in the RVUs for psychiatric services. In addition, this commenter has found that psychiatrists are spending a greater amount of time responding to review requests, developing treatment plans for managed care, managing and supervising nonphysician mental health providers, and documenting and coding work.

*Response:* Section 1848(c)(2)(B) of the Act requires that all RVUs be reviewed not less frequently than every 5 years to account for changes in medical practice, coding changes, new

data, and new procedures. Thus, the issues of psychiatric work time, as well as the [*63130] issue of psychiatric services delivered in a managed care setting, will be addressed as part of the 5-year review process.

*Final Decision:* We will bundle the payment for CPT codes 90825 and 90887 into the payment for other psychiatric services. Therefore, separate payment for CPT codes 90825 and 90887 is not allowed.

This policy change is not explicitly addressed in our regulations.

3.  Fitting of Spectacles

We proposed to cease paying separately for the fitting of glasses and low vision systems. The payment for the fitting of spectacles is included in the payment for the spectacles in the same way that payment for other prosthetic fitting services is included in the payment for the prosthetic device.

We proposed to assign a "B" status indicator to CPT codes 92352, 92353, 92354, 92355, 92358, and 92371 to indicate that the services are covered under Medicare but that payment for them is bundled into the payment for the spectacles. We proposed to implement this in a budget-neutral manner by redistributing the current RVUs for these services across all RVUs.

This reflects a policy change that is not explicitly addressed in our regulations.

*Comment:* A commenter believed that these fitting services should continue to be paid separately because of the time and expertise required to fit glasses for aphakic patients and low vision aids.

*Response:* The fitting of spectacles is covered under section 1861(s)(8) of the Act. Services under this section are not included in the definition of physician services as defined in section 1848(j)(3) of the Act and are not payable under the physician fee schedule. Although we have been allowing payment, the fitting of spectacles is included in the payment for the spectacles in the same way that payment for other prosthetic fitting services are included in the payment for the device. Under the current system, duplicate payment has been made for the aforementioned procedure codes.

*Final Decision:* We will no longer pay separately for CPT codes 92352, 92353, 92354, 92355, 92358, and 92371. Beginning January 1, 1996, these codes will be assigned a "B" status indicator to indicate that the services are covered under Medicare, but payment for them is bundled into the payment for the spectacles.

This policy change is not explicitly addressed in our regulations.

**C. X-Rays and Electrocardiograms Taken in the Emergency Room** We proposed to pay for the x-ray and/or electrocardiogram (EKG) interpretation that contributes to the diagnosis or treatment of the patient in the emergency room. We will pay for only one x-ray and/or EKG interpretation except under unusual circumstances.

*Comment:* The comments from radiologists opposed every aspect of the proposal. The primary point raised by virtually all of these commenters was that, by training and experience, they were more qualified than emergency physicians or other nonradiologists to furnish these interpretations. Some radiologists commented that we should require board certification as a requirement to bill for the interpretation of x-rays.

*Response:* In paying for physicians' services under the Act, we are charged with determining the following:

•    Is the service covered under Medicare?

•    Is the service reasonable and necessary for the individual beneficiary?

•    Is the physician licensed to perform the service in the State in which it is furnished?

60 FR 63124

In the case of a licensed physician who has furnished a covered service (that is not payable through another code) to a Medicare beneficiary in an emergency room, it is not readily apparent to us upon what basis the claim can be denied. There is no portion of the Act upon which to base a decision that only board-certified radiologists can furnish x-ray interpretations or board-certified cardiologists can furnish EKG interpretations. (Where the Congress has determined that there should be special qualifications in order to furnish a service, as in the case of mammography, a provision was made in the statute.) Our proposed policy for x-ray and EKG interpretation is consistent with how we generally treat other physician services.

Comment: Emergency room physicians supported the direction of the proposal but requested clarification of the proposal including its effect on payments for second interpretations. Many commended us for proposing to change the existing policy but criticized the agency for not going far enough. Several emergency physicians commented that it was unethical for us to withhold compensation from physicians who make life-saving decisions every day based on x-ray and EKG interpretations.

Response: Our proposal addressed situations in which both the emergency physician and the radiologist/cardiologist billed for the same interpretation. It is that situation in which a determination needs to be made of which interpretation contributed to the diagnosis and treatment of the individual patient. If an emergency physician does not bill for the interpretation, there would be no change from existing policy. We would like to stress that if the only bill received is from the radiologist or cardiologist, it is paid on the same basis as current claims.

Comment: We received relatively few comments from physicians and other entities specializing in cardiology procedures. Their comments focused on the cardiologists' greater qualifications to interpret EKGs based on their training and experience.

Response: The discussion above about the qualifications of the interpreting radiologist would also apply here. The situation with EKGs is somewhat different than with x-rays because section 13514 of OBRA 1993, Public Law 103-66, enacted August 10, 1993, requires us to make separate payment for EKG interpretations and to exclude the RVUs for EKG interpretations from the RVUs for visits and consultations, making the EKG portion of the current policy as set forth in section 2020G of the Medicare Carriers Manual obsolete.

Comment: We proposed that the radiologist or cardiologist should be paid for the interpretation when it is performed contemporaneously with the diagnosis and treatment of the emergency room patient. This standard would be met if an interpretation were initially conveyed to the treating physician verbally. Nearly all commenters seemed to be troubled by the use of the term "contemporaneous" and requested clarification of the term. Some radiologists indicated that their interpretation is furnished contemporaneously if it is provided timely, which commenters variously defined as 12-24 hours. Other radiologists indicated that there are teleradiology hook-ups to radiologists, homes which should satisfy the need for contemporaneous interpretations. Several emergency room specialists indicated that the circumstances under which a radiologist or cardiologist furnishes a contemporaneous interpretation as discussed in the proposal should be clarified. They expressed concern that the provision of a verbal interpretation by the specialist to the emergency room physician could be used to circumvent the stated intention to pay for the interpretation used in the diagnosis and treatment of the beneficiary. [*63131]

Response: When we used the term contemporaneous, we meant that the interpretation of the procedure by the radiologist or cardiologist and the diagnosis and treatment of the beneficiary by the physician in the emergency room occur at the same time, as opposed to an interpretation performed hours or days after the beneficiary is sent home. While the argument that the carrier should pay for any interpretation furnished timely sounds reasonable, it does not reflect the realities of claims processing. It would be impossible for a reviewer to make an assessment in every individual case as to whether the second interpretation was furnished "timely." In situations in which both physicians bill for the interpretation, the question to be resolved is whether the radiologist or

cardiologist performed the interpretation in time to be used in the diagnosis and treatment of the patient. As set forth in the proposal, we believe that in any case in which the radiologist or cardiologist furnishes the interpretation (a written interpretation or a verbal interpretation that will be written later), the emergency room physician should not bill for the interpretation, and the carrier should pay for the claim submitted by the radiologist or cardiologist. The comments we received from the emergency room physicians did not seem to be requesting payment for interpretations furnished under these conditions. We agree that an interpretation furnished via teleradiology meets the requirement when the interpretation is used in the diagnosis and treatment of the patient.

*Comment:* Several commenters indicated that emergency room physicians without formal training in interpreting computerized axial tomography (CT) scans will miss subtle changes which could lead to permanent injuries to patients. They also stated that there were problems with the application of the proposal to other diagnostic procedures such as mammography, ultrasound, and upper and lower gastrointestinal series.

*Response:* This proposal applies only to x-ray procedures and EKGs furnished in emergency rooms.

*Comment:* Many radiologists indicated that the proposal will increase the Medicare program costs "tremendously" because of the potential for self-referral abuse. The commenters believed that physicians who see patients in the emergency room will order unnecessary tests if they know that they will be able to bill for the interpretations of these tests.

*Response*: We would be interested in reviewing any evidence the radiologists have that emergency room physicians order additional tests that are not medically necessary when they are permitted to bill for x-ray and EKG interpretations. We are also interested in any suggestions we might offer to the carriers on how to identify such unnecessary testing. We will address any self referral prohibitions within our Stark regulations.

*Comment*: Several radiologists pointed out that a proper interpretation does not really mean a "check" or a few words on the chart, but requires a full written report.

*Response*: We agree completely. The requirement for a written report of the interpretation of an x-ray or EKG is an integral part of our proposal. We would point out that less extensive "reviews" by emergency room physicians are not separately billable because payment for such reviews is included in the payment for the evaluation and management services rendered in an emergency room.

*Comment*: Many radiologists commented that, while some emergency medicine specialists are very proficient at reading trauma films, they lack the necessary training to identify subtle changes. For example, a patient is brought into the emergency room with chest trauma. The commenter indicated that the emergency physician would identify the broken ribs but miss a lung tumor. Several other commenters were concerned that a missed early diagnosis could result from an interpretation performed by a nonradiologist emergency room physician while a radiologist would review the total film rather than just the area of clinical concern.

*Response*: It seems to us that the major purpose of the emergency room x-ray in this instance would be to diagnose the degree of chest trauma. However, in this circumstance, if the emergency physician billed for the interpretation and a radiologist made an additional finding of a lung tumor, it would be appropriate for the carrier to pay for both interpretations.

*Comment:* One radiologist indicated that all too often the emergency room preliminary interpretation is made by a nurse or medical student and the films are never reviewed by a staff emergency room physician.

*Response*: It is difficult to see how such an observation relates to our proposal. A physician could not provide a written interpretation of an x-ray unless he or she personally viewed it. A written report of interpretation is an integral part of our proposal.

*Comment*: Many commenters objected to the hospital playing a role in determining which physician should bill for the interpretation of these procedures. The following comments were received:

• Hospitals are not capable of making such determinations.

• It would be in the financial interest of the hospital for the interpretation to be paid to those physicians who order the most tests.

• The medical staff is usually a legally separate and independent body from the hospital, and hospitals have no authority to become involved in such matters.

• Such decisions should be left to peer review.

• Hospitals should be encouraged to ensure that the billed interpretation is the one upon which treatment is based.

• The concept of a hospital making a policy decision as to which physician should get paid for interpretations will be a regulatory nightmare and the time and money carriers will have to expend to monitor the situations will be enormous. However, one emergency room physician commented that he hoped the proposal would encourage radiologists and cardiologists to furnish these interpretations in a more timely fashion.

*Response*: In developing our proposal, we considered requiring hospitals to notify their local carrier of the identity of the physician who would be performing these interpretations for their patients. We determined that such a requirement would have had an effect as indicated by one of the commenters and that our authority to impose such a requirement was questionable. However, under our proposal, we suggested that hospitals act to ensure that only one interpretation is billed. (Hospitals could do this now; we are not mandating an additional duty.) If a carrier receives only one claim, there will be no problem. The problem will arise when hospitals do not take action and the carrier receives two claims for each interpretation and then must make a determination about which claim to pay. It seems reasonable to us for hospitals to work with their medical staffs to establish guidelines for the billing of x-ray and EKG interpretations for emergency room patients.

*Comment*: Some commenters expressed concern about the effect of the proposal on small, rural hospitals in which there are an insufficient number of radiologists to cover the emergency room 24 hours a day. It was pointed out that many of these hospitals either go without any service at all and ship films to radiologists for interpretation or **[*63132]** receive direct radiologist's services on an infrequent basis each week. One commenter indicated that consideration should be given to the size of the hospital, the definition of what constitutes an emergency room, and the availability of radiologic services.

*Response*: Since our proposal is limited to emergency room services, if a hospital does not have an emergency room and no claims with a place of service indicator of emergency room are received, there does not appear to be a problem. Likewise, if there is an emergency room in a hospital but no emergency room physician bills for an interpretation of the test, there is also no problem. We indicated in our proposal that if a carrier receives only one claim for a reasonable and necessary interpretation of an x-ray or EKG, it would pay the claim, generally without further development.

*Comment*: One commenter indicated that the proposal was inappropriate because emergency room physicians are thankful that radiologists will interpret the overnight x-rays the next morning in view of the harried circumstances under which services are furnished in the emergency room.

*Response*: Our proposal does not require emergency room physicians to bill for these interpretations. If the emergency room physicians do not bill for these interpretations, the radiologist and cardiologist may continue to be paid for the interpretations. Our proposal has no effect on situations in which the emergency physician does not wish to bill for the interpretation.

*Comment*: A carrier medical director expressed concern that it will be impossible to determine from a claim whether the emergency physician has submitted written documentation of the x-ray or EKG

60 FR 63124

interpretation for the medical record. The carrier medical director went on to indicate that encouraging hospitals to exercise their authority to ensure that only one claim for interpretation is received will not work and recommended that the current policy should be maintained.

*Response*: By submitting a claim for the interpretation of an x-ray or EKG, the emergency room physician is stating that he or she has prepared a written interpretation of the procedure for inclusion in the patient's medical record. We do not agree that the current manual policy works well since it became partially obsolete by the physician fee schedule.

*Comment*: Another carrier medical director indicated that the requirement for a written report be strengthened to indicate that Medicare is requiring a separately written report which meets the hospital's requirement for an official report.

*Response*: We agree and will include such a written report requirement in the revised manual instructions.

*Comment*: Some emergency room physicians commented that they should be paid for the x-ray and EKG interpretation in almost every case since it is they who furnish the real-time service.

*Response*: We believe that our proposal is a better approach. There is no question that the cardiologist or radiologist should be paid for the interpretation when that physician furnishes the service in time to be used in the diagnosis and treatment of the patient. Further, we believe that there are physicians who work in emergency rooms who prefer to defer to a cardiologist or radiologist for the final interpretation and do not wish to prepare written reports or bill for interpretations. However, our proposal provides for payment when the emergency room physician provides a written interpretation that contributed to the diagnosis and treatment of the patient.

*Comment*: One commenter indicated that, in their community hospital, the radiologist is summoned at the time of the initial diagnosis and treatment for the most serious cases, whereas, for less urgent examinations, the formal interpretation is made the following morning. The commenter went on to say that the issue should be the responsiveness of the radiologist when his or her input will affect care, and that having x-rays read by nonradiologists is moving in the wrong direction.

*Response*: As indicated previously, interpretations by radiologists used for the diagnosis and treatment of the patient would be payable.

*Comment:* A few commenters suggested that the appropriate approach is to split the fee for the interpretation between the radiologist and the ER physician.

*Response:* We do not believe that this would be a workable approach since the carrier would not know when or if it would receive the second claim.

*Comment:* Radiologists made the following additional comments:

- The majority of carrier medical directors do not support the proposal.

- The changes do not reflect the findings of the July 1993 report of the Department of Health and Human Services, Office of Inspector General, entitled "Medicare's Reimbursement for Interpretations of Hospital Emergency Room X-Rays."

*Response:* We did present the proposal to a committee of carrier medical directors during a monthly conference call on operational issues and the views were mixed. The major impression we drew from their comments was that they were most concerned with enforcement issues. We will continue to seek the guidance of the carrier medical directors and other interested parties in developing instructions to implement this policy.

The recommendation of the OIG report was to pay for reinterpretations of x-rays only when attending physicians specifically request a second physician's interpretation in order to render appropriate medical care before the patient is discharged. Any other reinterpretation of the attending physician's original interpretation should be treated and reimbursed as part of the hospital's quality assurance program.

Justin Brooks

60 FR 63124

Using 1990 data, the OIG projected savings of $ 20.4 million based on a cessation on payments for radiologists' interpretations of x-rays if its recommendation were implemented. We believe that the OIG recommendation would result in no payment for interpretations of these services in many cases; therefore, we reject that portion of the recommendation. In other words, we believe that one physician should be paid for the interpretation of an x-ray.

*Comment:* One commenter suggested that the solution to this problem be developed through the CPT system. The commenter suggested that we propose separate codes for the emergent reading of the test and a second, different code for the over-read. This commenter and some others indicated that payment for these interpretations be evenly divided between the two codes.

*Response:* The commenter may want to refer this proposal to the CPT Editorial Panel.

*Final Decision:* We are adopting the policy as set forth in the proposed rule for services furnished on or after January 1, 1996.

Listed below are the elements of our policy.

•   The carrier will pay separately for only one interpretation of an EKG or x-ray procedure furnished to an emergency room patient. However, there is a provision for payment of second interpretation under unusual circumstances such as a questionable finding for which the physician performing the initial interpretation believes another physician's expertise is needed.

•   The professional component of a diagnostic procedure furnished to a beneficiary in a hospital includes an interpretation and written report for **[*63133]**  inclusion in the beneficiary's medical record maintained by the hospital. We have placed this requirement in the radiology section of the regulations on services of physicians in providers at § 405.554(a). (Under the recodification, this section becomes 415.120(a)).

•   We distinguish between an "interpretation and report" of an x-ray or an EKG procedure and a "review" of the procedure. An interpretation and report of the procedure is separately payable by the carrier. A review of the findings of these procedures, without a written report, does not meet the conditions for separate payment of the service since the review is already included in the emergency room visit payment.

•   In the case of multiple bills for the same interpretation and report, we will instruct the carriers to adopt the following procedures:

+ Cease consideration of physician specialty in deciding which interpretation and report to pay regardless of when the service is performed.

+ Pay for the interpretation and report that directly contributed to the diagnosis and treatment of the individual patient.

+ Pay for the interpretation billed by the cardiologist or radiologist if the interpretation of the procedure is performed at the same time as the diagnosis and treatment of the beneficiary. (This interpretation may be a verbal report conveyed to the treating physician that will be written in a report at a later time.)

•   We will minimize the carrier's need to make decisions about which claim to pay when multiple claims for the interpretation and report of the same procedure are received by-

+ Encouraging hospitals to work with their medical staffs to ensure that only one claim per interpretation is submitted;

+ Advising hospitals that if they allow a physician to perform and bill for a medically necessary service (the interpretation and report) in an emergency room and permit another physician to perform and bill for the same service, the Medicare carrier will not pay two claims;

+ Advising hospitals that the Medicare carrier may determine the hospital's "official interpretation" is for quality control and liability purposes only and is a service to the hospital rather than to an individual beneficiary; and

+ Advising hospitals that Medicare fiscal intermediaries consider costs incurred for quality control activities in determining payments to hospitals.

- When the Medicare carrier receives only one claim for an interpretation and the procedure is reasonable and necessary, the carrier will pay the claim. We will presume that the one service billed was a service to the individual beneficiary and not a quality control measure.

Manual instructions to the carriers will be issued as soon as possible.

This policy change is not explicitly addressed in our regulations.

### D. Extension of Site-of-Service Payment Differential to Services in Ambulatory Surgical Centers

We proposed extending the site-of-service payment differential to services on the ambulatory surgical center (ASC) covered list of procedures that are predominantly performed in an office setting. We see no reason for exempting these procedures from the site-of-service payment differential. The practice expense RVUs duplicate many of the overhead expenses included in the ASC facility and hospital payment rates. As such, when a service is provided in an ASC or a hospital, the physician does not bear the same level of practice costs as when the same service is furnished in the office. Therefore, in § 414.32 ("Determining payments for certain physician services furnished in facility settings"), we proposed to modify in paragraph (d) ("Services excluded from the reduction") the subordinate paragraph (d)(2), which would have the effect of applying the site-of-service payment differential to ASC services. The payment differential does not apply to procedures performed in an ASC that are not on the ASC list because no facility payment is made.

*Comment:* Many commenters stated that the Act provides that procedures included on the ASC list, by definition, are not office-based procedures. Commenters indicated that we had concluded in previously published regulations on ASCs that certain procedures, such as cystoscopies, prostate biopsies, and skin lesion excisions, are not office-based procedures.

*Response:* Historically, the ASC list included only procedures that were performed less than half of the time in an office setting. Consequently, the ASC list and the site-of-service payment differential lists were mutually exclusive. Over time, many procedures shifted from being performed predominately in ASCs to being performed predominately in offices. However, in many cases the procedures were retained on the ASC list because we were persuaded by arguments that while the procedure may usually be done in an office, there were circumstances justifying using an ASC. Therefore, the two lists are no longer mutually exclusive. Retention of certain procedures on the ASC list does not imply that they cannot appropriately be performed in an office. In fact, the only procedures proposed for addition to the site-of-service differential payment list are those that are performed in an office setting the majority of the time.

*Comment:* Several commenters questioned the accuracy of data or indicated that they could not fully evaluate the proposals because we did not publish data on which the site-of-service list is based. Some stated we should use clinically-based criteria instead of purely objective, arithmetic data.

Many commenters indicated that many of the procedures added to the site-of-service differential list were inappropriate and unlikely to be office-based procedures because they are extraordinarily complicated procedures, require anesthesia or sophisticated equipment, or need to be evaluated on a case by case basis. Several commenters believed the list to be arbitrary and unfair. Others indicated that physicians should not be punished for selecting the medically appropriate site for certain procedures on the list. One commenter agreed that we should encourage physicians to perform procedures in an office when it is safe and effective.

Another commenter stated that we should pay urologists for supplies and a small facility fee to shift procedures to the less costly office setting.

Some commenters stated that because nasal/sinus endoscopy codes were added to the ASC list effective January 1, 1994 the site-of-service data are likely to be skewed toward the physician's

office setting. Other commenters stated the CPT description for breast biopsy (CPT code 19100) was recently changed to include only core needle aspiration while fine needle aspiration is now reported using code CPT code 88170. One commenter agreed that breast biopsy should be on the list. Other commenters argued that the data do not distinguish between techniques employed. Many commenters indicated that the policy does not account for gender differences. For example, cystoscopies performed on males are more difficult and painful and are inappropriate for an office setting.

*Response:* According to our data, the procedures on the site-of-service payment differential list are performed in a physician's office more than 50 percent of the time. Inclusion of procedures on the list is not intended to **[*63134]**  reflect a judgment regarding the appropriateness of the site where the service is performed or to encourage performance of procedures in the less costly office setting or to create a financial disincentive for the physician to select the most appropriate site. Inclusion on this list merely recognizes where the service is being furnished the majority of the time. We recognize that although the majority of the procedures we proposed to add to the site-of-service list are performed in a physician's office, the ASC setting is sometimes appropriate. That is the reason they remain on the ASC list. It is not the purpose of this policy to dictate where a physician should perform the service. The policy reflects the lower practice costs incurred by physicians when these services are performed in an ASC or a hospital.

*Comment:* One commenter objected to including urodynamic evaluation CPT codes 51725, 51726, and 51772 on the site-of-service payment differential list. Another commenter provided information demonstrating that 21 other proposed procedures should not be on the list because more recent data indicate that the procedures are not performed in the office more than 50 percent of the time.

*Response:* We agree with the comment that urodynamic evaluation codes do not belong on the list and have removed CPT codes 51725, 51726, 51772, and 51785 from the list. We also agree with the comment that some of the proposed procedures are not performed in the office setting more than 50 percent of the time based on the most current data available. Therefore, we have removed the following CPT codes from the list: 13150, 14020, 14060, 15740, 21208, 21440, 23066, 26645, 28030, 28043, 28092, 28261, 40510, 41805, 42408, 46220, 46610, 63600, 64420, 65270, and 67921.

*Comment:* Some commenters stated that the site-of-service payment differential should not apply to services furnished in an ASC for which no facility payment is made. Another commenter said that many ASCs are considered extensions of a physician's office, not a free-standing facility, and physicians are responsible for ASC overhead.

*Response:* We agree with these comments. Therefore, we have clarified the proposal to state that when a service that is not on the ASC list is performed in an ASC, the site-of-service payment differential does not apply. In this case, we view the ASC as an extension of the physician's office and, for purposes of this provision, view this as an office service.

*Comment:* Some commenters said that there is no difference in practice costs between the office setting and the ASC. In some cases, costs may be higher in the ASC because of more complicated cases, the delivery of anesthesia services, and physician travel costs. Other commenters said it is unjustified to conclude that there is no office overhead for physicians performing procedures in another setting.

Some commenters recommended that we make no changes to the site-of-service payment differential before the implementation of resource-based practice expense RVUs in 1998. One commenter requested that we suspend the site-of-service payment differential altogether. Others recommended increasing practice expense payments for procedures performed in the office to discourage physicians from using hospital ASCs. Other commenters said we should exempt codes that are reduced by the interim practice expense reduction of OBRA 1993.

60 FR 63124

*Response:* The site-of-service payment differential is a long established policy that aims to avoid duplicate payments for overhead while, at the same time, recognizes that some office overhead is incurred when physicians perform procedures outside the office setting. For this reason, the practice expense RVUs are reduced by only 50 percent. While we will implement resource-based practice expense RVUs in 1998, we see no reason to postpone applying the payment differential to ASCs until then. The site-of-service policy currently applies to both inpatient and outpatient hospital settings. We see no justification for continuing to exempt services provided in ASCs.

Section 13513 of OBRA 1993 provided for reductions in practice expense RVUs for services for which practice expense RVUs exceeded 128 percent of the work RVUs and that are performed less than 75 percent of the time in an office setting. This reduction was based on the Congress' determination that practice expense RVUs were too high for some procedures. This reduction is independent of the long standing site-of-service payment differential.

*Comment:* Many commenters stated that the proposal would result in reduced quality of care. Other commenters said it did not encourage placement of patients in the most appropriate and cost-effective setting to address the patient's medical needs. Several commenters indicated that since we have determined that the proposed procedures are appropriate for ASCs based on medical review and patient safety outcome data, it would be inconsistent to apply the site-of-service payment differential.

Some commenters indicated that many of the proposed procedures cannot be performed safely in an office. They indicated that offices are not certified to meet the same standards of care or health care outcomes as ASCs, which are generally safer places to perform procedures. They believed the proposal creates a disincentive for physicians to use ASCs even when it is in the patient's best interest to do so. Other commenters said procedures are performed in an ASC because of patient choice or for a patient's safety and comfort. They believed that paying less for the most complicated cases will discourage doctors from doing such cases, thereby creating serious access problems for patients.

*Response:* We disagree that application of the site-of-service payment differential will penalize a physician who has valid clinical reasons for performing a procedure in an ASC. Rather, we believe the payment differential will appropriately reflect that the physician incurs fewer costs when furnishing service in an ASC. We believe that physicians consider the welfare of the beneficiary in selecting the appropriate site to perform the service. We do not believe that physicians will make inappropriate decisions regarding the health and well being of their patients because of a reduction in their payment.

*Comment:* Many commenters said that the proposal will encourage physicians to buy costly equipment for their offices, such as that required for urologic and arthroscopic procedures, which most do not have.

*Response:* We believe the payment differential is incentive neutral with regard to selecting a practice site. That is, we do not believe that the payment differential will induce physicians to purchase additional equipment to enable them to furnish services in the office.

*Comment:* One commenter stated that a large number of procedures proposed for addition to the site-of-service list were originally exempt from the list because they were performed less than 50 percent of the time in a physician's office. Therefore, the practice expense values already reflect the costs of furnishing the procedures outside the office setting.

*Response:* Physicians shift the place of service for procedures from the hospital setting to the office setting for various reasons. Two reasons are (1) that advances in technology, technique, or other factors make it now feasible to do many services in the office setting that **[*63135]** historically were furnished in a hospital setting; and (2) physicians believe that it is cost-effective and efficient to shift the place of service. We believe that the direct costs of providing the service (staff, supplies, equipment, and space) are reflected in the practice expense relative values based on the predominant place of service. Therefore, we believe it is appropriate to apply the site-of-service

reduction to these services when they are performed in a setting where we make a payment for the direct costs of providing the service; for example, hospitals and ASCs. However, this issue will be further examined as part of the development of practice expense RVUs for 1998.

*Comment:* Several commenters misunderstood the proposal. Some implied that we were proposing a reduction in the ASC facility payment rate or reducing payments for office based procedures. One objected to applying the site-of-service payment differential to the hospital setting. One commenter was not convinced the proposal will save money.

Several comments concerned issues not covered under this proposal, for example, objections to removing certain codes from the ASC approved list and requests that particular codes be added or deleted from the ASC list. Another commenter suggested that new criteria are needed for procedures on the ASC list. Another thought we were proposing removing the codes from the ASC list.

*Response:* The proposal does not affect ASC facility payment rates or physician payments for procedures performed in an office setting. The site-of-service payment differential already applies to the hospital outpatient setting. The proposal is budget neutral and is not intended to reduce Medicare payments. The proposal does not revise procedures on the approved ASC list.

*Final Decision:* We will extend the site-of-service payment differential to office-based services on the ASC list if those services are performed in an ASC or in a hospital setting. However, when a service that is not on the ASC list is performed in an ASC, the site-of-service payment differential will not apply. The site-of-service list for 1996 appears in Addendum E of this final rule. All additions to the list are identified by an asterisk.

### E. Services of Teaching Physicians

**1.** General Background

Our July 26, 1995 proposed rule *(60 FR 38405)* discussed Medicare payment for those services furnished under graduate medical education (GME) programs that are not payable through the mechanisms established for direct GME costs by section 1886(h) of the Act. Section 1886(h) addresses Medicare payments to hospitals and hospital-based providers for the costs of approved GME programs in medicine, osteopathy, dentistry, and podiatry. Those costs include residents' salaries and fringe benefits, physician compensation costs for GME program activities that are not payable on a fee schedule basis, and other GME program costs.

Medicare intermediary expenditures under section 1886(h) of the Act for fiscal year 1996 are estimated to be approximately $ 1.9 billion. In addition, under section 1886(d)(5)(B) of the Act, Medicare makes additional payments to teaching hospitals under the prospective payment system for the higher indirect operating costs hospitals incur by having GME programs. (These are costs other than direct GME costs.) Medicare indirect GME payments for fiscal year 1996 are estimated to be approximately $ 4.9 billion. Medicare also supports GME programs in teaching hospitals through billings for the services of attending physicians who involve residents in the care of their patients. The amount of Medicare expenditures for these services is not known since attending physicians are not required to distinguish between services they personally furnish and those they furnish as attending physicians in claims submitted to the Part B carriers.

Our proposal addressed services of teaching physicians that are payable on a fee schedule basis, services of residents in settings that are not payable under section 1886(h), and services of moonlighting residents. In addition, the proposed rule addressed, but did not substantially change, existing rules on related issues on Medicare payments for the services of residents in approved GME programs furnished in certain freestanding skilled nursing facilities and home health agencies, and services of residents who are not in approved GME programs. We referred to the section 1886(h) mechanisms to distinguish between that payment methodology and other payment mechanisms.

Title XVIII of the Act provides separate coverage and payment bases for provider services and physician services. Under Medicare, provider services, such as inpatient hospital services and skilled nursing facility services, are covered under Hospital Insurance (Part A) and are paid from the Part A Trust Fund. Outpatient hospital services are covered under Supplementary Medical Insurance (Part B) and are paid from the Part B Trust Fund. Provider services are paid on a prospective payment, reasonable cost, or other payment mechanism through Medicare contractors called "fiscal intermediaries." Physician services and other "medical and other health services," as defined in section 1861(s) of the Act, are generally paid under Part B through Medicare contractors called "carriers." To administer the Medicare program, we must distinguish clearly between provider services and physician services to determine the appropriate payment methodology and the appropriate Trust Fund that is liable for payment.

As discussed in the proposed rule, in part 405 ("Federal Health Insurance for the Aged and Disabled"), subpart D ("Principles of Reimbursement for Services by Hospital-Based Physicians"), current regulations beginning with § 405.480 set forth the basic principles regarding payment for services of physicians who practice in providers. Additional principles applicable to payment for physician services in teaching hospitals appeared in subpart E ("Criteria for Determination of Reasonable Charges; Payment for Services of Teaching Interns, Residents, and Supervising Physicians") in §§ 405.520 and 405.521. Principles applicable to services of interns and residents appeared in §§ 405.522 through 405.525. Sections 405.465 and 405.466 addressed the payment methodology for teaching hospitals that elect reasonable cost payments for physician services. (See sections 1832(a)(2)(B)(i)(II) and 1861(b)(7) of the Act.) Since the publication of those regulations, the Congress enacted a series of legislative changes that affected payments for these services, and we proposed to revise the regulations to conform to those statutory changes and to clarify current policy.

Section 948 of the Omnibus Reconciliation Act of 1980 (ORA 1980) ( *Pub. L. 96-499*), enacted on December 5, 1980, as amended by section 2307 of the Deficit Reduction Act of 1984 (DEFRA 1984) ( *Pub. L. 98-369*), enacted on July 18, 1984, addressed payments for physician services in teaching settings. (See section 1842(b)(7) of the Act.) Another pertinent legislative change, section 108 of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA 1982) ( *Pub. L. 97-248*), enacted on September 3, 1982, added a new section 1887 to the Act. That legislation dealt explicitly with distinguishing between the professional services physicians furnish to individual patients in a provider and services physicians furnish to the provider itself. While section 1887 of the Act does not [*63136] specifically address teaching physicians or GME issues, it is consistent with Medicare policy on classifying the activities in which physicians in teaching hospitals are engaged.

We published a final rule with comment period in the **Federal Register** on March 2, 1983 *(48 FR 8902),* which implemented the provisions of section 1887 of the Act. That final rule revised the regulations that govern Medicare payment for services of physicians who practice in providers such as hospitals, skilled nursing facilities, and comprehensive outpatient rehabilitation facilities. As a part of that final rule, we revised §§ 405.480 through 405.482, removed §§ 405.483 through 405.488, and added new §§ 405.550 through 405.557. Those regulations-

•   Set forth basic criteria for distinguishing those physician services furnished in providers that are payable by Part B carriers as physician services to individual patients from those services that are payable by fiscal intermediaries as physician services to the provider itself;

•   Set limits on the amounts payable on a reasonable cost basis to providers for physician services to the provider; and

•   Established more specific criteria for determining the basis and amount of payment for physician services in the specialties of anesthesiology, radiology, and pathology.

60 FR 63124

In the preamble to the March 1983 final rule *(48 FR 8906),* we stated that because of problems related to applying portions of the revised regulations to teaching hospitals and to implement sections 1842(b)(6) and 1861(b)(7) of the Act for physician payment (as amended by section 948 of ORA 1980), we planned to publish, in a separate document, proposed regulations that would establish special rules governing payment for services of physicians in teaching hospitals. Those rules would have superseded §§ 405.520 and 405.521 if they became effective. Subsequently, however, the Congress passed DEFRA 1984, which further amended section 1842(b)(6) of the Act and redesignated it as section 1842(b)(7).

Another statutory change that affected payments to teaching hospitals was section 9202 of the Consolidated Omnibus Budget Reconciliation Act of 1985 ( *Pub. L. 99-272*), enacted on April 7, 1986, as amended by section 9314 of the Omnibus Budget Reconciliation Act of 1986 ( *Pub. L. 99-509*), enacted on October 21, 1986, which added a new section 1886(h) to the Act. Section 1886(h) of the Act revised the method of calculating Medicare payment for the direct costs of approved GME activities such as residents' salaries and fringe benefits, from reasonable cost payment to payments based on hospital-specific per-resident amounts multiplied by the number of full-time equivalent residents working in the hospital during a hospital's cost reporting period.

A major change in the Medicare payment rules for physician services in general was enacted as part of the Omnibus Budget Reconciliation Act of 1989 (OBRA 1989) ( *Pub. L. 101-239*), enacted on December 19, 1989, which added section 1848 to the Act. Section 1848 replaced the reasonable charge payment mechanism with a fee schedule for physician services. The Omnibus Budget Reconciliation Act of 1990 (OBRA 1990) ( *Pub. L. 101-508*), enacted on November 5, 1990, contained several modifications and clarifications to the OBRA 1989 provisions that established the physician fee schedule.

2. Payment for Physician Services Furnished in Teaching Settings

   a. Current Practices

   In our proposed rule *(60 FR 38406),* we stated that of the nearly 7,000 hospitals that participate in Medicare, approximately 1,200 have GME programs that are approved for residency training by the appropriate accrediting organization. (We used the term "residents" in the preamble of the proposed rule to include residents, interns, and fellows who are in formally organized and approved GME programs.)

   For hospital cost reporting periods beginning on or after July 1, 1985, the costs of residents' compensation (representing payment for the residents' services), certain physician compensation costs related to GME programs, and other GME program costs are payable based on hospital-specific per-resident amounts as described in § 413.86, in accordance with section 1886(h) of the Act. Physician compensation costs for administrative and supervisory services unrelated to the GME program or other approved educational activities are payable as operating costs through diagnosis-related group payments under the prospective payment system for inpatient services and on a reasonable cost basis for inpatient services in hospitals excluded from the prospective payment system and for outpatient services.

   In the case of those few teaching hospitals that elect reasonable cost payments for physician direct medical and surgical services under section 1861(b)(7) of the Act instead of billing for services to Medicare beneficiaries on a fee-for-service basis, the election and payment mechanisms described in former §§ 405.465 and 405.466 were set forth in the proposed rule in new § 415.160 and in redesignated §§ 415.162 and 415.164.

   Practices vary widely among and within teaching hospitals with respect to the degree of physician involvement in the care of patients. In some cases, teaching physicians personally direct residents in furnishing patient care services. In others, residents assume a greater degree of responsibility for the care patients receive, and the teaching physicians exercise only general control over the residents' activities.

Justin Brooks

60 FR 63124

**b.** Statutory and Other Developments Pertaining to Teaching Physician Services

**(1)** Original Medicare Law and Regulations

As originally enacted, title XVIII of the Act excluded the services of physicians, interns, and residents from the definition of "inpatient hospital services," except for the services of interns and residents in approved training programs. The services of residents in an approved program of a hospital with which a skilled nursing facility has a transfer agreement are included in the definition of "extended care services" and in the definition of "home health services" in the case of a home health agency that is affiliated with or under common control of a hospital having the program. These provisions established the costs of approved GME programs for provider services payable by intermediaries on a reasonable cost basis. The Act did not include special rules for payment of physician services in teaching hospitals.

At the time of the publication of the proposed rule, under §§ 405.520 and 405.521 for teaching physician services, and §§ 405.522 through 405.525 for residents' services, a physician in a teaching setting was considered the attending physician for a Medicare patient, and thereby qualified for Part B payment, only if he or she furnished "personal and identifiable direction" to the interns and residents who provided the actual services to the patient. Before January 1, 1992, Part B physician services were paid under the reasonable charge payment system. As of January 1, 1992, these physician services are paid under the physician fee schedule set forth in part 414 *(56 FR 59502).*

Although former § 405.521(b) listed examples that illustrated the types of responsibilities attending physicians **[*63137]** typically carry out, the list was not exhaustive. In individual cases, it might be difficult to determine, by referring to § 405.521, whether a physician in a teaching setting is the "attending physician" for a Medicare patient. It might be necessary for the carrier to review hospital charts to see if the attending physician requirements were met; however, the involvement of the teaching physician in individual services was often unclear from a review of the charts.

It became apparent, shortly after the former §§ 405.520 and 405.521 were issued, that some Medicare carriers were paying charges for physician services in some teaching hospitals, even though interns and residents were primarily responsible for the care of the patients. The physicians who were billing for these services were often assuming only limited responsibility for the medical management of the patients' treatment. It also became clear that some physicians were submitting charges for services furnished to Medicare patients even though non-Medicare patients were not billed for similar services, and patients generally were not obligated to pay for those physician services.

In April 1969, those problems led to the issuance of Intermediary Letter 372, which set forth specific conditions that physicians in teaching settings were required to meet to be considered attending physicians and, thus, qualify to charge the carrier for services in which they involved residents. It also specified how carriers were required to determine the reasonable charges for these services. Although Intermediary Letter 372, which was still in effect at the time of the publication of the proposed rule, provided guidance to Medicare carriers and intermediaries on payment for these services, it was not applied uniformly by all Medicare carriers.

**(2)** 1972 Amendments

On October 30, 1972, the Congress amended the Act to provide rules on payment for physician services (as distinguished from the services of interns and residents) furnished in teaching hospitals. Section 227 of the Social Security Amendments of 1972 ( *Pub. L. 92-603*) amended section 1861(b) of the Act to require that Medicare treat those services as hospital services and pay for them on a reasonable cost basis, except under certain specific circumstances. Section 227 also made certain incentives

60 FR 63124

available to hospitals that elected to be paid for physician services on a reasonable cost basis.

In subsequent legislation (section 15 of _Pub. L. 93-233_, enacted on December 31, 1973, and section 7 of the End-Stage Renal Disease Program Amendments of 1978 ( _Pub. L. 95-292_), enacted on June 13, 1978), the Congress deferred implementation of all provisions of section 227 of the 1972 amendments except for the incentives to elect reasonable cost payment for physician direct medical and surgical services. The cost reimbursement provisions were implemented through former § 405.465, as published in a final rule on August 8, 1975 _(40 FR 33440)._ The statutory provisions for which the Congress deferred implementation were eventually replaced by new provisions passed by the Congress in ORA 1980. ORA 1980 reaffirmed, but did not otherwise affect, the provisions of section 227 of the 1972 amendments authorizing cost reimbursement incentives.

**(3)**  ORA 1980

Section 948 of ORA 1980 made several important changes in the sections of the Medicare statute that address payment for physician services in teaching hospitals. Specifically, section 948-

- Repealed the provisions of the 1972 Amendments that required Medicare to pay for those services (with certain exceptions) on a reasonable cost basis;

- Amended section 1861(b) of the Act to allow hospitals with approved teaching programs to elect to be paid on a reasonable cost basis for physician direct medical and surgical services furnished to their Medicare patients and for the supervision of interns and residents in the care of individual patients if all physicians in the hospital agree not to bill charges for their services furnished to Medicare patients; and

- Added section 1842(b)(6) of the Act (now section 1842(b)(7)) to specify the conditions that must be met to permit payment under Part B for physician services in teaching hospitals that do not elect cost reimbursement, and to provide special payment rules for determining the customary charges applicable in this situation.

In the Conference Report accompanying ORA 1980 (H.R. Rep. No. 1479, 96th Cong., 2d Sess. 145 (1980)), the Conference Committee stated that its intention was to permit payment for physician services in a teaching hospital on a reasonable charge basis only if the physician is the patient's "attending physician." The conferees also endorsed the attending physician criteria in Intermediary Letter 372.

The Conference Report further stated that "[t]he conferees intend (without precluding reasonable changes in the future) that in determining the amount payable on a charge basis under Medicare Part B for services of physicians in teaching hospitals, the policies contained in Intermediary Letter 372 should be generally followed where these are not inconsistent with the provisions of the conference agreement." _Ibid. p. 146._

**(4)**  DEFRA 1984

Subsequently, section 2307(a) of DEFRA 1984 further amended section 1842(b)(7) of the Act concerning conditions for payment for physician services furnished in teaching hospitals that do not elect cost reimbursement. Section 2307(a) was later amended by sections 3(b) (5) and (6) of the DEFRA Technical Amendments ( _Public Law 98-617_), enacted on November 8, 1984. As revised, section 1842(b)(7) of the Act (which was redesignated from section 1842(b)(6) of the Act by section 2306 of DEFRA '84) provided that-

60 FR 63124

- The customary charge of a physician qualifying as a teaching physician is set no lower than 85 percent of the prevailing charge paid for similar services in the same locality; and

- If all the teaching physicians in a teaching hospital agree to accept assignment for all the services they furnish to Medicare patients in that hospital, the customary charge is set at 90 percent of the prevailing charge paid for similar services in the same locality.

**(5)**  1989 Proposed Rule

On February 7, 1989, we published a proposed rule that would have implemented the teaching physician payment provisions of both ORA 1980 and DEFRA 1984 *(54 FR 5946).* In that document, we proposed the following changes relating to teaching physicians:

- Revise the regulations governing the conditions under which Medicare payment is made for the services of physicians in teaching settings and implement a special methodology for determining customary charges for the services of teaching physicians.

- Revise the regulations governing Medicare payment to providers for compensation paid to physicians who furnish services that are of general benefit to patients in the provider.

That proposed rule was never published in final because legislation enacted in 1989 and 1990 that mandated the implementation of the Medicare physician fee schedule had the effect of replacing the payment methodology of the proposed rule.  **[*63138]**

**3.**  Payments for Supervising Physicians in Teaching Settings and for Residents in Certain Settings

In our July 26, 1995 proposed rule, we proposed to revise the regulations because of the substantial changes that have taken place in the way Medicare payments for physician services are determined (that is, the replacement of the reasonable charge system with the physician fee schedule); the length of time since the publication of the February 1989 proposed rule; and our decision to propose to replace the attending physician criteria of the February 1989 proposed rule. The details of the attending physician policy had been set forth earlier in Intermediary Letter 372, published in April 1969.

We proposed to change the attending physician criteria from those of Intermediary Letter 372 to make the criteria more flexible in terms of the individual teaching physician who may serve as the responsible physician for a particular service while ensuring that a teaching physician is present during at least some portion of each service payable by the carrier. We also proposed rules based on other Medicare policies that had been in effect for years but had never been explicitly addressed in the regulations.

**a.**  Distinction Between Teaching Hospital and Teaching Setting

We proposed to distinguish between "teaching hospital" and "teaching setting," because the former is more directly related to intermediary payments, and the latter (although defined in terms of intermediary payments) is more directly related to carrier payments. We proposed to define "teaching hospital" as a hospital engaged in an approved GME residency program in medicine, osteopathy, dentistry, or podiatry. We proposed to define "teaching setting" as a provider or freestanding setting for which Medicare payment for the services of residents is made under the direct GME payment provisions of § 413.86 (hospitals, hospital-based providers, and settings, including nonprovider settings, meeting the requirements for residents in § 413.86(f)(1)(iii)), or on a reasonable cost basis under the provisions of § 409.26 or § 409.40(f) for residents' services furnished in freestanding skilled nursing facilities or home health agencies, respectively.

60 FR 63124

**b.** Statutory Requirements for Payment in Teaching Hospitals Not Electing Reasonable Costs for Physician Services to Individual Patients

Section 1842(b)(7) of the Act is generally premised on the use of customary charges, that is, the reasonable charge system, as the basis for Medicare payments for the services of physicians in teaching hospitals. Section 1848 of the Act, however, established the physician fee schedule as the payment methodology for physician services furnished beginning January 1, 1992 without any exception for physician services furnished in teaching settings. Therefore, we based the policies in the July 26, 1995 proposed rule on principles established in legislation on payment for physician services generally under the physician fee schedule, on payment for physician services furnished in providers, and on payment to hospitals for GME programs. With regard to payment to hospitals for GME programs, the proposal addressed activities associated with GME programs that were not payable through fiscal intermediary payment mechanisms.

**c.** Intermediary Letter 372 Attending Physician Criteria

The Intermediary Letter 372 attending physician criteria and related policy were developed by Medicare in 1969 as a means of documenting the involvement of teaching physicians in patient care services furnished in teaching hospitals and have been controversial ever since. It was recognized then and now that residents must furnish patient care services to develop their skills as physicians and other types of practitioners. The "attending physician" policy was developed as a mechanism to make Part B fee schedule payments for services in which residents were involved. The main requirement of the policy was that there would be a single attending physician who personally examined the beneficiary within a reasonable time after admission, confirmed the diagnosis and course of treatment, and was continuously involved in the care of the beneficiary throughout the stay. The attending physician policy as set forth in Intermediary Letter 372 and related issuances specifically stated that the attending physician had to be present when a major surgical procedure or a complex or dangerous medical procedure was performed, but was vague, perhaps necessarily, on the matter of the presence of the physician during other occasions of inpatient service. There was less ambiguity with regard to individual outpatients. Part A Intermediary Letter No. 70-7/Part B Intermediary Letter No. 70-2 (issued in January 1970), a question-and-answer on Intermediary Letter 372, indicated that the supervising physician must either personally perform the service or function as the attending physician and be present while a service is being furnished (question 14).

Medicare carriers were directed to periodically review the hospital charts for verification of the establishment of attending physician relationships and their involvement in individual services. If the chart did not substantiate a sufficient level of involvement in the care furnished, the teaching physician role was seen as supervisory in nature, rather than as an attending physician, even though the teaching physician may have had legal responsibility for the care furnished to the patient. Consequently, the fiscal intermediary for the hospital would pay Medicare's share of the salary costs of the teaching physician attributable to the supervision of residents, but the Medicare carrier would not make payment for the physician services on the basis of reasonable charges.

We believe, after years of working experience with the Intermediary Letter 372 attending physician policy, that we should replace it. The amount of postpayment review necessary to verify the establishment and continuity of the attending physician relationship from patient charts had become impractical given reductions in contractor budgets and was inconsistent with more recent congressional action. While the Congress endorsed the attending physician policy in the Conference Report accompanying ORA 1980, the Intermediary Letter 372 policy might be viewed as not entirely consistent with the payment mechanism enacted in OBRA '86 under section 1886(h) of the Act for payment of direct GME costs in teaching hospitals. For example, Intermediary Letter 372 indicated that, if a physician was not an attending physician but supervised a resident who furnished a

service, the costs of the physician services were payable by the intermediary. Under section 1886(h) of the Act, if a service was determined not to be an attending physician service billable under Part B, the service could not become a provider service for purposes of additional payments made under Part A since the GME payments were prospectively determined amounts that could not be adjusted based on the individual circumstances of the delivery of individual services. Further, allocation agreements between physicians and hospitals identifying the various activities in which the **[*63139]** physicians were involved for purposes of determining the appropriate payment amounts had no effect on GME payments in an individual hospital cost reporting period. The costs that were allocated during the GME base period were carried forward regardless of changes in the physician activities.

Moreover, the Intermediary Letter 372 policy left it to individual carriers to determine coverage of the services based on customary practices in the area or on the competence of individual residents. For example, a sentence in Intermediary Letter 372.A. reads as follows:

If the supervising physician was present at surgery, and the surgery was performed by a resident acting under his close supervision and instruction, he would not be the attending surgeon unless it were customary in the community for such services to be performed in a similar fashion to private patients who pay for services rendered by a private physician.

While this policy might have been appropriate 30 years ago in the early days of Medicare, we stated in our proposed rule *(60 FR 38409)* that we believe it is inappropriate to base the determination of whether a carrier will pay several thousand dollars or zero dollars for a surgical procedure on this standard, which could result in a wide disparity of policy from area to area regarding when payment is made.

Another problem with the Intermediary Letter 372 policy was reliance on a single physician to be the attending physician for the beneficiary throughout the inpatient stay. The only exception permitting an attending physician relationship for only a portion of a stay was if the portion was a distinct segment of the patient's course of treatment, such as the postoperative period. Another example from Intermediary Letter 372 reads as follows:

A group of physicians share the teaching and supervision of the house staff on a rotating basis. Each physician sees patients every third day as he makes rounds. No physician can be held to be one of these patients' attending physician for any portion of the hospital care although consultations and other services they personally perform for the patient might be covered.

We stated in our proposed rule *(60 FR 38409)* that we believe that this emphasis on a single teaching physician serving as the attending physician through the stay was no longer necessary, and that we should provide teaching hospitals and GME programs with flexibility in the determination of the responsible teaching physician in an individual case. We no longer believe the Intermediary Letter 372 requirement that a single physician be recognized by the beneficiary as his or her personal physician through a period of hospitalization reflects current realities. Further, the existing attending physician regulation might operate at cross-purposes with managed care arrangements that often employ treatment teams.

The Intermediary Letter 372 requirements for continuity of care might be difficult for carriers to verify from reviews of medical records, might be interpreted in different ways by different carriers, and might be counterproductive and burdensome in the delivery of services to the patient. We believe the proposed policy would address potential sources of misunderstanding and abuse that have been longstanding Medicare program concerns. For example, Intermediary Letter 372 required the attending physician to personally examine the patient, review the history and record of test results, etc. From discussions with carrier medical directors, it is our understanding that some carriers considered the

requirements to be met if the teaching physician first saw the patient 1 or 2 days after admission. In those situations, the carrier might pay for an admission history and physical performed by a resident on Saturday while the teaching physician did not actually see and examine the patient until Monday. Other carriers would maintain that, to pay for the admission history and physical as an attending physician, the teaching physician would have to see the patient on the day the service was performed.

We believe that the most important consideration should be the presence of the teaching physician during the key portion of the service or procedure being furnished by the resident, and that requiring both an attending physician relationship and the presence of that same physician during every billable service is no longer warranted. Thus, under our proposal, carriers would no longer pay for services such as admission evaluation and management services unless a teaching physician was present during the key portion of the service.

### d.  Carrier Payment for Services of Teaching Physicians-General

We proposed to eliminate the Intermediary Letter 372 attending physician criteria from the determination of whether payment should be made for the services of physicians in teaching settings. We recognize that the term "attending physician" is used in academic medicine to denote the responsible physician, and we believe that hospitals and GME programs should be free to designate any physician to be the attending physician of the patients in the teaching setting. We proposed to require the following conditions for services of teaching physicians (physicians who involve residents in the care of their patients) in both inpatient and outpatient settings to be payable under the physician fee schedule:

•   A teaching physician (a physician other than a resident or fellow in an approved program) must be present for a key portion of the time during the performance of the service for which payment is sought.

•   In the case of surgery or a dangerous or complex procedure, the teaching physician must be present during all critical portions of the procedure and must be immediately available to furnish services during the entire service or procedure. We specified that the teaching physician presence requirement is not met when the presence of a teaching physician is required in two places for concurrent major surgeries. The operative notes must indicate when the teaching physician presence in individual procedures began and ended. In the case of procedures, such as an endoscopy, in which a body area, rather than a representation, is viewed, we would not make payment if the teaching physician was not present during the viewing. A discussion of the findings with a resident would not be sufficient. The situation is contrasted with a diagnostic procedure, such as an x-ray, in which the physician would not be expected to be present during the performance of a test and could bill for an interpretation by reviewing the film with the resident (or by performing an independent interpretation).

•   In the case of services such as evaluation and management services (for example, visits and consultations), for which there are several levels of service available for reporting purposes, the appropriate payment level must reflect the extent and complexity of the service if the service had been fully furnished by the teaching physician. In other words, if the medical decision-making in an individual service is highly complex to an inexperienced resident, but straightforward to the teaching physician, payment is made at the lower payment level reflecting the involvement of the teaching physician in the service. We intend to promote flexibility and leave the decision to the teaching physician as to whether the teaching physician should perform hands-on care, in addition to the care furnished by the resident in the presence of the teaching physician. **[*63140]** However, in the case of both hospital inpatient and

60 FR 63124

outpatient evaluation and management services, the teaching physician must be present during the key portion of the visit.

• The presence of the physician during the service or procedure must be documented in the medical records.

The proposal eliminated the Intermediary Letter 372 requirement that the attending physician personally examine the patient and left the decision to the teaching physician as to whether he or she should perform an examination in addition to the resident's examination based on medical and risk management considerations rather than Medicare payment rules. For example, a beneficiary might be admitted to the hospital on a Saturday and be examined by a resident in the presence of a teaching physician on duty at the time. On Monday, another teaching physician might be designated to be the attending physician in the case. Under the proposal to eliminate the Intermediary Letter 372 attending physician criteria, the services of both teaching physicians in this example would be payable (as long as distinct services are furnished).

Under our proposal, we clarified that services of teaching physicians that involve the supervision of residents in the care of individual patients are payable under the physician fee schedule only if the teaching physician is present during the key portion of the service. If a teaching physician is engaged in such activities as discussions of the patient's treatment with a resident but is not present during any portion of the session with the patient, we believe that the supervisory service furnished is a teaching service as distinguished from a physician service to an individual patient.

We believe that this clarification is consistent with existing policy. Part A Intermediary Letter No. 70-7/Part B Intermediary Letter No. 70-2, issued in January 1970, contained a series of questions and answers about the attending physician policy set forth in Intermediary Letter No. 372. Question 14 of that issuance addressed services furnished in emergency rooms and outpatient departments and states the following:

**Q.** Intermediary letter No. 372 states, "An emergency room supervising physician may not customarily be considered to be the attending physician of patients cared for by the house staff, etc." Is this also true in the hospital's outpatient department?

**A.** Yes, because an attending physician relationship is not normally established with anyone other than the treating physician in an outpatient department. If the Part B bills are submitted for services performed by a physician in either the emergency room or in any part of the outpatient department, the hospital records should clearly indicate either that: the supervising physician *personally* performed the service; or he functioned as the patient's attending physician and was present at the furnishing of the service for which payment is claimed.

At the same time we were concerned about the integrity of the Medicare payment process, we recognized that application of this policy to the reimbursement of teaching physicians in family practice residency programs raised special concerns about the viability of these programs. Family practice residency programs are different from other programs because training occurs primarily in an outpatient setting, known as a family practice center. In these centers, residents are assigned a panel of patients for whom they will provide care throughout their 3 years of training. While teaching physicians supervise this care and, indeed, are present during the actual furnishing of services in some circumstances (most notably with first year residents and for more complex patient cases), a general requirement that teaching physicians be physically present during all visits to the family practice center would undermine the development of this physician/patient relationship. This requirement also would be incompatible with the way family practice centers are organized and staffed and could require the hiring of additional teaching physicians when the faculty are already in short supply.

60 FR 63124

We stated in our July 26, 1995 proposed rule *(60 FR 38410)* that we would be willing to develop a special rule for paying teaching family physicians that takes into account the unique nature of these training programs while clarifying the appropriate level of involvement of the teaching physician in patient care in family practice centers. We invited comments on the structure and content of such a rule, or a legislative proposal, along with any supportive data. We also invited comments on whether and how such a rule might be applied to other primary care training programs.

**e.   Special Treatment-Psychiatric Services**

During the period in which we were developing the February 1989 proposed rule, we met with representatives of psychiatric GME programs who indicated that it was inappropriate for a physician other than the treating resident to be viewed by psychiatric patients as their physician. In psychiatric programs, the teaching physician may observe a resident's treatment of patients only through one-way mirrors or video equipment. We accepted this position and proposed that, with respect to psychiatric services (including evaluation and management services) furnished under an approved psychiatric GME program, the teaching physician would be considered to be "present" during each visit for which payment is sought as long as the teaching physician observes the visit through visual devices and meets with the patient after the visit.

**f.   Physician Services Furnished to Renal Dialysis Patients in Teaching Hospitals**

Effective for services furnished on or after August 1, 1983, Medicare pays for physician services to end-stage renal disease patients on the basis of the physician monthly capitation payment method described in § 414.314. This payment method generally applies to renal-related physician services furnished to outpatient maintenance dialysis patients, regardless of where the services are furnished (that is, in an independent end-stage renal disease facility, a hospital-based end-stage renal disease facility, or in the patient's home). Physician services furnished to end-stage renal disease patients on or after August 7, 1990 may also be paid on the basis of the initial method as described in § 414.313. We would continue application of these physician payment methods to teaching hospitals with end-stage renal disease facilities. We would not impose any special medical record documentation requirements solely because the end-stage renal disease facility is based in a teaching hospital.

Physician fee schedule payments for covered physician services furnished to inpatients in a hospital by a physician who elects not to continue to receive payment on a monthly capitation basis through the period of the inpatient stay, or who is paid based on the initial method, would be determined according to the rules described in proposed § 415.170. Physicians would have to either personally furnish the services, or furnish the services as a teaching physician as described in proposed § 415.172.

**g.   Special Criteria for Anesthesia Services and Interpretation of Diagnostic Tests**

Special criteria for anesthesia services involving residents appear in § 415.178. In the case of diagnostic radiology and other diagnostic tests, we make payment **[*63141]** for the interpretation if the physician either personally performs the interpretation or reviews the resident's interpretation.

**h.   Services of Residents**

We proposed to incorporate into the regulations longstanding Medicare coverage and payment policy regarding the circumstances under which the services of residents are payable as physician services. These policies are in operating instructions and other issuances.

Generally, the services of residents in approved GME programs furnished in hospitals and hospital-based providers are payable through the direct GME payment methodology in §

60 FR 63124

413.86. For hospital cost reporting periods beginning on or after July 1, 1985, a teaching hospital is entitled to include residents working in the hospital and hospital-based providers in the full-time equivalency count used to compute direct GME payments. These payments are based on per-resident amounts reflecting GME costs incurred during a base period and updated by the Consumer Price Index. Further, effective July 1, 1987, under the conditions set forth in § 413.86(f)(1)(iii), a teaching hospital may elect to enter into a written agreement with another entity for the purpose of including the time spent by residents in furnishing patient care services in a setting outside the hospital in the hospital's full-time equivalency count of residents for GME purposes. The agreement must specify that the hospital compensate the resident for the services in the nonhospital setting. When an agreement is in effect, the teaching setting guidelines of proposed §§ 415.170 through 415.184 would apply to services in which physicians involve residents in the nonhospital setting. The services of residents in these settings are payable as hospital services rather than physician services. We stated that proposed § 415.200 would replace current § 405.522.

Current § 405.523 addressed payment for the services of residents who are not in approved programs. The section was applicable to the services of a physician employed by a hospital who is authorized to practice only in a hospital setting and to residents in an unapproved program. We proposed to replace this rule with new § 415.202. The proposed rule incorporated the policy currently in section 404.1.B of the Provider Reimbursement Manual (HCFA Pub. 15-1), which provides that only the costs of the residents' services are allowable as Part B costs, and that other costs, such as teaching costs, of an unapproved program are not allowable.

Current § 405.524 ("Interns' and residents' services outside the hospital") provided for reasonable cost payments for the services of residents in freestanding skilled nursing facilities and home health agencies. We proposed to rename this section to clarify that its scope is limited to these types of providers and to include it with only minor changes into a new § 415.204.

We proposed to establish a new § 415.206 to address payment issues relating to the services of residents in nonprovider settings, such as freestanding clinics that are not part of a hospital. Paragraph (a) addresses situations when a teaching hospital and another entity have entered into a written agreement under which the time the residents spend in patient care activities in these nonhospital settings is included in the hospital's full-time equivalency count used to compute direct GME payments. If an agreement is in force, the carrier would make payments for teaching physician and other physician services under the rules in §§ 415.170 through 415.190.

If a nonprovider entity, such as a freestanding family practice or multispecialty clinic, does not enter into this type of agreement for residency training with a teaching hospital, the payment mechanism in proposed § 415.206(b) would apply in the case of services furnished by certain residents. We modified the policy on Part B billings for services furnished by licensed residents in the late 1970's in an action designed to enhance the ability of primary care residency programs to finance their training activities outside the teaching hospital setting. We revised the Medicare Carriers Manual (HCFA Pub. 14-3) to cover residents' services furnished in a setting that is not part of a hospital as physician services if the resident was fully licensed to practice by the State in which the service was performed. This policy applies whether or not the residents are functioning within the scope of their approved GME program. Under these circumstances, the resident is functioning in the capacity of a physician, and the teaching physician guidelines do not apply.

Additionally, the services of residents practicing in freestanding federally qualified health centers and rural health clinics who meet the requirements of proposed § 415.206(b) would be eligible for payment under the payment methodology for federally qualified health centers. (We would make payments for residents' services in a hospital-based entity under

the provisions of § 413.86 for direct GME payments.) We proposed to allow freestanding federally qualified health centers and rural health clinics to include the costs of a service performed by a resident meeting those requirements as an allowable cost on the entity's cost report. We proposed to amend § 405.2468(b)(1), which sets forth allowable costs for federally qualified health centers and rural health clinic services, to recognize these costs. Further, a resident is considered to be a physician as defined in revised § 405.2401(b) for the purpose of determining payments to the federally qualified health centers and rural health clinics. Consistent with the payment method for federally qualified health centers and rural health clinics, payments for services furnished in federally qualified health centers and rural health clinics would be paid under § 405.2462 rather than under the physician fee schedule. In other words, services of the resident would be treated in exactly the same manner as services of other physicians who are not residents in the federally qualified health center or rural health clinic. We believe that recognizing the costs of these residents in federally qualified health centers and rural health clinic settings would create more uniformity in the way these costs are treated by the Medicare program.

We proposed to establish a new § 415.208 to address carrier payments for the services of "moonlighting" residents. Paragraph (a) defines these services as referring to services that licensed residents perform that are outside the scope of an approved GME program. Paragraph (b) reflects the policy set forth in section 2020.8.C. of the Medicare Carriers Manual under which carriers may pay under the physician fee schedule for the services of moonlighting residents in the outpatient department or emergency department of a hospital in which they have their training program if there is a contract between the resident and the hospital indicating that the following criteria are met:

- The services are identifiable physician services and meet the criteria in § 415.102(a) (formerly § 405.550(b)).

- The resident is fully licensed to practice medicine, osteopathy, dentistry, or podiatry in the State in which the services are performed.

- The services can be separately identified from those services that are required as part of the approved GME program.

**Paragraph (c)** indicates that the moonlighting services of a resident furnished outside the scope of an approved GME program in a hospital or other setting that does not participate in **[*63142]** the GME program are payable as physician services under the physician fee schedule.

i. Redesignation of Regulations on Teaching Hospitals, Teaching Physicians, and Physicians Who Practice in Providers

As a part of this rulemaking process, we proposed to redesignate the regulations currently set forth in §§ 405.465 and 405.466, 405.480 through 405.482, 405.522 through 405.524, 405.550, 405.551, 405.554, 405.556, and 405.580 into a new part 415, along with the new regulations proposed in this rule. The redesignation is part of our continuing effort to improve the overall organization of title 42 of the Code of Federal Regulations and, in this case, specifically, the organization of the regulations on teaching hospitals, teaching physicians, and physicians who practice in providers.

Except as indicated below, we proposed only technical changes to conform cross-references, and no substantive changes were included. We proposed to remove §§ 405.520 and 405.521 because the applicable rules for payment of services are obsolete. We also proposed to remove the chart for payment to interns and residents in § 405.525 as obsolete. In addition, we proposed to remove § 405.552 because the applicable payment rules for anesthesia services are set forth in § 414.46. The proposed deletion of § 405.552 was an error; we are redesignating this section as § 415.110.

60 FR 63124

We intended the redesignation to make these regulations easier to use. Following is a distribution table that indicates the new section numbers that will result from the redesignation or the removal of the section:

**Distribution Table**

| Old section | New section |
|---|---|
| 405.465 | 415.162 |
| 405.466 | 415.164 |
| 405.480 | 415.55 |
| 405.481 | 415.60 |
| 405.482 | 415.70 |
| 405.520 | Removed. |
| 405.521 | Removed. |
| 405.522 | 415.200 |
| 405.523 | 415.202 |
| 405.524 | 415.204 |
| 405.525 | Removed. |
| 405.550 | 415.100, 415.102 |
| 405.551 | 415.105 |
| 405.552 | 415.110 |
| 405.554 | 415.120 |
| 405.556 | 415.130 |
| 405.580 | 415.190 |

Following is a derivation table that shows the origin of each section of the new material:

**Derivation Table**

| New section | Old section |
|---|---|
| 415.1 | |
| 415.50 | |
| 415.55 | 405.480 |
| 415.60 | 405.481 |
| 415.70 | 405.482 |
| 415.100, | 405.550 |
| 415.102 | |
| 415.105 | 405.551 |
| 415.110 | 405.552 |
| 415.120 | 405.554 |

Justin Brooks

60 FR 63124

**Derivation Table**

| New section | Old section |
| --- | --- |
| 415.130 | 405.556 |
| 415.150 | |
| 415.152 | |
| 415.160 | |
| 415.162 | 405.465 |
| 415.164 | 405.466 |
| 415.170 | |
| 415.172 | |
| 415.174 | |
| 415.176 | |
| 415.178 | |
| 415.180 | |
| 415.184 | |
| 415.190 | 405.580 |
| 415.200 | 405.522 |
| 415.202 | 405.523 |
| 415.204 | 405.524 |
| 415.206 | |
| 415.208 | |

**4.** Public Comments on the Teaching Physician Proposal in the Proposed Rule and Our Responses

We received several thousand comments on the teaching physician proposal in our July 26, 1995 proposed rule. Almost all of the comments came from medical schools, residency programs, and other entities that bill for physicians' services in teaching hospitals and GME programs. The comments and our responses to them follow.

*Comment:* Most commenters argued that the requirement of teaching physician presence during individual services was a significant departure from the current practice, and that a teaching setting would need a great deal of time to implement the requirement. They requested a delay in the effective date of any new policy. They believed that January 1 would be a particular problem since it falls in the middle of the cost reporting period for most teaching hospitals.

*Response:* We do not believe that the physical presence requirement is a significant departure from current practice. Instead, as we have indicated in the proposed rule and in this final rule, the proposed rule requiring physical presence clarifies current policy. Under the criteria in Intermediary Letter 372, Part B payment should be made only when a supervising physician either personally performed the service or functioned as the attending physician and was present while the service was furnished. It has always been our intent that, at a minimum, a

60 FR 63124

teaching physician must be present during a service furnished by an intern or resident in order for the teaching physician to receive Part B payment.

We proposed to clarify our policy because it has not been enforced consistently across carriers. More specifically, we have learned that some teaching physicians are billing Medicare and receiving Part B payment for services even when the service is performed by an intern or resident outside the presence of the teaching physician and the teaching physician has minimal involvement, or no involvement, in the service. Under the physician fee schedule, payment amounts are intended to reflect the amount of resources required for a particular service, and we believe a teaching physician should not receive a resource-based fee schedule amount when the physician has expended little or no resources with respect to the service. It would be particularly inequitable to make a resource-based payment to some teaching physicians when other teaching physicians receive no payment because a carrier is properly applying the physical presence requirement in Intermediary Letter 372.

Thus, the proposed rule would clarify the physical presence requirement reflected in Intermediary Letter 372. At the same time, the proposed rule increases flexibility for billing. The criteria in Intermediary Letter 372 were premised in part on the notion that the same physician served as the attending physician throughout the entire inpatient stay; therefore, only that physician could bill Medicare Part B. Accordingly, under Intermediary Letter 372, if a patient receives a service from the attending physician soon after admission, and receives services from other physicians during the course of the inpatient stay, the other physicians cannot bill Medicare Part B for services furnished by a resident. The proposed rule deletes the requirement of a single attending physician, and allows more than one teaching physician to receive Medicare Part B payment with respect to a particular inpatient stay.

Although the physical presence requirement merely clarifies current policy, we are nevertheless willing to delay the effective date of the provisions of this final rule concerning teaching physicians until July 1, 1996 to give our **[*63143]** contractors adequate time to educate all affected parties. This delay will apply to all provisions of the regulation concerning teaching physicians, including those that state the new policies relating to the elimination of the single attending physician requirement and the exception for residency programs in certain centers.

*Comment:* One commenter stated that section 948 of the Omnibus Reconciliation Act of 1980, as amended by section 2307 of the Deficit Reduction Act of 1984, requires only that-

The physician renders sufficient personal and identifiable physicians' services to the patient and exercises full, personal control over the management of the portion of the case for which payment is sought.

The commenter believed that these legislative provisions contain no physician presence requirement and questioned our authority to change 25 years of policy without a Congressional mandate to do so.

*Response:* We believe that the physical presence requirement is entirely consistent with our statutory authority. Under section 1887 of the Act, we are authorized to establish criteria to distinguish between services furnished for an individual patient, which may be paid for by carriers as physician services, and services that are furnished for the general benefit to patients in a hospital, which are paid for by intermediaries.

In addition, we do not view the proposed policy as inconsistent with the statutory provision cited by the commenter. In the first place, we note that section 1842(b)(7) of the Act is largely premised on the use of charges as a basis for payment, and the charge-based system for physicians' services has been superseded by the enactment of the physician fee schedule. Nevertheless, the requirements stated in that section are not in conflict with the physical presence requirement. Section 1842(b)(7) provides that Part B payment may not be made for the services of teaching physicians unless, among other things, "The physician renders *sufficient personal and identifiable services to the patient* and exercises full personal control

60 FR 63124

over the management of the portion of the case for which payment is sought." (Emphasis added.)

We believe we have ample authority under these provisions, as well as section 1848 of the Act, to determine the circumstances under which a teaching physician has performed a service for a patient, and thus has furnished a "physician's service" that warrants Part B payment under the physician fee schedule. Currently, despite the criteria in Intermediary Letter 372, many teaching physicians are billing Medicare and receiving Part B payment in situations when they have minimal, if any, involvement in the care of an individual patient. For example, the teaching physician may have medical and legal responsibility for the care a resident furnishes to a patient but may never actually see the patient after admission to the hospital. We believe it is inappropriate to make Part B payment in these cases, particularly because the amount of payment is resource-based.

Of course, it is often difficult, and quite time-consuming, to determine when a physician is "sufficiently involved" in a particular patient care service so that Part B payment is warranted. As indicated in the proposed rule (60 FR 38409), the amount of postpayment review necessary to verify the involvement of teaching physicians in the care of individual patients would be enormous, and the use of scarce carrier resources in that effort would be impractical. Therefore, consistent with our authority to establish standards for determining when a service is furnished *for a patient,* as a general matter we believe the most appropriate and feasible manner to determine when Part B payment may be made is to require that the teaching physician must be present for the service for which payment is sought. The physical presence requirement identifies situations when the teaching physician is sufficiently involved in the service, and at the same time it provides a standard that can be readily documented and verified.

*Comment:* One commenter argued that, under the proposed rule, teaching physicians would not be reimbursed in any manner under Medicare for certain teaching activities that were previously paid for under Part B. According to the commenter, Part A payment reflects base year costs that include only teaching physician costs related to the administration of the teaching program, and "Teaching physician time was not allocable to Part A if attributable to patient care, whether the service was personally performed by the physician, or furnished in the context of the attending physician relationship." The commenter argued that teaching activities related to services to individual patients could not be included in base year costs and thus would never be reimbursed under Part A. The commenter concluded that, under the physical presence requirement, teaching activities related to the care of individual patients would not be reimbursed under either Part A or Part B.

*Response:* We believe the policies reflected in this final rule fairly reimburse hospitals and physicians for the activities of teaching physicians. As we have indicated, currently many teaching physicians are billing Medicare and receiving Part B payment even when they have little or no involvement in a service furnished by an intern or resident. We believe it is not appropriate for teaching physicians to receive physician fee schedule payment in these situations as if the teaching physician had personally performed the service, particularly since fee schedule payments are intended to reflect the amount of resources expended by the physician. In order to address this problem, and to ensure that Part B payment is made only when the situation warrants, this final rule clarifies the physical presence requirement reflected in Intermediary Letter 372. We believe the requirement is reasonable and necessary because it ensures that Part B payment is made only when a teaching physician is sufficiently involved in the service and does so in a manner that can be readily documented.

We recognize that there may be some inherent tension between policies for carrier payments under Part B and policies for intermediary payments under Part A or Part B. If a service or activity is payable under Medicare, and it is not payable under Part B, then presumably the service or activity is encompassed in the Part A payment. Therefore, any "change" in (or

clarification of) Part B policy may, at least arguably, implicate Part A policy. The commenter argued that, despite this relationship between Part A and Part B, under the proposed policies, some services might not be reimbursed at all under Medicare.

We believe that the commenter's arguments are misguided. We note initially that, as a general matter, payment for the costs of direct GME under Part A, like any system that uses base year costs, necessarily reflects conditions in the base year, and any number of conditions might change after the base year (these changes might benefit or hurt the hospital). However, the use of base years for purposes of making these Part A payments is required by statute. We do not believe we should necessarily perpetuate inappropriate payments under Part B simply because payments under Part A cannot be adjusted.

Moreover, and more significantly, we believe that the policies reflected in this final rule taken as a whole reasonably reconcile any tension that there might be between Part A payment policies and **[*63144]** Part B payment policies. The commenter seemed to suggest that, in conducting the Part A base year audits, the agency excluded all costs associated with teaching activities that were related to patient care. This suggestion, however, is incorrect. Indeed, as the commenter acknowledged, time spent supervising residents in patient care was allocable to Part A under the audits if there was no attending physician relationship. Furthermore, although the commenter also asserted that 100 percent of a physician's time was allocable to Part B "in the absence of appropriate documentation," it follows that time spent supervising residents could have been allocated to Part A if the hospital or the physician provided appropriate documentation. Thus, contrary to the commenter's suggestion, teaching activities related to patient care were, or could have been, included in the Part A base year costs. We believe we should not perpetuate inappropriate Part B policies simply because hospitals and physicians failed to properly claim or document Part A costs in the base year.

The commenter also indicated that, under the proposed rule, certain teaching activities would not be reimbursed under Part B even though they were reimbursed under Part B previously (incorrectly or otherwise). This might relate to activities such as discussions about patient charts with a resident when the teaching physician was not present during the visit itself. The commenter stated that, in the proposed rule, we claimed incorrectly that lost Part B revenues could be collected through Part A. Contrary to the commenter's suggestion, we did not mean to suggest that services that were previously, but no longer, paid for under Part B would be paid for through increased payments under Part A. Rather, we meant to indicate that, at times in the past, improper payments may have been made.

We believe that our policies adequately reimburse hospitals and teaching physicians for the activities of teaching physicians. First, the services of the interns or residents themselves are payable under separate mechanisms. Thus, to the extent that services are provided by interns and residents who are largely unsupervised, Medicare pays for the direct costs of those services through GME payments. Second, consistent with the criteria in Intermediary Letter 372, the teaching physician may receive Part B payment as long as the physician is present for the service. Finally, we are providing further flexibility for billing in this final rule, so that services may now be paid for under Part B even though the same services could *not* previously be properly billed to Part B; specifically, under this final rule, more than one teaching physician may bill Part B with respect to a particular hospital inpatient stay, whereas under Intermediary Letter 372, only a single attending physician could properly bill Part B.

In short, hospitals and physicians will not, as alleged, be systematically underreimbursed under the policies reflected in this final rule. The Part A payment encompasses costs of supervising residents that were (or could have been) properly allocated and substantiated for the base year. Teaching physicians may continue to receive Part B payment under the physical presence requirement reflected in Intermediary Letter 372. And Part B payment may now be made under circumstances in which payment could not properly be made under Intermediary Letter 372.

*Comment:* Many commenters believed that we developed the teaching physician proposal because we had concluded that beneficiaries in teaching hospitals receive substandard care when the teaching physician is not present during the service or procedure.

*Response:* The policy was not intended to specifically address quality concerns. Rather, the policy addresses payment issues, in particular, identifying when it is appropriate to make Medicare Part B payment to teaching physicians who oversee the services of interns and residents.

It is important to distinguish between the services of interns and residents and the services of teaching physicians. Medicare fiscal intermediaries pay teaching hospitals for the services of interns and residents. Those services are described in sections 1861(b) and 1832(a) of the Act and are paid under the methodology established by section 1886(h) of the Act. Thus, the fiscal intermediaries are already paying teaching hospitals for services furnished to beneficiaries by residents. The graduate medical education costs payable through the section 1886(h) methodology also encompass any costs associated with the supervisory services of teaching physicians that were appropriately allocated during the base period for that methodology (fiscal year 1984).

Particularly in light of these other payments, we believe that, if we are to pay a fee to another physician who is medically responsible for the services the resident is furnishing to the beneficiary, it is entirely appropriate to require as a condition of payment that the supervising physician furnish a direct, personal physician service to the beneficiary. This is the basis for the payment of physician services under Medicare. If the resident has personally furnished the service to the beneficiary and the intermediary is paying the teaching hospital for Medicare's share of the services performed by the resident, we believe it is appropriate not to pay a full fee to a supervising physician who was not present when the service was furnished. Furthermore, the Medicare beneficiary is responsible for a 20 percent coinsurance amount for that physician's services as well as any deductible liability. We believe it is fully consistent with a resource-based fee schedule that the physician in whose name the service is billed furnishes a service to the beneficiary.

*Comment:* Many commenters stated that residency programs cannot afford to furnish services to Medicare beneficiaries without Medicare payment.

*Response:* Medicare fiscal intermediaries pay approximately $ 7 billion annually in direct and indirect medical expenses to teaching hospitals for the costs associated with approved GME programs.

*Comment:* Some commenters expressed concern about the term "key portion" in determining when the teaching physician should be present. They stated that it is often difficult to define the key portion of a service or procedure. Many commenters expressed their concern with the lack of a clear definition of what constitutes the key portion of every service or procedure. Many other commenters contended that the key portion of the teaching physician's services takes place during the teaching physician's discussions of the case with the resident before and after a visit or procedures. This argument was made by physicians in both medical and surgical specialties.

*Response:* We proposed the concept of the key portion of a service or procedure to provide flexibility and to avoid requiring the presence of the teaching physician for the duration of every service or procedure billed in his or her name. Many of the commenters expressed the view that the key portion-and the most meaningful portion-of the teaching physician's service to the beneficiary actually takes place in the absence of the beneficiary. We do not agree with this interpretation of key portion because it blurs the distinction between teaching oversight and actually furnishing an identifiable service to the beneficiary.

While we recognize the concern that it may be difficult to determine the key portion for a particular service, this concept is necessarily general because it **[*63145]** is not feasible to

define the key portion for each and every billable service. In order to provide guidance, we stated some general guidelines in the proposed rule. Thus, in the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. In the case of surgery, the teaching physician's presence is not required during opening and closing of the surgical field. In the case of procedures performed through an endoscope, the teaching physician must be present during the entire viewing.

In the case of evaluation and management services, the teaching physician must be present during the portion of the service that determines the level of service billed. The factors to be considered are complexity of medical decision-making, extent of history obtained, and extent of examination performed. We believe that the teaching physician should have considerable discretion in determining the key portion of the service, and we do not anticipate that carriers will deny claims submitted based on this discretion, as long as the claims are documented and in accord with our guidelines. If the teaching physician believes that a key portion of an entire evaluation and management service cannot be identified, the teaching physician should be present for the entire service.

We plan to address this matter further in carrier manual instructions.

*Comment:* Some commenters objected to the requirement of the proposed rule that the teaching physician be present during the viewing portion of a procedure such as an endoscopy. The commenters believed that the presence of the physician should be determined by the teaching physician based on the competence of the resident.

*Response:* In those situations, we believe that the carrier should pay for the interpretation of the viewed area by the teaching physician rather than by the resident. As indicated earlier, the viewing by the resident is not payable as a physician service; this service by the resident is paid under direct GME.

*Comment:* The majority of the commenters identified themselves as representatives of family practice residency programs. The commenters made the following points:

• Many appreciated the preamble language of the proposed rule indicating our willingness to consider adopting special rules for family practice programs.

• Many claimed that hospitals and health care delivery systems would cease residency training for family practice programs if the proposal went into effect without an exception.

• In a family practice program, the resident is the primary care-giver, and the faculty physician sees the patient only in a consultative role.

• It is beneficial for family practice residents to see patients alone in order to learn medical decision-making and to recognize their own limitations.

• A resident cannot be educated in the art and practice of medicine without unsupervised patient contact; the proposed policy would interfere with the development of a resident's bedside manner.

• One family practice resident objected to the low levels of fee payments for his services under Medicare and Medicaid.

• The teaching physician presence requirement intrudes upon the relationship between the resident and the patient and, in the view of some, would cause Medicare beneficiaries to lose confidence in the competence of their resident physician.

• The requirement would necessitate the hiring of more teaching physicians and inhibit the ability to finance family practice programs through patient care billings.

• In many cases, the presence of the teaching physician is superfluous.

- The proposal does not adequately recognize the way medicine is practiced in this country.

- The family practice teaching physician is responsible for supervising four or more residents and medical students who are seeing patients simultaneously. Since the teaching physician must remain with the medical students during patient care visits, he or she does not have time to be involved in services furnished by the residents.

- The family practice preceptors are responsible for signing the medical records after the residents have dictated their entries which, in the view of some, guarantees mandatory supervision for each and every visit.

- Some residents are experienced physicians who have been in private practice for years and are in the residency program only to obtain board certification. The proposal does not adequately address those residents.

- If the proposed policy is implemented, family practice clinics will refuse to treat Medicare beneficiaries. Thus, the beneficiaries will be forced to go to medical assistance clinics.

- The proposal would put the resident in the position of being a clerk rather than a physician.

- Care furnished in family practice programs is more cost-effective than care furnished in established practices; therefore, total Medicare costs are lower when services are provided by these programs.

- The physician presence requirement would inhibit the ability of family practice clinics to compete with managed care programs in the community.

In addition, the American Academy of Family Practice proposed a specific limited exception to the physician presence requirement that we have adopted in large part as set forth below.

*Response:* As we have discussed, we believe the physical presence requirement is necessary and appropriate as a general rule to ensure that Part B payment is not made when a teaching physician does not furnish a service for a patient; we also believe that hospitals and teaching physicians generally can, as a practical matter, reasonably meet the presence requirement and that Part B payment will be made as appropriate for the services and activities of teaching physicians. At the same time, we believe that, if the nature of a residency program is fundamentally incompatible with a physical presence requirement, it may be appropriate to make Part B payment if the teaching physicians satisfy certain conditions that demonstrate that they are sufficiently involved in the care of individual patients to warrant Medicare Part B payment. As reflected in the proposed rule, we believe a requirement of physical presence would be inherently incompatible with the nature of family practice residency programs, and thus unfairly deny reimbursement for the activities of teaching physicians in these programs and endanger the financial viability of these programs. Because of these considerations, we proposed a limited exception for family practice residency programs.

In light of the comments, we have concluded that an exception should not be limited to family practice programs, but instead should apply to any program that satisfies certain specified criteria. The criteria are designed to capture those residency programs with requirements that are incompatible with a physical presence requirement. Thus, in this final rule, we have decided to establish an exception to the physician presence requirement for certain evaluation and management services furnished in certain centers within the context of certain types of residency **[*63146]** training programs. The exception is set forth in a new § 415.174 of this final rule.

Under the exception, carriers may make physician fee schedule payment for reasonable and necessary low to mid-level evaluation and management services when furnished by a resident without the presence of a teaching physician if all of the following conditions are met:

60 FR 63124

- Services must be furnished in a center located in the outpatient department of a hospital or another ambulatory care entity in which the time spent by residents in patient care activities is included in determining intermediary payments to a hospital under § 413.86.

- Any resident furnishing the service without the presence of a teaching physician must have completed more than 6 months of an approved residency program. The center is responsible for furnishing this information to the carrier. The family practice groups recommended the 6-month requirement, and we believe it is an appropriate safeguard.

- The teaching physician may not supervise more than four residents at any given time and must direct the care from such proximity as to constitute immediate availability. The teaching physician must-

+ Have no other responsibilities at the time of the service for which payment is sought;

+ Assume management responsibility for those beneficiaries seen by the residents;

+ Ensure that the services furnished are appropriate;

+ Review with each resident during or immediately after each visit, the beneficiary's medical history, physical examination, diagnosis, and record of tests and therapies; and

+ Document the extent of his or her own participation in the review and direction of the services furnished to each beneficiary.

- The patients seen must be an identifiable group of individuals who consider the center to be the continuing source of their health care and in which services are furnished by residents under the medical direction of teaching physicians. The residents must generally follow the same group of patients throughout the course of their residency program. We are not requiring that the teaching physicians remain the same over any period of time.

- The range of services furnished by residents includes:

+ Acute care for undifferentiated problems or chronic care for ongoing conditions.

+ Coordination of care furnished by other physicians and providers.

+ Comprehensive care not limited by organ system, diagnosis, or gender.

We believe that the types of GME programs most likely to qualify for this exception include: family practice and some programs in general internal medicine, geriatrics, and pediatrics.

- The center must be located in a setting in which the resident's time is included in the full-time equivalency count used by the intermediary to make direct GME payments to a hospital for services of residents in that setting. In a freestanding setting in which residents are not counted for the purpose of making these payments, the services of licensed residents are already covered as physician services.

This exception to the teaching physician presence applies only to specific low- and mid-level evaluation and management codes for office or other outpatient visits for both new and established patients. The established patient codes to which the exception applies are CPT codes 99211, 99212, and 99213 (and their successor codes). New patient codes to which the exception applies are CPT codes 99201, 99202, and 99203 (and their successor codes). The teaching physician must be present for higher level evaluation and management codes and all invasive procedures.

In paragraph (b) of new § 415.174, we clarify that the exception may not be construed as providing a basis for the coverage of otherwise noncovered services under Medicare, such as routine physical checkups. Further, this special treatment for certain training situations does not apply to services involving medical school students. A service furnished by a medical school student is a noncovered service under Medicare even if the teaching physician is in the room. We will publish further instructions on the new policy in the Medicare Carriers Manual.

*Comment:* Some commenters who represent physician specialty organizations stated that they were opposed to any exception to the physician presence requirement if it was limited to a

60 FR 63124

particular specialty. They believed that the same rules on physician presence should apply to all specialties. Some commenters indicated that special treatment for family practice programs "devalued" the importance of residency training in other programs. Many commenters argued that any special treatment given to family practice programs should apply to their programs as well. These include psychiatry, physical medicine, internal medicine, and obstetrics-gynecology. For example, several commenters believed that psychiatric residency programs should be given the same special treatment in the final rule as might be afforded to family practice programs. Some indicated that the costs of purchasing video equipment or one-way mirrors would be too great.

*Response:* The exception we are establishing at new § 415.174 is not limited to family practice programs; it applies to the indicated evaluation and management codes when furnished under the specified conditions. We are continuing to provide an additional, special exception for psychiatric programs in § 415.184 as originally proposed.

*Comment:* Some commenters indicated that their family practice clinics are not under the sponsorship of a hospital, and that their programs do not receive Medicare funds from a hospital for the time the resident is in the clinic.

*Response:* If the family practice clinic is freestanding (that is, not part of a hospital) and the residents are not included in any hospital's full-time equivalent count of residents, the services of licensed residents are payable under the physician fee schedule on the same basis as any other physician's services. This longstanding policy applies regardless of whether or not the resident's services are furnished within the scope of an approved GME training program.

*Comment:* Several commenters expressed concern that the same residents for whom we are requiring the presence of a teaching physician are not supervised by a teaching physician when they "moonlight" outside of their training programs.

*Response:* We recognize moonlighting situations and addressed the subject in the proposed rule. When licensed residents moonlight outside of their training program, Medicare pays for their services as physician services. Medicare does not pay a teaching hospital for these services through the direct GME payment mechanism or through the indirect medical education payment mechanism. In other words, in moonlighting situations, the Medicare program pays for the service only once.

*Comment:* One organization supported the proposed rule on "moonlighting residents" but sought clarification as to the impact of the proposal on inpatient services. Another commenter sought clarification of the policy when a licensed resident moonlights in another teaching hospital.

*Response:* The proposal reflects longstanding policy outlined in section 2020.8 of the Medicare Carriers Manual. **[\*63147]** The policy does not encompass Medicare payment for moonlighting services furnished to inpatients in the hospital in which the resident has his or her program since we believe these services are virtually indistinguishable from the services the resident furnishes within the scope of the training program. However, when a licensed resident moonlights in another teaching hospital, the carrier must be furnished sufficient information to be sure that the moonlighting resident is not being included in the residency count (used to determine direct and indirect medical education payments) of either hospital for the period of time in question. Moreover, in this final rule, we are revising proposed § 415.202 ("Services of residents not in approved GME programs") (formerly § 405.523) to clarify that, when an intern or resident is in an approved GME program at one hospital and is concurrently furnishing moonlighting services in another hospital that lacks an approved GME program, the services in the second hospital may be reimbursed only pursuant to 42 CFR part 414 or section 2109 of the Provider Reimbursement Manual.

60 FR 63124

*Comment:* Some commenters suggested that we should discard the current proposal and implement the "philosophy" of teaching physician immediate availability rather than presence as proposed in the February 7, 1989 proposed rule.

*Response:* The exception that we have added to the policy we are adopting is consistent with the philosophy to which the commenters referred.

*Comment:* Some commenters stated that documentation of a teaching physician's presence during a procedure would add costs to an already burdensome, bureaucratic process.

*Response:* The policy we are adopting cannot be enforced without some documentation of the presence of the teaching physician during procedures and the personal involvement of the teaching physician in evaluation and management services.

*Comment:* A few physician specialty organizations supported the proposal. In addition, a few physicians stated that the physician presence requirements reflected their standard practice. Some commenters representing surgeons stated that, while they generally supported the physician presence proposal, they objected to the requirement that the surgeons have to indicate in their operative notes when their presence began and ended since the anesthesiologist and nurses already record this information. Many other commenters objected to any restriction in the involvement of teaching surgeons in concurrent cases. Some commenters believed that third or fourth year residents were capable of performing surgical procedures with the teaching physician in the operating suite rather than in the operating room.

*Response:* As we stated in the proposed rule, the notation in the nurse's notes is sufficient documentation of the teaching physician's presence during surgical procedures. There is no requirement that the teaching physician personally record the information if it duplicates information available elsewhere. If the teaching physician believes the third or fourth year resident is capable of performing surgical procedures without supervision, the teaching physician should not bill Part B for the surgical services furnished by the resident.

*Comment:* One commenter recommended that the teaching physician be able to indicate the following general statement on all records:

I have interviewed and examined the patient, and I agree with the history and physical findings as recorded by Dr. (Resident) in his/her note of (date).

The commenter believed that this would clarify that the physician participated in the care of the patient, but not require that he or she spend valuable time repeating all of the documentation already present in the record.

*Response:* This statement, by itself, would not be sufficient for Part B payment if the physician was not present during the service. If the physician was present, it is not necessary for the teaching physician to repeat all of the documentation entered into the medical records by the resident. The teaching physician may countersign the resident's entries and enter additional notes as necessary to indicate his or her involvement in the service. We will address these matters in more detail in manual instructions.

*Comment:* One commenter believed that we should pay teaching physicians under case management CPT codes 99361 through 99373 and care plan oversight codes (CPT codes 99375 and 99376). These services include care team conferences and telephone calls for consultation or medical management with other health care professionals. In addition, the commenter suggested that we undertake a demonstration project to test the feasibility and cost-effectiveness of these payments with the goal of implementing a budget-neutral policy for the payments. The same commenter also suggested a policy under which the teaching physician could bill Medicare for each visit if the physician were present to observe every third visit furnished by the resident to the patient.

60 FR 63124

*Response:* Medicare does not allow separate payment for the case management codes. We consider case management services to be included in the prework and postwork of the evaluation and management codes. The suggestion seems to be a way of removing the teaching physician further from the actual performance of the service, and we do not support this outcome.

*Comment:* Under current policy in § 414.46(c)(1)(iii), if a teaching anesthesiologist is involved in concurrent cases, the medical direction payment rules apply, and a reduced allowance is recognized for the physician service in each concurrent case. Commenters argued that this standard is inconsistent with the standard for teaching surgical services. They indicated their understanding that the teaching surgeon can be involved in concurrent procedures and receive a full allowance for each surgical procedure.

*Response:* We intend to apply the physician presence standard for both surgical and anesthesia teaching services and have revised § 415.178 ("Anesthesia services") accordingly. Under the policy we are adopting, while we require the teaching surgeon's presence during the critical portion of the service, we do not require the surgeon's presence during the opening and closing of the patient. However, during this period, the teaching surgeon may not be involved in surgical services for other patients since this would preclude his or her return to the original case. We believe that this policy is analogous to the teaching anesthesiologist policy under which, in order to receive an unreduced fee, the anesthesiologist must be present during all critical portions of the procedure and immediately available to furnish services during the entire procedure.

*Comment:* A carrier medical director commented that there should be a national standard on documentation of what the teaching physician actually does. The carrier medical director believed that physicians in nonteaching settings have to provide considerably more documentation than a counter-signature, and that the teaching physician should make a brief notation documenting his or her involvement in support of the level of evaluation and management code billed.

*Response:* We plan to address this matter in billing instructions to implement the new policy.

*Final decision:* We are going forward with the policy we proposed but have **[*63148]** included an exception to the teaching physician presence requirement for certain evaluation and management services furnished in certain centers within the context of certain types of residency training programs. The new exception is found in § 415.174 ("Exception: Evaluation and management services furnished in certain centers"). The effective date of the regulations concerning teaching physicians will be July 1, 1996.

### F. Unspecified Physical and Occupational Therapy Services (HCFA Common Procedure Coding System Codes M0005 Through M0008 and H5300)

We proposed to eliminate HCFA Common Procedure Coding System (HCPCS) codes M0005 through M0008 and H5300 and to redistribute the RVUs to the codes in the physical medicine section of the CPT (CPT codes 97010 through 97799). This policy change requires a single way of reporting and paying for a service for which there are now two ways to report. We proposed no change regarding what services may be covered, only as to how covered services would be billed and paid.

*Comment:* All the comments we received expressed agreement with our proposal to eliminate the HCPCS codes M0005 through M0008 and H5300. The commenters stated that these services can be accurately reported using the new and revised physical medicine and rehabilitation codes in the CPT. They considered the decision to delete these codes to be appropriate and long overdue. The commenters cited the opportunity for unnecessary duplications of service codes and the misuse and overuse of the "M" codes in billing by physical therapists to support eliminating the HCPCS codes.

However, some commenters were concerned that carriers might be reluctant to follow billing rules under the CPT for occupational and physical therapists in the same manner as is accepted for

physicians. One commenter had encountered problems in the past with carrier refusals to accept the range of codes allowed under the scope of practice, to allow payment for both physical therapy and occupational therapy services required by the same patient, or to reimburse for more than one code per visit. Another commenter questioned whether occupational therapists in independent practice could report the full range of codes or if some codes were appropriate only to physical therapists in independent practice. The commenter also observed that some procedures can be considered either a physical therapy service or an occupational therapy service based solely on the specialty of the provider performing the service. Because of the coding flexibility, a beneficiary who has met his or her outpatient limit for physical therapy can continue to receive some of the same services under the occupational therapy outpatient limit if the service is furnished by an occupational therapist and vice versa.

*Response:* Physical therapy and occupational therapy services required by the same patient are permitted, as is payment for more than one code per visit, subject to statutory requirements and limitations. That is, the provider of a service must be qualified within the State's scope of practice to furnish the service. According to § 410.60 ("Outpatient physical therapy services: Conditions."), the services must be furnished under a written plan of treatment established by the physician or therapist caring for the patient. The services also must be medically necessary and reasonable for the diagnosis or treatment of an illness or injury, as mandated by section 1862(a) of the Act. Occupational and physical therapy services furnished to the same patient on the same day would necessitate two separate treatment plans, two separate physician orders, and both must be medically necessary.

The current Medicare coding limitations apply when both physical therapists and occupational therapists furnish services to the same patient. Specifically, we do not allow separate payment for CPT code 97250 (Myofascial release/soft tissue mobilization, one or more regions) for the same patient, on the same date of service as CPT codes 97265 (Joint mobilization), 97260 (Manipulation (cervical, thoracic, lumbosacral, sacroiliac, hand, wrist) (separate procedure)), or 97261 (each additional area) because these services overlap. Because of the duplication of services represented by the codes for manual manipulation (CPT codes 97260 and 97261), soft tissue mobilization (CPT code 97250), joint mobilization (CPT code 97265), or osteopathic manipulation (CPT codes 98925 through 98929), we do not permit separate payment if any of these codes are reported for the same patient, on the same date of service. Aside from these limitations, there is nothing that precludes the payment for both physical therapy and occupational therapy services for the same patient on the same date of service.

The full range of CPT codes 97010 through 97799 may be reported by occupational therapists in independent practice as well as by physical therapists in independent practice if the service is within the scope of practice. We have no national payment policy that prevents occupational therapists in independent practice from billing and being paid for any CPT code that describes a service they furnish that may be covered. We do not allow payment for evaluation and management services billed by physical therapists in independent practice and occupational therapists in independent practice because the work RVUs for these services include work that they are not trained to perform (for example, evaluation for and prescription of drug therapy and evaluation for and prescription of surgical or other therapy). Otherwise, occupational therapists in independent practice may bill using any CPT code the carrier determines describes the covered services, not just the codes in the physical medicine section of the CPT.

It follows, therefore, that the same procedure code may be used to bill for an occupational therapy service or a physical therapy service. The covered outpatient limit applies to both specialties individually.

*Comment:* We were requested to clarify whether carriers allow payment for therapists' bills submitted under the physician fee schedule in the same manner as physicians' bills for similar services.

*Response:* Section 1848(j)(3) of the Act defines physicians' services to include outpatient physical therapy and occupational therapy for physician fee schedule payment and, therefore, bills of physical therapists and occupational therapists in independent practice are treated in the same manner as bills of a physician for covered services.

*Comment:* We received one comment asking if RVUs will be established for CPT codes 97545 and 97546, which are currently carrier priced.

*Response:* We reviewed the RUC recommendations and decided to defer assigning RVUs for these codes until there is a better definition of the services. It is unclear whether the time specified in the codes (CPT 97545, work hardening/conditioning, initial 2 hours and CPT code 97546, each additional hour) describes the time of the patient or the practitioner. It is our belief that it is possible for physical therapists in independent practice to do work hardening for four patients simultaneously, rotating from patient to patient located within the same room. Moreover, we believe that there is more work (that is, higher intensity and one-on-one attention) in the first 2 or more hours of service, not the initial 2 hours **[*63149]** of care in a given day, as these codes are defined. We believe that the intensity and amount of work drops off quickly in the process and that it would be impossible to value the services correctly under its current definition.

*Comment:* As noted in the proposed rule, the Health Care Professional Advisory Committee will be considering the creation of evaluation and management codes for physical therapists in independent practice and occupational therapists in independent practice. One commenter expressed hope that these codes would be developed by 1997.

*Response:* We anticipate these codes will be developed for use in 1997.

*Final Decision:* We will eliminate HCPCS codes M0005 through M0008 and H5300 and redistribute the RVUs across CPT codes 97010 through 97799. This policy change is not explicitly addressed in our regulations.

**G. Transportation in Connection with Furnishing Diagnostic Tests**The general physician fee schedule policy regarding additional payments for travel expenses is that travel is included in the practice expense RVUs for a service. However, we have not specifically applied that policy to the transportation of equipment used to perform diagnostic tests. In the absence of specific instructions from us, separate payment for the transportation of diagnostic equipment has been at the Medicare carriers' discretion. We proposed to standardize payment for transportation of diagnostic equipment by applying the general physician fee schedule policy regarding payment for travel expenses to transportation services except in some cases of transporting portable x-ray and EKG equipment.

The exceptions are based on longstanding specific instructions. In the case of x-ray services furnished by approved suppliers, section 1861(s)(3) of the Act establishes the coverage of diagnostic x-rays furnished in a place of residence used as the patient's home. Although the Congress did not explicitly so state, we determined that, because there were increased costs associated with transporting the x-ray equipment to the beneficiary, the Congress intended for us to pay an additional amount for the transportation service. Thus, we established codes for use in billing for a transportation component of these services. Nothing in our proposal affects the payment of a transportation component in connection with the x-ray procedures furnished by approved portable x-ray suppliers listed in section 2070.4.C of the Medicare Carriers Manual.

We later added the taking of an EKG tracing to the list of services approved suppliers of portable x-ray services may furnish (section 2070.4.F of the Medicare Carriers Manual) and established HCPCS code R0076 to pay for the transportation of EKG equipment. Under our proposal, we would continue to pay for the transportation of EKG equipment by approved suppliers of portable x-ray equipment although we did clarify that the policy applied only to standard EKG procedures described by CPT code 93005 (or CPT code 93000 if the interpretation is billed with the tracing).

Many Medicare carriers have limited the use of HCPCS code R0076 to approved portable x-ray suppliers, but some Medicare carriers permit other types of entities, such as independent physiological laboratories to use the code. Section 2070.1.G of the Medicare Carriers Manual provides for the coverage of an EKG tracing by an independent laboratory in the following situations:

•    In a home if the beneficiary is a homebound patient.

•    In an institution used as a place of residence if the patient is confined to the facility and the facility does not have on-duty personnel qualified to perform the service.

Under our proposal, we would remove the requirement that the beneficiary be confined to his or her home or to an institution for the EKG tracing to be a covered service since this requirement does not apply to EKG tracings taken by portable x-ray suppliers.

For all other types of diagnostic tests payable under the physician fee schedule, Medicare carriers would pay for the transportation of equipment only on a "by report" basis under CPT code 99082 if a physician submits documentation to justify the "very unusual" travel set forth in section 15026 of the Medicare Carriers Manual.

*Comment:* One commenter, representing a mobile independent physiological laboratory, indicated that the laboratory currently furnished several types of diagnostic procedures to patients in various settings without any separate payment for transportation. The commenter appreciated the fact that, under the proposal, the laboratory would now receive a transportation payment for CPT code 93005 (a 12-lead EKG) and suggested that the exceptions to the transportation payment proposal be extended to include CPT code 93225 (holter monitoring) and HCPCS code G0005 (patient activated event recording procedures). The commenter suggested that HCPCS code R0076 be revised to specifically include the transportation of holter monitoring and patient activated event recorder equipment to patients upon physician order.

*Response:* We were not seeking to expand the list of services independent physiological laboratories may furnish for which carriers will make separate transportation payments. Since the law does not provide for coverage of any diagnostic tests payable under the physician fee schedule furnished to beneficiaries in their place of residence other than x-ray services furnished under conditions we have approved, we will not provide for transportation payments in connection with other diagnostic tests furnished by independent physiological laboratories.

Under our proposal, Medicare carriers would make transportation payments under HCPCS code R0076 in connection with standard EKG procedures (CPT code 93005) furnished by an independent physiological laboratory when the coverage conditions of section 2070.5 of the Medicare Carriers Manual are met. We made this exception to the general policy on transportation of diagnostic equipment because of the longstanding nature of the Medicare Carriers Manual policy on furnishing EKGs to patients in their residences or in nursing homes by "independent" laboratories. We have some concerns about making this exception because it is our understanding that some Medicare carriers are not currently making such payments. However, we anticipate that this additional cost will be offset, to some degree, nationally by the discontinuation of transportation payments to independent physiological laboratories for other types of diagnostic tests that Medicare carriers may currently allow. In addition, we are modifying our proposal in that we are maintaining section 2070.1.G of the Medicare Carriers Manual regarding the homebound status of the beneficiary receiving the service.

*Comment:* A carrier medical director questioned why the proposal did not address whether the diagnostic procedure itself was payable when furnished by an independent physiological laboratory in settings such as a nursing home and whether we were suggesting that such procedures should not be done in nursing homes. The commenter noted that it would be useful for us to establish a list of "physiological" tests that can be furnished by an independent physiological laboratory.

60 FR 63124

*Response:* Our proposal does not address the coverage for procedures **[*63150]** furnished by independent physiological laboratories. In the absence of a national policy on the payment for the services, the coverage for independent physiological laboratory services remains within the authority of the carrier and must be consistent with any applicable State or local laws.

*Comment:* A national organization of suppliers of portable x-ray services commented that portable x-ray suppliers should be the only entities paid under the physician fee schedule who may bill for transportation of diagnostic equipment under HCPCS codes R0070, R0075, and R0076.

*Response:* Under the policy we are adopting, approved suppliers of portable x-ray services are the only entities who may bill HCPCS codes R0070 and R0075 under the physician fee schedule. Portable x-ray suppliers and independent physiological laboratories may bill HCPCS code R0076 for the transportation of EKG equipment used to furnish standard EKGs (CPT codes 93000 and 93005).

*Comment:* A national organization whose membership includes primary care physicians opposed the proposal because it would adversely affect the availability of portable diagnostic equipment for small hospitals and for patients in home care and skilled nursing facilities. The commenter noted that it was not in the best interest of patient care to force patients to travel to medical facilities outside their communities to receive the testing and that Medicare carriers should ensure that transportation payments do not exceed transportation costs.

*Response:* We believe there is no problem with respect to the transportation of diagnostic equipment to small hospitals. The hospital must purchase the service "under arrangements" if the service is provided to its patients. When a hospital purchases services "under arrangement," it assumes responsibility for the service furnished, and Medicare intermediary payment is made for this service through one of several payment mechanisms applicable to payment for hospital services.

*Comment:* Several commenters indicated that home and facility bound patients would benefit from expanded coverage of portable ultrasound services. One commenter indicated that these services offer the patient a top quality examination while eliminating the trauma and expense of an ambulance ride and emergency room stay. The commenter requested a mobile ultrasound transport code and a mobile ultrasound set-up code.

*Response:* Our proposal does not affect the furnishing of these procedures in homes or facilities; it merely affects any additional payment for the transportation of the diagnostic equipment. We can find no basis in the statute to support separate payments for the transportation of the equipment used to furnish these services.

*Comment:* A national physicians' organization recommended we establish a list of diagnostic services for which transportation payment will be made. It suggested the list include transportation of diagnostic equipment used to perform the following:

•   Frozen section diagnosis in hospitals and other facilities in which surgery is provided.

•   Therapeutic apheresis furnished to patients in sites where the equipment is not available.

*Response:* The frozen section diagnostic equipment should be purchased "under arrangement" by the hospital and is payable through Medicare intermediary payment mechanisms. Therapeutic apheresis services are outside the scope of this proposal, which only relates to diagnostic tests.

*Comment:* We received several comments requesting the following:

•   The definition of an independent physiological laboratory be extended to include diagnostic and screening mammograms furnished by certified facilities.

•   Transportation payments be made to mobile facilities providing mammography services.

60 FR 63124

• Diagnostic and screening mammography services be added to the list of covered portable x-ray services.

*Response:* As indicated in an earlier response, the coverage of services furnished by independent physiological laboratories is beyond the scope of this proposal. Furthermore, the Congress has placed the authority for setting standards for entities furnishing both diagnostic and screening mammograms with the Food and Drug Administration. If an independent physiological laboratory were to receive certification from the Food and Drug Administration, it may furnish these services to Medicare beneficiaries.

Under the policy we are adopting, the only service furnished by an independent physiological laboratory for which a separate transportation payment may be made is a standard EKG.

Under our proposal, we were not planning to make any changes in the services an approved supplier of portable x-ray services may furnish; however, the commenter has made a good point about mammography services. Under the changes made to section 1861(s)(3) of the Act by section 145(b) of the Social Security Act Amendments of 1994, *Public Law 103-432*, enacted on October 31, 1994, we believe that the Congress has added diagnostic mammography as part of the portable x-ray benefit. We will issue instructions to Medicare carriers regarding payments (including transportation payments) for mammograms furnished by approved portable x-ray suppliers.

*Final Decision:* We are adopting the proposal to preclude separate payment for the transportation of diagnostic equipment except under the following circumstances:

• Transportation services billed under HCPCS codes R0070, R0075, or R0076 in connection with services furnished by approved suppliers of portable x-ray services as set forth in section 2070.4 of the Medicare Carriers Manual.

• Transportation services billed by an independent physiological laboratory under HCPCS code R0076 in connection with the provision of the CPT codes 93000 or 93005 (a 12-lead EKG with interpretation and report or a 12-lead EKG, tracing only, without interpretation and report, respectively) furnished under the conditions set forth in section 2070.1.G. of the Medicare Carriers Manual.

• Transportation services billed on a "by report" basis under CPT code 99082 (unusual travel) if a physician submits documentation to justify "very unusual" travel as set forth in section 15026 of the Medicare Carriers Manual.

Payment for expenses associated with the transportation of diagnostic equipment under conditions that do not meet any of the above criteria is included in the practice expense RVUs assigned to the service or procedure and is not separately payable. In addition, we plan to develop a proposal related to the transportation of EKG equipment furnished by any supplier as part of next year's physician fee schedule regulation.

**H. Maxillofacial Prosthetic Services** We proposed to eliminate the carrier-priced status and establish RVUs for maxillofacial prosthetic services effective for services performed on or after January 1, 1996. We proposed RVUs for CPT codes 21079 through 21087 and HCPCS codes G0020 and G0021.

The work RVUs that we proposed were developed by the American Academy of Maxillofacial Prosthetics. We believe they appropriately represent the work involved in these procedures. **[*63151]** Because the CPT codes were introduced in 1991 and the HCPCS codes in 1995, we have little or no charge data on which to base practice expense and malpractice expense RVUs in accordance with section 1848(c)(2)(C) of the Act. Therefore, we imputed the practice expense and malpractice expense RVUs from the work RVUs based on the practice cost shares provided by the American Association of Oral and Maxillofacial Surgeons. Those shares are 54.7 percent for practice expense and 4.4 percent for malpractice expense.

*Comment:* We received numerous comments in response to the RVUs assigned to maxillofacial prosthetic services. Although there was some support for eliminating the carrier-priced status of

these services and at least one commenter expressed appreciation of the work RVUs, the commenters were unanimous in objecting to our use of the American Association of Oral and Maxillofacial Surgeons' practice cost shares. These commenters stated that the practice and malpractice expenses for the sub-specialty of maxillofacial prosthetics differ substantially from those of maxillofacial surgery, primarily due to increased laboratory, supply, and maxillofacial material costs. The commenters believed that the RVUs imputed for practice expense are too low and should be between 65 and 70 percent to accurately reflect the practice expenses incurred by the prosthodontist. According to the commenters, the RVUs we proposed for malpractice expense are too high and should be in the range of 1 percent to 3.5 percent of the total RVUs.

Because maxillofacial prosthodontic practice expenses include laboratory charges (including precious metals and impression materials) that are rarely seen in oral and maxillofacial surgery and include significantly higher practice expenses, the commenters requested that we revise the RVUs for maxillofacial prosthetic procedures to account for the higher practice cost shares.

*Response:* In the absence of charge data, we use the best available data to impute practice expense and malpractice expense RVUs. Maxillofacial surgery represented the specialty for which we had available data that used comparable survey methods. We note, also, that we are currently working on a resource-based practice expense study and, as part of this effort, hope to have more definitive data in the future. At that time, we will reevaluate all maxillofacial practice expense RVUs.

*Final Decision:* We are recommending no additional modifications to the RVUs for maxillofacial codes at this time. The proposed RVUs for CPT codes 21079 through 21087 are accepted as final. HCPCS code G0020 has been replaced by new CPT code 21076, and G0021 has been replaced by new CPT code 21077. Because these new CPT codes describe the same services as the HCPCS codes, the assigned RVUs will not change. Therefore, the proposed relative values for G0020 and G0021 are accepted as final but are assigned to CPT codes 21076 and 21077, respectively. G0020 and G0021 are deleted effective January 1, 1996. All RVUs for oral maxillofacial prosthetic services are published in Addendum B.

***I. Coverage of Mammography Services*** Based on recommendations from the Food and Drug Administration, the National Cancer Institute, and a carrier medical directors' workgroup, we proposed to revise the definitions of "diagnostic" and "screening" mammography in § 410.34 to make them consistent with previous Medicare coverage policy regarding "diagnostic" mammography and with the way these terms are used in general clinical practice in the United States. Specifically, we proposed to expand the definition of "diagnostic" mammography in § 410.34(a)(1) to include as candidates for this service asymptomatic men or women who have a personal history of biopsy-proven breast disease. However, we proposed to retain the substance of the present definition of "screening" mammography in § 410.34(a)(2) so that patients with a personal history of breast disease can be considered candidates for the "screening" examination, if the woman's attending physician determines that this is appropriate.

*Comment:* One commenter indicated that, because of the overlap in the definitions for "screening" and "diagnostic" mammograms, the proposal would lead to allowing almost every mammogram furnished to a Medicare beneficiary to be covered as a diagnostic mammogram, thereby increasing Medicare costs for mammograms.

*Response:* We do not believe the revised definitions will significantly increase the total number of diagnostic mammography services furnished. Information from the Medicare carriers indicates that most asymptomatic patients with a personal history of biopsy-proven breast disease are already receiving diagnostic mammograms rather than screening mammograms. This final rule is consistent with general clinical practice in the United States and falls within the parameters of Medicare statutory coverage for diagnostic and screening mammograms.

*Comment:* Two commenters recommended that we clarify the term "a personal history of biopsy-proven breast disease." One commenter assumed that both benign (for example, fibroadenomas) and malignant neoplasms would fall in that category. The other commenter suggested that we

60 FR 63124

make a distinction between "a personal history of breast cancer" and "a personal history of biopsy-proven breast disease."

*Response:* We agree that this point needs to be clarified. The intent of the proposal was to include both benign and malignant neoplasms within the meaning of the term "a personal history of biopsy-proven breast disease." Breast diseases, including both benign and malignant neoplasms, that require a biopsy and subsequently demonstrate a pathologic process, establish a history of biopsy-proven breast disease. In the final rule, we are clarifying this by revising the term "a personal history of biopsy-proven breast disease" to read "a personal history of breast cancer or a personal history of biopsy-proven benign breast disease."

*Comment:* One commenter expressed the opinion that the term "fibrocystic disease" referred to in the preamble of the proposed rule should be more appropriately referenced as "fibrocystic changes."

*Response:* The terms "fibrocystic disease" and "fibrocystic changes" are often used synonymously. We agree that, in our discussion of this subject in the preamble to the proposed rule, the preferred term is "fibrocystic changes."

*Comment:* One commenter suggested that the proposal should be revised to include, as candidates for diagnostic mammography, women who have a family history of breast disease (within one generation).

*Response:* While there is a growing consensus among clinicians and mammography experts that family history is an important etiologic factor that places women at high risk of developing breast cancer, and thus eligible for screening mammography at frequent intervals, the data are not sufficiently definitive at present to consider these women to be candidates for diagnostic mammography.

*Comment:* One commenter suggested that we discuss whether women who have tested positive for any of the recently identified breast cancer genes, such as BRCA1, should be considered to have a personal history of breast cancer **[*63152]** within the meaning of this term in the regulations.

*Response:* As we stated in the final rule concerning Medicare coverage of screening mammography that was published in the **Federal Register** on September 30, 1994 *(59 FR 49826),* the term "a personal history of breast cancer" in § 410.34(b)(4) of the regulations was intended to mean that there is documented evidence in the woman's medical record that she has tested positive for breast cancer. While the development of screening tests in this area is promising, we do not believe that the inclusion of these tests as specific criteria for coverage of screening mammograms is warranted at this time. However, as new information becomes available, we will reconsider this issue.

*Final Decision:* We are adopting our proposal to revise the definitions of the terms diagnostic and screening mammography in § 410.34. As requested by several commenters, we are clarifying the final regulations text by revising the term "a personal history of biopsy-proven breast disease" to read "a personal history of breast cancer or a personal history of biopsy-proven benign breast disease."

**III. Anesthesia Issues**

*A. Modifier Units for Anesthesia Services*In the January 26, 1989 proposed rule *(54 FR 3794)* and the August 7, 1990 final rule implementing the uniform relative value guide for physician anesthesia services, we stated our national policy that Medicare carriers cannot recognize payments for anesthesia modifiers. Anesthesia modifiers represent additional units charged by physicians because of the patient's advanced age, poor physical health status, or unusual circumstances including the performance of anesthesia under emergency circumstances or anesthesia complicated by the use of controlled hypotension.

60 FR 63124

For the 3 years preceding the physician fee schedule, Medicare carriers had uniformly implemented the policy of not allowing modifier units in determining payment for physician anesthesia services.

The physician fee schedule legislation required us to use the uniform relative value guide to the extent feasible and to make any necessary adjustments to the anesthesia CF. In the November 1991 final rule *(56 FR 59509)* to implement the physician fee schedule, we stated that we were continuing to use the uniform relative value guide to determine payment for physician anesthesia services under the physician fee schedule. Since it was the established uniform practice for Medicare carriers not to recognize modifier units, we believed it was sufficient to write the regulations to explain only those elements that the Medicare carrier would recognize in calculating anesthesia payments, namely anesthesia base and time units. Thus, in the final rule to implement the physician fee schedule, we did not include specific regulatory language prohibiting anesthesia modifier units.

Some administrative law judges have interpreted the absence of language expressly prohibiting the use of modifier units under the physician fee schedule to mean that modifier units can be allowed. This is clearly an incorrect interpretation of our regulations, and we have chosen to clarify this matter by including a specific reference in the regulations stating that modifier units are not allowed. We have revised § 414.46 to reflect this policy. Because this clarification of the regulations is an interpretive change, the law does not require prior notice and comment. However, we will accept comments on this change in the regulations.

***B. Issue for Change in Calendar Year 1998--Two Anesthesia Providers Involved in One Procedure***As a result of the revised payment methodology for the anesthesia care team established by section 13516 of OBRA 1993, we proposed to apply the medical direction payment policy to the single procedure involving both the physician and the certified registered nurse anesthetist. Thus, in § 414.46 we proposed to revise paragraphs (c) and (d) to state that, in this situation, the payment allowance for the medical direction service of the physician and the medically directed service of the certified registered nurse anesthetist or the anesthesiologist assistant is based on the specified percentage of the payment allowance in § 414.46(d)(3). In addition, we proposed that in 1998 and later years, this payment allowance is equal to 50 percent of the allowance for personally performed procedures.

We proposed to implement this policy on January 1, 1998. At that time, the change in policy will be done in a budget-neutral manner.

*Comment:* Commenters referred to those complicated anesthesia cases when it may be medically necessary for two anesthesia care providers to be involved. The anesthesia providers could be an anesthesiologist and a certified registered nurse anesthetist or two anesthesiologists. They asked whether we would permit full payment for each of these providers or subject these providers to the new proposal in which case each provider would receive only 50 percent of the allowance recognized for the anesthesia case personally performed by a single anesthesiologist.

*Response:* We are not changing the current policy under which the Medicare carriers can, on the basis of medical necessity, recognize full payment for the services of each of two anesthesia providers if both providers are needed in a single anesthesia case. Thus, the Medicare carriers can continue, based on medical necessity, to allow full payment for the service furnished by each anesthesia provider in a single case.

*Comment:* A commenter offered an alternative proposal that would achieve budget neutrality but allow implementation beginning in 1996. Under the commenter's proposal, which would take effect in 1996, the payment allowance for both the certified registered nurse anesthetist and the anesthesiologist involved in the single case would be 50 percent of the allowance recognized for the single anesthesiologist.

*Response:* The law recognizes that an anesthesia service is either personally performed by a physician (or nonmedically directed certified registered nurse anesthetist) or the case is medically

60 FR 63124

directed. We have implemented the medical direction policy as applying only to two, three, or four concurrent procedures. Therefore, we deemed the case involving both the anesthesiologist and the certified registered nurse anesthetist to be personally performed by the physician. In the July 26, 1995 proposed rule, we proposed to modify the definition of medical direction to include a single procedure in addition to concurrent procedures. The statutory provisions governing medical direction provide that, in 1996, the payment allowance for both the certified registered nurse anesthetist and the physician are equal to 55 percent of the single anesthesiologist payment allowance. Thus, there is no direct authority in the law to recognize a payment allowance that is 50 percent of the single anesthesiologist payment allowance for both the certified registered nurse anesthetist and the physician.

*Final Decision:* We will apply the medical direction payment policy to the single procedure involving both the physician and the certified registered nurse anesthetist. We will implement this policy on January 1, 1998. At that **[*63153]** time, the change in policy will be done in a budget-neutral manner.

**IV. Refinement of Relative Value Units for Calendar Year 1996 and Responses to Public Comments on Interim Relative Value Units for 1995**

*A. Summary of Issues Discussed Related to the Adjustment of Relative Value Units*Section IV.B. of this final rule describes the methodology used to review the comments received on the relative value units (RVUs) for physician work and the process used to establish RVUs for new and revised CPT codes. (The CPT, which is published annually by the American Medical Association, is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians.) Changes to codes on the physician fee schedule reflected in Addendum B are effective for services furnished beginning January 1, 1996.

*B. Process for Establishing Work Relative Value Units for the 1996 Fee Schedule*Our December 8, 1994 final rule on the 1995 physician fee schedule *(59 FR 63410)* announced the final RVUs for Medicare payment for existing procedure codes under the physician fee schedule and interim RVUs for new and revised codes. The RVUs contained in the rule apply to physician services furnished beginning January 1, 1995. We announced that we would accept comments on interim RVUs for new or revised codes. We announced that we considered the RVUs for the remaining codes to be subject to public comment under the 5-year refinement process. In this section, we summarize the refinements to the interim work RVUs that have occurred since publication of the December 1994 final rule and our establishment of the work RVUs for new and revised codes for the 1996 fee schedule.

1.  Work Relative Value Unit Refinements of Interim and Related Relative Value Units

    *a. Methodology (Includes Table 1-Work Relative Value Unit Refinements of Interim and Related Relative Value Units).*Although the RVUs in the December 1994 final rule were used to calculate 1995 payment amounts, we considered the RVUs for the new or revised codes to be interim. We accepted comments for a period of 60 days. We received approximately 100 substantive comments from 24 specialty societies on approximately 83 CPT codes with interim RVUs.

    Only comments received on codes listed in Addendum C of the December 1994 final rule were considered this year. We will consider comments we received on other codes under the 5-year refinement process. We convened a multispecialty panel of physicians to assist us in the review of the comments with certain exceptions. The comments that we did not submit to panel review are discussed at the end of this section. The panel was moderated by our medical staff and consisted of the following groups:

    •   A clinician representing each of the specialties most identified with the procedures in question. Each specialist on the panel was nominated by the specialty society that submitted the comments. Eleven specialty societies, including primary care, were represented on the panel.

Justin Brooks

60 FR 63124

- Primary care clinicians nominated by the American Academy of Family Physicians, the American Society of Internal Medicine, the American College of Physicians, and the American Academy of Pediatrics.

- Carrier medical directors.

After eliminating the codes with final RVUs and certain codes that are discussed at the end of this section, we submitted comments on 18 codes for evaluation by the panel. The panel discussed the work involved in each procedure under review in comparison to the work associated with other services on the fee schedule. We had assembled a set of reference services and asked specialty societies to compare clinical aspects of the work of services they believed were incorrectly valued to one or more of the reference services. In compiling the set, we attempted to include: (1) Services that are commonly performed whose work RVUs are not controversial; (2) services that span the entire spectrum from the easiest to the most difficult; and (3) at least three services performed by each of the major specialties so that each specialty would be represented. The set listed approximately 120 services. Panelists were encouraged to make comparisons to reference services.

The intent of the panel process was to capture each participant's independent judgment based on the discussion and his or her clinical experience. Following each discussion, each participant rated the work for the procedure. Ratings were individual and confidential, and there was no attempt to achieve consensus among the panel members.

We then analyzed the ratings based on a presumption that the final rule RVUs were correct. To overcome this presumption, the inaccuracy of the interim RVUs had to be apparent to the broad range of physicians participating in each panel.

Ratings of work were analyzed for consistency among the groups represented on each panel. In general terms, we used statistical tests to determine whether there was enough agreement among the groups of the panel and whether the agreed-upon RVUs were significantly different from the interim RVUs published in Addendum C of the December 1994 final rule. We did not modify the RVUs unless there was clear indication for a change. If there was agreement across groups for change, but the groups did not agree on what the new RVUs should be, we eliminated the outlier group and looked for agreement among the two remaining groups as the basis for new RVUs. We used the same methodology in analyzing the ratings that we used in the refinement process for the 1993 fee schedule. The statistical tests were described in detail in the November 25, 1992 final notice *(57 FR 55938)*.

Our decision to convene multispecialty panels of physicians and to apply the statistical tests described above was based on our need to balance the interests of those who commented on the work RVUs against the redistributive effects that would occur in other specialties, particularly the potential adverse effect on primary care services. Of the 18 codes reviewed by our multispecialty panel, all of the requests were for increased values.

We also received comments on RVUs that were interim for 1995 but which we did not submit to the panel for review for a variety of reasons. These comments and our decisions on those comments are discussed in further detail in section VI.B.1.c. of this final rule. Of the 44 interim work RVUs that were reviewed, approximately 41 percent were increased, and approximately 59 percent were not changed.

*Table 1--Work Relative Value Unit Refinements of Interim Relative Value Units*

Table 1 lists the interim and related codes reviewed during the 1995 refinement process described in this section. This table includes the following information:

- *CPT code.* This is the CPT code for a service.

- *Modifier.* A "26" in this column indicates that the RVUs are for the professional component of the code.

Justin Brooks

60 FR 63124

- *Description.* This is an abbreviated version of the narrative description of the code. **[*63154]**

- *1995 work RVUs.* The work RVUs that appeared in the December 1994 rule are shown for each reviewed code.

- *Requested work RVUs.* This column identifies the work RVUs requested by commenters. We received more than one comment on some codes, and, in a few of these cases, the commenters requested different RVUs. The table lists the highest requested RVUs. For some codes, we received recommendations for an increase or decrease but no specific RVU recommendations.

- *1996 work RVUs.* This column contains the final RVUs for physician work.

- *Basis for decision.* This column indicates whether:

-The recommendations of the refinement panel were the basis upon which we determined that the interim work RVUs published in the December 1994 final rule should be retained (indicator 1);

-A new value emerged from our analysis of the refinement panel ratings (indicator 2); or

-A new or retained value emerged from some other source (indicator 3). Codes with an indicator of 3 are discussed following Table 1, in section VI.B.1.c.

-New or retained values emerged through a combination of the panel ratings and code descriptor interpretation (indicator 4). Codes with an indicator of 4 are discussed following Table 1, in section VI.B.1.b.

**Table 1.--Work RVU Refinements of Interim and Related RVUs**

| CPT * | Mod | Description | 1995 work RVU | Re-quested work RVU | 1996 work RVU | Basis for decision |
|---|---|---|---|---|---|---|
| 11977 | | Removal/reinsert contra cap | 2.52 | 3.30 | 3.30 | 3 |
| 19367 | | Breast reconstruction | 24.73 | 26.50 | 24.73 | 3 |
| 20955 | | Microvascular fibula graft | 37.58 | 43.00 | 37.58 | 3 |
| 25337 | | Reconstruct ulna/radioulna | 9.10 | 9.50 | 9.50 | 3 |
| 25830 | | Fusion radioulnar jnt/ulna | 9.10 | 9.50 | 9.50 | 3 |
| 26580 | | Repair hand deformity | 15.81 | 17.71 | 17.71 | 3 |

60 FR 63124

**Table 1.--Work RVU Refinements of Interim and Related RVUs**

| CPT * | Mod | Description | 1995 work RVU | Requested work RVU | 1996 work RVU | Basis for decision |
|---|---|---|---|---|---|---|
| 29445 | | Apply rigid leg cast | 1.78 | 0.57 | 1.78 | 3 |
| 31276 | | Sinus surgical endoscopy | 7.42 | 8.85 | 8.85 | 3 |
| 37209 | | Exchange arterial catheter | 1.48 | 3.66 | 2.27 | 2 |
| 41822 | | Excision of gum lesion | 2.26 | 4.20 | 2.26 | 1 |
| 41823 | | Excision of gum lesion | 3.15 | 4.60 | 3.15 | 1 |
| 41828 | | Excision of gum lesion | 1.26 | 4.44 | 3.04 | 2 |
| 41830 | | Removal of gum tissue | 1.12 | 5.00 | 3.30 | 2 |
| 43842 | | Gastroplasty for obesity | 13.76 | 17.47 | 13.76 | 3 |
| 43843 | | Gastroplasty for obesity | 13.76 | 17.47 | 13.76 | 3 |
| 43846 | | Gastric bypass for obesity | 17.84 | 20.87 | 17.84 | 3 |
| 43847 | | Gastric bypass for obesity | 19.87 | 23.24 | 19.87 | 3 |
| 43848 | | Revision gastroplasty | 22.10 | 24.75 | 22.10 | 3 |
| 52647 | | Laser surgery of prostate | 7.42 | 11.51 | 9.84 | 2 |

Justin Brooks

60 FR 63124

**Table 1.--Work RVU Refinements of Interim and Related RVUs**

| CPT * | Mod | Description | 1995 work RVU | Re-quested work RVU | 1996 work RVU | Basis for decision |
|---|---|---|---|---|---|---|
| 52648 | | Laser surgery of prostate | 8.65 | 11.51 | 10.69 | 2 |
| 59855 | | Abortion | 4.75 | 5.80 | 5.80 | 3 |
| 64820 | | Remove sympathetic nerves | 9.10 | 10.00 | 10.00 | 3 |
| 76093 | 26 | Magnetic image, breast | 1.63 | 1.94 | 1.63 | 1 |
| 76094 | 26 | Magnetic image, both breasts | 1.63 | 1.94 | 1.63 | 1 |
| 76936 | 26 | Echo guide for artery repair | 1.31 | 2.64 | 1.99 | 2 |
| 90849 | | Special family therapy | 0.59 | 0.78 | 0.59 | 3 |
| 90918 | | ESRD related services, month | 9.77 | 13.27 | 11.18 | 4 |
| 90919 | | ESRD related services, month | 7.13 | 9.13 | 8.54 | 4 |
| 90920 | | ESRD related services, month | 5.86 | 6.64 | 7.27 | 4 |
| 90921 | | ESRD related services, month | 3.06 | 5.06 | 4.47 | 4 |
| 92587 | 26 | Evoked auditory test | 0.13 | 1.40 | 0.13 | 3 |
| 92588 | 26 | Evoked auditory test | 0.36 | 1.70 | 0.36 | 3 |

60 FR 63124

**Table 1.--Work RVU Refinements of Interim and Related RVUs**

| CPT * | Mod | Description | 1995 work RVU | Requested work RVU | 1996 work RVU | Basis for decision |
|---|---|---|---|---|---|---|
| 93350 | 26 | Echo exam of heart | 0.78 | Increase | 0.78 | 3 |
| 93990 | 26 | Doppler flow testing | 0.25 | 1.18 | 0.25 | 1 |
| 95812 | 26 | Electroencephalogram (EEG) | 1.08 | 1.75 | 1.08 | 4 |
| 95813 | 26 | Electroencephalogram (EEG) | 1.73 | 2.50 | 1.73 | 4 |
| 96913 | | Photochemotherapy, UV-A or B | 0.00 | Increase | 0.00 | 3 |
| 97124 | | Massage therapy | 0.35 | Decrease | 0.35 | 3 |
| 97265 | | Joint mobilization | 0.45 | Decrease | 0.45 | 3 |
| 99354 | | Prolonged service, office | 1.51 | 2.33 | 1.51 | 3 |
| 99355 | | Prolonged service, office | 1.51 | 1.20 | 1.51 | 3 |
| 99356 | | Prolonged service, inpatient | 1.44 | 3.00 | 1.44 | 3 |
| 99357 | | Prolonged service, inpatient | 1.44 | 1.50 | 1.44 | 3 |
| 99375 | | Care plan oversight/30-60 | 1.06 | 2.65 | 1.73 | 2 |

***b. Discussion of codes reviewed by the panel for which clarification of the description of the service is required.*** For several of the codes reviewed by the refinement panel, it was necessary to reach agreement on the meaning of the codes before individual ratings of

Justin Brooks

work could be provided. In the following paragraphs, we summarize the **[*63155]** panel's understanding of the nature and extent of the services included in the codes for which extensive discussion was required.

*End-stage renal disease services, per full month (CPT codes 90918 through 90921).*

Before rating the work of CPT codes 90918 through 90921, the refinement panel discussed the definition of the monthly capitation payment and the list of services included in and excluded from the monthly capitation payment that was developed by the Renal Physicians Association and presented to the RUC and the refinement panel. The refinement panel also reviewed HCFA regulations regarding the monthly capitation payment and agreed to rate the work of the codes based on the following definition and list of services included in and excluded from the monthly capitation payment.

The monthly capitation payment for maintenance dialysis is defined as a comprehensive monthly payment that covers all physician services associated with the continuing medical management of a maintenance dialysis patient.

The following physician services are included in the monthly capitation payment:

- Assessment and determination of the need for outpatient chronic dialysis therapy.

- Assessment of the need for a specified diet and the need for nutritional supplementation for the control of chronic renal failure. Specification of the quantity of total protein, high biologic protein, sodium, potassium, and amount of fluids to be allowed during a given time period. For diabetic patients with chronic renal failure, the prescription usually includes specification of the number of calories in the diet.

- Assessment of which mode(s) of chronic dialysis (types of hemodialysis or peritoneal dialysis) are suitable for a given patient and recommendation of the type(s) of therapy for a given patient.

- Assessment and determination of which type of dialysis access is best suited for a given patient and arrangement for creation of dialysis access.

- Assessment of whether the patient meets preliminary criteria as a renal transplant candidate and presentation of this assessment to the patient and family.

- Prescription of the parameters of intradialytic management. For chronic hemodialysis therapies, this includes the type of dialysis access, the type and amount of anticoagulant to be employed, blood flow rates, dialysate flow rate, ultrafiltration rate, dialysate temperature, type of dialysate (acetate versus bicarbonate) and composition of the electrolytes in the dialysate, size of hemodialyzer (surface area) and composition of the dialyzer membrane (conventional versus high flux), duration and frequency of treatments, the type and frequency of measuring indices of clearance, and intradialytic medications to be administered. For chronic peritoneal dialysis therapies, this includes the type of peritoneal dialysis, the volume of dialysate, concentration of dextrose in the dialysate electrolyte composition of the dialysate, duration of each exchange, and addition of medication to the dialysate, such as heparin, and the type and frequency of measuring indices of clearance. For diabetics, the quantity of insulin to be added to each exchange is prescribed.

- Assessment of whether the patient has significant renal failure-related anemia, determination of the etiology(ies) for the anemia based on diagnostic tests, and prescription of therapy for correction of the anemia, such as vitamins, oral or parenteral iron, and hormonal therapy such as erythropoietin.

- Assessment of whether the patient has hyperparathyroidism and/or renal osteodystrophy secondary to chronic renal failure and prescription of appropriate therapy, such as calcium and phosphate binders for control of hyperphosphatemia.

Based upon assessment of parahormone levels, serum calcium levels, and evaluation for the presence of metabolic bone disease, the physician determines whether oral or parenteral therapy with vitamin D or its analogs is indicated, and prescribes the appropriate therapy. Based upon assessment and diagnosis of aluminum bone disease, the physician may prescribe specific chelation therapy with deferoxamine and the use of hemoperfusion for removal of aluminum and the chelator.

- Assessment of whether the patient has dialysis-related arthropathy or neuropathy and adjustment of the patient's prescription accordingly. Referral of the patient for any additional needed specialist evaluation and management of these end-organ problems.

- Assessment of whether the patient has fluid overload resulting from renal failure and establishment of an estimated "ideal (dry) weight." The physician determines the need for fluid removal independent of the dialysis prescription and implements these measures when indicated.

- Determination of the need for and prescription of anti-hypertensive medications and their timing relative to dialysis when the patient is hypertensive in spite of correction of fluid overload.

- Periodic review of the dialysis records to ascertain whether the patient is receiving the prescribed amount of dialysis and ordering of indices of clearance, such as urea kinetics, in order to ascertain whether the dialysis prescription is producing adequate dialysis. If the indices of clearance suggest that the prescription requires alteration, the physician orders changes in the hemodialysis prescription, such as blood flow rate, dialyzer surface area, dialysis frequency, and/or dialysis duration (length of treatment). For peritoneal dialysis patients, the physician may order changes in the volume of dialysate, dextrose concentration of the dialysate, and duration of the exchanges.

- Periodic visits to the patient during dialysis to ascertain whether the dialysis is working well and whether the patient is tolerating the procedure well (physiologically and psychologically). During these visits, the physician determines whether alteration in any aspect of a given patient's prescription is indicated, such as changes in the estimate of the patient's dry weight. Review of the treatment with the nurse or technician performing the therapy is also included. The frequency of these visits will vary depending upon the patient's medical status, complicating conditions, and other determinants.

- Performance of periodic physical assessments, based upon the patient's clinical stability, in order to determine the necessity for alterations in various aspects of the patient's prescription. Similarly, the physician reviews the results of periodic laboratory testing in order to determine the need for alterations in the patient's prescription, such as changes in the amount and timing of phosphate binders or dose of erythropoietin.

- Periodic assessment of the adequacy and function of the patient's dialysis access.

- Assessment of patients on peritoneal dialysis for evidence of peritonitis and the ordering of appropriate tests and antibiotic therapy.  **[*63156]**

- Periodic review and update of the patient's short-term and long-term care plans with staff.

- Coordination and direction of the care of patients by other professional staff, such as dieticians and social workers.

- Certification of the need for items and services such as durable medical equipment and home health care services. Care plan oversight services described by CPT code

99375 also are included in the monthly capitation payment and may not be separately reported.

The following physician services are excluded from the monthly capitation payment:

• Surgical services such as-

-Temporary hemodialysis catheter placement.

-Permanent hemodialysis catheter placement.

-Temporary peritoneal dialysis catheter placement.

-Permanent peritoneal dialysis catheter placement.

-Repair of existing dialysis accesses.

-Placement of catheter(s) for thrombolytic therapy.

-Thrombolytic therapy (systemic, regional, or access catheter only; hemodialysis or peritoneal dialysis).

-Thrombectomy of clotted cannula.

-Arthrocentesis.

-Bone marrow aspiration.

-Bone marrow biopsy.

• Interpretation of tests that have a professional component such as:

-Electrocardiograms (12 lead, Holter monitor, stress tests, etc.).

-Echocardiograms.

-24-hour blood pressure monitor.

-Nerve conduction velocity and electromyography studies.

-Flow doppler studies.

-Bone densitometry studies.

-Biopsies.

-Spirometry and complete pulmonary function tests.

• Complete evaluation for renal transplantation. While the physician assessment of whether the patient meets preliminary criteria as a renal transplant candidate is included under the monthly capitation payment, the complete evaluation for renal transplantation is excluded from the monthly capitation payment.

• Evaluation of potential living transplant donors.

• The training of patients to perform home hemodialysis, self hemodialysis, and the various forms of self peritoneal dialysis.

• Non-renal related physician's services. These services may be furnished by the physician providing renal care or by another physician. They may not be incidental to services furnished during a dialysis session or office visit necessitated by the renal condition. For example, the medical management of diabetes mellitus that is not related to the dialysis or furnished during a dialysis session is excluded.

• Covered physician services furnished to hospital inpatients, including services related to inpatient dialysis, by a physician who elects not to continue to receive the monthly capitation payment during the period of inpatient stay. In these cases, the physician receives a prorated portion of the monthly capitation payment for that month.

• All physician services that antedate the initiation of outpatient dialysis.

While the refinement panel agreed to rate the work of the monthly capitation payment codes based on the above definitions, it was unable to reach consensus on whether the

interpretation of all tests that have a professional component should be included in or excluded from the monthly capitation payment. Because the American Medical Association Specialty Society Relative Value Update Committee (RUC) recommendations were based on the Renal Physicians Association's definition, which excludes test interpretations from the monthly capitation payment, it was decided to rate the physician work based on an assumption that the physician work associated with test interpretations was excluded from the monthly capitation payment and included in other codes that would be reported separately. It was also agreed that the Renal Physicians Association and HCFA would examine current utilization data and that HCFA would consider bundling the work of test interpretations into the monthly capitation payment. This would lead to adding additional RVUs to the RVUs that emerged from the panel ratings. The RVUs that emerged from the statistical tests of the refinement panel were 4.45.

Subsequent to the refinement panel, we analyzed utilization data on test interpretations provided to end-stage renal disease patients by monthly capitation payment physicians. In general, most physicians who are paid under the monthly capitation payment method do not separately bill for test interpretations. Based on our analysis, we have bundled the work RVUs of the test interpretations listed below into the monthly capitation payment:

•   Bone mineral density studies (CPT codes 76070, 76075, 78350, and 78351).

•   Non-invasive vascular diagnostic studies of hemodialysis access (CPT codes 93925, 93926, 93930, 93931, and 93990).

•   Nerve conduction studies (CPT codes 95900, 95903, 95904, 95925, 95926, 95927, 95934, 95935, and 95936).

•   Electromyography studies (CPT codes 95860, 95861, 95863, 95864, 95867, 95868, 95869, and 95872).

In performing our analysis, we took into account the fact that the coding for the four categories of services listed above has changed in the past 2 years. Thus, while we used all of the most current utilization data, the specific codes listed may be new, revised or deleted from CPT 1996. When the physician receiving the monthly capitation payment payment performs the services listed above, we will not make separate payment. However, these and other medically necessary services that are included or bundled into the monthly capitation payment are separately payable when furnished by physicians other than the monthly capitation payment physician.

The bundling of these services leads to the addition of 0.02 RVUs to the refinement panel rating of 4.45 RVUs to result in the assignment of 4.47 RVUs. Medically necessary services that are included or bundled into the monthly capitation payment are separately payable when furnished by physicians other than the monthly capitation payment physician.

We next increased the RVUs of the pediatric monthly capitation payment CPT codes (90918 through 90920) to maintain the relationship of adult to pediatric services that we established in last year's final rule. This led to the assignment of 11.18 RVUs to CPT code 90918, 8.54 RVUs to CPT code 90919, and 7.27 RVUs to CPT code 90920.

*Electroencephalogram Codes*

Before rating the work of CPT codes 95812 and 95813 (electroencephalogram (EEG) extended monitoring), the panel discussed extensively the work involved in EEG monitoring compared to other EEG and electrodiagnostic services on the fee schedule. Subsequent to the panel meeting, the American Academy of Neurology provided us with the following written definitions and clinical vignettes to clarify the types of services that should be coded using nine **[*63157]**  common EEG diagnostic codes by comparing and

contrasting them. The panel members discussed these definitions of the EEG services before they rated the work of extended EEG monitoring.

*Extended EEG; up to one hour (CPT code 95812).*

EEG recording is conducted for 45 to 60 minutes. Hyperventilation, photic stimulation and/or oral sedation may be used. The physician reviews in detail the entire 45-to-60 minute record (270 to 360 pages of standard EEG paper).

The following is a vignette for CPT code 95812: A 35-year-old woman experiences episodic loss of consciousness. Differential diagnosis includes syncope and several types of seizure disorder. The EEG is extended because the EEG technologist detected no epileptic abnormalities during the first 20 to 30 minutes of recording, and the physician had requested a longer recording if needed to find abnormalities. Bursts of epileptic abnormalities are finally detected at 55 minutes into the recording. This helps make the diagnosis of a seizure disorder. The type of epileptic abnormalities seen on the EEG guides the diagnosis and choice of medications.

*Extended EEG; greater than one hour (CPT code 95813).*

EEG recording is conducted continuously for more than 1 hour. Hyperventilation, photic stimulation and/or oral sedation may be used. The recording is continued until the events sought are obtained, if possible. Typical recording time is 2 to 3 hours. The physician reviews the entire recording in detail (typically equal to 360 to 1,000-plus pages of standard EEG paper). The entire continuous EEG recording is also interpreted for additional diagnostic information.

The following is a vignette for CPT code 95813: A 55-year-old woman is comatose in the intensive care unit with multiple medical problems and is having repeated episodes of movements possibly representing epileptic seizures. Continuous EEG recording is performed for 3 hours, including recording during two of her episodes. Four additional subclinical ictal events were also detected on the EEG beyond the two events noted by the nurses. Events are determined to be epileptic seizures, and a treatment plan is developed accordingly.

*Awake EEG (CPT code 95816).*

The test is conducted with the patient awake. The patient often becomes drowsy or may briefly fall asleep, but the test is not run deliberately to obtain sleep. Hyperventilation and/or photic stimulation are usually obtained. The minimum recording time is 20 minutes. The typical recording time is 20 to 25 minutes. The physician reads in detail the entire 20-to-25 minute record (120 to 150 pages of standard EEG paper).

The following is a vignette for CPT code 95816: A 60-year-old man complains of memory and other cognitive impairment. Differential diagnosis includes dementia and depression. EEG seeks objective evidence of organic impairment supporting a diagnosis of a dementia.

*EEG awake and asleep (CPT code 95819).*

Sleep is deliberately sought during the EEG record to identify specific epileptic abnormalities. The patient may be sleep-deprived before the recording or given sedative medication to induce sleep. The recording continues until at least 5 minutes of Stage 2 sleep is obtained. During the awake portion of the recording, hyperventilation and/or photic stimulation are usually obtained. The minimum recording time is 20 minutes. The typical recording time is 30 to 35 minutes. The physician reads in detail the entire 30-to-35 minute record (180 to 210 pages of standard EEG paper).

The following is a vignette for CPT code 95819: A 25-year-old woman experiences recent onset of lapses of consciousness. The differential diagnosis includes syncope and several types of seizure disorders. A test is conducted to look for evidence of a seizure disorder and to help specify which type of seizure disorder.

60 FR 63124

*EEG; sleep only (CPT code 95822).*

The EEG is conducted with the patient asleep, stuporous, or comatose. Little or no awake EEG is recorded. Hyperventilation and photic stimulation are generally not performed. Stuporous or comatose patients may be stimulated by the technologist to attempt to induce state changes. The minimum recording time is 20 minutes. The typical recording time is 20 to 30 minutes. The physician reads in detail the entire 20 to 30 minute record (120 to 180 pages of standard EEG paper).

The following is a vignette for CPT code 95822: A 45-year-old man is comatose after a head injury. An EEG is performed to assess the depth of the coma, assist in assessing prognosis, and evaluate for epileptic discharges or focal cerebral abnormality.

*EEG; all night sleep only (CPT code 95827).*

Prolonged EEG recording is performed by leaving equipment at the hospital bedside. The recording may or may not be continuous. If not continuous, the recording is done periodically as needed. The minimum time the EEG is at the bedside is 8 hours. The physician scans the hours-long records, reading in detail selected or specific portions. The minimum amount of the EEG actually reviewed in detail is 20 minutes of recording (120 pages of standard EEG paper). The typical amount reviewed in detail is 30 to 40 minutes.

The following is a vignette for CPT code 95827: A 3-year-old boy is comatose from near-drowning. The patient is in a therapeutic barbiturate coma. The EEG is used to titrate the amount of barbiturate to keep the EEG in burst-suppression. Incidental observations are made of any epileptic discharges or focal features. The EEG is kept at the intensive care unit bedside for 3 days. Each day, 50 to 90 minutes of EEG are printed, of which 20 to 30 minutes (120 to 180 pages of standard EEG paper) are reviewed in detail, and other pages are scanned for relevant events.

*Electrocorticography (CPT code 95829).*

The EEG is recorded in the operating room from electrodes applied directly to the surgically exposed cerebral cortex. Many separate recording sites are used. While it is being recorded in the operating room, the EEG is interpreted by the EEG physician, who is present in the operating room for 60 minutes or more. The EEG physician uses the EEG features for determining the extent of surgical resection of the cerebral cortex. During this 60 minutes, 30 to 60 minutes of EEG recording (minimum 20 minutes) are made from various cortical recording sites.

The following is a vignette for CPT code 95829: A 25-year-old man, disabled by medically refractory epileptic seizures, undergoes a craniotomy to resect a portion of his temporal lobe. The EEG physician interprets the record in the operating room. Electrocorticography is used to define the extent of epileptic spiking and slowing, and the resection is tailored to include regions of electrically identified pathology. Follow-up recording is made to check for any remaining epileptic spiking after resection.

*Ambulatory EEG monitoring (CPT code 95950).*

The EEG is recorded onto a long-term storage medium such as magnetic disc **[*63158]** or tape, using a small portable recorder. The patient is free to take this home, returning to the laboratory one or several days later. The recording is continuous for 24 hours per day. The patient, family, and friends write notes about clinical events. The recorded EEG is scanned to find these or other events of clinical interest. Around the time of each clinical event of interest, 5 to 10 minutes of the EEG is reviewed in detail. The EEG is also surveyed for other EEG findings of clinical importance.

The following is a vignette for CPT code 95950: A 12-year-old boy has episodes of staring or daydreaming, possibly representing nonconvulsive seizures. Previous routine EEG recording was normal. Ambulatory EEG is conducted to search for signs of epileptic abnormality. During 2 days of ambulatory monitoring, 6 clinical daydreaming events are

60 FR 63124

noted by the family. These demonstrate petit mal seizures, as do 10 additional events not noted by the family but found on EEG review. A treatment plan is developed accordingly.

*Video EEG long-term monitoring (CPT code 95951).*

This daily procedure is used when video and EEG are continuously recorded for several days. Continuous videotaping of the patient's behavior is made simultaneously with the EEG. Monitoring is usually conducted in a specialized inpatient epilepsy evaluation and monitoring unit, with the patient's antiepileptic medications reduced or withdrawn to induce epileptic seizures. The physician reviews the EEG and videotapes recorded before, during, and after each captured epileptic seizure. Typically, several seizures may occur each day. In some patients, no seizures may occur for several days, whereas other patients may have more than a dozen seizures per day. Randomly selected recorded segments are also chosen for review and comparison to look for subclinical seizures and isolated epileptic EEG discharges. Monitoring generally is continued until at least 5 seizures are captured to characterize and to localize the abnormality. The exact number of seizures needed varies with the specific clinical circumstances and the nature of EEG findings.

The following is vignette number one for CPT code 95951: A 25-year-old man has become totally disabled as a result of frequent medically refractory epileptic seizures. Long-term video EEG monitoring for 4 days captures 6 seizures and localizes the ictal onset sufficiently to refer the patient for surgical excision of the epileptic area. Localization for surgical excision is based primarily on this EEG localization. After eventual surgical excision, the patient becomes seizure-free, stops medication, and is no longer disabled.

The following is vignette number two for CPT code 95951: A 9-year-old boy has frequent seizures not controlled by medication, during some of which he abruptly falls to the ground. Because of the falls, he has lacerated his scalp on several occasions, requiring trips to the emergency room for x-rays, sutures, and antibiotic treatment. His physicians are considering corpus callosum section, but some of the clinical data suggest that the seizures may be originating from a more localized area of one frontal lobe. Forty seizures are recorded in 2 days, some of which appear to originate from this region. Analysis of the recordings indicates, however, that the majority do not, and he undergoes callosal section. Following callosal section, he no longer has "falling seizures" and no longer needs to wear a helmet for protection. He does continue to have focal seizures of one arm.

We have finalized the interim RVUs for the EEG CPT codes; we have not changed any of the interim RVUs for these codes. However, we have clarified the descriptors for the CPT codes for the services. We have assigned 1.08 RVUs to CPT code 95812, 1.73 RVUs to CPT code 95813, 1.08 RVUs to CPT code 95816, 1.08 RVUs to CPT code 95819, 1.08 RVUs to CPT code 95822, 1.08 RVUs to CPT code 95827, 6.21 RVUs to CPT code 95829, 1.51 RVUs to CPT code 95950, and 3.80 RVUs to CPT code 95951.

**c. Discussion of codes not reviewed by the panel.**Codes listed in Table 1 with a basis of decision of "3" fall into several categories. For most of these codes, we received comments that were not considered by the multispecialty refinement panel for a variety of reasons. Those codes and our rationale for the final work RVUs we have established for the codes are discussed below.

*Removal with reinsertion, implantable contraceptive capsules (CPT code 11977).*

*Comment:* A commenter stated that we erred in rejecting the RUC recommendation of 3.30 RVUs for CPT code 11977. The commenter recommended that "Removal with reinsertion" should be assigned the full value of both CPT code 11975 (Insertion, implantable contraceptive capsules) and CPT code 11976 (Removal, implantable contraceptive capsules). Typically, the new capsules are inserted at a different site than the one from which the old capsules were removed, thus requiring a second incision and closure. In addition, the amount of preservice and postservice work associated with reinsertion is

60 FR 63124

similar to the preservice and postservice work for the original insertion. The physician must ascertain that the patient has not undergone changes in health status or experienced side effects that would make her an unsuitable candidate for this contraceptive method and must instruct her about follow-up care and potential complications.

*Response:* We agree with the comment and have assigned 3.30 RVUs to CPT code 11977, as recommended.

*Breast reconstruction with a TRAM flap (CPT code 19367).*

*Comment:* A commenter recommended that the RVUs of CPT code 19367 be increased from 24.73 to a minimum 26.50 RVUs. The commenter stated that breast reconstruction is similar to facial fracture surgeries and that in comparison to CPT code 21159 (Le Forte III), with 40.99 RVUs, a TRAM flap reconstruction is a much larger procedure.

*Response:* We disagree with this comment that we believe may have been based on a misunderstanding of CPT code 21159. This code is used to report reconstruction of the midface. It is not used to report the repair of facial fractures. When compared to the RVUs of codes for the open repair of a facial fracture, for example, CPT code 21432, which is assigned 8.05 RVUs, the RVUs of the breast reconstruction code are much higher. The 24.73 interim RVUs, which were based on a RUC recommendation, will be made final.

*Microvascular fibula graft (CPT code 20955).*

*Comment:* A commenter recommended 43.00 RVUs for this procedure, which was described as a very delicate, labor-intensive procedure particularly for mandible reconstruction, multiple osteotomies, and plate and wire fixation. The commenter stated that the work and postoperative care can be compared to twice that of a breast reconstruction with a TRAM flap (CPT code 19367), with 24.73 RVUs. Because of the nature of this delicate procedure, the risks for malpractice are greater than for any **[*63159]** other bone procedure. These risks include complications such as foot drop, sensory loss of the lower extremity, complications related to skin graft healing, chronic pain, and wound closure.

*Response:* We agree this is a complex procedure as confirmed by our acceptance of a RUC recommendation of 38.00 RVUs (see Table 4, "American Medical Association RUC Recommendations and HCFA's Decisions," in our December 8, 1994 final rule with comment period *(60 FR 63441)).* We do not believe, however, the arguments presented warrant an increase to 43.00 RVUs, which would be nearly 3.00 RVUs higher than the reference code for repair of a thoracoabdominal aortic aneurysm with graft (CPT code 33877) valued at 40.29 RVUs. We have retained 38.00 RVUs for CPT code 20955 (37.58 RVUs after adjustment for budget neutrality).

*Reconstruction for stabilization of unstable distal ulna or distal radioulnar joint (CPT code 25337).*

*Comment:* A commenter disagreed with our decision to value new CPT code 25337 at 9.10 RVUs instead of 9.50 RVUs as the RUC recommended. The commenter stated that the preservice and postservice work is quite similar between the new code and the reference service, CPT code 25312. The commenter also stated the intraservice work requires more skill, effort, and time because the new code may involve a two-tendon transfer with two skin incisions, hence, a larger surgical exposure. The potential of injury to the ulnar nerve is high. Confirmation of an accurate reduction of the distal ulna requires an intraoperative x-ray, and, frequently, internal fixation with K-wires. Tunnels must be drilled into bone to allow passage of the tendons.

*Response:* We agree with the comment and have assigned 9.50 RVUs to CPT code 25337, as recommended.

*Distal radioulnar joint arthrodesis and segmental resection of ulna (Sauve-Kapandji procedure) (CPT code 25830).*

*Comment:* A commenter stated that the work of CPT code 25830 is equal to the work of CPT code 25337 (Distal radioulnar tenodesis) and recommended that 9.50 RVUs are the most appropriate RVUs for both codes. The commenter also stated that the RUC accepted CPT code 25390 (Osteoplasty, radius or ulna; shortening), with 9.96 RVUs, as a reference service for new CPT code 25830. This reference service involves excising a carefully measured segment of ulna followed by internal fixation using a plate and screws. Preoperative work is somewhat greater than the work in new CPT code 25830. New CPT code 25830 is similar to the reference service in that a small segment of ulna is excised and then fused to the adjacent radius using pins or screws. Plates are not used and the amount of excised ulna is less critical. For these clinical reasons, the commenter recommended 9.50 RVUs for CPT code 25830.

*Response:* We agree with the comment and have assigned 9.50 RVUs to CPT code 25830, as recommended.

*Repair of cleft hand (CPT code 26580).*

*Comment:* A commenter disagreed with our decision to value CPT code 26580 at 15.99 RVUs (15.81 RVUs rescaled) instead of 17.71 RVUs, as the RUC recommended (see Table 4 of our December 8, 1994 final rule with comment period *(60 FR 63441)).* The commenter objected to the use of CPT code 28360 (Repair of a cleft foot) as the reference service. The commenter argued that the choice of this code as a reference service was inappropriate because of its clinical dissimilarity to the revised code. The commenter stated that CPT code 26590 (Repair macrodactylia), with 17.63 RVUs, is a more appropriate reference service. This code deals with a congenital anomaly of the digits of the hand requiring exacting microsurgical reconstruction of soft tissue, nerves, and bone in an infant. Revised CPT code 26580 requires metacarpal alignment by soft tissue dissection or metacarpal osteotomy requiring internal fixation, reconstruction of the deep transverse metacarpal ligament, and a thumb re-alignment to allow opposition. Mobilization of skin flaps may be necessary to achieve skin closure. This is a microsurgical procedure performed in infants, with an amount of work similar to the work involved in CPT code 26590. For these clinical reasons, the commenter recommended that revised CPT code 26580 should have 17.71 RVUs.

*Response:* We agree with the comment and have assigned 17.71 RVUs to CPT code 26580, as recommended.

*Application of rigid total contact leg cast (CPT code 29445).*

*Comment:* A commenter stated that this service is overvalued compared to the application of an Unna boot (CPT code 29580), with 0.57 RVUs.

*Response:* We disagree that this service is overvalued. The application of a rigid total contact leg cast (CPT code 29445) involves more work than the application of an Unna boot because it requires the physician to custom make and fabricate the walking surface for each cast. The patient is usually diabetic with a grade 1 or 2 foot ulcer. The use of casts by these patients is risky because they are at risk of developing additional ulcers. Therefore, a great deal of time is spent ensuring that the cast will fit properly. Unlike Unna boots or other casts, total contact casts are always performed personally by a physician who must hold the foot in place while applying the cast.

 *Nasal/sinus endoscopy, surgical with frontal sinus exploration, with or without removal of tissue from frontal sinus (CPT code 31276).*

60 FR 63124

*Comment:* A commenter objected to the assigned 7.42 RVUs and requested an increase to 8.85 RVUs. The commenter presented the following description of the procedure. This procedure is performed around the middle turbinate anterior attachment in the frontal recess at 90 degrees to the line of sight. It requires the use of 70 and 30 degree telescopes, small-angled forceps, curettes, and hooks. It requires an exhaustive knowledge of frontal recess anatomy, very delicate technique, removal of tiny bone fragments, preservation of mucosa, and a dry field. It is very tedious and time-consuming. The commenter believed that the overall intensity and time is significantly greater for the endoscopic frontal sinusotomy than either a total ethmoidectomy (CPT code 31255), with 6.96 RVUs, or an external frontal sinusotomy (CPT code 31075), with 8.85 RVUs.

*Response:* We agree with the comment and have assigned 8.85 RVUs to CPT code 31276, as recommended.

*Gastroplasties and gastric bypass for obesity (CPT codes 43842, 43843, 43846, 43847, and 43848).*

*Comment:* A commenter requested a re-evaluation of the entire family of codes because of a lack of representation of bariatric surgeons in the original resource-based relative value scale process. The commenter stated that the modest increase in the RVUs we assigned to these procedures still left a deficit valuation of approximately 27 percent for CPT codes 43842 and 43843, 17 percent for CPT codes 43846 and 43847, and 12 percent for CPT code 43848.

*Response:* We have not revised the interim RVUs because we do not believe the commenter made a compelling argument for change. We also disagree that the increases in RVUs assigned to **[*63160]** these codes were modest. As we discussed in Table 4 of our December 8, 1994 final rule *(59 FR 63444),* the increases were as follows: CPT code 43842 from 11.99 RVUs to 13.91 RVUs; CPT code 43843 from 11.99 RVUs to 13.91 RVUs; CPT code 43846 from 12.90 RVUs to 18.04 RVUs; CPT code 43847 from 14.32 RVUs to 20.09 RVUs; and, CPT code 43848 from 15.00 RVUs to 22.35 RVUs. When the RVUs were adjusted for budget neutrality, the RVUs were as follows: CPT code 43842, assigned 13.76 RVUs; CPT code 43843, assigned 13.76 RVUs; CPT code 43846, assigned 17.84 RVUs; CPT code 43847, assigned 19.87 RVUs; and, CPT code 43848 assigned 22.10 RVUs. We believe that further increases would create rank order anomalies with other abdominal surgical procedures on the physician fee schedule.

*Induced abortion, by one or more vaginal suppositories (eg. prostaglandin) with or without cervical dilation (eg. laminaria), including hospital admission and visits (CPT code 59855).*

*Comment:* A commenter recommended that we assign the RUC-recommended 5.80 RVUs to CPT code 59855. The commenter believed that our rationale for lowering the work RVUs to 4.80 (4.75 rescaled) was "the physician work in placing suppositories is less than the work in an amnioinjection, regardless of the number of suppositories needed" and that CPT code 59855 requires less physician work than CPT code 59850 (Induced abortion by amnioinjection). The commenter stated that while it is true that the procedural work associated with placing suppositories is less than the procedural work associated with amnioinjection, placement of the suppositories or performance of the amnioinjection is only one element of the total work of each of these services. Use of prostaglandin suppositories typically results in more side effects that the physician must manage over a period of time that is longer than that associated with the amnioinjection, increasing the amount of evaluation and management work for CPT code 59855. Overall, CPT code 59855 requires a greater amount of physician work than CPT code 59850.

*Response:* We agree with the comment and have assigned 5.80 RVUs to CPT code 59855, as recommended.

60 FR 63124

*Sympathectomy, digital arteries (CPT code 64820).*

*Comment:* A commenter disagreed with our decision to value CPT code 64820 at 9.20 RVUs (9.10 RVUs rescaled) instead of 10.00 RVUs as the RUC recommended. The commenter objected to our determination that the work involved in new CPT code 64820 is approximately the same as the repair of a blood vessel of the hand or finger (CPT code 35207). The commenter stated that the work on the two vessels involved in a digital sympathectomy is not similar to the anastomosis of a single vessel and offered the following explanation. CPT code 35207 involves the repair of a single injured vessel through an existing skin laceration. CPT code 35207 has less preservice and intraservice work than new CPT code 64820. Digital sympathectomy is performed in individuals with vasospastic disease of the hand and severe ischemic pain frequently with ulceration of the finger tip. Two vessels are always treated through an extensile palmar incision on the radial and ulnar side of a digit. Using an operating microscope and jeweler's forceps, a tedious removal of the adventitia is performed for a distance of 1.5 to 2.0 centimeters. Extraordinary care must be taken to avoid perforating the vessel. Damaging the vessel's media or intima will cause thrombosis and possible gangrene of the finger. Considering the clinical circumstances regarding the patient indications and actual intraservice work, digital sympathectomy represents a greater intensity of work than CPT code 35207, as measured by increased mental effort and judgment, greater technical skill, and considerably more psychological stress. Postservice work is similar for both codes, however, with an average of four office visits after the procedure. For these clinical reasons, the commenter recommended that new CPT code 64820 should have 10.00 RVUs.

*Response:* We agree with the comment and have assigned 10.00 RVUs to CPT code 64820, as recommended.

*Multiple-family group medical psychotherapy (CPT code 90849).*

*Comment:* A commenter recommended increases for all psychiatric services in response to our request for comments as part of the 5-year refinement of RVUs under the physician fee schedule. Included in that comment was a recommendation to increase the RVUs for CPT code 90849 from 0.59 to 0.78 to maintain the relative value with the recommended increases for the other psychiatric codes.

*Response:* The RVUs assigned to this code were based on a 1994 RUC recommendation that we accepted. We have not increased the RVUs this year because we believe it is an issue for the 5-year refinement. We will consider the recommended RVUs as part of that process. In the meantime, we will maintain the assigned 0.59 RVUs.

*Evoked otoacoustic emissions testing (CPT codes 92587 and 92588).*

*Comment:* A commenter recommended that we provide a ten-fold increase in the RVUs for these audiology services to "properly compensate for the training, effort, and time necessary to diagnose hearing loss and related disorders."

*Response:* We have not accepted this comment because it did not provide enough clinical information about the nature of the work to warrant a reconsideration of the interim RVUs.

*Stress echocardiography (CPT code 93350).*

*Comment:* A commenter expressed concern about the decrease in RVUs for this service.

*Response:* The decrease in RVUs for stress echocardiography occurred as a result of a change in CPT reporting instructions that now direct the user to report the appropriate stress testing code from the 93015 through 93018 series in addition to CPT code 93350. The sum of the RVUs for these services is equal to the RVUs that were assigned to CPT code 93350 in the past when it was the only code used to report stress echocardiography.

*Photochemotherapy (Goeckerman and/or PUVA) for severe photoresponsive dermatoses requiring at least four to eight hours of care under direct supervision of the physician (includes application of medication and dressings) (CPT code 96913).*

*Comment:* A commenter objected to our decision not to assign physician work RVUs to this service. The commenter stated that with the availability of psoriasis day treatment centers, much Goeckerman therapy is now practical in a day treatment program but that it is very different from a simple office visit. The commenter argued that there is considerable professional judgment involved and there is also an extraordinary quantity of nursing time involved since the patient is typically in a day treatment center for 6 hours or more a day. The treatment requires bathing, scale removal, twice daily application of tar over the total body surface, shampoos, scale removal from scalp, ultraviolet light, and typically anthralin as well. The treatment is extremely time-consuming because the medication must be put on **[*63161]** each individual spot while avoiding normal skin.

*Response:* We have not revised our decision regarding this code. We have not assigned any work RVUs to this service because the commenter did not persuade us that photochemotherapy requires any physician work beyond that already described by existing evaluation and management codes. We have assigned practice expense and malpractice expense RVUs based on historic charges for this code so that it will no longer be carrier-priced. We have categorized this service as an "incident to" code, which means that it is covered incident to a physician's service when it is furnished by auxiliary personnel employed by the physician and working under his or her direct supervision. Payment may not be made for this service when it is furnished to hospital inpatients or patients in a hospital outpatient department. Physicians may bill for evaluation and management services in those settings.

*Joint mobilization and massage (CPT codes 97124 and 97265).*

*Comment:* One commenter stated that these codes may be overvalued relative to osteopathic manipulative treatment (CPT codes 98925 through 98929) and evaluation and management services.

*Response:* The interim RVUs we proposed for these codes were based on our acceptance of recommendations we received from the RUC Health Care Professionals Advisory Committee Review Board last year. The history and functions of this board are described below.

In 1992 the American Medical Association recommended that a Health Care Professionals Advisory Committee be established to expand the CPT Editorial Panel and the RUC processes to all groups legally required to use the CPT to report their services. Organizations representing physician assistants, nurses, occupational and physical therapists, optometrists, podiatrists, psychologists, social workers, audiologists and speech pathologists were invited to nominate representatives to the CPT and RUC Health Care Professionals Advisory Committee. The CPT Health Care Professionals Advisory Committee was created to foster participation in and solicit comments from these professional organizations in coding changes affecting their members, while the RUC Health Care Professionals Advisory Committee was formed to allow participation in development of RVUs for new and revised codes within their scope of practice.

To further facilitate the decision-making process on issues of concern to both medical doctors (MDs) and doctors of osteopathy (DOs) and non-MDs and non-DOs, CPT and RUC Health Care Professionals Advisory Committee Review Boards were also formed. The review boards bring MDs and DOs and non-MDs and non-DOs together to discuss coding issues and RVU proposals. The RUC Health Care Professionals Advisory Committee Review Board comprises all nine members of the current RUC Health Care Professionals Advisory Committee and three RUC members. For codes used only or

predominantly by non-MDs and non-DOs, the RUC Health Care Professionals Advisory Committee Review Board replaces the RUC as the body responsible for developing recommendations for HCFA.

We have decided to maintain the RVUs for joint mobilization (CPT code 97265), with 0.45 RVUs, and massage (CPT code 97124), with 0.35 RVUs, as interim RVUs on the 1996 fee schedule so that we will have additional time to re-evaluate them. While we agree that these services appropriately are compared to other therapeutic procedures in the physical medicine section of CPT, our review of them in light of the comment causes us to believe that the interim RVUs we assigned to the therapeutic procedures services may have been too high relative to other services on the fee schedule, for example, osteopathic manipulative treatments and evaluation and management services.

While we acknowledge that we accepted last year's recommendations of the RUC Health Care Professionals Advisory Committee Review Board, we now plan to refer these and all other physical medicine and rehabilitation codes (CPT codes 97010 through 97770) back to the RUC Health Care Professionals Advisory Committee Review Board for its reconsideration. We also will notify the RUC of our concerns. In addition, we seek public comments on this issue.

*Prolonged physician services (CPT codes 99354 through 99357).*

*Comment:* A commenter provided extensive arguments for an increase in the RVUs of these codes based on the premise that we have underestimated the time involved in furnishing these services. Because the RVUs for evaluation and management services are related to the time specified in the CPT codes, the commenter believed that the selection of the appropriate level of service should be based solely on the time spent providing the service. For example, a consultation (CPT code 99253) typically assumes a 55-minute time segment. The commenter stated that if less time is spent, the consultation would be coded at a lower level as CPT code 99252 or 99251. The commenter believed that the correct key references for these prolonged physician services are CPT codes 99245 (Office consultation) and 99255 (Hospital inpatient consultation) because the times specified in those codes correspond to the times specified in the prolonged services codes.

*Response:* We have decided not to accept this comment, which we believe is based, in part, on a misunderstanding of the relationship of the typical times associated with the evaluation and management codes and the RVUs assigned to the codes. While it is true that time is a key predictor of work, it is not true that physicians are required to report their evaluation and management services based solely on the amount of time spent furnishing the service. CPT codes 99354 and 99356 both describe the "first hour" of prolonged services. This terminology in the code does not require that an entire hour of service be furnished in order for the code to be used. In fact, the CPT directs the reader to use the code to report 30 to 74 minutes of prolonged services. In our discussion of these codes in the December 8, 1994 **Federal Register** *(59 FR 63437* through 63440), we indicated that we did not expect that the typical use of the code would be to report an hour of service. We assigned RVUs that are equivalent to 40 minutes of face-to-face or floor time.

Finally, for those specialties with very prolonged encounters, we have assigned the same RVUS to the "each additional 30 minutes" codes (CPT codes 99355 and 99357) that we assigned to the "first hour" codes. This actually represents an increase above the recommended RVUs we received from the RUC for CPT codes 99355 and 99357. We believe the final RVUs for the prolonged service codes appropriately recognize the work associated with very prolonged services.

2.  Establishment of Interim Work Relative Value Units for New and Revised Codes for 1996

   ***a. Methodology (Includes Table 2-American Medical Association Specialty Society Relative Value Update [\*63162]*** Committee Recommendations and HCFA's Decisions).

Justin Brooks

60 FR 63124

The major aspect of establishing work RVUs for 1996 was related to the assignment of interim RVUs for all new and revised CPT codes. As described in our November 1992 notice on the 1993 fee schedule *(57 FR 55938),* we established a process, based on recommendations received from the RUC, for establishing interim RVUs for new and revised codes.

The RUC was formed in November 1991 and grew out of a series of discussions between the American Medical Association and the major national medical specialty societies. The RUC is comprised of 26 members; 22 are representatives of major specialty societies. The remaining members represent the American Medical Association, the American Osteopathic Association, and the CPT Editorial Panel. The work of the RUC is supported by the RUC Advisory Committee made up of representatives of 65 specialty societies in the American Medical Association House of Delegates. The RUC used a small group survey method to produce work RVUs that were voted on by the RUC, with a two-thirds vote required for acceptance. The RUC then submitted to us those accepted RVUs as recommended values.

We received work RVU recommendations for approximately 140 new and revised codes from the RUC. We also received RUC recommendations for base units for two anesthesia codes, CPT codes 00520 (Anesthesia, closed chest procedures) and 00540 (Anesthesia, chest procedure) and have accepted the recommendations of 6.00 and 13.00 base units, respectively. Physician panels consisting of carrier medical directors and our staff reviewed the RUC recommendations by comparing them to our reference set or to other comparable services on the fee schedule for which work RVUs had been established previously, or to both of these criteria. The panels also considered the relationships among the new and revised codes for which we received the RUC recommendations. We agreed with a majority of the relationships reflected in the RUC values. In some cases when we agreed with the RUC relationships, we revised the RVUs recommended by the RUC in order to achieve work neutrality within families of codes. For example, if CPT revised an existing code by splitting it into two or more new codes, we took into account the RVUs assigned to the existing code and the expected utilization of the split codes in such a way that the coding change would not lead to an overall increase in RVUs associated with services previously described by a single code. For approximately 90 percent of the RUC recommendations, proposed RVUs were accepted or increased, and for approximately 10 percent, RVUs were decreased.

We also received two recommendations from specialty societies and four recommendations from the Health Care Professionals Advisory Committee for new or revised codes for which the RUC did not provide a recommendation. The specialty society recommendations were also reviewed by the physician panels. All of the proposed RVUs of the specialty society recommendations were accepted. All of the proposed RVUs of the Health Care Professionals Advisory Committee recommendations were decreased.

Table 2 is a listing of those codes that will be new or revised in 1996 for which we received recommended work RVUs. This table includes the following information:

• A " #" identifies a new code for 1996.

• *CPT code.* This is the CPT code for a service.

• *Modifier.* A "26" in this column indicates that the RVUs are for the professional component of the code.

• *Description.* This is an abbreviated version of the narrative description of the code.

• *RUC-recommended work RVUs.* This column identifies the work RVUs recommended by the RUC. If no recommendation was received from the RUC, this column shows "no rec."

60 FR 63124

- *Health Care Professionals Advisory Committee (HCPAC) recommendations.* This column identifies work RVUs recommended by the Health Care Professionals Advisory Committee.

- *Specialty-recommended RVUs.* This column identifies work RVUs recommended by a specialty society.

- *HCFA decision.* This column indicates whether we agreed with the RUC recommendation ("agreed"); we established work RVUs that are higher than the RUC recommendation ("increased"); or we established work RVUs that were less than the RUC recommendation ("decreased"). Codes for which we did not accept the RUC recommendation are discussed in greater detail following Table 2. A discussion follows the table in section VI.B.2.b. An (a) in the column indicates that RVUs were not assigned.

- *HCFA value.* This column contains the 1996 RVUs for physician work.

This table includes only those codes that were reviewed by the full RUC or for which we received a recommendation from a specialty society or Health Care Professionals Advisory Committee.

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recommendations | HCPAC recommendations | Specialty recommendations | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| 17110 | | Destruction of skin lesions | 0.55 | | | Agreed | 0.55 |
| #201 00 | | Explore wound, neck | 9.50 | | | Agreed | 9.50 |
| #201 01 | | Explore wound, chest | 3.00 | | | Agreed | 3.00 |
| #2 | | Explore wound, abdomen | 3.6 | | | Agreed | 3 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-mend-a-tions | HCPAC recom-mend-a-tions | Specialty recom-mend-a-tions | HCFA decision | 1996 work RVUs |
|------|-----|-------------|------|------|------|------|------|
| 0102 | | | 8 | | | | .68 |
| #20103 | | Explore wound, extremity | 4.95 | | | Agreed | 4.95 |
| #20930 | | Spinal bone allograft | 0.00 | | | Agreed | 0.00 |
| #20931 | | Spinal bone allograft | 1.81 | | | Agreed | 1.81 |
| #20936 | | Spinal bone autograft | 0.00 | | | Agreed | 0.00 |
| #20937 | | Spinal bone autograft | 2.79 | | | Agreed | 2.79 |
| #20938 | | Spinal bone autograft | 3.02 | | | Agreed | 3.02 |
| #21076 | | Prepare face/oral | | | 12.54 | Agreed | 12.54 |

60 FR 63124

### Table 2.--AMA RUC Recommendations and HCFA's Decisions

| CPT* | Mod | Description | RUC recommendations | HCPAC recommendations | Specialty recommendations | HCFA decision | 1996 work RVUs |
|------|-----|-------------|---------------------|-----------------------|---------------------------|---------------|----------------|
| | | prosthesis | | | | | |
| #21077 | | Prepare face/oral | | | 31.54 | Agreed | 31.54 |
| | | prosthesis | | | | | |
| #21141 | | Reconstruct midface, lefort | 16.92 | | | Agreed | 16.92 |
| #21142 | | Reconstruct midface, lefort | 17.58 | | | Agreed | 17.58 |
| #21143 | | Reconstruct midface, lefort | 18.30 | | | Agreed | 18.30 |
| 2145 | | Reconstruct midface, lefort | 18.92 | | | Agreed | 18.92 |
| 2146 | | Reconstruct midface, lefort | 19.58 | | | Agreed | 19.5 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom- menda- tions | HCPAC recom- menda- tions | Spec- ialty recom- menda- tions | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| 21147 | | Reconstruct midface, lefort | 20.30 | | | Agreed | 20.30 |
| 22100 | | Remove part of neck | 9.05 | | | Agreed | 9.05 |
| | | vertebra | | | | | |
| 22101 | | Remove part, thorax | 9.00 | | | Agreed | 9.00 |
| | | vertebra | | | | | |
| 22102 | | Remove part, lumbar | 9.00 | | | Agreed | 9.00 |
| | | vertebra | | | | | |
| #221 03 | | Remove extra spine segment | 2.34 | | | Agreed | 2.34 |
| 22110 | | Remove part of neck | 11.59 | | | Agreed | 11.59 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recommendations | HCPAC recommendations | Specialty recommendations | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| | | vertebra | | | | | |
| 22112 | | Remove part, thorax | 11.59 | | | Agreed | 11.59 |
| | | vertebra | | | | | |
| 22114 | | Remove part, lumbar | 11.59 | | | Agreed | 11.59 |
| | | vertebra | | | | | |
| #2 2116 | | Remove extra spine segment | 2.32 | | | Agreed | 2.32 |
| 22210 | | Revision of neck spine | 22.51 | | | Agreed | 22.51 |
| 22212 | | Revision of thorax spine | 18.14 | | | Agreed | 18.14 |
| 22214 | | Revision of lumbar spine | 18.14 | | | Agreed | 18. |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom- menda- tions | HCPAC recom- menda- tions | Spec- ialty recom- menda- tions | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| | | | | | | | 14 |
| #22216 | | Revise, extra spine segment | 6.04 | | | Agreed | 6.04 |
| 22220 | | Revision of neck spine | 20.15 | | | Agreed | 20.15 |
| 22222 | | Revision of thorax spine | 20.15 | | | Agreed | 20.15 |
| 22224 | | Revision of lumbar spine | 20.15 | | | Agreed | 20.15 |
| #22226 | | Revise, extra spine segment | 6.04 | | | Agreed | 6.04 |
| 22305 | | Treat spine process fracture | 1.86 | | | Agreed | 1.86 |
| 22 | | Treat spine fracture | 1.8 | | | Agreed | 1 |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Specialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| 310 | | | 6 | | | | .86 |
| 22315 | | Treat spine fracture | 8.36 | | | Agreed | 8.36 |
| 22325 | | Repair of spine fracture | 17.19 | | | Agreed | 17.19 |
| 22326 | | Repair neck spine fracture | 18.43 | | | Agreed | 18.43 |
| 22327 | | Repair thorax spine fracture | 17.56 | | | Agreed | 17.56 |
| #22328 | | Repair each add spine fx | 4.61 | | | Agreed | 4.61 |
| 22548 | | Neck spine fusion | 24.08 | | | Agreed | 24.08 |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Spec-ialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|-------|-----|-------------|------|------|------|------|------|
| 22554 | | Neck spine fusion | 17.24 | | | Agreed | 17.24 |
| 22556 | | Thorax spine fusion | 22.27 | | | Agreed | 22.27 |
| 22558 | | Lumbar spine fusion | 21.22 | | | Agreed | 21.22 |
| 22585 | | Additional spinal fusion | 5.53 | | | Agreed | 5.53 |
| 22590 | | Spine & skull spinal fusion | 19.50 | | | Agreed | 19.50 |
| 22595 | | Neck spinal fusion | 18.19 | | | Agreed | 18.19 |
| 22600 | | Neck spine fusion | 14.74 | | | Agreed | 14. |

60 FR 63124

## Table 2.--AMA RUC Recommendations and HCFA's Decisions

| CPT* | Mod | Description | RUC recom-mendations | HCPAC recom-mendations | Specialty recom-mendations | HCFA decision | 1996 work RVUs |
|------|-----|-------------|-------|-------|-------|---------|-------|
| 22610 | | Thorax spine fusion | 14.62 | | | Agreed | 14.62 |
| 22612 | | Lumbar spine fusion | 20.19 | | | Agreed | 20.19 |
| #2614 | | Spine fusion, extra segment | 6.44 | | | Agreed | 6.44 |
| 22630 | | Lumbar spine fusion | 20.03 | | | Agreed | 20.03 |
| #2632 | | Spine fusion, extra segment | 5.23 | | | Agreed | 5.23 |
| 22800 | | Fusion of spine | 16.92 | | | Agreed | 16.92 |
| 2280 | | Fusion of spine | 29.74 | | | Agreed | 29 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recommendations | HCPAC recommendations | Specialty recommendations | HCFA decision | 1996 work RVUs |
|------|-----|-------------|---------------------|-----------------------|---------------------------|---------------|----------------|
| 2 | | | | | | | .74 |
| #2 28 04 | | Fusion of spine | 35.00 | | | Agreed | 35.00 |
| #2 28 08 | | Fusion of spine | 25.00 | | | Agreed | 25.00 |
| 22 81 0 | | Fusion of spine | 29.00 | | | Agreed | 29.00 |
| 22 81 2 | | Fusion of spine | 31.00 | | | Agreed | 31.00 |
| 22 83 0 | | Exploration of spinal fusion | 10.22 | | | Agreed | 10.22 |
| 22 84 0 | | Insert spine fixation | 6.27 | | | Agreed | 6.2 |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Spec-ialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|------|-----|-------------|------------------------|-------------------------|------------------------------|---------------|----------------|
| | | | | | | | 7 |
| | | device | | | | | |
| #2 28 41 | | Insert spine fixation | 0.00 | | | Agreed | 0.00 |
| | | device | | | | | |
| #2 28 42 | | Insert spine fixation | 7.19 | | | Agreed | 7.19 |
| | | device | | | | | |
| #2 28 43 | | Insert spine fixation | 8.97 | | | Agreed | 8.97 |
| | | device | | | | | |
| #2 28 44 | | Insert spine fixation | 10.96 | | | Agreed | 10.96 |
| | | device | | | | | |
| 22 84 5 | | Insert spine fixation | 5.98 | | | Agreed | 5.98 |
| | | device | | | | | |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Spec-ialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| #2 28 46 | | Insert spine fixation device | 8.28 | | | Agreed | 8.28 |
| #2 28 47 | | Insert spine fixation device | 9.20 | | | Agreed | 9.20 |
| #2 28 48 | | Insert pelvic fixation device | 6.00 | | | Agreed | 6.00 |
| #2 28 51 | | Apply spine prosth device | 6.71 | | | Agreed | 6.71 |
| 32 09 5 | | Biopsy through chest wall | 7.13 | | | Agreed | 7.13 |
| #3 25 01 | | Repair bronchus (add-on) | 4.69 | | | Agreed | 4.69 |
| #3 32 53 | | Reconstruct atria | 30.00 | | | Agreed | 30. |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Specialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| #33924 | | Remove pulmonary shunt | 5.50 | | | Agreed | 5.50 |
| #38231 | | Stem cell collection | 1.74 | | | Decreased | 1.50 |
| 38240 | | Bone marrow/stem transplant | 2.24 | | | Agreed | 2.24 |
| 38241 | | Bone marrow/stem transplant | 2.24 | | | Agreed | 2.24 |
| 47350 | | Repair liver wound | 11.29 | | | Agreed | 11.29 |
| 47360 | | Repair liver wound | 15.34 | | | Agreed | 15.34 |
| #47361 | | Repair liver wound | 28.00 | | | Agreed | 28.0 |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-mendations | HCPAC recom-mendations | Specialty recom-mendations | HCFA decision | 1996 work RVUs |
|------|-----|-------------|------|------|------|------|------|
| #473 62 | | Repair liver wound | 10.00 | | | Agreed | 10.00 |
| 49000 | | Exploration of abdomen | 8.99 | | | Agreed | 8.99 |
| 49002 | | Reopening of abdomen | 9.40 | | | Agreed | 9.40 |
| 49010 | | Exploration behind abdomen | 11.19 | | | Agreed | 11.19 |
| 55859 | | Percut/needle insert, pros | 14.00 | | | Decreased | 8.29 |
| #56343 | | Laparoscopic salpingostomy | 6.96 | | | Agreed | 6.96 |
| #56344 | | Laparoscopic fimbrioplasty | 7.16 | | | Agreed | 7.16 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Specialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|-------|-----|-------------|------|------|------|------|------|
| #57284 | | Repair paravaginal defect | 12.10 | | | Agreed | 12.10 |
| #59610 | | Vbac delivery | 22.63 | | | Decreased | 22.55 |
| #59612 | | Vbac delivery only | 15.00 | | | Decreased | 14.84 |
| #59614 | | Vbac care after delivery | 16.00 | | | Decreased | 15.96 |
| #59618 | | Attempted vbac delivery | 25.03 | | | Increased | 25.23 |
| #59620 | | Attempted vbac delivery only | 16.75 | | | Increased | 16.95 |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Spec-ialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|-------|-----|-------------|------|------|------|------|------|
| #596 22 | | Attempted vbac after care | 17.94 | | | Increased | 18.11 |
| 62 27 4 | | Inject spinal anesthetic | 1.78 | | | Agreed | 1.78 |
| 62 28 8 | | Injection into spinal canal | 1.74 | | | Agreed | 1.74 |
| #623 50 | | Implant spinal catheter | 6.25 | | | Agreed | 6.25 |
| #623 51 | | Implant spinal catheter | 9.25 | | | Agreed | 9.25 |
| #623 55 | | Remove spinal canal catheter | 4.80 | | | Agreed | 4.80 |
| #623 60 | | Insert spine infusion | 2.00 | | | Agreed | 2.00 |

60 FR 63124

### Table 2.--AMA RUC Recommendations and HCFA's Decisions

| CPT * | Mod | Description | RUC recom- menda- tions | HCPAC recom- menda- tions | Spec- ialty recom- menda- tions | HCFA decision | 1996 work RVUs |
|-------|-----|-------------|------|------|------|------|------|
| | | device | | | | | |
| #623 61 | | Implant spine infusion pump | 4.80 | | | Agreed | 4.80 |
| #623 62 | | Implant spine infusion pump | 6.29 | | | Agreed | 6.29 |
| #623 65 | | Remove spine infusion | 4.77 | | | Agreed | 4.77 |
| | | device | | | | | |
| #623 67 | 26 | Analyze spine infusion pump | 0.48 | | | Agreed | 0.48 |
| #623 68 | 26 | Analyze spine infusion pump | 0.75 | | | Agreed | 0.75 |
| 6710 7 | | Repair detached retina | 13.99 | | | Agreed | 13.99 |
| 6710 8 | | Repair detached retina | 19.90 | | | Agreed | 19. |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recommendations | HCPAC recommendations | Specialty recommendations | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| 67112 | | Re-repair detached retina | 16.15 | | | Agreed | 16.15 |
| #76965 | 26 | Echo guidance radiotherapy | 1.34 | | | Agreed | 1.34 |
| #78459 | 26 | Heart muscle imaging (PET) | 1.88 | | | Agreed | 1.88 |
| #78810 | 26 | Tumor imaging (PET) | 1.93 | | | Agreed | 1.93 |
| #90922 | | ESRD related services, day | 0.44 | | | Decreased | 0.37 |
| #90923 | | Esrd related services, day | 0.30 | | | Decreased | 0.28 |
| #90924 | | Esrd related services, day | 0.22 | | | Increased | 0.24 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-mendations | HCPAC recom-mendations | Specialty recom-mendations | HCFA decision | 1996 work RVUs |
|------|-----|-------------|------|-------|-----------|---------|------|
| #909 25 | | Esrd related services, day | 0.17 | | | Decreased | 0.15 |
| 925 06 | | Speech & hearing evaluation | 0.86 | | | Agreed | 0.86 |
| 925 07 | | Speech/hearing therapy | 0.52 | | | Agreed | 0.52 |
| 925 08 | | Speech/hearing therapy | 0.26 | | | Agreed | 0.26 |
| #925 10 | | Rehab for ear implant | 1.50 | | | Agreed | 1.50 |
| 925 16 | | Facial nerve function test | 0.43 | | | Agreed | 0.43 |
| #925 25 | | Oral function evaluation | 1.61 | | | Decreased | 1.13 |
| #925 26 | | Oral function therapy | 0.64 | | | Decreased | 0.5 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom- menda- tions | HCPAC recom- menda- tions | Spec- ialty recom- menda- tions | HCFA decision | 1996 work RVUs |
|------|-----|-------------|------|------|------|------|------|
| 9254 6 | 2 6 | Sinusoidal rotational test | 0.29 | | | Agreed | 0.29 |
| #9 2579 | | Visual audiometry (vra) | | | | (fn a) | |
| #9 2597 | | Oral speech device eval | 1.50 | | | Decreased | 1.11 |
| #9 2598 | | Modify oral speech device | 0.99 | | | Decreased | 0.73 |
| #9 2987 | | Revision of mitral valve | 20.69 | | | Agreed | 20.69 |
| 9587 2 | 2 6 | Muscle test, one fiber | 1.50 | | | Agreed | 1.50 |
| 9590 0 | 2 6 | Motor nerve conduction test | 0.42 | | | Agreed | 0.42 |
| #9 59 | 2 6 | Motor nerve conduction test | 0.60 | | | Agreed | 0. |

Justin Brooks

60 FR 63124

### Table 2.--AMA RUC Recommendations and HCFA's Decisions

| CPT* | Mod | Description | RUC recommendations | HCPAC recommendations | Specialty recommendations | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| 03 | | | | | | | 60 |
| 95904 | 26 | Sense nerve conduction test | 0.34 | | | Agreed | 0.34 |
| 95925 | 26 | Somatosensory testing | 0.81 | | | Decreased | 0.54 |
| #95926 | 26 | Somatosensory testing | 0.81 | | | Decreased | 0.54 |
| #95927 | 26 | Somatosensory testing | 0.81 | | | Decreased | 0.54 |
| #95930 | 26 | Visual evoked potential test | 0.35 | | | Agreed | 0.35 |
| #95934 | 26 | H' reflex test | 0.51 | | | Agreed | 0.51 |
| #95936 | 26 | H' reflex test | 0.55 | | | Agreed | 0.55 |

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT* | Mod | Description | RUC recom-menda-tions | HCPAC recom-menda-tions | Spec-ialty recom-menda-tions | HCFA decision | 1996 work RVUs |
|---|---|---|---|---|---|---|---|
| 97116 | | Gait training therapy | 0.40 | | | Agreed | 0.40 |
| #97535 | | Self care mngment training | | 0.45 | | Decreased | 0.33 |
| #97537 | | Community/work reintegration | | 0.45 | | Decreased | 0.33 |
| #97542 | | Wheelchair mngement training | | 0.45 | | Decreased | 0.25 |
| #97703 | | Prosthetic checkout | | 0.45 | | Decreased | 0.25 |
| 99238 | | Hospital discharge day | 1.06 | | | Agreed | 1.06 |
| #99239 | | Hospital discharge day | 1.75 | | | Agreed | 1.75 |

Justin Brooks

60 FR 63124

**Table 2.--AMA RUC Recommendations and HCFA's Decisions**

| CPT * | Mod | Description | RUC recom- menda- tions | HCPAC recom- menda- tions | Spec- ialty recom- menda- tions | HCFA decision | 1996 work RVUs |
|-------|-----|-------------|------|------|------|------|------|
| #9 94 35 | | Hospital NB discharge day | 1.50 | | | Agreed | 1. 50 |

* All CPT codes and descriptors copyright 1995 American Medical Association.

fn a No work RVUs assumed.

[*63165]

***b. Discussion of codes for which the recommendations were not accepted or for which clarification of the code is necessary.***The following is a summary of our rationale for not accepting particular recommendations. It is arranged by type of service in CPT code order. We have included in this section a clarification of the intended use of one family of codes for which we accepted the RUC recommendations. This summary refers only to work RVUs.

*Exploration of penetrating wounds (CPT codes 20100 through 20103).*

We accepted the RUC recommendations for these codes but are concerned that they could be inappropriately used to report the repair of wounds. Therefore, we are providing a clarification of the codes based on the language that will be included in CPT 1996.

These codes are used to report the treatment of wounds resulting from penetrating trauma that require surgical exploration and enlargement of the wound, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s), of the subcutaneous tissue, muscle fascia, and/or muscle. If a repair is done to major blood vessel(s) requiring thoracotomy or laparotomy, those specific code(s) would supersede the use of CPT codes 20100 through 20103. These codes should not be used to report simple, intermediate, or complex repair of wound(s) that do not require enlargement of the wound, extension of dissection, etc., as stated above.

*Blood-derived peripheral stem cell harvesting for transplantation, per collection (CPT code 38231).*

60 FR 63124

The RUC recommended 1.74 RVUs based on its determination that the work is equivalent to the work of CPT code 36520 (Therapeutic apheresis). We believe that the work associated with this procedure is less than that for CPT code 36520 in that the patients are less ill and the risk of complications is much less. In addition, patients require less physician monitoring, and the procedure is more likely to be performed on an outpatient basis. We believe the work is comparable to a level-5 evaluation and management service (CPT code 99215), which is assigned 1.50 RVUs.

However, as with therapeutic apheresis, we do not permit payment for both harvesting and certain evaluation and management codes on the same date. Specifically, we do not allow separate payment for CPT codes 99211 through 99215 (Established patient office or other outpatient visits), 99231 through 99233 (Subsequent hospital care), and 99261 through 99263 (Follow-up inpatient consultations) on the same date that CPT code 38231 (Stem cell harvesting) is furnished because it would allow duplicate payment for the evaluation and management service. Physicians furnishing stem cell harvesting services may choose to bill for the appropriate evaluation and management visit or consultation code indicating the level of services furnished rather than billing for the stem cell harvesting. This will permit physicians to be paid for the level of service furnished.

Separate payment will be allowed for physician services furnished to establish the required vascular access if performed by the physician and if the criteria for payment under the appropriate CPT code are satisfied. We will also allow separate billing for CPT codes 99221 through 99223 (Initial hospital visit), CPT codes 99241 through 99245 and 99251 through 99255 (Initial consultations), and CPT code 99238 (Hospital discharge service) when billed on the same date as CPT code 38231 (Stem cell harvesting) because the work associated with these evaluation and management services is not included in work RVUs assigned to the stem cell harvesting. These policies are consistent with the policies for therapeutic apheresis that were established for the 1995 fee schedule.

*Transperineal placement of needles or catheters into prostate for interstitial radioelement application, with or without cystoscopy (CPT code 55859).*

We received a RUC recommendation of 14.00 RVUs based upon the use of CPT code 61770 (Stereotactic localization, any method, including burr hole(s) with insertion of catheter(s) for brachytherapy) as a reference procedure. We believe that these RVUs are too high and disagree with the RUC's use of CPT code 61770 as a reference procedure; we view that procedure as requiring greater technical skill, mental effort, and judgment. The recommended 14.00 RVUs are higher than the RVUs assigned to CPT code 55860 (Exposure of prostate, any approach, for insertion of radioactive substance), which is assigned 13.33 RVUs. This is an open surgical procedure with significantly more postprocedure work than CPT code 55859, which can be performed on an outpatient basis.

The placement of needles or catheters into the prostate is performed under ultrasonic guidance, and the guidance is separately reported by new CPT code 76965 for which we accepted the RUC recommendation of 1.34 RVUs. In addition, CPT also directs separate reporting of the interstitial radioelement application (CPT codes 77776 through 77778). CPT code 77778 (Interstitial radioelement application, complex) is the code most likely to be reported. We assigned 10.46 RVUs to this code. Thus, a physician performing all aspects of this procedure would report all three codes with 25.80 total RVUs if we accepted the RUC recommendation of 14.00 for code 55859.

We believe it is possible that urologists responding to the surveyed vignette may have misunderstood that this code is used to report only the placement of the needles or catheters into the prostate and that they inadvertently included in their estimates of work the separately reported work of ultrasonic guidance and application of the radioelements.

We believe that a more appropriate reference procedure than a neurosurgical procedure would be another prostate procedure that can be performed on an outpatient basis. We

60 FR 63124

selected CPT code 55700 (Biopsy, prostate; needle or punch, single or multiple, any approach), which is assigned 1.57 RVUs. Because of the increased intraoperative time and complexity as well as the increased surgical risk associated with CPT code 55859, we have increased the RVUs four-fold to 6.28 RVUs. In addition we added 2.01 RVUs, the RVUs assigned to CPT code 52000, to reflect the added work of the cystoscopy. This addition results is the assignment of 8.29 RVUs for CPT code 55859.

*Vaginal birth after cesarean (CPT codes 59610, 59612, 59614, 59618, 59620, and 59622).*

The CPT has added a new section to the 1996 edition for "delivery after previous cesarean delivery." Included in this section are six new codes that are used to report the services furnished to patients who have had a previous cesarean delivery and who present with the expectation of a vaginal delivery. If the patient has a successful vaginal delivery after a previous cesarean delivery (VBAC), then either CPT code 59610, 59612, or 59614 is reported. If the attempt is unsuccessful and another cesarean delivery is carried out, either **[*63166]** CPT code 59618, 59620, or 59622 is reported. The RUC-recommended RVUs for all six codes that added varying increments of work to the RVUs of the six existing codes that are used to report routine vaginal and cesarean deliveries. The following table includes the RVUs for the six existing codes, the RUC recommendations for the six new VBAC codes and the difference in RVUs for each of the six pairs.

| Existing delivery code RVU differ- ence | RVUs of HCFA RVUs existing delivery code | Corre- sponding new VBAC code | RUC- Recommended RVUs for new VBAC code |
|---|---|---|---|
| 59400 1.64 | 20.99 22.55 | 59610 | 22.63 |
| 59409 1.72 | 13.28 14.84 | 59612 | 15.00 |
| 59410 1.56 | 14.44 15.96 | 59614 | 16.00 |
| 59510 1.36 | 23.67 25.23 | 59618 | 25.03 |
| 59514 1.36 | 15.39 16.95 | 59620 | 16.75 |
| 59515 1.39 | 16.55 18.11 | 59622 | 17.94 |

While we accept the RUC conclusion that VBAC services entail more physician work and that the existing delivery codes are appropriate reference points, we disagree with the variable and small differences in work from one code to the next. We believe the increased stress, mental effort, and judgment associated with VBAC is the same regardless of the particular delivery service furnished. Therefore, we are adding 1.56 RVUs (the median RVUs of the above differences) to each of the existing delivery codes. This results in the interim RVUs identified in the last column of the table as "HCFA RVUs."

*End-stage renal disease services, per day (CPT codes 90922 through 90925).*

CPT 1996 will include four codes for the reporting of end-stage renal disease services on a per day rather than per month basis. We did not accept the RUC recommendations for these codes that were based on the RUC's recommendations for the monthly codes (CPT codes 90918 through 90921). As discussed in section VI.B.1.b. of this final rule, new RVUs emerged from the refinement panel ratings for these codes. We calculated work RVUs for

60 FR 63124

the four "per day" end-stage renal disease codes by dividing the RVUs of the "per full month" codes by 30. This led to the assignment of 0.37 RVUs to CPT code 90922, 0.28 RVUs to CPT code 90923, 0.24 RVUs to CPT code 90924, and 0.15 RVUs to CPT code 90925.

*Evaluation of swallowing and oral function for feeding (CPT code 92525).*

The RUC made its recommendation of 1.61 RVUs based on a clinical vignette of an inpatient whose evaluation included a barium swallow. The RUC lowered the specialty's recommendation to better account for the times when the barium swallow might not be done. We believe the RVUs recommended, which are between the RVUs of a level-3 inpatient consultation (CPT code 99253), with 1.56 RVUs, and a level-4 inpatient consultation (CPT code 99254) with 2.27 RVUs, are too high. While we believe that the intraservice work determined by the survey for the vignette may be reasonable, we do not believe that the surveyed vignette represented a typical patient.

Our data suggest that this procedure, which was formerly reported by CPT code 92506, is performed primarily in the physician's office. We took into consideration that the procedure is currently reported using CPT code 92506, which is assigned 0.86 RVUs. We then took into account that the barium swallow is probably included in at least 50 percent of the cases and that the evaluation of the barium swallow is an integral part of the procedure. Therefore, we added half the value of CPT code 74230 (Swallowing function, pharynx and/or esophagus, with cineradiography and/or video), which is assigned 0.54 RVUs to the 0.86 RVUs for CPT code 92506 resulting in an assignment of 1.13 RVUs to CPT code 92525. These RVUs are slightly higher than the RVUs of CPT code 99242, which is the code for a level-2 office consultation, the components of which include an expanded problem-focused history, an expanded problem-focused examination, and straightforward medical decision making.

*Treatment of swallowing dysfunction and/or oral function for feeding (CPT code 92526).*

The RUC recommended 0.64 RVUs based on a clinical vignette of an inpatient similar to the patient described in the vignette used for CPT code 92525 described above. Our data suggest that this procedure, which is currently reported using CPT code 92507, also is performed primarily in physicians' offices. Because we believe the surveyed vignette does not describe a typical patient, we reduced the RUC recommendation for CPT code 92526 to 0.52 RVUs, which are the same RVUs as those for CPT code 92507 (Speech, language or hearing therapy, with continuing medical supervision; individual). These RVUs are slightly less than the RVUs assigned to a mid-level office visit (CPT code 99213), with 0.55 RVUs, which typically requires 15 minutes of face-to-face time with a physician.

*Visual reinforcement audiometry (VRA) (CPT code 92579).*

The RUC made no recommendation for RVUs for this procedure. As with most of the audiologic function tests, we do not believe this service requires performance by a physician. Consequently, we have not assigned physician work RVUs to this code. However, we have assigned 0.69 practice expense RVUs and 0.07 malpractice expense RVUs.

*Evaluation for use and/or fitting of voice prosthetic or augmentative/alternative communication device to supplement oral speech (CPT code 92597).*

The RUC recommended 1.50 RVUs. We believe the recommended RVUs are too high because they are comparable to the highest level established patient office visit, CPT code 99215, the components of which include a comprehensive history, a comprehensive examination, and medical decision-making of high complexity. We do not believe the work of these two services is comparable. Rather, we believe the work associated with CPT code 92597 is slightly less than the work associated with a level-3 new patient office visit

(CPT code 99203) with 1.14 RVUs and a level-2 inpatient consultation (CPT code 99252) with 1.13 RVUs. Therefore, we have assigned 1.11 RVUs to CPT code 92597.   **[*63167]**

*Modification of voice prosthetic or augmentative/alternative communication device to supplement oral speech (CPT code 92598).*

The RUC recommended 0.99 RVUs, which are higher than the RVUs assigned to a level-4 established patient office visit (CPT code 99214), with 0.94 RVUs. We believe that the recommendation is too high. However, we believe that the relative relationship between this service and CPT code 92597, as established by the RUC, should be maintained. Thus, we calculated the interim RVUs by multiplying the recommended 0.99 RVUs by 74 percent (0.99x1.11/1.5) representing the percentage of the RUC-recommended RVUs, which we accepted for the preceding code. This calculation results in 0.73 interim RVUs for CPT code 92598.

*Short-latency somatosensory evoked potential studies, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system (CPT codes 95925 through 95927).*

The existing code for the reporting of somatosensory testing is CPT code 95925. The descriptor in CPT 1995 is "Somatosensory testing (e.g., cerebral evoked potentials), one or more nerves." CPT revised existing CPT code 95925 by splitting it into three codes (95925, 95926, and 95927), which will be used to report testing of the upper limbs, lower limbs, and trunk or head, respectively. Currently, 0.81 RVUs are assigned to CPT code 95925. The RUC viewed the coding change as editorial and recommended 0.81 RVUs for each of these codes. While we agree that the same RVUs should be assigned to the three codes, we have not accepted the specific recommendation of 0.81 RVUs because we do not view it as an editorial change. We believe that the RUC failed to take account of the fact that some patients will require testing of both the upper and lower limbs during an encounter and that, under the existing code, only one unit of service can be reported regardless of the number of nerves tested because the descriptor specifies "one or more nerves." We estimate that the cases previously reported with CPT code 95925 will be reported under the new and revised codes as follows: About 50 percent will be reported with revised CPT code 95925; about 50 percent will be reported as new CPT code 95926; about 1 percent will be reported as CPT code 95927; and 50 percent of all testing will involve both CPT codes 95925 and 95926 during the same encounter. Using these estimates, we adjusted the RVUs for the three codes so that the total number of RVUs under the new codes will be the same as the total number of RVUs under the old codes. This results in a decrease of the RUC's recommendation of 0.81 RVUs for each of the codes to 0.54 RVUs for each of the codes.

**Additional Codes**

| CPT code | Description |
| --- | --- |
| 97535 | Self care/home management training (eg, activities of daily living (ADL) and compensatory training, meal preparation, safety procedures, and instructions in use of adaptive equipment) direct one on one contact by provider, each 15 minutes. |
| 97537 | Community/work reintegration, training (eg, |

60 FR 63124

**Additional Codes**

| CPT code | Description |
|---|---|
| | shopping, transportation, money management, avocational activities and/or work environment/modification analysis, work task analysis), direct one on one contact by provider, each 15 minutes. |
| 97542 | Wheelchair management/propulsion training, each 15 minutes. |
| 97703 | Checkout for orthotic/prosthetic use, established patient, each 15 minutes. |

The RUC Health Care Professionals Advisory Committee Review Board recommended 0.45 RVUs for each of these services on the basis of their comparability to other physical medicine codes, for example, CPT code 97110 (Therapeutic procedure, one or more areas, each 15 minutes; therapeutic exercises to develop strength and endurance, range of motion and flexibility). While we agree that these new services appropriately are compared to other therapeutic procedures, our review of the new services causes us to believe that the interim RVUs we assigned to the therapeutic procedures services may have been too high relative to other services on the fee schedule, for example, evaluation and management services.

We have decided to maintain the interim RVUs for the physical medicine and rehabilitation codes (CPT codes 97010 through 97770) as interim RVUs on the 1996 fee schedule so that we will have additional time to re-evaluate them. While we acknowledge that we accepted last year's recommendations of the Health Care Professionals Advisory Committee Review Board to assign 0.45 RVUs to CPT code 97110 and several other of the therapeutic procedures, we now plan to refer these codes back to the RUC Health Care Professionals Advisory Committee Review Board for its reconsideration, and we will notify the RUC of our concerns. In addition, we seek public comments on this issue.

For new CPT codes 97535 and 97537, we believe the recommended 0.45 RVUs are too high. Since they are currently reported using CPT code 97540 (Training in activities of daily living (self care skills and/or daily life management skills); initial 30 minutes, each visit), which has 0.44 RVUs, we divided the RVUs for CPT code 97540 by 2 to arrive at RVUs for 15 minutes and added 50 percent to account for the prework and postwork inherent in the service. This results in 0.33 RVUs for CPT codes 97535 and 97537.

For new CPT codes 97542 and 97703, we believe the recommended 0.45 RVUs are too high. We believe these services are comparable to attended modality services such as manual electrical stimulation (CPT code 97032), with 0.25 RVUs. Therefore, we have assigned 0.25 RVUs to both CPT codes 97542 and 97703.

| CPT code | Description |
|---|---|
| 99238 | Hospital discharge day management; 30 minutes or less. |
| 99239 | Hospital discharge day management; more than 30 minutes. |

Justin Brooks

60 FR 63124

We agreed with the RUC recommendation of 1.06 RVUs for CPT code 99238 and 1.75 RVUs for CPT code 99239. The reporting of CPT code 99239 must be supported by documentation in the patient's medical record of the time spent by the physician furnishing the service as well as documentation of the actual services furnished. Time spent by individuals other than the physician should not be considered in selecting the appropriate hospital discharge day management code.  **[*63168]**

| CPT code | Description |
|----------|-------------|
| 99411 | Preventive medicine counseling and/or risk factor |
| | reduction intervention(s) provided to individuals |
| | in a group setting (separate procedure): |
| | approximately 30 minutes. |
| 99412 | Preventive medicine counseling and/or risk factor |
| | reduction intervention(s) provided to individuals |
| | in a group setting (separate procedure): |
| | approximately 60 minutes. |

We agreed with the RUC recommendations of 0.15 RVUs for CPT code 99411 and 0.25 RVUs for CPT code 99412. While these services are not covered by Medicare, we believe it is important to state the assumptions we made in agreeing with the RUC-recommended RVUs. The intent of the codes is to represent an interactive service between the patient and the physician. We expect that the interaction will be documented in each patient's individual medical record. In addition, since the RVUs are based on physician work, the codes should not be reported unless they are personally performed by a physician; they should not be used to report group preventive medicine counseling furnished by anyone other than a physician. Nor is the service to be reported if it is furnished in a place of service other than the physician's office. Finally, the assigned RVUs are based on a group of two to five persons for CPT code 99411 and a group of two to six persons for CPT code 99412. Preventive medicine furnished to groups larger than these should be reported using code 99249 which is for the reporting of preventive medicine services not listed in CPT.

***c. Temporary alpha-numeric HCFA Common Procedure Coding System codes.*** For the 1996 Medicare fee schedule for physicians services, we have established several new alpha-numeric HCFA Common Procedure Coding System (HCPCS) codes for the reporting of certain new services that are not clearly described by existing CPT codes. In this section, we discuss our rationale for establishing the codes as well as the basis of the interim RVUs we have assigned to them. We view these codes as temporary since we will be referring them to the CPT Editorial Panel for possible inclusion in future editions of the CPT.

*Measurement of post-voiding residual urine and/or bladder capacity by ultrasound (HCPCS code G0050).*

Measurement of postvoiding residual (PVR) urine and/or bladder capacity can be done by simple diagnostic catheterization. It can also be done by ultrasound using either traditional sonographic equipment or smaller less expensive equipment whose capacity is limited only to bladder volume determination. When done by catheterization, CPT code 53670, with 0.74 RVUs, is reported. When done by ultrasound, CPT code 76857, pelvic echography, with 1.65 RVUs, is reported whether done using traditional equipment or the smaller bladder scan. There is presently no separate CPT code for a bladder scan only. Both individual carriers and a manufacturer of bladder scanning devices have recommended that we establish a separate code to distinguish bladder scans from general pelvic scans

60 FR 63124

because they believe that payment for CPT code 76857 is too high for only a bladder scan to determine PVR. We agree with this recommendation and are issuing the new HCPCS code G0050.

| HCPCS code | Work RVUs | Practice RVUs | Malpractice RVUs | Total RVUs |
|---|---|---|---|---|
| G0050 | 0.00 | 0.81 | 0.05 | 0.86 |

We believe that this bladder scan performs the same function as a simple diagnostic catheterization but without the risk of infection. To recognize the slightly higher equipment costs, we have established interim total RVUs for bladder scan of 0.86, or about 0.12 RVUs higher than for catheterization. We have not assigned physician work RVUs for a bladder scan. We expect that the scan will be performed after a physician has examined the patient and determined the medical necessity for a bladder scan. Physician interpretation of the scan is included in the associated evaluation and management service.

*Lung volume reduction surgery (reduction pneumoplasty) eg, lung shaving, lung contouring, unilateral or bilateral (HCPCS code G0061).*

Lung volume reduction surgery, also termed reduction pneumoplasty, lung shaving, or lung contouring is a procedure performed to improve pulmonary function in patients with severe emphysema. Medicare has not established that the procedure is reasonable and necessary for the diagnosis or treatment of illness or injury. Therefore, we have excluded this procedure from coverage under the provisions of section 1862(a)(1)(A) of the Act.

Although we have assigned a noncoverage indicator of "N" to this code, we are providing interim RVUs for those who look to the Medicare fee schedule for information on the relative value of all physicians services including those not covered by Medicare.

We believe the procedure is most often being reported as wedge resection(s) of the lung using CPT code 32500, which has 13.10 work RVUs. Based on discussions with carrier medical directors, we believe that lung volume reduction surgery is more difficult than wedge resection(s). After considering existing CPT codes for other pulmonary procedures, we have assigned 17.62 RVUs on an interim basis to HCPCS code G0061. These are the same RVUs assigned to total pulmonary decortication (CPT code 32220), which we believe is similar to lung reduction surgery in terms of physician work.

## V. Issues for Discussion

**A. Five-Year Refinement of Relative Value Units** Section 1848(c)(2)(B)(i) of the Act requires that we review all RVUs no less often than every 5 years. Since we implemented the physician fee schedule effective for services furnished beginning January 1, 1992, we have initiated the 5-year refinement of RVUs that will be effective for services furnished beginning January 1, 1997.

All work RVUs included in the December 1994 final rule *(59 FR 63617)* were subject to comment. During the comment period, which closed on February 6, 1995, we received approximately 500 public comments on approximately 1,100 procedure codes. After review by our medical staff, we forwarded comments on approximately 700 CPT codes for consideration by the **[*63169]** American Medical Association/Specialty Society Relative Value Update Committee (RUC).

After a thorough review of the RUC recommendations, we will announce any proposed changes to the work RVUs in the **Federal Register** in early 1996 and provide an opportunity for the public to comment before we finalize the changes.

**B. Resource-Based Practice Expense Relative Value Units** With the exception of anesthesia services, physician services and other diagnostic services paid under the physician fee schedule

60 FR 63124

have practice expense and malpractice expense RVUs. Payments for practice expense RVUs account for approximately 42 percent of physician fee schedule payments.

The practice expense RVUs are derived from historical allowed charge data. The common criticism is that the practice expense RVUs are not truly resource-based because they are not based on resource costs.

Section 121 of the Social Security Act Amendments of 1994, *Public Law 103-432*, enacted on October 31, 1994, requires the Secretary to develop a methodology for a resource-based system for determining practice expense RVUs for each physician service. In developing the methodology, the Secretary must consider the staff, equipment, and supplies used in the provision of medical and surgical services in various settings. The Secretary must report to the Congress on the methodology by June 30, 1996. The new payment methodology is effective for services furnished in 1998. There is no transition provision for these services.

We awarded a contract to Abt Associates in March 1995. Abt will develop a uniform database that can be used to support a number of analytical methods (for example, microcosting or economic cost functions) to estimate practice expense per service. Abt will also provide us with both direct and indirect practice expense estimates for all services paid under the physician fee schedule. We expect that these estimates will vary based on the site where the service is furnished. For example, the practice expense for a physician service furnished in the hospital outpatient department will differ from the practice expense for the same service performed in the physician's office.

As we pointed out in our July 26, 1995 proposed rule *(60 FR 38400),* Abt will use information from two separate processes to generate practice expense RVUs for physician services *(60 FR 38417).* Through the use of Clinical Practice Expert Panels, Abt will estimate the expenses, including the cost of clinical labor, supplies, and medical equipment for specific physician services. The Clinical Practice Expert Panels will also consider whether additional items, such as the cost of administrative services, can be directly assigned to individual services. The remaining expenses for physician services will be calculated from the information obtained through the practice expense survey.

*Practice Expense Survey*

Abt will obtain physician practice specific information through a practice expense survey. Abt expects to receive responses from approximately 3,000 practices.

The survey instrument was sent to the Office of the Secretary in the Department of Health and Human Services on August 7, 1995. Under current procedures, the Department has a 60-day period to review this survey. After Departmental clearance, the survey is sent to the Office of Management and Budget where it will undergo a 60-day clearance process. Under the current schedule, the earliest clearance on the survey will be in early December.

We expect that Abt will send the survey to individual practices starting in January 1996. Abt estimates that it will take approximately 7 months for its staff to mail the survey, to compile the completed responses, and to assemble the data into a database.

As we stated in the July 26, 1995 proposed rule, one of the main objectives of the practice expense survey will be to collect indirect practice expenses so that these expenses can be related to individual CPT procedure codes.

*Clinical Practice Expert Panels*

We furnished Abt with a list of all the codes in the Medicare physician fee schedule database for which practice expense RVUs are to be estimated. As a starting point, Abt used a classification system that is a hybrid of the Ambulatory Patient Groups system developed by 3M and the Berenson-Eggers-Holahan (Urban Institute) system to group the codes into similar families of codes. The objective was to sort the codes into families that are clinically related and have relatively comparable direct costs. This system was reviewed by our medical staff, clinical consultants, and the Clinical Practice Expert Panel Technical Expert Group, the advisory group for the overall design of the project.

Justin Brooks

60 FR 63124

At a HCFA-sponsored public meeting on August 18, 1995, a draft copy of this classification system was provided to various specialty groups. These groups were given the opportunity to review the families of codes and the Clinical Practice Expert Panel to which the family was assigned and to suggest one or more reference codes for each family. Abt considered these comments in the development of the final classification system.

At this time, Abt has grouped the codes into 199 families. These families have been assigned to 15 Clinical Practice Expert Panels. Each Clinical Practice Expert Panel is generally assigned between 6 to 25 families. A goal is to keep the number of service families per Clinical Practice Expert Panel manageable.

Each Clinical Practice Expert Panel will be composed of up to 15 members. Clinical Practice Expert Panel membership is not restricted to practicing physicians. Clinical Practice Expert Panel members can be practice managers and nonphysician clinicians who are knowledgeable about physician practice expenses. There will be a primary care physician and surgeon on every Clinical Practice Expert Panel. The remainder of the Clinical Practice Expert Panel members will be composed of the primary providers of the services in the Clinical Practice Expert Panel families.

The Clinical Practice Expert Panel is to reach consensus on the detailed direct inputs for one reference procedure per family. The following four criteria were established to guide the selection process of the reference procedure:

- The service should be commonly performed.

- The service should have a mid-range level of resource usage relative to the other codes in the family.

- The service should be a code whose definition or coding application has not changed in the last several years.

- The variation across physicians in the way the service is performed should be minimal.

A Clinical Practice Expert Panel Technical Expert Group meeting was held on September 7 and 8, 1995. The Clinical Practice Expert Panel Technical Expert Group devoted its attention to **[\*63170]** the following topics: service family composition including criteria; reference procedures per family; composition of the Clinical Practice Expert Panel; and the process for conducting the Clinical Practice Expert Panels, in particular, the worksheets to be completed.

*Future Scheduled Activities*

A mock Clinical Practice Expert Panel meeting will be held in January 1996. The purpose of the mock Clinical Practice Expert Panel meeting is to pre-test the Clinical Practice Expert Panel process and worksheets.

The first series of Clinical Practice Expert Panel meetings will be conducted beginning in late January 1996. Before the Clinical Practice Expert Panel meetings, each Clinical Practice Expert Panel member (and if it so chooses, specialty group) will complete the worksheets on the resource costs of reference procedures. Abt will compile these data and provide summary information to each Clinical Practice Expert Panel member. The Clinical Practice Expert Panel members will use a consensus approach to estimate the direct inputs for the reference services.

The second series of Clinical Practice Expert Panel meetings will be conducted in the spring of 1996. The Clinical Practice Expert Panel members will use an extrapolation process to estimate the direct costs of the other nonreference procedures in the same family.

Data collection on the practice expense survey will be completed by June 1996. Abt will deliver data files by August 1, 1996. We expect to award multiple contracts to analyze the data. Abt's report on the analysis of the data is due by September 1996.

We expect to publish the proposed rule in the **Federal Register** in the spring of 1997 and the final rule in the fall of 1997. We will implement the resource-based practice expense RVUs beginning January 1, 1998.

60 FR 63124

As we also stated in the July 26, 1995 proposed rule, this discussion of our efforts to implement the requirement in the statute to develop a resource-based relative value scale is for informational purposes and is not a formal proposal. We were not soliciting comments on the proposal. While we did receive several comments, we are not providing a summary of these comments nor responses to them because it was not a formal proposal. We will, however, consider the comments.

***C. Case Management in a Fee-for-Service System***In the July 26, 1995 proposed rule, we solicited information, recommendations, and suggestions from the public on how we might apply case management to the Medicare fee-for-service system. While the comments we received addressed the issues we raised in the proposed rule, we are now seeking comments on some additional issues.

We are currently interested in paying physicians for the management of patients with specific diagnoses. We believe that physicians often provide extensive case management to patients with certain chronic conditions and that these management activities may maintain or improve health status. We are interested in learning more about which patients would benefit from this case management.

We are also exploring various managed care options within the Medicare fee-for-service system. We are interested in receiving public comment about the appropriateness and feasibility of creating periodic capitated payments for comprehensive management of medical cases.

Our intent at this time is to solicit information, recommendations, and suggestions from the public on how we might create a capitated payment for case management. We are particularly interested in the following:

- What types of patients would benefit from extensive case management? We are considering developing bundled payments for physician services furnished to patients with dementia and one or more co-morbidities, diabetes, hypertension, or congestive heart failure. We are seeking comments on these and other types of patients who would benefit from case management. Any information about the types of services that should be included in a bundled payment for care of these patients and data on the prevalence of a given medical condition or combination of conditions in the Medicare population would be appreciated.

- What is an appropriate periodicity for a capitated payment? There is precedent in the Medicare program for monthly and weekly capitated payments. (Medicare pays on a monthly basis for physician services associated with the continuing medical management of a maintenance dialysis patient and has a weekly radiation therapy management payment.) Do other schedules such as quarterly or semiannually make more sense for identifiable groups of patients?

**VI. Provisions of the Final Rule**The provisions of this final rule, for the most part, restate the provisions of the July 1995 proposed rule. This section includes the following changes from the proposed rule:

- Adds a new statutory basis section in § 405.500 for subpart E ("Criteria for Determining Reasonable Charges") in part 405 and also revises the authority citation for subpart E.

- Redesignates § 405.552 ("Conditions for payment: Anesthesiology services") as § 415.110.

- Adds a statutory basis section in § 405.2400 for subpart X ("Health Clinic and Federally Qualified Health Center Services") of part 405 and also revises the authority citation for subpart X.

- Revises § 405.2468 ("Allowable costs") to expand the definition of physician services in rural health clinics and Federally qualified health centers to include services of residents as defined in § 415.152 ("Definitions") who meet the requirements in § 415.206(b) (concerning physician fee schedule payment for services of residents in nonprovider settings).

- Revises § 414.30 ("Conversion factor update") to incorporate a change regarding the downward adjustment to the conversion factor required by section 13511 of OBRA 1993.

60 FR 63124

- Revises § 414.32 ("Determining payments for certain physicians' services furnished in facility settings") to state that when a service which is not on the ASC list is performed in an ASC, the site-of-service payment differential does not apply.

- Removes the urodynamic evaluation CPT codes 51725, 51726, 51772, 51785 and CPT codes 13150, 14020, 14060, 15740, 21208, 21440, 23066, 26645, 28030, 28043, 28092, 28261, 40510, 41805, 42408, 46220, 46610, 63600, 64420, 65270, and 67921 from the site-of-service payment differential list as proposed.

- Revises § 414.46 ("Additional rules for payment of anesthesia services") to state that anesthesia CPT modifier units are not allowed for Medicare payment.

- Moves the "Scope" paragraph (a) in § 415.100 of subpart C ("Part B Carrier Payments for Physician Services to Beneficiaries in Providers") of part 415 in the proposed rule into a separate § 415.100. Redesignates the remaining paragraphs in proposed rule § 415.100 as § 415.102 ("Conditions for fee **[*63171]** schedule payment for physician services to beneficiaries in providers").

- Creates a limited exception to the teaching physician presence requirement for certain residency programs in new § 415.174 ("Exception: Evaluation and management services furnished in certain centers").

In addition, the final rule differs from the proposed rule in that we have revised our proposed payment policy related to hydration therapy and chemotherapy as a result of public comments. We will allow separate payment for hydration therapy or the infusion of antiemetics or other nonchemotherapy drug on the same date of service as chemotherapy infusion only when the nonchemotherapy drug is administered sequentially rather than at the same time as the chemotherapy infusion. However, as we proposed, we will not pay for hydration therapy when administered at the same time as chemotherapy infusion.

**VII. Collection of Information Requirements** Under the Paperwork Reduction Act of 1995, agencies are required to provide 60-day notice in the **Federal Register** and solicit public comment before a collection of information requirement is submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

- Whether the information collection is necessary and useful to carry out the proper functions of the agency;

- The accuracy of the agency's estimate of the information collection burden;

- The quality, utility, and clarity of the information to be collected; and

- Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

Therefore, we are soliciting public comment on each of these issues for the information collection requirements discussed below.

The following sections of this document contain information collection requirements as described below:

The information collection requirements in § 415.60 ("Allocation of physician compensation costs"), in paragraph (f)(1), concern determination and payment of allowable physician compensation costs. The requirements also concern the amounts of time the physician spends in furnishing physician services to the provider, physician services to patients, and services that are not paid under either Part A or Part B of Medicare; and assurance that the compensation is reasonable in terms of the time devoted to these services. The information collection requirements in § 415.60(g) concern recordkeeping requirements for allocation of physician compensation costs. They also concern time records used to allocate physician compensation, information on which the physician compensation allocation is based, and

60 FR 63124

retention of this information for a 4-year period after the end of each cost reporting period to which the allocation applies. Respondents that will provide the information are 7,091 hospitals, 10,630 freestanding skilled nursing facilities, and 258 freestanding comprehensive outpatient rehabilitation facilities. The respondents will provide the information in Exhibits 2 through 4 on Form HCFA-339, "Provider Cost Report Reimbursement Questionnaire."

The information collection requirements in § 415.130 ("Conditions for payment: Physician pathology services"), paragraph (b)(3), concern a written narrative report included in the beneficiary's medical record for clinical consultation pathology services. The services must be requested by the beneficiary's attending physician, relate to a test result that lies outside the clinically significant normal or expected range in view of the condition of the beneficiary, and require the exercise of medical judgment by the consultant physicians. Respondents who will provide the information are physicians furnishing clinical consultation pathology services.

The information collection requirements in § 415.162 ("Determining payment for physician services furnished to beneficiaries in teaching hospitals") concern the apportionment of compensation in the case of teaching hospitals electing cost reimbursement for direct medical and surgical services furnished by physicians to beneficiaries and supervision of interns and residents furnishing care to beneficiaries in a teaching hospital. Respondents that will provide the information are 40 cost election teaching hospitals. The respondents will provide the information on Supplemental Worksheet, Part I and Part II, of Form HCFA-2552-92.

The information collection requirements in § 415.172 ("Physician fee schedule payment for services of teaching physicians"), paragraph (b), concern documentation in the medical records that the teaching physician was present at the time the service was furnished, and, in the case of evaluation and management services, personal documentation by the teaching physician in the medical records of his or her participation in the service. The information collection requirements also concern, in the case of surgical, high-risk, or other complex procedures, the presence of the teaching physician during all critical portions of the procedure and immediate availability to furnish services during the entire service or procedure. In the case of surgery, the teaching physician's presence is not required during opening and closing of the surgical field. In the case of procedures performed through an endoscope, the teaching physician must be present during the entire viewing. In the case of evaluation and management services, the teaching physician must be present during the portion of the service that determines the level of service billed. Respondents who will provide this information are physicians, residents, or nurses; however, in the case of evaluation and management services, the teaching physician must personally document in the medical records his or her participation in the service.

The information collection requirements in § 415.174 ("Exception: Evaluation and management services furnished in certain centers"), paragraph (a)(3)(v), concern documentation of the extent of the teaching physician's participation in the review and direction of the services furnished to each beneficiary in an outpatient department of a hospital or another ambulatory care entity. The information collection requirements concern the conditions under which carriers will make physician fee schedule payment for certain evaluation and management services of lower and mid-level complexity furnished by a resident without the presence of a teaching physician. Respondents who will provide this information are teaching physicians.

The information collection requirements in § 415.178 ("Anesthesia services"), paragraph (b), concern [*63172] documentation of the teaching physician's presence or participation in the administration of the anesthesia and a preoperative and postoperative visit by the teaching physician. The teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. The teaching physician cannot receive an unreduced fee if he or she performs services involving other patients during the period the anesthesia resident is furnishing services in a single case. Respondents who will provide this information are teaching physicians.

The information collection requirements in § 415.180 ("Teaching setting requirements for the interpretation of diagnostic radiology and other diagnostic tests"), paragraph (b), concern documentation that the teaching physician personally performed the interpretation or reviewed the

60 FR 63124

resident's interpretation with the resident. Physician fee schedule payment will be made in those situations. Respondents who will provide this information are teaching physicians.

The table below indicates the annual number of responses for each regulation section in this final rule containing information collection requirements, the average burden per response in minutes or hours, and the total annual burden hours.

**Estimated Annual Reporting and Recordkeeping Burden**

| CFR sections | Annual No. of responses | Annual frequency | Average burden per response | Annual burden hours |
|---|---|---|---|---|
| 415.60 | 17,979 | 1 | 11 hours | 197,769 |
| 415.130 | 9,273 | 1 | 3 minutes | 464 |
| 415.162 | 40 | 1 | 2 hours | 80 |
| 415.172 | 3,200,232 | 1 | 1 minute | 53,337 |
| 415.174 | 1,237,516 | 1 | 1 minute | 20,625 |
| 415.178 | 106,819 | 1 | 1 minute | 1,780 |
| 415.180 | 1,000,107 | 1 | 1 minute | 16,668 |

The information collection requirements were approved by OMB for §§ 415.60 and 415.162 as §§ 405.481 and 405.465, respectively, under OMB control number 0938-0301 and expire August 31, 1998.

We have submitted a copy of this final rule with comment period to OMB for its review of the information collection requirements in §§ 415.130, 415.172, 415.174, 415.178, and 415.180. These requirements are not effective until they have been approved by OMB. A document will be published in the **Federal Register** when OMB approval is obtained.

Organizations and individuals desiring to submit comments on the information collection and recordkeeping requirements should send them to the Health Care Financing Administration, Office of Financial and Human Resources, Management Planning and Analysis Staff, 7500 Security Boulevard, Baltimore, Maryland, 21244-1850 and to the Office of Management and Budget official whose name appears in the **ADDRESSES** section of this preamble.

**VIII. Response to Comments** Because of the large number of items of correspondence we normally receive on **Federal Register** documents published for comment, we are not able to acknowledge or respond to them individually. We will consider all comments we receive by the date and time specified in the **DATES** section of this preamble, and, if we proceed with a subsequent document, we will respond to the comments in the preamble to that document.

**IX. Regulatory Impact Analysis**

*A. Regulatory Flexibility Act* Consistent with the Regulatory Flexibility Act (*5 U.S.C. 601* through *612*), we prepare a regulatory flexibility analysis unless the Secretary certifies that a rule will not have a significant economic impact on a substantial number of small entities. For purposes of the Regulatory Flexibility Act, all physicians are considered to be small entities.

This final rule will not have a significant economic impact on a substantial number of small entities. Nevertheless, we are preparing a regulatory flexibility analysis because the provisions of this rule are expected to have varying effects on the distribution of Medicare physician payments across specialties and across geographic areas. We anticipate that virtually all of the approximately 500,000 physicians who furnish covered services to Medicare beneficiaries will be affected by one or more provisions of this rule. In addition, physicians who are paid by private insurers for non-

Medicare services will be affected to the extent that they are paid by private insurers that choose to use the RVUs. However, with few exceptions, we expect that the impact on individual medical practitioners will be limited.

In accordance with the provisions of Executive Order 12866, this final rule was reviewed by the Office of Management and Budget.

***B. Budget-Neutrality Adjustment*** Section 1848(c)(2)(B) of the Act requires that adjustments to RVUs in a year may not cause the amount of expenditures for the year to differ by more than $ 20 million from the amount of expenditures that would have been made if these adjustments had not been made. We refer to this as the budget-neutrality adjustment.

In past years, we have made this adjustment across all RVUs. This year, as we proposed, we are making this adjustment on the conversion factors instead of the RVUs. This alternative approach is administratively simpler, and it facilitates policy and data analysis of RVUs. It does not significantly affect the final payments that are made to physicians because any changes to payments will be the result of rounding and will be minimal.

The issues discussed in sections IX.C. through IX.K. will have no impact on Medicare program expenditures because the effects of these changes have been neutralized in the calculation of the conversion factors for 1996.

We have estimated the net increase in program costs in calendar year 1996 **[*63173]** resulting from the adjustments to RVUs and revisions in payment policies to be approximately $ 140 million. This is a net figure in that savings from the reductions in RVUs for some services partially offset the cost associated with increases in the RVUs for other services. This figure requires a reduction of 0.36 percent in the conversion factors for all services to comply with the statutory limitation on increases in expenditures. Although a $ 20 million tolerance is permitted under the law, this 0.36 percent reduction to all conversion factors is designed to approximate budget neutrality as closely as possible, without creating any increase or decrease in expenditures as a result of RVU adjustments or revisions in payment policies.

### C. Bundled Services

1. Hydration Therapy and Chemotherapy

   Bundling of payment for CPT codes 90780 and 90781, (Therapeutic infusions except for chemotherapy) into CPT codes 96410, 96412, and 96414 (Chemotherapy infusion), when nonchemotherapy drugs are infused at the same time as chemotherapy drugs means that in some cases, physicians will no longer be paid for CPT codes 90780 and 90781. However, our policy will allow physicians to continue to be paid for CPT codes 90780 and 90781 when done on the same day as CPT codes 96410, 96412, and 96414 if the nonchemotherapy drugs are infused sequentially rather than contemporaneously with the chemotherapy drugs. We are unable to determine from our existing data which portion of billings for CPT codes 90780 and 90781 that are currently furnished on the same day as CPT codes 96410, 96412, and 96414 are for sequential or contemporaneous services. Therefore, at this time, we are unable to estimate the impact of this policy. We expect that the impact will be minor.

2. Evaluation of Psychiatric Records and Reports and Family Counseling Services

   Bundling of payment for CPT codes 90825 and 90887 into the payment for other psychiatric codes means that physicians who are currently billing for, and receiving separate payment for, these services may no longer do so. Because we believe that the services described by CPT codes 90825 and 90887 are captured in the prework and postwork of other psychiatric services, we will implement this change in policy by redistributing the RVUs for CPT codes 90825 and 90887 equally into the following psychiatric procedure codes: CPT codes 90801, 90820, 90835, 90842 through 90847, and 90853 through 90857. We estimate that this change will increase the RVUs for the latter codes by approximately 0.7 percent.

3. Fitting of Spectacles

60 FR 63124

We will cease making separate payment under the physician fee schedule for fitting of spectacles and low vision systems (CPT codes 92352 through 92358 and 92371) beginning January 1, 1996. Payment for these services is already included in the payment for the prosthetic device. We will redistribute the payment currently made for these CPT codes across all physician services, which is what should have occurred had we not included these fees when the fee schedule was created. Because the total payment for spectacle fitting services is relatively low (approximately $ 2.5 million in calendar year 1994) compared to the total payment for all physician services, we believe the impact on RVUs for all physician services is negligible.

Virtually all of the providers who have been billing for the fitting of spectacles as a professional service have been optometrists. Under this revised policy, they are no longer able to bill separately for this service. The effect on individual optometrists will depend upon the amount of their income derived from billing for spectacle fitting services.

**D. X-Rays and Electrocardiograms Taken in the Emergency Room** Under policy issued in 1981, the interpretation of an x-ray or EKG furnished to an emergency room patient by a radiologist or cardiologist, respectively, "almost always" constituted a covered Part B service payable by the carrier, regardless of whether the test results had been previously used in the diagnosis and treatment of the patient by a physician in the emergency room and regardless of when the specialist furnished the interpretation. A study completed by the Office of Inspector General of the Department of Health and Human Services, dated July 1993, recommended that we change this policy to indicate that the second interpretation is generally a quality control service to be taken into account by intermediaries in determining hospital reasonable costs. Further, we understand that some carriers are currently paying both the emergency room physician and the radiologist or cardiologist for the interpretation of the same x-ray or EKG.

We will pay for only one interpretation of an x-ray or EKG furnished to an emergency room patient except under unusual circumstances. In situations in which both the emergency room physician and the radiologist or cardiologist bill for the interpretation, we will instruct the carriers to pay for the interpretation used in the diagnosis and treatment of the patient. We will consider the second interpretation to be a quality control service. Under this policy, we will reduce the incidence of carriers' paying twice for an interpretation, but we have no estimate of the number of duplicate payments that will be eliminated. We believe that the specialists will be affected primarily. If hospitals want to ensure that their specialists are paid for these interpretations, they can make arrangements to preclude the emergency room physician from billing for the same service.

**E. Extension of Site-of-Service Payment Differential to Services in Ambulatory Surgical Centers** We are extending the site-of-service payment limit to office-based services if those services are performed in an ambulatory surgical center, effective for services furnished beginning January 1, 1996. We are adding 126 procedure codes to the list. Were it not for budget-neutrality adjustments, we estimate that these additions would result in a $ 24.6 million reduction in 1996 Medicare payments.

**F. Services of Teaching Physicians** This change removes the single attending physician criteria for hospital patients. It allows and promotes supervision of the care by physician group practices. We believe allowing for more than one teaching physician per beneficiary inpatient stay will result in negligible additional cost, but the lack of any data prevents us from quantifying the effects of this change. In addition, this rule will incorporate longstanding Medicare coverage and payment policy regarding the circumstances under which the services of residents are payable as physician services.

We will require the physical presence of a teaching physician during the key portion of the service in order for the teaching physician to receive Part B physician fee schedule payment for the service. Details regarding the physical **[*63174]** presence of a teaching physician during different types of services and procedures are discussed in section II.F. of this preamble. Although we lack specific data, we believe that the provisions of this part of the final rule have no budgetary effect because we believe that the potential costs are offset by the potential savings.

60 FR 63124

**G. Unspecified Physical and Occupational Therapy Services (HCFA Common Procedure Coding System Codes M0005 Through M0008 and H5300)** We are eliminating HCPCS codes M0005 through M0008 and H5300 and redistributing the RVUs to codes in the physical medicine and rehabilitation section of the CPT (codes 97010 through 97799). The codes we are deleting are general codes that do not describe adequately the service being furnished. Their use precludes effective review necessary to ensure that the services being paid are covered by Medicare. In 1995, the American Medical Association revised the CPT codes in the Physical Medicine and Rehabilitation section of the CPT to better reflect the provision of physical and occupational therapy services.

We believe that each unit of service currently billed under the codes we are deleting will be billed under a CPT or HCPCS code and that the total amount of Medicare payment for physical medicine services will not change significantly as a result of the elimination of these codes. Therefore, we believe there will be no additional costs or savings as a result of this change in billing. Since the original codes were not descriptive, we had no way of comparing payments. However, we believe that we are eliminating potential manipulation of payment and are improving the data collected by requiring practitioners to use the more specific codes when billing for these services.

**H. Transportation in Connection With Furnishing Diagnostic Tests** Under the policy adopted in this final rule, we are restricting the discretion of carriers to make separate payments for the transportation of diagnostic testing equipment. Effective for services furnished beginning January 1, 1996, the general policy is that separate transportation payments will be made only in connection with the following services:

- X-ray and standard EKG services furnished by an approved portable x-ray supplier; and

- Standard EKG services furnished by an independent physiological laboratory under special conditions.

For all other types of diagnostic tests payable under the physician fee schedule, travel expenses are considered to be "bundled" into the payment for the procedure, and Medicare carriers will pay for the transportation of equipment only on a "by report" basis under CPT code 99082 if a physician submits documentation to justify the "very unusual" travel as set forth in section 15026 of the Medicare Carriers' Manual.

We are unable to assess the impact of this new national policy because carriers have had such varying payment policies on this issue. We had thought that this might be a significant policy change since we had received many inquiries on the subject in recent years; however, we received fewer than 10 comments on this policy as set forth in the proposed rule, and we now conclude that the national impact of the new policy will not be significant. There will likely be an impact on payments to independent physiological laboratories in some areas in which transportation payments were made before January 1, but it is not possible to assess these reductions from the comments received.

**I. Maxillofacial Prosthetic Services** We are establishing national RVUs for these services and, therefore, are discontinuing pricing by individual carriers, effective January 1, 1996. We estimate that total expenditures for CPT codes 21079 through 21087 and codes G0020 and G0021 (replaced by CPT codes 21076 and 20177 in 1996), based on the RVUs will be approximately $ 2.4 million in calendar year 1996. The 1994 Medicare expenditures for these codes under the carrier pricing methodology were approximately $ 1.5 million which, if updated for 1995, would be approximately $ 1.6 million. Thus, we estimate an increase of approximately $ 800,000 for these codes. However, total expenditures for physician services will not increase because we are implementing this change in a budget-neutral manner in accordance with section 1848(c)(2)(B)(ii) of the Act.

These services are furnished most frequently by oral surgeons (dentists only) and by maxillofacial surgeons. Because we estimate that the total expenditures for these services will increase slightly, we expect that, in general, the physicians who perform and bill for these procedures will realize an

increase in payment. However, in some areas, the payment amounts based on national RVUs may be lower than those calculated by the local carrier.

**J. Coverage of Mammography Services**We are expanding the definition of "diagnostic" mammography to include as candidates for this service asymptomatic men or women who have a personal history of breast cancer or a personal history of biopsy-proven benign breast disease. We do not believe this change will result in a significant increase in the total number of mammography services because information from carriers indicates that most asymptomatic patients in these categories are already receiving diagnostic mammography services.

**K. Two Anesthesia Providers Involved in One Procedure**We will apply the medical direction payment policy to the single procedure involving both the physician and the CRNA. We will not implement this policy until January 1, 1998, at which time the proposal will be budget-neutral. In 1998, the allowance for the medically-directed CRNA service and the medical-direction service of the anesthesiologist will be equivalent to 50 percent of the allowance recognized for the service personally performed by the anesthesiologist alone. Thus, payment for both services will be no different than what would be allowed for the anesthesia service personally performed by the anesthesiologist.

Although this proposal is budget-neutral, total payments to anesthesiologists will decrease slightly and payments to the CRNAs' employers will increase slightly. We cannot quantify the amount of the losses to the anesthesiologists or the gains to the CRNAs' employers. However, anesthesiologists can lessen their losses by actually personally performing as many of these services as possible and receiving the same allowance they would have in the absence of this new policy.

**L. Rural Hospital Impact Statement**

Section 1102(b) of the Act requires the Secretary to prepare a regulatory impact analysis if a rule may have a significant impact on the operations of a substantial number of small rural hospitals. This analysis must conform to the provisions of section 604 of the Regulatory Flexibility Act. For purposes of section **[*63175]** 1102(b) of the Act, we define a small rural hospital as a hospital that is located outside of a Metropolitan Statistical Area and has fewer than 50 beds.

This final rule will have little direct effect on payments to rural hospitals since this rule will change only payments made to physicians and certain other practitioners under Part B of the Medicare program and will not change payments to hospitals under Part A. We do not believe the changes will have a major, indirect effect on rural hospitals.

Therefore, we are not preparing an analysis for section 1102(b) of the Act since we have determined, and the Secretary certifies, that this rule will not have a significant impact on the operations of a substantial number of small rural hospitals.

# Regulations

## List of Subjects

*42 CFR Part 400*

Grant programs-health, Health facilities, Health maintenance organizations (HMO), Medicaid, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 405*

Administrative practice and procedure, Health facilities, Health professions, Kidney diseases, Medicare, Reporting and recordkeeping requirements, Rural areas, X-rays.

*42 CFR Part 410*

Health facilities, Health professions, Kidney diseases, Laboratories, Medicare, Rural areas, X-rays.

*42 CFR Part 411*

60 FR 63124

Kidney diseases, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 412*

Administrative practice and procedure, Health facilities, Medicare, Puerto Rico, Reporting and recordkeeping requirements.

*42 CFR Part 413*

Health facilities, Kidney diseases, Medicare, Puerto Rico, Reporting and recordkeeping requirements.

*42 CFR Part 414*

Administrative practice and procedure, Health facilities, Health professions, Kidney diseases, Medicare, Reporting and recordkeeping requirements, Rural areas, X-rays.

*42 CFR Part 415*

Health facilities, Health professions, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 417*

Administrative practice and procedure, Grant programs-health, Health care, Health facilities, Health insurance, Health maintenance organizations (HMO), Loan programs-health, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 489*

Health facilities, Medicare, Reporting and recordkeeping requirements.

Under the authority of *42 U.S.C. 1302* and *1395hh*, 42 CFR chapter IV is amended as set forth below:

## PART 400-- INTRODUCTION; DEFINITIONS

**A.** Part 400 is amended as set forth below:

**B.** The authority citation for part 400 continues to read as follows:

> **Authority:** Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*) and 44 U.S.C. Chapter 35.

**C.** In § 400.202, the introductory text is republished and the definition of *GME* is added in alphabetical order to read as follows:

### § 400.202 -- Definitions specific to Medicare.

> As used in connection with the Medicare program, unless the context indicates otherwise-
> * * * * *
>
> *GME* stands for graduate medical education.
> * * * * *

## PART 405-- FEDERAL HEALTH INSURANCE FOR THE AGED AND DISABLED

**B.** Part 405 is amended as set forth below:

### Subpart D-- [Removed and Reserved]

**1.** Subpart D, consisting of §§ 405.465 through 405.482, is removed and reserved.

**2.** Subpart E is amended as set forth below:

**a.** The authority citation for subpart E is revised to read as follows:

> **Authority:** Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*).

**b.** The heading for subpart E is revised to read as follows:

### Subpart E-- Criteria for Determining Reasonable Charges

60 FR 63124

c.   A new § 405.500 is added to read as follows:

**§ 405.500 -- Basis.**

**Subpart E is based on the provisions of the following sections of the Act: Section 1814(b) provides for Part A payment on the basis of the lesser of a provider's reasonable costs or customary charges. Section 1832 establishes the scope of benefits provided under the Part B supplementary medical insurance program. Section 1833(a) sets forth the amounts of payment for supplementary medical insurance services on the basis of the lesser of a provider's reasonable costs or customary charges. Section 1834(a) specifies how payments are made for the purchase or rental of new and used durable medical equipment for Medicare beneficiaries. Section 1834(b) provides for payment for radiologist services on a fee schedule basis. Section 1834(c) provides for payments and standards for screening mammography. Section 1842(b) sets forth the provisions for a carrier to enter into a contract with the Secretary and to make determinations with respect to Part B claims. Section 1842(h) sets forth the requirements for a physician or supplier to voluntarily enter into an agreement with the Secretary to become a participating physician or supplier. Section 1842(i) sets forth the provisions for the payment of Part B claims. Section 1848 establishes a fee schedule for payment of physician services. Section 1861(b) sets forth the inpatient hospital services covered by the Medicare program. Section 1861(s) sets forth medical and other health services covered by the Medicare program. Section 1861(v) sets forth the general authority under which HCFA may establish limits on provider costs recognized as reasonable in determining Medicare program payments. Section 1861(aa) sets forth the rural health clinic services and Federally qualified health center services covered by the Medicare program. Section 1861(jj) defines the term "covered osteoporosis drug." Section 1862(a)(14) lists services that are excluded from coverage. Section 1866(a) specifies the terms for provider agreements. Section 1881 authorizes special rules for the coverage of and payment for services furnished to patients with end-stage renal disease. Section 1886 sets forth the requirements for payment to hospitals for inpatient hospital services. Section 1887 sets forth  [*63176]  requirements for payment of provider-based physicians and payment under certain percentage arrangements. Section 1889 provides for Medicare and Medigap information by telephone.**

**§ 405.501 -- [Amended]**

d.   In § 405.501, the following changes are made:

i.   Paragraphs (c) and (d) are removed, and paragraphs (e) and (f) are redesignated as paragraphs (c) and (d), respectively.

ii.   In newly redesignated paragraph (c), the phrase "§§ 405.480 through 405.482 and §§ 405.550 through 405.557" is removed, and the phrase "§§ 415.55 through 415.70 and §§ 415.100 through 415.130 of this chapter" is added in its place.

iii.   In newly redesignated paragraph (d), the words "For services furnished on or after January 1, 1989, payment" are removed, and the word "Payment" is added in their place.

**§§ 405.520-405.525 -- [Removed]**

e.   Sections 405.520 through 405.525 are removed.

**Subpart F-- [Removed and Reserved]**

3.   Subpart F, consisting of §§ 405.550 through 405.580, is removed and reserved.

**Subpart X-- Rural Health Clinic and Federally Qualified Health Center Services**

4.   Subpart X is amended as set forth below:

a.   The authority citation for subpart X is revised to read as follows:

**Authority:**  Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*).

b.   A new § 405.2400 is added to read as follows:

**§ 405.2400 -- Basis.**

Justin Brooks

60 FR 63124

**Subpart X is based on the provisions of the following sections of the Act: Section 1833 sets forth the amounts of payment for supplementary medical insurance services. Section 1861(aa) sets forth the rural health clinic services and Federally qualified health center services covered by the Medicare program.**

c.  In § 405.2401, paragraph (b), the introductory text is republished, and the definition for physician is revised to read as follows:

### § 405.2401 -- Scope and definitions.

\* \* \* \* \*

  *(b) Definitions.* As used in this subpart, unless the context indicates otherwise:

  \* \* \* \* \*

  *Physician* means the following:

  **(1)** A doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which the function is performed.

  **(2)** Within limitations as to the specific services furnished, a doctor of dentistry or dental or oral surgery, a doctor of optometry, a doctor of podiatry or surgical chiropody or a chiropractor. (See section 1861(r) of the Act for specific limitations.)

  **(3)** A resident (including residents as defined in § 415.152 of this chapter who meet the requirements in § 415.206(b) of this chapter for payment under the physician fee schedule).

  \* \* \* \* \*

d.  In § 405.2468, the introductory text of paragraph (b) is republished, and paragraph (b)(1) is revised to read as follows:

### § 405.2468 -- Allowable costs.

\* \* \* \* \*

  *(b) Typical rural health clinic and Federally qualified health center costs.* The following types and items of cost are included in allowable costs to the extent that they are covered and reasonable:

  **(1)** Compensation for the services of physicians, (including residents as defined in § 415.152 of this chapter who meet the requirements in § 415.206(b) of this chapter for payment under the physician fee schedule), physician assistants, nurse practitioners, nurse midwives, specialized nurse practitioners, visiting nurses, qualified clinical psychologists, and clinical social workers employed by the clinic or center.

  \* \* \* \* \*

## PART 410-- SUPPLEMENTARY MEDICAL INSURANCE (SMI) BENEFITS

C.  Part 410 is amended as set forth below:

D.  The authority citation for part 410 continues to read as follows:

  **Authority:** Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*).

E.  Section 410.34 is amended by republishing the introductory text to paragraph (a) and revising paragraphs (a)(1), (a)(2), and (d) to read as follows:

### § 410.34 -- Mammography services: Conditions for and limitations on coverage.

  *(a) Definitions.* As used in this section, the following definitions apply:

  *(1) Diagnostic mammography* means a radiologic procedure furnished to a man or woman with signs or symptoms of breast disease, or a personal history of breast cancer, or a personal history of biopsy-proven benign breast disease, and includes a physician's interpretation of the results of the procedure.

60 FR 63124

**(2) *Screening mammography*** means a radiologic procedure furnished to a woman without signs or symptoms of breast disease, for the purpose of early detection of breast cancer, and includes a physician's interpretation of the results of the procedure.

* * * * *

**(d) *Limitations on coverage of screening mammography services.*** The following limitations apply to coverage of screening mammography services as described in paragraph (a)(2) of this section:

**(1)** The service must be, at a minimum a two-view exposure (that is, a cranio-caudal and a medial lateral oblique view) of each breast.

**(2)** Payment may not be made for screening mammography performed on a woman under age 35.

**(3)** Payment may be made for only 1 screening mammography performed on a woman over age 34, but under age 40.

**(4)** For a woman over age 39, but under age 50, the following limitations apply:

  **(i)** Payment may be made for a screening mammography performed after at least 11 months have passed following the month in which the last screening mammography was performed if the woman has-

    **(A)** A personal history of breast cancer;

    **(B)** A personal history of biopsy-proven benign breast disease;

    **(C)** A mother, sister, or daughter who has had breast cancer; or

    **(D)** Not given birth before age 30.

  **(ii)** If the woman does not meet the conditions described in paragraph (d)(4)(i) of this section, payment may be made for a screening mammography performed after at least 23 months have passed following the month in which the last screening mammography was performed.

**(5)** For a woman over age 49, but under age 65, payment may be made for a screening mammography performed after at least 11 months have passed **[\*63177]** following the month in which the last screening mammography was performed.

**(6)** For a woman over age 64, payment may be made for a screening mammography performed after at least 23 months have passed following the month in which the last screening mammography was performed.

## PART 414-- PAYMENT FOR PART B MEDICAL AND OTHER HEALTH SERVICES

**D.** Part 414 is amended as set forth below:

**E.** The authority citation for part 414 continues to read as follows:

  **Authority:** Secs. 1102, 1871, and 1881(b)(1) of the Social Security Act (*42 U.S.C. 1302*, *1395hh*, and *1395rr(b)(1)*).

**F.** In § 414.2, the following definitions are added alphabetically:

  **§ 414.2 -- Definitions.**

  *AA* stands for anesthesiologist assistant.

  * * * * *

  *CRNA* stands for certified registered nurse anesthetist.

  * * * * *

**G.** In § 414.28, the introductory text is republished, and paragraph (b) is revised to read as follows:

  **§ 414.28 -- Conversion factors.**

60 FR 63124

HCFA establishes CFs in accordance with section 1848(d) of the Act.

\* \* \* \* \*

(b) *Subsequent CFs.* For calendar years 1993 through 1995, the CF for each year is equal to the CF for the previous year, adjusted in accordance with § 414.30. Beginning January 1, 1996, the CF for each calendar year may be further adjusted so that adjustments to the fee schedule in accordance with section 1848(c)(2)(B)(ii) of the Act do not cause total expenditures under the fee schedule to differ by more than $ 20 million from the amount that would have been spent if these adjustments had not been made.

H.   In § 414.30, the introductory text to the section and the introductory text to paragraph (b) are republished, paragraph (b)(2) is revised, and paragraph (c) is added to read as follows:

### § 414.30 -- Conversion factor update.

Unless Congress acts in accordance with section 1848(d)(3) of the Act-

\* \* \* \* \*

(b) *Downward adjustment.* The downward adjustment may not exceed the following:

\* \* \* \* \*

(2)   For CY 1994, 2.5 percentage points.

\* \* \* \* \*

(c)   For CYs 1995 and thereafter, 5 percentage points.

I.   In § 414.32, the introductory text to paragraph (d) is republished and paragraph (d)(2) is revised to read as follows:

### § 414.32 -- Determining payments for certain physician services furnished in facility settings.

\* \* \* \* \*

(d) *Services excluded from the reduction.*The reduction established under this section does not apply to the following:

\* \* \* \* \*

(2)   Surgical services not on the ambulatory surgical center covered list of procedures published under § 416.65(c) of this chapter when furnished in an ambulatory surgical center.

\* \* \* \* \*

### § 414.46 -- [Amended]

6.   In § 414.46, the following changes are made:

a.   The word "procedure" in paragraph (g) is removed, and the word "service" is added in its place. The word "procedures" in paragraphs (a)(1), (e) and (g) is removed, and the word "services" is added in its place.

b.   Paragraphs (b), (c), and (d) are revised to read as follows:

### § 414.46 -- Additional rules for payment of anesthesia services.

\* \* \* \* \*

(b) *Determination of payment amount-Basic  rule.*For anesthesia services performed, medically directed, or medically supervised by a physician, HCFA pays the lesser of the actual charge or the anesthesia fee schedule amount.

(1)   The physician fee schedule amount for an anesthesia service is based on the product of the allowable base and time units and an anesthesia-specific CF.

(2)   The allowable base units are determined by the uniform relative value guide based on the 1988 American Society of Anesthesiologists' Relative Value Guide except that the number of

base units recognized for anesthesia services furnished during cataract or iridectomy surgery is four units. The uniform base units are identified in program operating instructions.

(3)   Modifier units are not allowed. Modifier units include additional units charged by a physician or a CRNA for patient health status, risk, age, or unusual circumstances.

### (c) Physician personally performs the anesthesia procedure.

(1)   HCFA considers an anesthesia service to be personally performed under any of the following circumstances:

(i)    The physician performs the entire anesthesia service alone.

(ii)   The physician establishes an attending physician relationship in one or two concurrent cases involving an intern or resident and the service was furnished before January 1, 1994.

(iii)  The physician establishes an attending physician relationship in one case involving an intern or resident and the service was furnished on or after January 1, 1994 but prior to January 1, 1996. For services on or after January 1, 1996, the physician must be the teaching physician as defined in §§ 415.170 through 415.184 of this chapter.

(iv)  The physician and the CRNA or AA are involved in a single case and the services of each are found to be medically necessary.

(v)   The physician is continuously involved in a single case involving a student nurse anesthetist.

(vi)  The physician is continuously involved in a single case involving a CRNA or AA and the service was furnished prior to January 1, 1998.

(2)   HCFA determines the fee schedule amount for an anesthesia service personally performed by a physician on the basis of an anesthesia-specific fee schedule CF and unreduced base units and anesthesia time units. One anesthesia time unit is equivalent to 15 minutes of anesthesia time, and fractions of a 15-minute period are recognized as fractions of an anesthesia time unit.

### (d) Anesthesia services medically directed by a physician.

(1)   HCFA considers an anesthesia service to be medically directed by a physician if:

(i)    The physician performs the activities described in § 415.110 of this chapter.

(ii)   The physician directs qualified individuals involved in two, three, or four concurrent cases.

(iii)  Medical direction can occur for a single case furnished on or after January 1, 1998 if the physician performs the activities described in § 415.110 of this **[\*63178]** chapter and medically directs a single CRNA or AA.

(2)   The rules for medical direction differ for certain time periods depending on the nature of the qualified individual who is directed by the physician. If more than two procedures are directed on or after January 1, 1994, the qualified individuals could be AAs, CRNAs, interns, or residents. The medical direction rules apply to student nurse anesthetists only if the physician directs two concurrent cases, each of which involves a student nurse anesthetist or the physician directs one case involving a student nurse anesthetist and the other involving a CRNA, AA, intern, or resident.

(3)   Payment for medical direction is based on a specific percentage of the payment allowance recognized for the anesthesia service personally performed by a physician alone. The following percentages apply for the years specified:

(i)    CY 1994-60 percent of the payment allowance for personally performed procedures.

60 FR 63124

    **(ii)** CY 1995-57.5 percent of the payment allowance for personally performed services.

    **(iii)** CY 1996-55 percent of the payment allowance for personally performed services.

    **(iv)** CY 1997-52.5 percent of the payment allowance for personally performed services.

    **(v)** CY 1998 and thereafter-50 percent of the payment allowance for personally performed services.

           * * * * *

**J.** Section 414.60 is revised to read as follows:

**§ 414.60 -- Payment for the services of CRNAs.**

    *(a) Basis for payment.* Beginning with CY 1994-

        **(1)** The allowance for an anesthesia service furnished by a medically directed CRNA is based on a fixed percentage of the allowance recognized for the anesthesia service personally performed by the physician alone, as specified in § 414.46(d)(3); and

        **(2)** The CF for an anesthesia service furnished by a CRNA not directed by a physician may not exceed the CF for a service personally performed by a physician.

    *(b) To whom payment may be made.* Payment for an anesthesia service furnished by a CRNA may be made to the CRNA or to any individual or entity (such as a hospital, rural primary care hospital, physician, group practice, or ambulatory surgical center) with which the CRNA has an employment or contract relationship that provides for payment to be made to the individual or entity.

    *(c) Condition for payment.* Payment for the services of a CRNA may be made only on an assignment related basis, and any assignment accepted by a CRNA is binding on any other person presenting a claim or request for payment for the service.

**Subpart H-- [Removed and Reserved]**

    **8.** Subpart H, consisting of §§ 414.450 through 414.453, is removed and reserved.

    **E.** A new part 415 is added to read as follows:

**PART 415-- SERVICES FURNISHED BY PHYSICIANS IN PROVIDERS, SUPERVISING PHYSICIANS IN TEACHING SETTINGS, AND RESIDENTS IN CERTAIN SETTINGS**

**Subpart A-- General Provisions**

    **Authority:** Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*).

**Subpart A-- General Provisions**

**§ 415.1 -- Basis and scope.**

    *(a) Basis.* This part is based on the provisions of the following sections of the Act: Section 1848 establishes a fee schedule for payment for physician services. Section 1861(q) specifies what is included in the term "physician services" covered under Medicare. Section 1862(a)(14) sets forth the exclusion of nonphysician services furnished to hospital patients under Part B of Medicare. Section 1886(d)(5)(B) provides for a payment adjustment under the prospective payment system for the operating costs of inpatient hospital services furnished to Medicare beneficiaries in cost reporting periods beginning on or after October 1, 1983, to account for the indirect costs of medical education. Section 1886(h) establishes the methodology for Medicare payment of the cost of direct GME activities.

    *(b) Scope.* This part sets forth rules for fiscal intermediary payments to providers for physician services, Part B carrier payments for physician services to beneficiaries in providers, physician services in teaching settings, and services of residents.

**Subpart B-- Fiscal Intermediary Payments to Providers for Physician Services**

### § 415.50 -- Scope.

This subpart sets forth rules for payment by fiscal intermediaries to providers for services furnished by **[*63179]** physicians. Payment for covered services is made either under the prospective payment system (PPS) to PPS-participating providers in accordance with part 412 of this chapter or under the reasonable cost method to non-PPS participating providers in accordance with part 413 of this chapter.

### § 415.55 -- General payment rules.

*(a) Allowable costs.* Except as specified otherwise in §§ 413.102 of this chapter (concerning compensation of owners), 415.60 (concerning allocation of physician compensation costs), and 415.162 (concerning payment for physician services furnished to beneficiaries in teaching hospitals), costs a provider incurs for services of physicians are allowable only if the following conditions are met:

**(1)** The services do not meet the conditions in § 415.102(a) regarding fee schedule payment for services of physicians to a beneficiary in a provider.

**(2)** The services include a surgeon's supervision of services of a qualified anesthetist, but do not include physician availability services, except for reasonable availability services furnished for emergency rooms and the services of standby surgical team physicians.

**(3)** The provider has incurred a cost for salary or other compensation it furnished the physician for the services.

**(4)** The costs incurred by the provider for the services meet the requirements in § 413.9 of this chapter regarding costs related to patient care.

**(5)** The costs do not include supervision of interns and residents unless the provider elects reasonable cost payment as specified in § 415.160, or any other costs incurred in connection with an approved GME program that are payable under § 413.86 of this chapter.

*(b) Allocation of allowable costs.* The provider must follow the rules in § 415.60 regarding allocation of physician compensation costs to determine its costs of services.

*(c) Limits on allowable costs.* The intermediary must apply the limits on compensation set forth in § 415.70 to determine its payments to a provider for the costs of services.

### § 415.60 -- Allocation of physician compensation costs.

*(a) Definition.* For purposes of this subpart, *physician compensation costs* means monetary payments, fringe benefits, deferred compensation, and any other items of value (excluding office space or billing and collection services) that a provider or other organization furnishes a physician in return for the physician services. Other organizations are entities related to the provider within the meaning of § 413.17 of this chapter or entities that furnish services for the provider under arrangements within the meaning of the Act.

*(b) General rule.* Except as provided in paragraph (d) of this section, each provider that incurs physician compensation costs must allocate those costs, in proportion to the percentage of total time that is spent in furnishing each category of services, among-

**(1)** Physician services to the provider (as described in § 415.55);

**(2)** Physician services to patients (as described in § 415.102); and

**(3)** Activities of the physician, such as funded research, that are not paid under either Part A or Part B of Medicare.

*(c) Allowable physician compensation costs.* Only costs allocated to payable physician services to the provider (as described in § 415.55) are allowable costs to the provider under this subpart.

**(d) Allocation of all compensation to services to the provider.** Generally, the total physician compensation received by a physician is allocated among all services furnished by the physician, unless-

    **(1)** The provider certifies that the compensation is attributable solely to the physician services furnished to the provider; and

    **(2)** The physician bills all patients for the physician services he or she furnishes to them and personally receives the payment from or on behalf of the patients. If returned directly or indirectly to the provider or an organization related to the provider within the meaning of § 413.17 of this chapter, these payments are not compensation for physician services furnished to the provider.

**(e) Assumed allocation of all compensation to beneficiary services.** If the provider and physician agree to accept the assumed allocation of all the physician services to direct services to beneficiaries as described under § 415.102(a), HCFA does not require a written allocation agreement between the physician and the provider.

**(f) Determination and payment of allowable physician compensation costs.**

    **(1)** Except as provided under paragraph (e) of this section, the intermediary pays the provider for these costs only if-

        **(i)** The provider submits to the intermediary a written allocation agreement between the provider and the physician that specifies the respective amounts of time the physician spends in furnishing physician services to the provider, physician services to patients, and services that are not payable under either Part A or Part B of Medicare; and

        **(ii)** The compensation is reasonable in terms of the time devoted to these services.

    **(2)** In the absence of a written allocation agreement, the intermediary assumes, for purposes of determining reasonable costs of the provider, that 100 percent of the physician compensation cost is allocated to services to beneficiaries as specified in paragraph (b)(2) of this section.

**(g) Recordkeeping requirements.** Except for services furnished in accordance with the assumed allocation under paragraph (e) of this section, each provider that claims payment for services of physicians under this subpart must meet all of the following requirements:

    **(1)** Maintain the time records or other information it used to allocate physician compensation in a form that permits the information to be validated by the intermediary or the carrier.

    **(2)** Report the information on which the physician compensation allocation is based to the intermediary or the carrier on an annual basis and promptly notify the intermediary or carrier of any revisions to the compensation allocation.

    **(3)** Retain each physician compensation allocation, and the information on which it is based, for at least 4 years after the end of each cost reporting period to which the allocation applies.

### § 415.70 -- Limits on compensation for physician services in providers.

**(a) Principle and scope.**

    **(1)** Except as provided in paragraphs (a)(2) and (a)(3) of this section, HCFA establishes reasonable compensation equivalency limits on the amount of compensation paid to physicians by providers. These limits are applied to a provider's costs incurred in compensating physicians for services to the provider, as described in § 415.55(a).

    **(2)** Limits established under this section do not apply to costs of physician compensation attributable to furnishing inpatient hospital services that are paid for under the prospective **[*63180]** payment system implemented under part 412 of this chapter or to costs of physician compensation attributable to approved GME programs that are payable under § 413.86 of this chapter.

60 FR 63124

**(3)** Compensation that a physician receives for activities that may not be paid for under either Part A or Part B of Medicare is not considered in applying these limits.

*(b) Methodology for establishing limits.* HCFA establishes a methodology for determining annual reasonable compensation equivalency limits and, to the extent possible, considers average physician incomes by specialty and type of location using the best available data.

*(c) Application of limits.* If the level of compensation exceeds the limits established under paragraph (b) of this section, Medicare payment is based on the level established by the limits.

*(d) Adjustment of the limits.* The intermediary may adjust limits established under paragraph (b) of this section to account for costs incurred by the physician or the provider related to malpractice insurance, professional memberships, and continuing medical education.

**(1)** For the costs of membership in professional societies and continuing medical education, the intermediary may adjust the limit by the lesser of-

**(i)** The actual cost incurred by the provider or the physician for these activities; or

**(ii)** Five percent of the appropriate limit.

**(2)** For the cost of malpractice expenses incurred by either the provider or the physician, the intermediary may adjust the reasonable compensation equivalency limit by the cost of the malpractice insurance expense related to the physician service furnished to patients in providers.

*(e) Exception to limits.* An intermediary may grant a provider an exception to the limits established under paragraph (b) of this section only if the provider can demonstrate to the intermediary that it is unable to recruit or maintain an adequate number of physicians at a compensation level within these limits.

*(f) Notification of changes in methodologies and payment limits.*

**(1)** Before the start of a cost reporting period to which limits established under this section will be applied, HCFA publishes a notice in the **Federal Register** that sets forth the amount of the limits and explains how it calculated the limits.

**(2)** If HCFA proposes to revise the methodology for establishing payment limits under this section, HCFA publishes a notice, with opportunity for public comment, in the **Federal Register**. The notice explains the proposed basis and methodology for setting limits, specifies the limits that would result, and states the date of implementation of the limits.

**(3)** If HCFA updates limits by applying the most recent economic index data without revising the limit methodology, HCFA publishes the revised limits in a notice in the **Federal Register** without prior publication of a proposal or public comment period.

### Subpart C-- Part B Carrier Payments for Physician Services to Beneficiaries in Providers

### § 415.100 -- Scope.

This subpart implements section 1887(a)(1)(A) of the Act by providing general conditions that must be met in order for services furnished by physicians to beneficiaries in providers to be paid for on the basis of the physician fee schedule under part 414 of this chapter. Section 415.102 sets forth the conditions for fee schedule payment for physician services to beneficiaries in providers. Section 415.105 sets forth general requirements for determining the amounts of payment for services that meet the conditions of this section. Sections 415.120 and 415.130 set forth additional conditions for payment for physician services in the specialties of radiology and pathology (laboratory services).

### § 415.102 -- Conditions for fee schedule payment for physician services to beneficiaries in providers.

*(a) General rule.* If the physician furnishes services to beneficiaries in providers, the carrier pays on a fee schedule basis provided the following requirements are met:

(1) The services are personally furnished for an individual beneficiary by a physician.

(2) The services contribute directly to the diagnosis or treatment of an individual beneficiary.

(3) The services ordinarily require performance by a physician.

(4) In the case of radiology or laboratory services, the additional requirements in § 415.120 or § 415.130, respectively, are met.

*(b) Exception.* If a physician furnishes services in a provider that do not meet the requirements in paragraph (a) of this section, but are related to beneficiary care furnished by the provider, the intermediary pays for those services, if otherwise covered. The intermediary follows the rules in §§ 415.55 and 415.60 for payment on the basis of reasonable cost or PPS, as appropriate.

*(c) Effect of billing charges for physician services to a provider.*

(1) If a physician furnishes services that may be paid under the reasonable cost rules in § 415.55 or § 415.60, and paid by the intermediary, or would be paid under those rules except for the PPS rules in part 412 of this chapter, and under the payment rules for GME established by § 413.86 of this chapter, neither the provider nor the physician may seek payment from the carrier, beneficiary, or another insurer.

(2) If a physician furnishes services to an individual beneficiary that do not meet the applicable conditions in §§ 415.120 (concerning conditions for payment for radiology services) and 415.130 (concerning conditions for payment for physician pathology services), the carrier does not pay on a fee schedule basis.

(3) If the physician, the provider, or another entity bills the carrier or the beneficiary or another insurer for physician services furnished to the provider, as described in § 415.55(a), HCFA considers the provider to which the services are furnished to have violated its provider participation agreement, and may terminate that agreement. See part 489 of this chapter for rules governing provider agreements.

*(d) Effect of physician assumption of operating costs.* If a physician or other entity enters into an agreement (such as a lease or concession) with a provider, and the physician (or entity) assumes some or all of the operating costs of the provider department in which the physician furnishes physician services, the following rules apply:

(1) If the conditions set forth in paragraph (a) of this section are met, the carrier pays for the physician services under the physician fee schedule in part 414 of this chapter.

(2) To the extent the provider incurs a cost payable on a reasonable cost basis under part 413 of this chapter, the intermediary pays the provider on a reasonable cost basis for the costs associated with producing these services, including overhead, supplies, equipment costs, and services furnished by nonphysician personnel.

(3) The physician (or other entity) is treated as being related to the provider within the meaning of § 413.17 of this **[*63181]** chapter (concerning cost to related organizations).

(4) The physician (or other entity) must make its books and records available to the provider and the intermediary as necessary to verify the nature and extent of the costs of the services furnished by the physician (or other entity).

### § 415.105 -- Amounts of payment for physician services to beneficiaries in providers.

*(a) General rule.* The carrier determines amounts of payment for physician services to beneficiaries in providers in accordance with the general rules governing the physician fee schedule payment in part 414 of this chapter, except as provided in paragraph (b) of this section.

*(b) Application in certain settings -*

60 FR 63124

**(1)** *Teaching hospitals.* The carrier applies the rules in subpart D of this part (concerning physician services in teaching settings), in addition to those in this section, in determining whether fee schedule payment should be made for physician services to individual beneficiaries in a teaching hospital.

**(2)** *Hospital-based ESRD facilities.* The carrier applies §§ 414.310 through 414.314 of this chapter, which set forth determination of reasonable charges under the ESRD program, to determine the amount of payment for physician services furnished to individual beneficiaries in a hospital-based ESRD facility approved under part 405 subpart U.

## § 415.110 -- Conditions for payment: Anesthesiology services.

**(a)** *Services furnished directly or concurrently.* The carrier pays a physician for anesthesia services furnished to patients in a provider on a fee schedule basis only if the services meet the conditions in § 415.102(a) and the following additional conditions:

**(1)** For each patient, the physician-

**(i)** Performs a pre-anesthetic examination and evaluation;

**(ii)** Prescribes the anesthesia plan;

**(iii)** Personally participates in the most demanding procedures in the anesthesia plan, including induction and emergence;

**(iv)** Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual as defined in program operating instructions;

**(v)** Monitors the course of anesthesia administration at frequent intervals;

**(vi)** Remains physically present and available for immediate diagnosis and treatment of emergencies; and

**(vii)** Provides indicated post-anesthesia care.

**(2)** The physician performs the procedure personally or directs no more than four anesthesia procedures concurrently and does not perform any other services while he or she is directing the concurrent procedures.

**(b)** *Supervision of more than four procedures concurrently.* If a physician is involved in furnishing more than four procedures concurrently, or is performing other services while directing the concurrent procedures, the concurrent anesthesia services are physician services to the provider in which the procedures are performed. In these cases, the physician is not required to meet the criteria of paragraphs (a)(1) (iii) and (vii) of this section personally, but must ensure that a qualified individual performs any procedure in which the physician does not personally participate. In these cases, the intermediary pays for the services under the rules in §§ 415.55 and 415.60 on reasonable cost payment for physician services to providers or under the rules in part 412 of this chapter for payment under the prospective payment system.

## § 415.120 -- Conditions for payment: Radiology services.

**(a)** *Services to beneficiaries.* The carrier pays for radiology services furnished by a physician to a beneficiary on a fee schedule basis only if the services meet the conditions for fee schedule payment in § 415.102(a) and are identifiable, direct, and discrete diagnostic or therapeutic services furnished to an individual beneficiary, such as interpretation of x-ray plates, angiograms, myelograms, pyelograms, or ultrasound procedures. The carrier pays for interpretations only if there is a written report prepared for inclusion in the patient's medical record maintained by the hospital.

**(b)** *Services to providers.* The carrier does not pay on a fee schedule basis for physician services to the provider (for example, administrative or supervisory services) or for provider services needed to produce the x-ray films or other items that are interpreted by the radiologist. However, the

60 FR 63124

intermediary pays the provider for these services in accordance with § 415.55 for provider costs; § 415.102(d)(2) for costs incurred by a physician, such as under a lease or concession agreement; or part 412 of this chapter for payment under PPS.

### § 415.130 -- Conditions for payment: Physician pathology services.

*(a) Physician pathology services.*The carrier pays for pathology services furnished by a physician to an individual beneficiary on a fee schedule basis only if the services meet the conditions for payment in § 415.102(a) and are one of the following services:

**(1)** Surgical pathology services.

**(2)** Specific cytopathology, hematology, and blood banking services that have been identified to require performance by a physician and are listed in program operating instructions.

**(3)** Clinical consultation services that meet the requirements in paragraph (b) of this section.

**(4)** Clinical laboratory interpretative services that meet the requirements of paragraphs (b)(1), (b)(3), and (b)(4) of this section and that are specifically listed in program operating instructions.

*(b) Clinical consultation services.*For purposes of this section, clinical consultation services must meet the following requirements:

**(1)** Be requested by the beneficiary's attending physician.

**(2)** Relate to a test result that lies outside the clinically significant normal or expected range in view of the condition of the beneficiary.

**(3)** Result in a written narrative report included in the beneficiary's medical record.

**(4)** Require the exercise of medical judgment by the consultant physician.

*(c) Physician pathology services furnished by an independent laboratory.*Laboratory services, including the technical component of a service, furnished to a hospital inpatient or outpatient by an independent laboratory are paid on a fee schedule basis under this subpart only if they are physician pathology services as described in paragraph (a) of this section.

### Subpart D-- Physician Services in Teaching Settings

### § 415.150 -- Scope.

This subpart sets forth the rules governing payment for the services of physicians in teaching settings and the criteria for determining whether the payments are made as one of the following:

**(a)** Services to the hospital under the reasonable cost election in §§ 415.160 through 415.164. **[*63182]**

**(b)** Provider services through the direct GME payment mechanism in § 413.86 of this chapter.

**(c)** Physician services to beneficiaries under the physician fee schedule as set forth in part 414 of this chapter.

### § 415.152 -- Definitions.

As used in this subpart-

*Approved graduate medical education (GME) program* means a residency program approved by the Accreditation Council for Graduate Medical Education of the American Medical Association, by the Committee on Hospitals of the Bureau of Professional Education of the American Osteopathic Association, by the Council on Dental Education of the American Dental Association, or by the Council on Podiatric Medicine Education of the American Podiatric Medical Association.

*Direct medical and surgical services* means services to individual beneficiaries that are either personally furnished by a physician or furnished by a resident under the supervision of a physician in a teaching hospital making the cost election described in §§ 415.160 through 415.162.

*Nonprovider setting* means a setting other than a hospital, skilled nursing facility, home health agency, or comprehensive outpatient rehabilitation facility in which residents furnish services. These include, but are not limited to, family practice or multispecialty clinics and physician offices.

*Resident* means one of the following:

**(1)** An individual who participates in an approved GME program, including programs in osteopathy, dentistry, and podiatry.

**(2)** A physician who is not in an approved GME program, but who is authorized to practice only in a hospital, for example, individuals with temporary or restricted licenses, or unlicensed graduates of foreign medical schools. For purposes of this subpart, the term *resident* is synonymous with the terms *intern* and *fellow.*

*Teaching hospital* means a hospital engaged in an approved GME residency program in medicine, osteopathy, dentistry, or podiatry.

*Teaching physician* means a physician (other than another resident) who involves residents in the care of his or her patients.

*Teaching setting* means any provider, hospital-based provider, or nonprovider settings in which Medicare payment for the services of residents is made under the direct GME payment provisions of § 413.86, or on a reasonable-cost basis under the provisions of § 409.26 or § 409.40(f) for resident services furnished in skilled nursing facilities or home health agencies, respectively.

### § 415.160 -- Election of reasonable cost payment for direct medical and surgical services of physicians in teaching hospitals: General provisions.

**(a) Scope.** A teaching hospital may elect to receive payment on a reasonable cost basis for the direct medical and surgical services of its physicians in lieu of fee schedule payments that might otherwise be made for these services.

**(b) Conditions.** A teaching hospital may elect to receive these payments only if-

**(1)** The hospital notifies its intermediary in writing of the election and meets the conditions of either paragraph (b)(2) or paragraph (b)(3) of this section;

**(2)** All physicians who furnish services to Medicare beneficiaries in the hospital agree not to bill charges for these services; or

**(3)** All physicians who furnish services to Medicare beneficiaries in the hospital are employees of the hospital and, as a condition of employment, are precluded from billing for these services.

**(c) Effect of election.** If a teaching hospital elects to receive reasonable cost payment for physician direct medical and surgical services furnished to beneficiaries-

**(1)** Those services and the supervision of interns and residents furnishing care to individual beneficiaries are covered as hospital services, and

**(2)** The intermediary pays the hospital for those services on a reasonable cost basis under the rules in § 415.162. (Payment for other physician compensation costs related to approved GME programs is made as described in § 413.86 of this chapter.)

**(d) Election declined.** If the teaching hospital does not make this election, payment is made-

**(1)** For physician services furnished to beneficiaries on a fee schedule basis as described in part 414 subject to the rules in this subpart, and

**(2)** For the supervision of interns and residents as described in § 413.86.

### § 415.162 -- Determining payment for physician services furnished to beneficiaries in teaching hospitals.

60 FR 63124

**(a) General rule.** Payments for direct medical and surgical services of physicians furnished to beneficiaries and supervision of interns and residents furnishing care to beneficiaries is made by Medicare on the basis of reasonable cost if the hospital exercises the election as provided for in § 415.160. If this election is made, the following occurs:

**(1)** Physician services furnished to beneficiaries and supervision of interns and residents furnishing care to beneficiaries are paid on a reasonable-cost basis, as provided for in paragraph (b) of this section.

**(2)** Payment for certain medical school costs may be made as provided for in paragraph (c) of this section.

**(3)** Payments for services donated by volunteer physicians to beneficiaries are made to a fund designated by the organized medical staff of the teaching hospital or medical school as provided for in paragraph (d) of this section.

**(b) Reasonable cost of physician services and supervision of interns and residents.**

**(1)** Physician services furnished to beneficiaries and supervision of interns and residents furnishing care to beneficiaries in a teaching hospital are payable as provider services on a reasonable-cost basis.

**(2)** For purposes of this paragraph, *reasonable cost* is defined as the direct salary paid to these physicians, plus applicable fringe benefits.

**(3)** The costs must be allocated to the services as provided by paragraph (j) of this section and apportioned to program beneficiaries as provided by paragraph (g) of this section.

**(4)** Other allowable costs incurred by the provider related to the services described in this paragraph are payable subject to the requirements applicable to all other provider services.

**(c) Reasonable costs for the services furnished by a medical school or related organization in a hospital.**An amount is payable to the hospital by HCFA under the Medicare program provided that the costs would be payable if incurred directly by the hospital rather than under the arrangement. The amount must not be in excess of the reasonable costs (as defined in paragraphs (c)(1) and (c)(2) of this section) incurred by a teaching hospital for services furnished by a medical school or organization as described in § 413.17 of this chapter for certain costs to the medical school (or a related organization) in furnishing services in the hospital.

**(1) Reasonable costs of physician services.**

**(i) When the medical school and the hospital are related organizations.**If the  **[*63183]** medical school (or organization related to the medical school) and the hospital are related by common ownership or control as described in § 413.17 of this chapter-

**(A)** The costs of these services are allowable costs to the hospital under the provisions of § 413.17 of this chapter; and

**(B)** The reimbursable costs to the hospital are determined under the provisions of this section in the same manner as the costs incurred for physicians on the hospital staff and without regard to payments made to the medical school by the hospital.

**(ii) When the medical school and the hospital are not related organizations.**

**(A)** If the medical school and the hospital are not related organizations under the provisions of § 413.17 of this chapter and the hospital makes payment to the medical school for the costs of those services furnished to all patients, payment is made by Medicare to the hospital for the reasonable cost incurred by the hospital for its payments to the medical school for services furnished to beneficiaries.

**(B)** Costs incurred under an arrangement must be allocated to the full range of services furnished to the hospital by the medical school physicians on the same basis as

provided for under paragraph (j) of this section, and costs allocated to direct medical and surgical services furnished to hospital patients must be apportioned to beneficiaries as provided for under paragraph (g) of this section.

**(C)** If the medical school and the hospital are not related organizations under the provisions of § 413.17 of this chapter and the hospital makes payment to the medical school only for the costs of those services furnished to beneficiaries, costs of the medical school not to exceed 105 percent of the sum of physician direct salaries, applicable fringe benefits, employer's portion of FICA taxes, Federal and State unemployment taxes, and workmen's compensation paid by the medical school or an organization related to the medical school may be recognized as allowable costs of the medical school.

**(D)** These allowable medical school costs must be allocated to the full range of services furnished by the physicians of the medical school or organization related as provided by paragraph (j) of this section.

**(E)** Costs allocated to direct medical and surgical services furnished to hospital patients must be apportioned to beneficiaries as provided by paragraph (g) of this section.

**(2) Reasonable costs of other than direct medical and surgical services.** These costs are determined in accordance with paragraph (c)(1) of this section except that-

**(i)** If the hospital makes payment to the medical school for other than direct medical and surgical services furnished to beneficiaries and supervision of interns and residents furnishing care to beneficiaries, these payments are subject to the required cost-finding and apportionment methods applicable to the cost of other hospital services (except for direct medical and surgical services furnished to beneficiaries); or

**(ii)** If the hospital makes payment to the medical school only for these services furnished to beneficiaries, the cost of these services is not subject to cost-finding and apportionment as otherwise provided by this subpart, and the reasonable cost paid by Medicare must be determined on the basis of the health insurance ratio(s) used in the apportionment of all other provider costs (excluding physician direct medical and surgical services furnished to beneficiaries) applied to the allowable medical school costs incurred by the medical school for the services furnished to all patients of the hospital.

**(d) "Salary equivalent" payments for direct medical and surgical services furnished by physicians on the voluntary staff of the hospital.**

**(1)** HCFA makes payments under the Medicare program to a fund as defined in § 415.164 for direct medical and surgical services furnished to beneficiaries on a regularly scheduled basis by physicians on the unpaid voluntary medical staff of the hospital (or medical school under arrangement with the hospital).

**(i)** These payments represent compensation for contributed medical staff time which, if not contributed, would have to be obtained through employed staff on a payable basis.

**(ii)** Payments for volunteer services are determined by applying to the regularly scheduled contributed time an hourly rate not to exceed the equivalent of the average direct salary (exclusive of fringe benefits) paid to all full-time, salaried physicians (other than interns and residents) on the hospital staff or, if the number of full-time salaried physicians is minimal in absolute terms or in relation to the number of physicians on the voluntary staff, to physicians at like institutions in the area.

**(iii)** This "salary equivalent" is a single hourly rate covering all physicians regardless of specialty and is applied to the actual regularly scheduled time contributed by the physicians in furnishing direct medical and surgical services to beneficiaries including supervision of interns and residents in that care.

**(iv)** A physician who receives any compensation from the hospital or a medical school related to the hospital by common ownership or control (within the meaning of § 413.17 of this chapter) for direct medical and surgical services furnished to any patient in the hospital is not considered an unpaid voluntary physician for purposes of this paragraph.

**(v)** If, however, a physician receives compensation from the hospital or related medical school or organization only for services that are other than direct medical and surgical services, a salary equivalent payment for the physician's regularly scheduled direct medical and surgical services to beneficiaries in the hospital may be imputed. However, the sum of the imputed value for volunteer services and the physician's actual compensation from the hospital and the related medical school (or organization) may not exceed the amount that would have been imputed if all of the physician's hospital and medical school services (compensated and volunteer) had been volunteer services, or paid at the rate of $ 30,000 per year, whichever is less.

**(2)** The following examples illustrate how the allowable imputed value for volunteer services is determined. In each example, it has been assumed that the average salary equivalent hourly rate is equal to the hourly rate for the individual physician's compensated services.

*Example No: 1.* Dr. Jones received $ 3,000 a year from Hospital X for services other than direct medical services to all patients, for example, utilization review and administrative services. Dr. Jones also voluntarily furnished direct medical services to beneficiaries. The imputed value of the volunteer services amounted to $ 10,000 for the cost reporting period. The full imputed value of Dr. Jones' volunteer direct medical services would be allowed since the total amount of the imputed value ($ 10,000) and the compensated services ($ 3,000) does not exceed $ 30,000.

*Example No: 2.* Dr. Smith received $ 25,000 from Hospital X for services as a department head in a teaching hospital. Dr. Smith also voluntarily furnished direct medical services to beneficiaries. The imputed value of the **[*63184]** volunteer services amounted to $ 10,000. Only $ 5,000 of the imputed value of volunteer services would be allowed since the total amount of the imputed value ($ 10,000) and the compensated services ($ 25,000) exceeds the $ 30,000 maximum amount allowable for all of Dr. Smith's services.

Computation:

| | |
|---|---|
| Maximum amount allowable for all services performed by Dr. Smith for purposes of this computation | $ 30,000 |
| Less compensation received from Hospital X for other than direct medical services to individual patients | $ 25,000 |
| Allowable amount of imputed value for the volunteer services furnished by Dr. Smith | $ 5,000 |

*Example No. 3.* Dr. Brown is not compensated by Hospital X for any services furnished in the hospital. Dr. Brown voluntarily furnished direct surgical services to beneficiaries for a period of 6 months, and the imputed value of these services amounted to $ 20,000. The allowable amount of the imputed value for volunteer services furnished by Dr. Brown would be limited to $ 15,000 ($ 30,000 x 6/12).

**(3)** The amount of the imputed value for volunteer services applicable to beneficiaries and payable to a fund is determined in accordance with the aggregate per diem method described in paragraph (g) of this section.

**(4)** Medicare payments to a fund must be used by the fund solely for improvement of care of hospital patients or for educational or charitable purposes (which may include but are not limited to medical and other scientific research).

60 FR 63124

    (i) No personal financial gain, either direct or indirect, from benefits of the fund may inure to any of the hospital staff physicians, medical staff faculty, or physicians for whom Medicare imputes costs for purposes of payment into the fund.

    (ii) Expenses met from contributions made to the hospital from a fund are not included as a reimbursable cost when expended by the hospital, and depreciation expense is not allowed with respect to equipment or facilities donated to the hospital by a fund or purchased by the hospital from monies in a fund.

*(e) Requirements for payment -*

    *(1) Physicians on the hospital staff.*The requirements under which the costs of physician direct medical and surgical services (including supervision of interns and residents) to beneficiaries are the same as those applicable to the cost of all other covered provider services except that the costs of these services are separately determined as provided by this section and are not subject to cost-finding as described in § 413.24 of this chapter.

    *(2) Physicians on the medical school faculty.*Payment is made to a hospital for the costs of services of physicians on the medical school faculty, provided that if the medical school is not related to the hospital (within the meaning of § 413.17 of this chapter, concerning cost to related organizations), the hospital does not make payment to the medical school for services furnished to all patients and the following requirements are met: If the hospital makes payment to the medical school for services furnished to all patients, these requirements do not apply. (See paragraph (c)(1)(ii) of this section.)

    (i) There is a written agreement between the hospital and the medical school or organization, specifying the types and extent of services to be furnished by the medical school and specifying that the hospital must pay to the medical school an amount at least equal to the reasonable cost (as defined in paragraph (c) of this section) of furnishing the services to beneficiaries.

    (ii) The costs are paid to the medical school by the hospital no later than the date on which the cost report covering the period in which the services were furnished is due to HCFA.

    (iii) Payment for the services furnished under an arrangement would have been made to the hospital had the services been furnished directly by the hospital.

    *(3) Physicians on the voluntary staff of the hospital (or medical school under arrangement with the hospital).*If the conditions for payment to a fund outlined in § 415.164 are met, payments are made on a "salary equivalent" basis (as defined in paragraph (d) of this section) to a fund.

*(f) Requirements for payment for medical school faculty services other than physician direct medical and surgical services.*If the requirements for payment for physician direct medical and surgical services furnished to beneficiaries in a teaching hospital described in paragraph (e) of this section are met, payment is made to a hospital for the costs of medical school faculty services other than physician direct medical and surgical services furnished in a teaching hospital.

*(g) Aggregate per diem methods of apportionment -*

    *(1) For the costs of physician direct medical and surgical services.*The cost of physician direct medical and surgical services furnished in a teaching hospital to beneficiaries is determined on the basis of an average cost per diem as defined in paragraph (h)(1) of this section for physician direct medical and surgical services to all patients (see §§ 415.172 through 415.184) for each of the following categories of physicians:

    (i) Physicians on the hospital staff.

    (ii) Physicians on the medical school faculty.

**(2)** *For the imputed value of physician volunteer direct medical and surgical services.* The imputed value of physician direct medical and surgical services furnished to beneficiaries in a teaching hospital is determined on the basis of an average per diem, as defined in paragraph (h)(1) of this section, for physician direct medical and surgical services to all patients except that the average per diem is derived from the imputed value of the physician volunteer direct medical and surgical services furnished to all patients.

### (h) Definitions.

**(1)** *Average cost per diem for physician direct medical and surgical services (including supervision of interns and residents) furnished in a teaching hospital to patients in each category of physician services described in paragraph (g)(1) of this section* means the amount computed by dividing total reasonable costs of these services in each category by the sum of-

    **(i)** Inpatient days (as defined in paragraph (h)(2) of this section); and

    **(ii)** Outpatient visit days (as defined in paragraph (h)(3) of this section).

**(2)** *Inpatient days* are determined by counting the day of admission as 3.5 days and each day after a patient's day of admission, except the day of discharge, as 1 day.

**(3)** *Outpatient visit days* are determined by counting only one visit day for each calendar day that a patient visits an outpatient department or multiple outpatient departments.

### (i) Application.

**(1)** The following illustrates how apportionment based on the aggregate per diem method for costs of physician direct medical and surgical services furnished in a teaching hospital to patients is determined.

#### Teaching Hospital Y

Statistical and financial data:

| | |
|---|---|
| Total inpatient days as defined in paragraph (h)(2) of this section and outpatient visit days as defined in paragraph (h)(3) of this section | 75,000 |
| Total inpatient Part A days | 20,000 |
| Total inpatient Part B days where Part A coverage is not available | 1,000 |
| Total outpatient Part B visit days | 5,000 |
| Total cost of direct medical and surgical services furnished to all patients by physicians on the hospital staff as determined in accordance with paragraph (i) of this section | $ 1,500,000 |
| Total cost of direct medical and surgical services furnished to all patients by physicians on the medical school faculty as determined in accordance with paragraph (i) of this section | $ 1,650,000 |

Computation of cost applicable to program for physicians on the hospital staff:

Average cost per diem for direct medical and surgical services to patients by physicians on the hospital staff: $ 1,500,000 75,000 = $ 20 per diem.

| | |
|---|---|
| Cost of physician direct medical and surgical services furnished to inpatient beneficiaries covered under Part A: $ 20 per diem x 20,000 | $ 400,000 |
| Cost of physician direct medical and surgical services furnished to inpatient beneficiaries covered under Part B: $ 20 per diem x 1,000 | $ 20,000 |
| Cost of physician direct medical and surgical services | $ 100,000 |

60 FR 63124

furnished to outpatient beneficiaries covered under Part B:
$ 20 per diem x 5,000

Computation of cost applicable to program for physicians on the medical school faculty:

Average cost per diem for direct medical and surgical services to patients by physicians on the medical school faculty: $ 1,650,000 75,000 = $ 22 per diem.

| | |
|---|---|
| Cost of physician direct medical and surgical services furnished to inpatient beneficiaries covered under Part A: $ 22 per diem x 20,000 | $ 440,000 |
| Cost of physician direct medical and surgical services furnished to inpatient beneficiaries covered under Part B: $ 20 per diem x 1,000 | $ 22,000 |
| Cost of physician direct medical and surgical services furnished to outpatient beneficiaries covered under Part B: $ 22 per diem x 5,000 | $ 110,000 |

(2) The following illustrates how the imputed value of physician volunteer direct medical and surgical services furnished in a teaching hospital to beneficiaries is determined.

*Example:* The physicians on the medical staff of Teaching Hospital Y donated a total of 5,000 hours in furnishing direct medical and surgical services to patients of the hospital during a cost reporting period and did not receive any compensation from either the hospital or the medical school. Also, the imputed value for any physician volunteer services did not exceed the rate of $ 30,000 per year per physician.

Statistical and financial data:

| | |
|---|---|
| Total salaries paid to the full-time salaried physicians by the hospital (excluding interns and residents) | $ 800,000 |
| Total physicians who were paid for an average of 40 hours per week or 2,080 (52 weeks x 40 hours per week) hours per year | 20 |
| Average hourly rate equivalent: $ 800,000 41,600 (2,080 x 20) | $ 19.23 |

Computation of total imputed value of physician volunteer services applicable to all patients:

| | |
|---|---|
| (Total donated hours x average hourly rate equivalent): 5,000 x $ 19.23 | $ 96,150 |
| Total inpatient days (as defined in paragraph (h)(2) of this section) and outpatient visit days (as defined in paragraph (h)(3) of this section) | 75,000 |
| Total inpatient Part A days | 20,000 |
| Total inpatient Part B days if Part A coverage is not available | 1,000 |
| Total outpatient Part B visit days | 5,000 |

Computation of imputed value of physician volunteer direct medical and surgical services furnished to Medicare beneficiaries:

Average per diem for physician direct medical and surgical services to all patients: $ 96,150 75,000 = $ 1.28 per diem

| | |
|---|---|
| Imputed value of physician direct medical and surgical services furnished to inpatient beneficiaries covered under Part A: $ 1.28 per diem x 20,000 | $ 25,600 |
| Imputed value of physician direct medical and surgical services furnished to inpatient beneficiaries covered under Part B: $ 1.28 per diem x 1,000 | $ 1,280 |
| Imputed value of physician direct medical and surgical | $ 6,400 |

services furnished to outpatient beneficiaries covered
under Part B: $ 1.28 per diem x 5,000
Total     $ 33,280

### *(j) Allocation of compensation paid to physicians in a teaching hospital.*

**(1)** In determining reasonable cost under this section, the compensation paid by a teaching hospital, or a medical school or related organization under arrangement with the hospital, to physicians in a teaching hospital must be allocated to the full range of services implicit in the physician compensation arrangements. (However, see paragraph (d) of this section for the computation of the "salary equivalent" payments for volunteer services furnished to patients.)

**(2)** This allocation must be made and must be capable of substantiation on the basis of the proportion of each physician's time spent in furnishing each type of service to the hospital or medical school.

### § 415.164 -- Payment to a fund.

*(a) General rules.* Payment for certain voluntary services by physicians in teaching hospitals (as these services are described in § 415.160) is made on a salary equivalent basis (as described in § 415.162(d)) subject to the conditions and limitations contained in parts 405 and 413 of this chapter and this part 415, to a single fund (as defined in paragraph (b) of this section) designated by the organized medical staff of the hospital (or, if the services are furnished in the hospital by the faculty of a medical school, to a fund as may be designated by the faculty), if the following conditions are met:

**(1)** The hospital (or medical school furnishing the services under arrangement with the hospital) incurs no actual cost in furnishing the services.

**(2)** The hospital has an agreement with HCFA under part 489 of this chapter.

**(3)** The intermediary, or HCFA as appropriate, has received written assurances that-

    **(i)** The payment is used solely for the improvement of care of hospital patients or for educational or charitable purposes; and

    **(ii)** Neither the individuals who are furnished the services nor any other persons are charged for the services (and if charged, provision is made for the return of any monies incorrectly collected).   **[*63186]**

*(b) Definition of a fund.* For purposes of paragraph (a) of this section, a *fund* is an organization that meets either of the following requirements:

**(1)** The organization has and retains exemption, as a governmental entity or under *section 501(c)(3) of the Internal Revenue Code* (nonprofit educational, charitable, and similar organizations), from Federal taxation.

**(2)** The organization is an organization of physicians who, under the terms of their employment by an entity that meets the requirements of paragraph (b)(1) of this section, are required to turn over to that entity all income that the physician organization derives from the physician services.

*(c) Status of a fund.* A fund approved for payment under paragraph (a) of this section has all the rights and responsibilities of a provider under Medicare except that it does not enter into an agreement with HCFA under part 489 of this chapter.

### § 415.170 -- Conditions for payment on a fee schedule basis for physician services in a teaching setting.

Services meeting the conditions for payment in § 415.102(a) furnished in teaching settings are payable under the physician fee schedule if-

**(a)** The services are personally furnished by a physician who is not a resident; or

(b) The services are furnished by a resident in the presence of a teaching physician except as provided in § 415.172 (concerning physician fee schedule payment for services of teaching physicians), § 415.174 (concerning an exception for services furnished in hospital outpatient and certain other ambulatory settings), § 415.176 (concerning renal dialysis services), and § 415.184 (concerning psychiatric services), as applicable.

### § 415.172 -- Physician fee schedule payment for services of teaching physicians.

*(a) General rule.* If a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought.

    (1) In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure.

        (i) In the case of surgery, the teaching physician's presence is not required during opening and closing of the surgical field.

        (ii) In the case of procedures performed through an endoscope, the teaching physician must be present during the entire viewing.

    (2) In the case of evaluation and management services, the teaching physician must be present during the portion of the service that determines the level of service billed. (However, in the case of evaluation and management services furnished in hospital outpatient departments and certain other ambulatory settings, the requirements of § 415.174 apply.)

*(b) Documentation.* Except for services furnished as set forth in §§ 415.174 (concerning an exception for services furnished in hospital outpatient and certain other ambulatory settings), 415.176 (concerning renal dialysis services), and 415.184 (concerning psychiatric services), the medical records must document the teaching physician was present at the time the service is furnished. The presence of the teaching physician during procedures may be demonstrated by the notes in the medical records made by a physician, resident, or nurse. In the case of evaluation and management procedures, the teaching physician must personally document his or her participation in the service in the medical records.

*(c) Payment level.* In the case of services such as evaluation and management for which there are several levels of service codes available for reporting purposes, the appropriate payment level must reflect the extent and complexity of the service when fully furnished by the teaching physician.

### § 415.174 -- Exception: Evaluation and management services furnished in certain centers.

(a) In the case of certain evaluation and management codes of lower and mid-level complexity (as specified by HCFA in program instructions), carriers may make physician fee schedule payment for a service furnished by a resident without the presence of a teaching physician. For the exception to apply, all of the following conditions must be met:

    (1) The services must be furnished in a center that is located in an outpatient department of a hospital or another ambulatory care entity in which the time spent by residents in patient care activities is included in determining intermediary payments to a hospital under § 413.86.

    (2) Any resident furnishing the service without the presence of a teaching physician must have completed more than 6 months of an approved residency program.

    (3) The teaching physician must not direct the care of more than four residents at any given time and must direct the care from such proximity as to constitute immediate availability. The teaching physician must-

        (i) Have no other responsibilities at the time;

60 FR 63124

    (ii)  Assume management responsibility for those beneficiaries seen by the residents;

    (iii)  Ensure that the services furnished are appropriate;

    (iv)  Review with each resident during or immediately after each visit, the beneficiary's medical history, physical examination, diagnosis, and record of tests and therapies; and

    (v)  Document the extent of the teaching physician's participation in the review and direction of the services furnished to each beneficiary.

  (4)  The range of services furnished by residents in the center includes all of the following:

    (i)  Acute care for undifferentiated problems or chronic care for ongoing conditions.

    (ii)  Coordination of care furnished by other physicians and providers.

    (iii)  Comprehensive care not limited by organ system, diagnosis, or gender.

  (5)  The patients seen must be an identifiable group of individuals who consider the center to be the continuing source of their health care and in which services are furnished by residents under the medical direction of teaching physicians.

**(b)**  Nothing in paragraph (a) of this section may be construed as providing a basis for the coverage of services not determined to be covered under Medicare, such as routine physical checkups.

### § 415.176 -- Renal dialysis services.

In the case of renal dialysis services, physicians who are not paid under the physician monthly capitation payment method (as described in § 414.314 of this chapter) must meet the requirements of §§ 415.170 and 415.172 (concerning physician fee schedule payment for services of teaching physicians).

### § 415.178 -- Anesthesia services.

**(a) General rule.** An unreduced physician fee schedule payment may be made if a physician is involved in a  **[*63187]**  single anesthesia procedure involving an anesthesia resident. In the case of anesthesia services, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. The teaching physician cannot receive an unreduced fee if he or she performs services involving other patients during the period the anesthesia resident is furnishing services in a single case. For additional rules for payment of anesthesia services involving residents, see § 414.46(c)(1)(iii)).

**(b) Documentation.** Documentation must indicate the physician's presence or participation in the administration of the anesthesia and a preoperative and postoperative visit by the physician.

### § 415.180 -- Teaching setting requirements for the interpretation of diagnostic radiology and other diagnostic tests.

**(a) General rule.** Physician fee schedule payment is made for the interpretation of diagnostic radiology and other diagnostic tests if the interpretation is performed or reviewed by a physician other than a resident.

**(b) Documentation.** Documentation must indicate that the physician personally performed the interpretation or reviewed the resident's interpretation with the resident.

### § 415.184 -- Psychiatric services.

To qualify for physician fee schedule payment for psychiatric services furnished under an approved GME program, the physician must meet the requirements of §§ 415.170 and 415.172, including documentation, except that the requirement for the presence of the teaching physician during the service in which a resident is involved may be met by observation of the service by use of a one-way mirror, video equipment, or similar device.

### § 415.190 -- Conditions of payment: Assistants at surgery in teaching hospitals.

**(a) Basis, purpose, and scope.** This section describes the conditions under which Medicare pays on a fee schedule basis for the services of an assistant at surgery in a teaching hospital. This section is based on section 1842(b)(7)(D)(I) of the Act and applies only to hospitals with an approved GME residency program. Except as specified in paragraph (c) of this section, fee schedule payment is not available for assistants at surgery in hospitals with-

   **(1)** A training program relating to the medical specialty required for the surgical procedure; and

   **(2)** A resident in a training program relating to the specialty required for the surgery available to serve as an assistant at surgery.

**(b) Definition. Assistant at surgery** means a physician who actively assists the physician in charge of a case in performing a surgical procedure.

**(c) Conditions for payment for assistants at surgery.** Payment on a fee schedule basis is made for the services of an assistant at surgery in a teaching hospital only if the services meet one of the following conditions:

   **(1)** Are required as a result of exceptional medical circumstances.

   **(2)** Are complex medical procedures performed by a team of physicians, each performing a discrete, unique function integral to the performance of a complex medical procedure that requires the special skills of more than one physician.

   **(3)** Constitute concurrent medical care relating to a medical condition that requires the presence of, and active care by, a physician of another specialty during surgery.

   **(4)** Are medically required and are furnished by a physician who is primarily engaged in the field of surgery, and the primary surgeon does not use interns and residents in the surgical procedures that the surgeon performs (including preoperative and postoperative care).

   **(5)** Are not related to a surgical procedure for which HCFA determines that assistants are used less than 5 percent of the time.

## Subpart E-- Services of Residents

### § 415.200 -- Services of residents in approved GME programs.

**(a) General rules.** Services furnished in hospitals by residents in approved GME programs are specifically excluded from being paid as "physician services" defined in § 414.2 of this chapter and are payable as hospital services. This exclusion applies whether or not the resident is licensed to practice under the laws of the State in which he or she performs the service. The payment methodology for services of residents in hospitals and hospital-based providers is set forth in § 413.86 of this chapter.

**(b) Exception.** For low and mid-level evaluation and management services furnished under certain conditions in centers located in hospital outpatient departments and other ambulatory settings, see § 415.174.

**(c) Definitions.** See § 415.152 for definitions of terms used in this subpart E.

### § 415.202 -- Services of residents not in approved GME programs.

**(a) General rules.** For services of a physician employed by a hospital who is authorized to practice only in a hospital setting and for the services of a resident who is not in any approved GME program, payment is made to the hospital on a Part B reasonable cost basis regardless of whether the services are furnished to hospital inpatients or outpatients.

**(b) Payment.** For services described in paragraph (a) of this section, payment is made under Part B by reducing the reasonable costs of furnishing the services by the beneficiary deductible and paying 80 percent of the remaining amount. No payment is made for other costs of unapproved programs, such as administrative costs related to teaching activities of physicians.

60 FR 63124

### § 415.204 -- Services of residents in skilled nursing facilities and home health agencies.

*(a) Medicare Part A payment.* Payment is made under Medicare Part A for interns' and residents' services furnished in the following settings that meet the specified requirements:

*(1) Skilled nursing facility.* Payment to a participating skilled nursing facility may include the cost of services of an intern or resident who is in an approved GME program in a hospital with which the skilled nursing facility has a transfer agreement that provides, in part, for the transfer of patients and the interchange of medical records.

*(2) Home health agency.* A participating home health agency may receive payment for the cost of the services of an intern or resident who is under an approved GME program of a hospital with which the home health agency is affiliated or under common control if these services are furnished as part of the home health visits for a Medicare beneficiary. (Nevertheless, see § 413.86 of this chapter for the costs of approved GME programs in hospital-based providers.)

*(b) Medicare Part B payment.* Medical services of a resident of a hospital that are furnished by a skilled nursing facility or home health agency are paid under Medicare Part B if payment is not provided under Medicare Part A. Payment is made under Part B for a resident's services by reducing the **[*63188]** reasonable costs of furnishing the services by the beneficiary deductible and paying 80 percent of the remaining amount.

### § 415.206 -- Services of residents in nonprovider settings.

Patient care activities of residents in approved GME programs that are furnished in nonprovider settings are payable in one of the following two ways:

*(a) Direct GME payments.* If the conditions in § 413.86(f)(1)(iii) regarding patient care activities and training of residents are met, the time residents spend in nonprovider settings such as clinics, nursing facilities, and physician offices in connection with approved GME programs is included in determining the number of full-time equivalency residents in the calculation of a teaching hospital's resident count. The teaching physician rules on carrier payments in §§ 415.170 through 415.184 apply in these teaching settings.

*(b) Physician fee schedule.*

**(1)** Services furnished by a resident in a nonprovider setting are covered as physician services and payable under the physician fee schedule if the following requirements are met:

**(i)** The resident is fully licensed to practice medicine, osteopathy, dentistry, or podiatry in the State in which the service is performed.

**(ii)** The time spent in patient care activities in the nonprovider setting is not included in a teaching hospital's full-time equivalency resident count for the purpose of direct GME payments.

**(2)** Payment may be made regardless of whether a resident is functioning within the scope of his or her GME program in the nonprovider setting.

**(3)** If fee schedule payment is made for the resident's services in a nonprovider setting, payment must not be made for the services of a teaching physician.

**(4)** The carrier must apply the physician fee schedule payment rules set forth in subpart A of part 414 of this chapter to payments for services furnished by a resident in a nonprovider setting.

### § 415.208 -- Services of moonlighting residents.

*(a) Definition.* For purposes of this section, the term *services of moonlighting residents* refers to services that licensed residents perform that are outside the scope of an approved GME program.

*(b) Services in GME program hospitals.*

60 FR 63124

(1) The services of residents to inpatients of hospitals in which the residents have their approved GME program are not covered as physician services and are payable under § 413.86 regarding direct GME payments.

(2) Services of residents that are not related to their approved GME programs and are performed in an outpatient department or emergency department of a hospital in which they have their training program are covered as physician services and payable under the physician fee schedule if all of the following criteria are met:

(i) The services are identifiable physician services and meet the conditions for payment of physician services to beneficiaries in providers in § 415.102(a).

(ii) The resident is fully licensed to practice medicine, osteopathy, dentistry, or podiatry by the State in which the services are performed.

(iii) The services performed can be separately identified from those services that are required as part of the approved GME program.

(3) If the criteria specified in paragraph (b)(2) of this section are met, the services of the moonlighting resident are considered to have been furnished by the individual in his or her capacity as a physician, rather than in the capacity of a resident. The carrier must review the contracts and agreements for these services to ensure compliance with the criteria specified in paragraph (b)(2) of this section.

(4) No payment is made for services of a "teaching physician" associated with moonlighting services, and the time spent furnishing these services is not included in the teaching hospital's full-time equivalency count for the indirect GME payment (§ 412.105 of this chapter) and for the direct GME payment (§ 413.86 of this chapter).

*(c) Other settings.* Moonlighting services of a licensed resident in an approved GME program furnished outside the scope of that program in a hospital or other setting that does not participate in the approved GME program are payable under the physician fee schedule as set forth in § 415.206(b)(1).

F. Technical Amendments

## PART 400-- [AMENDED]

1. In § 400.310, the following changes are made:

a. The entries for §§ 405.481 and 405.552 are removed.

b. The table is amended by adding the following entries:

§ 400.310 -- Display of currently valid OMB control numbers.

| Sections in 42 CFR that contain collections of information | Current OMB control numbers |
|---|---|
| * * * * * | |
| 415.60 | 0938-0301 |
| 415.162 | 0938-0301 |
| * * * * * | |

## PART 405-- [AMENDED]

## § 405.502 -- [Amended]

60 FR 63124

2.  In § 405.502(a)(10), the phrase "§ 405.580(c)(2) or (3)" is removed, and the phrase "§ 415.190(c)(2) or (c)(3) of this chapter" is added in its place.

**PART 411-- EXCLUSIONS FROM MEDICARE AND LIMITATIONS ON MEDICARE PAYMENT**

3.  The authority citation for part 411 continues to read as follows:

**Authority:**  Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*).

**§ 411.15 -- [Amended]**

4.  In § 411.15(m)(2)(i), "§ 405.550(b)" is removed, and "§ 415.102(a)" is added in its place.

**PART 412-- PROSPECTIVE PAYMENT SYSTEMS FOR INPATIENT HOSPITAL SERVICES**

5.  The authority citation for part 412 continues to read as follows:

**Authority:**  Secs. 1102, 1815(e), 1820, 1871, and 1886 of the Social Security Act (*42 U.S.C. 1302*, *1395g(e)*, *1395i-4*, *1395hh*, and *1395ww*).

**§ 412.50 -- [Amended]**

6.  In § 412.50, the following changes are made:

a.  In paragraph (a), "§ 405.550(b)" is removed, and "§ 415.102(a)" is added in its place.

b.  In paragraph (b), "§ 405.550(b)" is removed, and "§ 415.102(a)" is added in its place.

**§ 412.71 -- [Amended]**

7.  In § 412.71(c)(1)(i), "§ 405.550(b)" is removed, and "§ 415.102(a)" is added in its place.

**§ 412.105 -- [Amended]**

8.  In § 412.105(g)(1)(i)(A), "§ 405.522(a)" is removed, and "§ 415.200(a)" is added in its place.   **[*63189]**

**PART 413-- [AMENDED]**

9.  The authority citation for part 413 continues to read as follows:

**Authority:**  Secs. 1102, 1861(v)(1)(A), and 1871 of the Social Security Act (*42 U.S.C. 1302*, *1395x(v)(1)(A)*, and *1395hh*).

**§ 413.5 -- [Amended]**

10.  In § 413.5(c)(9), the phrase "(as described in § 405.465 of this chapter) where elected as provided for in § 405.521 of this chapter." is removed, and the phrase "(as described in § 415.162 of this chapter) if elected as provided for in § 415.160 of this chapter." is added in its place.

**§ 413.13 -- [Amended]**

11.  In § 413.13(g)(1)(i), the phrase "§§ 405.480 through 405.482" is removed, and the phrase "§§ 415.55 through 415.70" is added in its place.

**§ 413.80 -- [Amended]**

12.  In § 413.80(h), the phrase ", as described in § 414.450 of this chapter," is removed.

**§ 413.86 -- [Amended]**

13.  In § 413.86, the following changes are made:

a.  In paragraph (b), in the definition of "Approved medical residency program" in paragraph (1), "§ 405.522(a)" is removed, and "§ 415.200(a)" is added in its place.

b.  In paragraph (g)(1)(ii), "§ 405.522(a)" is removed, and "§ 415.200(a)" is added in its place.

**§ 413.174 -- [Amended]**

14.  In § 413.174(b)(4)(iv), the phrase "§§ 405.465 through 405.482" is removed, and the phrase "§§ 415.55 through 415.70, § 415.162, and § 415.164" is added in its place.

60 FR 63124

## PART 414-- [AMENDED]

### § 414.58 -- [Amended]

**15.** In § 414.58, the following changes are made:

    **a.** In paragraph (a), the phrase "§§ 405.550 through 405.580" is removed, and the phrase "§§ 415.100 through 415.130, and § 415.190" is added in its place.

    **b.** In paragraph (b), the phrase "§ 405.465 of this chapter if the hospital exercises the election described in § 405.521(c)(2) of this chapter" is removed, and the phrase "§ 415.162 of this chapter if the hospital exercises the election described in § 415.160 of this chapter" is added in its place.

## PART 417-- HEALTH MAINTENANCE ORGANIZATIONS, COMPETITIVE MEDICAL PLANS, AND HEALTH CARE PREPAYMENT PLANS

**16.** The authority citation for part 417 continues to read as follows:

    **Authority:** Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*), secs. 1301, 1306, and 1310 of the Public Health Service Act (*42 U.S.C. 300e*, *300e-5*, and *300e-9*); and *31 U.S.C. 9701*.

### § 417.554 -- [Amended]

**17.** In § 417.554, the phrase "§ 405.480, part 412 of this chapter, and §§ 413.55 and 413.24" is removed, and the phrase "part 412, §§ 413.24, 413.55, and 415.55" is added in its place.

## PART 489-- PROVIDER AGREEMENTS AND SUPPLIER APPROVAL

**18.** The authority citation for part 489 continues to read as follows:

    **Authority:** Secs. 1102 and 1871 of the Social Security Act (*42 U.S.C. 1302* and *1395hh*).

### § 489.20 -- [Amended]

**19.** In § 489.20(d)(1), "§ 405.550(b)" is removed, and "§ 415.102(a)" is added in its place.

### § 489.21 -- [Amended]

**20.** In § 489.21(f), "§ 405.550(b)" is removed, and "§ 415.102(a)" is added in its place.

(Catalog of Federal Domestic Assistance Program No. 93.773, Medicare-Hospital Insurance; and Program No. 93.774, Medicare-Supplementary Medical Insurance Program)

Dated: November 28, 1995.

**Bruce C. Vladeck,**

*Administrator, Health Care Financing Administration.*

Dated: December 1, 1995.

**Donna E. Shalala,**

*Secretary.*

**Note:** These addenda will not appear in the Code of Federal Regulations.

## Addendum A-- Explanation and Use of Addenda B Through E

The addenda on the following pages provide various data pertaining to the Medicare fee schedule for physician services furnished in 1995. Addendum B contains the RVUs for work, practice expense, and malpractice expense, and other information for all services included in the physician fee schedule. Addendum C provides interim RVUs and related information for codes that are subject to comment. Each code listed in Addendum C is also included in Addendum B. Further explanations of the information in these addenda are provided at the beginning of each addendum.

60 FR 63124

To compute a fee schedule amount according to the formula provided in the final rule, use the RVUs listed in Addendum B and the GPCIs for 1996 listed in Addendum D of this final rule. In applying the formula, use the appropriate CF: For services designated as surgical, use a CF of $ 40.7986. For primary care services, use a CF of $ 35.4173. For other nonsurgical services, use a CF of $ 34.6293.

**Addendum D lists the GPCIs for 1996.**

**Addendum E lists the procedure codes subject to the site-of-service differential.**

**Addendum B-- 1996 Relative Value Units and Related Information Used in Determining Medicare Payments for 1996**

This addendum contains the following information for each CPT code and alphanumeric HCPCS code, except for alphanumeric codes beginning with B (enteral and parenteral therapy), E (durable medical equipment), K (temporary codes for nonphysician services or items), or L (orthotics), and codes for anesthesiology.

*1. CPT/HCPCS code.* This is the CPT or alphanumeric HCPCS number for the service. Alphanumeric HCPCS codes are included at the end of this addendum.

*2. Modifier.* A modifier is shown if there is a technical component (modifier TC) and a professional component (PC) (modifier 26) for the service. If there is a PC and a TC for the service, Addendum B contains three entries for the code: One for the global values (both professional and technical); one for modifier 26 (PC); and one for modifier TC. The global service is not designated by a modifier, and physicians must bill using the code without a modifier if the physician furnishes both the PC and the TC of the service.

*3. Status indicator.* This indicator shows whether the CPT/HCPCS code is in the physician fee schedule and whether it is separately payable if the service is covered.

A = Active code. These codes are separately payable under the fee schedule if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national decision regarding the coverage of the service. Carriers remain responsible for coverage decisions in the absence of a national Medicare policy.

B = Bundled code. Payment for covered services is always bundled into payment for other services not specified. If RVUs are shown, they are not used for Medicare payment. If these services are covered, payment for them is subsumed by the payment for the services to which they are incident. (An example is a telephone call from a hospital nurse regarding care of a patient.)

C = Carrier-priced code. Carriers will establish RVUs and payment amounts for these services, generally on a case-by-case basis following review of documentation, such as an operative report.

D = Deleted code. These codes are deleted effective with the beginning of the calendar year. **[*63190]**

E = Excluded from physician fee schedule by regulation. These codes are for items or services that we chose to exclude from the physician fee schedule payment by regulation. No RVUs are shown, and no payment may be made under the physician fee schedule for these codes. Payment for them, if they are covered, continues under reasonable charge or other payment procedures.

G = Code not valid for Medicare purposes. Medicare does not recognize codes assigned this status. Medicare uses another code for reporting of, and payment for, these services.

H = Deleted modifier. This code had TC and PC components in 1995. For 1996, these components are deleted.

N = Noncovered service. These codes are noncovered services. Medicare payment may not be made for these codes. If RVUs are shown, they are not used for Medicare payment.

P = Bundled or excluded code. There are no RVUs for these services. No separate payment should be made for them under the physician fee schedule.

60 FR 63124

-If the item or service is covered as incident to a physician service and is furnished on the same day as a physician service, payment for it is bundled into the payment for the physician service to which it is incident (an example is an elastic bandage furnished by a physician incident to a physician service).

-If the item or service is covered as other than incident to a physician service, it is excluded from the physician fee schedule (for example, colostomy supplies) and is paid under the other payment provisions of the Act.

R = Restricted coverage. Special coverage instructions apply. If the service is covered and no RVUs are shown, it is carrier-priced.

T = Injections. There are RVUs for these services, but they are only paid if there are no other services payable under the physician fee schedule billed on the same date by the same provider. If any other services payable under the physician fee schedule are billed on the same date by the same provider, these services are bundled into the service(s) for which payment is made.

X = Exclusion by law. These codes represent an item or service that is not within the definition of "physician services" for physician fee schedule payment purposes. No RVUs are shown for these codes, and no payment may be made under the physician fee schedule. (Examples are ambulance services and clinical diagnostic laboratory services.)

*4. Description of code.* This is an abbreviated version of the narrative description of the code.

*5. Physician work RVUs.* These are the RVUs for the physician work for this service in 1996. Codes that are not used for Medicare payment are identified with a " #."

*6. Practice expense RVUs.* These are the RVUs for the practice expense for the service for 1996. Codes that are subject to the OBRA 1993 practice expense reduction are identified by an asterisk in this column.

*7. Malpractice expense RVUs.* These are the RVUs for the malpractice expense for the service for 1996.

*8. Total RVUs.* This is the sum of the work, practice expense, and malpractice expense RVUs for 1996.

*9. Global period.* This indicator shows the number of days in the global period for the code (0, 10, or 90 days). An explanation of the alpha codes follows:

MMM = The code describes a service furnished in uncomplicated maternity cases including antepartum care, delivery, and postpartum care. The usual global surgical concept does not apply. See the 1996 Physicians' Current Procedural Terminology for specific definitions.

XXX = The global concept does not apply.

YYY = The global period is to be set by the carrier (for example, unlisted surgery codes).

ZZZ = The code is part of another service and falls within the global period for the other service.

*10. Update indicator.* This column indicates whether the update for surgical procedures, primary care services, or other nonsurgical services applies to the CPT/HCPCS code in column 1. A "0" appears in this field for codes that are deleted in 1996 or are not paid under the physician fee schedule. A "P" in this column indicates that the update and CF for primary care services applies to this code. An "N" in this column indicates that the update and CF for other nonsurgical services applies to this code. An "S" in this column indicates that the separate update and CF for surgical procedures applies.

# Dates

**DATES:** *Effective Date:* This final rule is effective January 1, 1996, except part 415 which is effective July 1, 1996.

*Comment Date:* We will accept comments on interim RVUs for new or revised procedure codes identified in Addendum C. Comments will be considered if we receive them at the appropriate addresses, as provided below, no later than 5 p.m., February 6, 1996.

60 FR 63124

# Contacts

**ADDRESSES:** Mail written comments (1 original and 3 copies) to the following address: Health Care Financing Administration, Department of Health and Human Services, Attention: BPD-827-FC, P.O. Box 7519, Baltimore, MD 21207-0519.

If you prefer, you may deliver your written comments (1 original and 3 copies) to one of the following addresses:

Room 309-G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201,

 or

Room C5-09-26, 7500 Security Boulevard, Baltimore, MD 21244-1850.

Because of staffing and resource limitations, we cannot accept comments by facsimile (FAX) transmission. In commenting, please refer to file code BPD-827-FC. Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in Room 309-G of the Department's offices at 200 Independence Avenue, SW., Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (phone: (202) 690-7890).

For comments that relate to information collection requirements, mail a copy of comments to: Allison Herron Eydt, HCFA Desk Officer, Office of Information and Regulatory Affairs, Rm. 10235, New Executive Office Bldg., Washington, DC 20530.

*Copies:* To order copies of the **Federal Register** containing this document, send your request to: New Orders, Superintendent of Documents, P.O. Box 371954, Pittsburgh, PA 15250-7954. Specify stock number 069-001-00090-4 and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or MasterCard number and expiration date. Credit card orders can also be placed by calling the order desk at (202) 512-1800 or by faxing to (202) 512-2250. The cost for each copy is $ 8. As an alternative, you can view and photocopy the **Federal Register** document at most libraries designated as Federal Depository Libraries and at many other public and academic libraries throughout the country that receive the **Federal Register**.

Copies of the source files for this document can also be purchased on high density 3.5 inch personal computer diskettes for $ 20.00. Send your request to: Superintendent of Documents, Attention: Electronic Products, P.O. Box 37082, Washington, DC 20013-7082. Enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or MasterCard number and expiration date. Credit card orders for the diskettes can also be placed by calling (202) 512-1530 or by faxing to (202) 512-1262. The file format on the diskettes is comma delimited ASCII, Lotus 123, and WordPerfect 5.1.

**FOR FURTHER INFORMATION CONTACT:** Shana Olshan, (410) 786-5714 (for all issues except those related to physician services in teaching settings). William Morse, (410) 786-4520 (for issues related to physician services in teaching settings).

FEDERAL REGISTER

End of Document