# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, J. WILLIAM BOOKWALTER, III, M.D., ROBERT J. SCLABASSI, M.D., and ANNA MITINA, | : : : : | Civil Action No. 2:12-cv-00145 |
| | : | **FILED UNDER SEAL PURSUANT** |
| Plaintiffs, | : : | **TO 31 U.S.C. § 3730(b)(2)** |
| v. | : : | |
| UPMC; UPP, INC. d/b/a UPP DEPARTMENT OF NEUROSURGERY, | : : : | **DO NOT PLACE IN PRESS BOX** **DO NOT ENTER ON PACER** |
| Defendants. | : : | |

## AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730)

The United States of America, by and through *qui tam* relators, J. William Bookwalter, III, M.D., Robert J. Sclabassi, M.D., and Anna Mitina, ("Relators") on behalf of themselves and the United States, bring this action under the False Claims Act, 31 U.S.C. §§ 3729-3732, to recover all damages, penalties and other remedies available under the Act by and on behalf of the United States and themselves, and in support thereof states as follows:

## INTRODUCTION

1.      Relators bring this action on behalf of the United States of America against Defendants for treble damages and civil penalties arising from Defendants' false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA")

2.      As set forth herein, the Defendants have created a culture where money – not medicine – drives the decision making process at UPMC and where profits trump patient safety.  Defendants' illegal and fraudulent conduct consists of knowingly submitting false claims to Medicare, Medicaid, TRICARE/CHAMPUS and the Federal Employees Health Benefit Program ("FEHBP")  by, inter alia, 1) entering into contracts with physicians in which UPMC pays such physicians well in excess of fair market value and incentivizes such physicians to increase production (surgeries) so that UPMC can benefit from the referrals of those surgeries to its facilities in a scheme to increase its facilities' revenues; 2) encouraging and promoting the performance of medically unnecessary surgeries; 3)  billing for "First Assistant" services, and; 4)  billing for Teaching Physician services in which UPMC submits claims for surgeries performed by residents for whom UPMC is already compensated under Medicare Part A.

3.      Defendants have knowingly engaged in the illegal and fraudulent billing practices described herein for their own financial reward to the detriment of patient care.

4.      The False Claims Act provides that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the government because of the false claim and attorneys fees.

5.      The Act allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730. Relators claim entitlement to a portion of any recovery obtained by the United States as *qui tam* Relators/Plaintiffs.  There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relators are an original source as defined therein.

6.      Based on these provisions, Relators on behalf of the United States Government seek through this action to recover damages and civil penalties arising from the Defendants' submission of false claims for payment or approval to government entities for payment. *Qui tam* Relators/Plaintiffs believe the United States has suffered tens of millions of dollars in damages as a result of thousands of false claims submitted by the Defendants.

7.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States and to the United States Attorney for the Western District of Pennsylvania a disclosure of all material evidence and information related to this Complaint.  Relators' disclosure is supported by material evidence known to Relators at the time of filing which establishes the existence of Defendants' false statements and false claims. Because Relators' disclosure statement includes attorney-client communications and work product of Relators' attorneys and was submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel

in this action, Relators' disclosure statement is strictly confidential and not subject to disclosure in this action.

## JURISDICTION AND VENUE

8.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

9.      Venue is proper in the Western District of Pennsylvania pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in this district, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transacted business in this District.

10.     Pursuant to the False Claims Act, the Complaint was filed and remained under seal for a period of at least sixty (60) days and was not served on Defendants, pending the Court's order.

## PARTIES

11.     Relators are citizens of the United States and residents of the Commonwealth of Pennsylvania and bring this action on behalf of the United States of America.

12.     Relators bring this action based on their direct, independent and personal knowledge.

13.     Relators are the original source of this information to the United States.  They have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States before filing this action.

14.     J. William Bookwalter, III, M.D. is an adult individual who resides in Pennsylvania.

15.     Robert J. Sclabassi, M.D. is an adult individual who resides in Pennsylvania.

16.     Anna Mitina is an adult individual who resides in Pennsylvania.

17.     Defendant UPMC is a Pennsylvania non-profit corporation with its principal place of business located at 200 Lothrop Street, Pittsburgh, Pennsylvania 15213.   According to recent reports, UPMC is a $9 billion global health enterprise.

18.     Defendant UPP is a Pennsylvania corporation with its principal place of business located at 200 Lothrop Street, Pittsburgh, Pennsylvania 15213.

19.     Under an affiliation agreement with the University of Pittsburgh School of Health Sciences, UPMC, through UPP, operates separate clinical practice plans that consist of faculty groups, such as UPP's Department of Neurological Surgery.  Thus, physicians employed by UPP provide neurosurgery care to patients within UPMC's global health enterprise.

## BACKGROUND

### The Extraordinary Financial
### Performance of UPMC, UPP and its Physicians

20.     Since June 2006, the Department of Neurosurgery (the "Department"), along with UPP and UPMC, have enjoyed a phenomenal and unprecedented increase in revenue.  For example, based solely upon its revenue from Medicare, UPMC's Department of Neurosurgery has been in the top 10 highest grossing neurosurgical departments in the nation.  Indeed, in 2009 it was the single highest grossing neurosurgical department in the United States, with Medicare charges alone of $58.6 million.

21.     In October of 2010, UPMC Presbyterian was ranked the top grossing short-term, acute-care hospital in the United States according to Medicare cost report data.

22.     According to UPMC, its 2011 operating revenues increased by $955 million to $9 billion.  Today, UPMC boasts of being a $12 billion health care conglomerate.

23.     Further, UPMC's prosperity and financial might is reflected in the compensation it pays to top employees and producers.  Just for example, in 2009, Jeffrey Romoff, president and CEO of UPMC, received at least $4.01 million in compensation, which has steadily increased to over $6 million. In 2009, UPP neurosurgeon, Richard Spiro, M.D., received at least $2.23 million in compensation, and UPP neurosurgeon, Ghassan K. Bejjani, M.D., received $2.7 million in compensation.

6

24.     However, a significant portion of UPMC's financial success is attributable to fraudulent practices that run afoul of the Medicare, Medicaid, TRICARE/CHAMPUS and FEHBP statutes, regulations and administrative directives.

25.     As will be discussed below, Defendants UPMC and UPP are repeat offenders with regard to one component of its fraudulent activity, specifically, the billing of Medicare and Medicaid for surgical procedures performed exclusively by residents and/or fellows and/or physician assistants without either involvement or supervision by a teaching physician.  This practice is a clear violation of Medicare regulations and may violate Medicaid, TRICARE/CHAMPUS and FEHBP regulations as well .

26.     To this end, UPMC's payment in 1998 of $17 million dollars in settlement based upon the Office of Inspector General's ("OIG") audit of Physicians At Teaching Hospitals ("PATH") arising out of improper billing for surgical procedures performed exclusively by residents, obviously did not constitute a sufficient deterrent to forego its clearly fraudulent billing practices.

### The Federal False Claims Act
### 31 U.S.C. §§ 3729-3732

27.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729 (a)(1).[1]

---

[1] In May of 2009, the FCA was amended pursuant to Public Law 111-21, Fraud Enforcement and Recovery Act of 2009 (FERA).  Although § 3729(a) was amended in its entirety, only §

7

28.      Title 31 U.S.C. § 3729 of the Federal False Claims Act

provides in pertinent part, that a person who

> (A) knowingly presents, or causes to be presented, a false
> or fraudulent claim for payment or approval; (B) knowingly
> makes, uses, or causes to be made or used, a false record or
> statement material to a false or fraudulent claim; (C)
> conspires to commit a violation of subparagraph (A), (B),
> (D), (E), (F), or (G); . . . or (G) knowingly makes, uses, or
> causes to be made or used, a false record or statement
> material to an obligation to pay or transmit money or
> property to the Government, or knowingly conceals or
> knowingly and improperly avoids or decreases an
> obligation to pay or transmit money or property to the
> Government,
>
>              * * *
>
> Is liable to the United States Government for a civil penalty
> of not less than  $5,000 and not more than $10,000, as
> adjusted by the Federal Civil Penalties Inflation
> Adjustment Act of 1990 (28 U.S. C. 2461 note: Public Law
> 104-410), plus 3 times the amount of damages which the
> Government sustains because of the act of that person . . ..

---

3729(a)(2), which FERA renumbered as §  3729(a)(1)(B), can be applied retroactively back to and
including June 7, 2008 by virtue of  § 4(f) of FERA. "The amendments made by this section shall
take effect on the date of enactment of the Act and shall apply to conduct on or after the date of
enactment, except that (1) subparagraph (B) of section 3729(a)(1), as added by subsection (a)(1),
shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act
(31 U.S.C. § 3729 *et seq*.) that are pending on or after that date…" FERA, § 4(f).  For conduct that
predates the effective dates of the amendments, the relevant portions of the pre-FERA FCA
provide:

> (a) Any person who (1) knowingly presents, or causes to be presented,
> to an officer or employee of the United States Government or a
> member of the Armed Forces of the United States a false or fraudulent
> claim for payment or approval; (2) knowingly makes, uses, or causes to
> be made or used, a false record or statement to get a false or fraudulent
> claim paid or approved by the Government; (3) conspires to defraud the
> Government by getting a false or fraudulent claim paid or approved by
> the Government;. . . or (7) knowingly makes, uses, or causes to be
> made or used, a false record or statement to conceal, avoid, or decrease
> an obligation to pay or transmit money or property to the Government.

8

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 372

## The Federal Healthcare Programs

<u>The Medicare Program</u>

29.     The Defendants receive a significant portion of their revenue from the United States Government through Medicare, Medicaid and other federal health insurance programs.

30.     The United States, through the Department of Health and Human Services ("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program") and the supplementary Medical Insurance Program established by Part B ("Medicare Part B Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§1395 *et seq.* The Medicare Part A and Medicare Part B programs are federally financed health insurance systems for persons who are aged 65 and over and those who are disabled.

31.     HHS has delegated the administration of the Medicare program to CMS (formerly the Health Care Financing Administrator ("HCFA"), a component of HHS.

32.     Another component of HHS, the OIG, is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and

instructions that implement the Medicare and Medicaid fraud and abuse authorities.

33.     The Medicare Part A Program covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries.  In addition, the Part A Program covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage.  The Medicare Part B Program provides coverage for a wide range of inpatient and outpatient services, for physician and diagnostic services, for home health services for Part B eligible persons and for durable medical equipment. The Medicare Part B Program is a 100 percent federally subsidized health insurance system for disabled persons 65 years of age or older.

34.     If health care services provided under either the Part A or Part B Program are reasonable and medically necessary, then the United States, through HHS-CMS, reimburses 80 percent of the reasonable cost of the service to either the Medicare beneficiary or the health service provider to whom the beneficiary's claim is assigned.

35.     CMS assigns to private insurance carriers the task of administering and paying Medicare claims.  In the Commonwealth of Pennsylvania, Highmark is a contracted insurance carrier for Medicare and is commonly referred to as an intermediary.  The intermediary reviews and approves claims submitted for reimbursement by health services providers and oversees payment of those claims.  The claims are paid with funds of the United States Treasury.

36.     As a prerequisite to payment by Medicare, CMS (HCFA) requires hospitals to submit annually a form HCFA-2552, more commonly known as the Hospital Cost Report.   Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

37.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year.   *See* 42 U.S.C. §1395g(a); 42 C.F.R. § 413.20.   *See also* 42 C.F.R. § 405.1801(b)(1).   Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

38.     UPMC was, at all times relevant to this complaint, required to submit Hospital Cost Reports to its fiscal intermediary.

39.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82s) during the course of the fiscal year.  On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

11

40.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by UPMC to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. § 413.64(f).

41.     Although Hospital Cost Reports are subject to audit review, it is known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them.

42.     Providers know that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized.  For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

43.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

44.     For cost reporting periods prior to September 30, 1994, the responsible provider official was required to certify, in pertinent part:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Form HCFA-2552-81.

12

45.     Thus, the provider was required to certify that the filed Hospital Cost Report is (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) complete, i.e., that the Hospital Cost Report is based upon all information known to the provider.

46.     The "applicable instructions" contained in the pre-September 1994 certification included the requirement that services described in the cost report complied with Medicare program requirements, including the provision outlawing kickbacks, codified in 42 U.S.C.§ 1320a-7b(b).

47.     The pre-September 1994 Hospital Cost Report (HCFA-2552-81) reminded providers "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law."

48.     On September 30, 1994, Medicare revised the certification provision of the Hospital Cost Report to add the following:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

49.     Subsequently, in or about 1996, the Hospital Cost Report was revised again to include the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.

13

Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

50.     UPMC and its management, including its chief financial officer, were at all times familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

51.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

52.     Hospital Cost Reports submitted by UPMC were, at all times material to this complaint, signed by the chief financial officer or other hospital official, who attested, among other things, to the certification quoted above.

53.     To participate in Medicare, providers must certify that their services are provided economically and only when, and to the extent medically required, or that the services are "reasonable and necessary," as required by statute. 42 U.S.C. § 1395n; 42 U.S.C. § 1395y(a)(1)(A). A service is expressly excluded from coverage if it is "not reasonable and necessary" for "the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1). In other words, it is an express

14

condition of payment that the treatment sought under Medicare must be medically necessary. *Id.*; 42 C.F.R. § 411.15 (delineating "[p]articular services excluded from coverage"); *id.* at § 411.1(b)(1) (stating that "[t]his subpart identifies: (1) The particular types of services that are excluded" from coverage); *see also* 42 C.F.R. Subpart 411 (titled "Exclusions From Medicare and Limitations on Medicare Payment").

The Medicaid Program

54.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

55.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP).  42 U.S.C. §§ 1396, *et seq.*

56.    Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

57.    In many states, provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

58.    In some states, provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program,

which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement. In other states, provider hospitals file a separate Medicaid cost report.

59. Providers incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

60. Typically, each state requiring the submission of a Medicaid cost report also requires an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

61. Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled. The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

62. Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

63. Where a provider submits a Medicaid cost report containing the same false or incorrect information from the Medicare cost report, false statements and false claims for reimbursement are made to Medicaid.

64. The state directly reimburses physicians for services rendered, with the state obtaining the federal share of the payment from accounts, which draw on

funds of the United States Treasury.   42 C.F.R. §§ 430.0-430.30.   The federal share of each state's Medicaid program varies state by state.

65.     The Commonwealth of Pennsylvania participates in the Medicaid Program, through its Department of Public Welfare ("DPW"), the state agency responsible for administering the Medicaid Program.

66.     At all times relevant to the complaint, the United States provided federal funds to Pennsylvania and its DPW through the Medicaid program, pursuant to Title XIX of the Social Security Act 42 U.S.C, §§ 1396 et seq. Enrolled providers of medical services to Medicaid recipients, including each of the Defendants, are eligible for reimbursement for covered medical services under the provisions of Title XIX of the 1995 Amendments to the Federal Social Security Act.   By becoming a participating provider in Medicaid, enrolled providers, including each of the Defendants, agree to abide by the rules regulations policies and procedures governing reimbursement, and to keep and allow access to records and information by Medicaid.   In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures promulgated by DPW.

67.     Applicable provisions of 42 CFR, Chapter 4, Subpart D, and other applicable Federal statues, provide for payments for physician services and providers and facilities providing physician services, including Defendants, as long as such services were medically indicated, necessary to the health of the

17

patient, and certified as required by Medicare and Intermediary rules. Like Medicare, a "claim" under Medicaid is only reimbursable if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member". 42 C.F.R. § 402.3.

TRICARE/CHAMPUS

68.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

69.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

70.     The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West. The Defendants serve patients in the South TriCare region. TRICARE health services are provided through both network, and non-network,

participating providers.  Providers who are Medicare-certified providers are also considered TRICARE-authorized providers.  TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

71.    "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's managed care contractor, and provide services for an agreed reimbursement rate.  32 C.F.R. § 199.14(a).  "Non-Network Participating Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals who do not enter an agreement with the region's managed care provider, and are reimbursed at rates established by TRICARE regulations.  *Id.*

72.    Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary."  32 C.F.R. § 199.6(a)(5).

73.    TRICARE's  governing  regulations,  like  Medicare's  and Medicaid's requirements also are based upon "medical necessity."  TRICARE's governing regulations require that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. 199.6(a)(5).  In this respect, similar to Medicare and

Medicaid, services provided at a level higher than the medically necessary are improper and violations of TRICARE. *Id.*

Federal Employee Health Benefits Program

74.     The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.* Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees.  Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906.  The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

75.     Like Medicare, Medicaid and TRICARE, FEHBP will not cover any treatment or surgery that is not medically necessary.     5 U.S.C. § 8902(n)(1)(A).

## Medical Billing Process

76.     In the early 1990's, Medicare (with other federal health benefit programs and private insurers following suit) began to utilize a physician fee schedule to determine reimbursement/payments for physicians.  In establishing the fee schedule, HCFA adopted a comprehensive system of coding for services established by the American Medical Association ("AMA").   The Current

Procedural Terminology ("CPT") codes describe thousands of services using a five-digit code with a narrative explanation of the use of the code.

77.     Physician services described by the CPT and the Healthcare Common Procedure Coding System ("HCPCS") codes, range from those that require considerable amounts of physician time and resources to those that require little.

78.     The fee that is charged for each medical service rendered by a physician depends upon the Relative Value Unit (wRVU) established for that service.

79.     Specifically, each medical service described by either the CPT or HCPCS codes is assigned a numerical wRVU upon which medical billing and reimbursement is based.  The more complex the procedure, the greater number of wRVUs which are assigned to the procedure.

80.     In the UPMC system, the Medicare (and other federal health benefit program) billing and payment process for surgical procedures occurs as follows: (1) the UPP physician dictates an operative note; (2) the operative note is sent to a UPMC central coding and billing department where a UPMC employee interprets the operative note and assigns CPT or HCPCS codes so that UPMC can bill Medicare, Medicaid and/or other federal health benefit programs for the procedure; (3) UPMC then submits the bill for the neurosurgical procedure, as well as any and all other applicable charges and ancillary fees (such as anesthesiology, radiology, laboratory, physical therapy, etc., associated with said surgery) to Medicare, Medicaid and/or other federal health benefit programs

21

under the name of the UPP practice group that performed the procedure, such as

the Department of Neurological Surgery; (4) Medicare, Medicaid and/or other

federal health benefit programs issue payment directly to UPMC; and (5) UPMC

retains a percentage of all dollars received and allocates the remaining funds to

the UPP practice group that performed the procedure as well as other groups or

departments rendering services or goods associated with the surgical procedure.

The practice group then allocates the Medicare, Medicaid and other federal health

benefit programs' funds to compensate the individual physicians.

### The Stark Statute
### 42 U.S.C. § 1395 nn

81.    Enacted as amendments to the Social Security Act, 42 U.S.C. §

1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other

entity providing healthcare items or services) from submitting Medicare claims

for payment based on patient referrals from physicians having a "financial

relationship" (as defined in the statute) with the hospital.   The regulations

implementing 42 U.S.C. § 1395nn expressly require that any entity collecting

payment for a healthcare service performed under a prohibited referral must

refund all collected amounts on a timely basis 42 C.F.R. § 411.353.

82.    The Stark Statute establishes the clear rule that the government

will not pay for items or services prescribed by physicians who have improper

financial relationships with other providers.   In enacting the statute, Congress

found that improper financial relationships between physicians and entities to

which they refer patients, can compromise the physician's professional judgment

as to whether an item or service is medically necessary, safe, effective, or of good

quality.  Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships.  The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

83.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239 § 6204.

84.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66 § 13562, Social Security Act Amendments of 1994, P.L. 103-432 § 152.

85.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services. See 42 U.S.C § 1395nn(h)(6).

In pertinent part, the Stark Statute provides:

    (a) Prohibition of certain referrals

        (1)     In general

23

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added)

86. The Stark Statute is a strict liability statute. If a financial relationship between a hospital and a physician does not strictly satisfy all requirements of an exception, then the physician is prohibited from making a referral to the hospital for designated health services, and the hospital is prohibited from submitting a claim to Medicare for such services.

87. Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services result from a prohibited referral under subsection (a). *See* 42 U.S.C. § 1395nn(g)(1).

88. "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician.

89. The Stark Statute and companion regulations contain exceptions for certain compensation arrangements. These exceptions include, among others,

24

"bona fide employment relationships," "personal service arrangements," "fair market value arrangements," and "indirect compensation relationships."

90.     In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory requirements: (A) the amount of the remuneration is fair market value for services personally performed by the physician and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. *See* 42 U.S.C. § 1395nn(e)(2)(B) and (e)(2)(C).

91.     In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements: (A) the compensation does not exceed fair market value for services personally performed by the physician, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further physician incentive plan exception as described in the statute. *See* 42 U.S.C. § 1395nn(e)(2)(A)(v).

92.     A physician incentive plan under § 1395nn(e) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or eliminating services provided with respect to individuals enrolled with the entity. *See* 42 U.S.C. § 1395nn(e)(3)(B)(ii).

93.     In order to qualify for the Stark Statute's exception for fair market value compensation, there must be an agreement in writing, the agreement must set forth all services to be furnished, all compensation must be set in advance and consistent with fair market value for services personally performed by the physician, and the agreement must not take into consideration volume or value of referrals or other business generated by the referring physician, and the agreement must not violate federal or state law. 42 C.F.R. § 411.357(1).

94.     In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (see 42 C.F.R. § 411.354(c)(2)), there must be a written agreement, the compensation must be consistent with fair market value for services personally performed by the physician, and the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. *See* 42 C.F.R. § 411.357(p).

95.     The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. *See* 42 U.S.C. § 1396b(s).

## The Anti-Kickback Statute
## 42 U.S.C. § 1320a-7b(b)

96.     The Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically

unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

97.     The Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs. In pertinent part, the statute states:

> (b) Illegal remuneration
>
>> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --
>>
>>> (A) In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

> (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

98.    Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997,

28

civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

99.     The statute further provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the False Claims Act." 42 U.S.C. § 1320a-7b(g).

## THE FRAUDULENT SCHEME

100.    At all times relevant hereto, Defendant UPP operated separate clinical practices plans, consisting of University of Pittsburgh faculty groups, such as UPP's Department of Neurological Surgery.

101.    Under an affiliation agreement between Defendant UPMC and The University of Pittsburgh School of Health Sciences, the neurosurgeons employed by Defendant UPP provided neurosurgery care to patients of UPMC.

102.    In 2006 Dr. Amin Kassam was appointed as Chairman of the Department of Neurological Surgery and shortly thereafter, under his leadership, the Department embarked upon a campaign to increase the volume of surgical procedures.

103.    At least as early as 2006 and continuing thereafter, the compensation for UPP neurosurgeons has been based directly upon their individual wRVU production.

104.    Under UPP's standard physician contract, the neurosurgeons were required to generate a minimum number of wRVUs per calendar year in order to earn his or her base compensation. This base wRVU number was specifically

designated in the physician's employment contract. If the physician failed to meet the base wRVU requirement, Defendant UPP had the right and ability to reduce the physician's base salary in succeeding years.

105.    Under the plan, once the physician's base wRVU number has been met, the physician then receives incentive compensation or "bonus pay" for each wRVU generated above the physician's annual base wRVU number at the rate of $45 for each work wRVU generated, even though Medicare reimburses UPMC at a lower rate of approximately $35 per wRVU. Not only is this "bonus pay" a significant financial incentive for each physician to generate as many wRVUs as possible each year, it is also commercially unreasonable for UPMC to subsidize these bonuses in the absence of referrals or other business generated by the referring physicians.

106.    This overpayment constitutes an illegal kickback to the physicians in excess of the applicable physician fee conversion factor, i.e., approximately $34-36 per wRVU during the relevant years.

107.    In fact, Defendant UPMC realizes a financial benefit in the form of "referrals and other business generated" as surgeons generate more surgeries and more complex surgeries at its facilities, resulting in increased billings for the attendant hospital and ancillary services including, but not limited to, anesthesiology, radiology, hospital and nursing charges, and physical therapy, to name a few. Said another way, more surgeries equal more revenue for Defendant UPMC.

108.     Encouraging and incentivizing the individual physician to perform more neurosurgeries and more complex neurosurgeries also increases the likelihood of in-patient hospital admissions, as opposed to out patient surgeries that are less profitable to UPMC.

109.     As a result of the foregoing, under the compensation system designed by Defendant UPMC with the Department of Neurosurgery, the individual physicians can earn hundreds of thousands of dollars per year in "bonus pay" based upon the wRVUs that they generate.

110.     This compensation model has created a culture within the Department of Neurosurgery whereby individual Department members are incentivized to increase and inflate wRVU production for their own, personal financial gain and for that of Defendant UPMC.

111.     Indeed, beginning in 2006, and continuing to the present day, Defendant UPMC has maintained confidential wRVU "stats" for both the Department of Neurosurgery and the individual members within the Department.

112.     At monthly Department meetings, Dr. Kassam would review Confidential Productivity Reports with the neurosurgeons during which time he openly exhorted them to increase their surgical volume, and hence their wRVU production.

113.     The Productivity Reports were also provided to members of UPMC's administration who similarly encouraged and incentivized increases in surgical volume regardless of indication.

114. The relentless drive of Defendant UPMC to generate ever-increasing wRVU numbers for the department was overwhelmingly successful.

115. Since 2006, the wRVU production for the Department of Neurosurgery has grown at an astonishing rate, with the individual neurosurgeons performing at what can only be characterized as "super human" levels.

116. Upon information and belief, a neurosurgeon who maintains a busy clinical and surgical practice can reasonably be expected to generate approximately 15,000 wRVUs annually.

117. Several UPP neurosurgeons regularly generated in excess of 25,000 wRVUs annually, with some exceeding 30,000 and, in certain cases, 50,000 wRVUs per year.

118. For example, in 2009, Dr. Richard Spiro, who received $2.2 million dollars in compensation, generated more than 43,000 wRVUs.

119. In addition to Dr. Spiro, in 2009, Dr. Peter C. Gerszten, Dr. Adnan A. Abla, D. Michael B. Horowitz, and Dr. David Okonkwo each generated in excess of 25,000 wRVUs.

120. Defendant Dr. Hikmat El-Kadi generated almost 60,000 wRVUs, resulting in truly extraordinary compensation of $4 million dollars per year. Relators have been advised that Dr. El-Kadi's compensation is not reflected on the UPMC 990 because it is paid through an affiliate company.

121. Defendant UPP's internal reports document that in 2007, 2008 and 2009, UPP realized annual growth rates of work wRVUs within UPMC's Neurosurgical Department of 20.3%, 57.1% and 20.0% respectively.

122.    Defendant UPP's same internal reports confirm that the total wRVU's for the Department exploded from 217,000 in 2006 to almost 500,000 in fiscal year 2009.

123.    Without artificially inflating their wRVUs in the manner specified in this Complaint, it would require "super human" feats for the individual physicians to regularly generate annual wRVUs in excess of 25,000.

124.    Under their UPP contracts, fueled by the wRVU-based bonus incentives, the neurosurgeons were paid excessive compensation, that was far above fair market value and commercially unreasonable.   The chart below shows the compensation that Defendant UPMC paid To Dr. Abla, Dr. Spiro, Dr. Kassam, and Dr. Bejjani as reflected in UPMC's 990 filings for FY2008, FY2009, FY2010, and FY2011:

| Name | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|
| Dr. Adnan Alba | $1,583,164 | $1,441,447 | $1,435,537 | $1,359,098 |
| Dr. Richard Spiro | $1,087,811 | $2,213,088 | $1,960,342 | $1,854,825 |
| Dr. Amin Kassam | $2,061,213 | $1,819,335 | | |
| Dr. Ghassan Bejjani | $1,774,857 | $2,336,905 | $2,834,418 | $2,482,944 |

125.    In addition to paying their base salaries and incentive bonuses, Defendants UPMC and UPP paid for all of the expenses associated with the neurosurgeons' practices, including the salaries and benefits for clerical and clinical staff, office expenses and professional liability insurance.

126.    The astonishing increase in wRVUs for the Department was the intended result of UPMC's and UPP's scheme to pay kickbacks to the neurosurgeons for referrals. Claims from those referrals were submitted to

33

Medicare and Medicaid (and other federal health benefits programs) in violation of the Stark Statute and the Anti-Kickback Statute.

### Incentivizing Medically Unnecessary Procedures

127.    As described above, the fees that the physicians are paid by Medicare, Medicaid and other federal health benefit programs for each medical service is dependent upon the assigned wRVU for the involved service. More complex surgical procedures are assigned higher wRVU values than routine procedures. Accordingly, a physician can generate significantly more wRVUs by performing a complex surgical procedure even if a less complex surgical procedure and/or conservative treatment is medically appropriate.

128.    Even though the assigned wRVU value is not based upon the quality of care or the necessity of care, but rather only the dollar value to be derived from the specific medical service provided, UPMC administration openly encouraged, and contractually incentivized, physicians to increase their individual wRVU generation by increasing surgical volume, regardless of whether surgery is medically necessary for patients.

129.    With the full knowledge and endorsement of UPMC's administration, certain of the physicians have engaged in a pervasive pattern of performing medically unnecessary and/or more complex surgeries when simpler and safer procedures were the standard of care, solely to inflate their own individual wRVU numbers.

130.    Of course, an increasing volume of surgeries alone and an increasing volume of more complex surgeries at UPMC facilities enabled

34

Defendant UPMC to increase its revenues many fold because those surgeries were referred to UPMC's facilities.

131.     The physicians perform complex neurosurgical procedures with implementation of expensive instrumentation at a rate far exceeding statistical norms for patients presenting at comparable neurosurgical practice groups.

132.     The greater reliance on more complex procedures is reflected in the Department's wRVU statistics.  In 2006, the Department average wRVU per surgical procedure was 38.3.  That average increased to 51.7 in 2008 and 49.8 in 2009.

133.     Since the individual physicians' compensation is tied directly to wRVU production, it has proven extremely lucrative for individual physicians to perform more complex neurosurgical procedures than otherwise required.

134.     These physicians knowingly engage in this practice solely to inflate Medicare and Medicaid billings.

135.     And as the neurosurgeons' wRVUs increase, Defendant UPMC enjoys the additional, inflated Medicare and Medicaid reimbursements from these more complex, but unnecessary, surgeries.

136.     In 2008, Defendant UPMC ranked first among the nation's 25 largest hospitals in the performance of instrumented spinal surgeries.  Through this scheme, the individual physicians and Defendants UPP and UPMC have knowingly submitted tens, and possibly hundreds, of millions of dollars in fraudulent billings to Medicare and Medicaid for reimbursement based solely on lack of medical necessity.

137.     To illustrate the nature of the incentivized compensation scheme and its effects, the total wRVUs from the more complicated Posterior Lumbar Interbody and Pedicle Screw Fusion multi-part surgery is approximately 101.

138.     By comparison, a microdiscectomy, which is a surgical procedure that is also performed for lumbar disc herniation and is done on an out patient basis, generates only 13 numerical wRVUs.

139.     Because of the disparity between the wRVU values for the two procedures, very few microdiscectomies are performed by the individual physicians. Rather, the neurosurgeons perform unnecessary, instrumented, multi-part surgeries at a rate far exceeding statistical norms for patients presenting at comparable, neurosurgical practice groups. The more complex procedure is done so that the physicians can increase their revenue from Medicare, Medicaid and other federal health benefit programs.

140.     Additionally, the physicians' compensation structure is such that it incentivizes them to perform the higher-value surgical procedure requiring an inpatient admission, instead of the lower value out patient procedure. The financial benefit to Defendant UPMC for inpatient admissions is significantly greater than out-patient procedures as UPMC can submit much more substantial claims for reimbursement to Medicare, Medicaid and other federal health benefit programs.

141.     Medicare reimbursement guidelines, for example, only authorize 100 percent reimbursement for the first part of a Posterior Lumbar Interbody and

Pedicle Screw Fusion (*i.e.*, discectomy) and then declining percentage reimbursements for the other portions of the surgery (*i.e.*, fusion and plating).

142.    As a result, Medicare does not reimburse fully for 100 percent of the services that comprise this surgery.

143.    Notwithstanding the fact that Medicare does not reimburse for 100 percent of this procedure, the individual neurosurgeons, for purposes of their individual wRVU requirements and production bonus calculations, receive credit from Defendants UPP and UPMC for 100 percent of the wRVUs associated with the performance of this procedure for purposes of compensation.

144.    For purposes of determining individual physician compensation (both base and bonus), Defendant UPMC credits the individual physicians with 100 percent of the wRVUs that he/she generates, irrespective of whether UPMC receives 100 percent reimbursement for those wRVUs.

145.    From UPMC's perspective, it derives a direct financial benefit when the individual physicians perform complex neurosurgical procedures, even though UPMC does not receive 100% reimbursement from Medicare for the services that comprise the surgery.

146.    Specifically, the more complex neurosurgical procedures that are performed, the higher the hospital portion of the reimbursement and the greater the ancillary services that are required for those patients, such as more radiological studies, more therapy, etc.

147. Upon information and belief, for more complicated procedures, UPMC obtains a multiplier of 4 to 10 times the individual physician wRVU dollar amount that it collects from Medicare and/or DPW for such ancillary services.

148. As a result, crediting the individual physicians with 100 percent of the wRVUs generated by a particular procedure, regardless of actual reimbursement, is of little moment to the institution from a macro financial standpoint.

149. Under this scheme, UPMC is paying its neurosurgery physicians a kickback through incentive compensation for performing more complex surgeries in that Defendants UPMC and UPP are paying the surgeons monies beyond the reimbursement amount, i.e., UPMC is "out of pocket" for those amounts.

150. The more complex neurosurgical procedures being performed by UPMC physicians have higher rates of complications and comorbidities.

151. Thus, not only is the performance of medically unnecessary procedures to inflate wRVU production to increase individual physician compensation and revenues of UPMC fraudulent, but the individual physicians, through such conduct, are exposing patients to an unnecessary increased risk of physical harm.

## Referrals in Violation of the Stark Statute

152. At all times relevant to this complaint, a financial relationship existed between Defendant UPMC and Dr. Richard M. Spiro, Dr. Adnan A. Abla, Dr. Ghassan K. Bejjani, Dr. Hikmat El-Kadid, Dr. Amin Kassam, Dr. Pedro J.

Aguilar, Dr. Dave Atteberry, Dr. Peter C. Gerszten, Dr. Michael B. Horowitz, Dr. Adam Kantor, Dr. Arlan H. Mintz, Dr. Joseph Maroon, and Dr. David O. Okonkwo pursuant to the Stark Statute, and the parties did not satisfy any exception under the statute.

153.    At all times relevant to this complaint, Dr. Richard M. Spiro, Dr. Adnan A. Abla, Dr. Ghassan K. Bejjani, Dr. Hikmat El-Kadid, Dr. Amin Kassam, Dr. Pedro J. Aguilar, Dr. Dave Atteberry, Dr. Peter C. Gerszten, Dr. Michael B. Horowitz, Dr. Adam Kantor, Dr. Arlan H. Mintz, Dr. Joseph Maroon, and Dr. David O. Okonkwo made referrals to Defendant UPMC for designated health services, and Defendant UPMC submitted claims for such services to Medicare and Medicaid in violation of 42 USC § 1395nn(a)(1)(A) and (B).

154.    All such claims constitute false claims, in that they were submitted in violation of the Stark Statute.

155.    As a result, The United States has suffered damages by paying claims that are not payable under the Stark Statute.

### Referrals Induced by Illegal Kickbacks to Neurosurgeons in Violation of Anti-Kickback Statute

156.    At all times relevant hereto, the neurosurgeons referred patients to UPMC for the furnishing of items or services for which payment may be made in whole or in part under a Federal healthcare program. 42 U.S.C. § 1320a-7b.

157.    To induce patient referrals, Defendant UPMC knowingly and willfully paid indirectly through Defendant UPP and then to the neurosurgeons

39

remuneration prohibited under the Anti-Kickback Statute in the form of incentive payments determined in a manner that takes into account the volume or value of referrals by the neurosurgeons to UPMC. 42 U.S.C. § 1320a-7b(b)(2).

158.   In return for patient referrals, the neurosurgeons knowingly and willfully received from the Defendants remuneration prohibited under the Anti-Kickback Statute in the form of incentive payments determined in a manner that takes into account the volume or value of referrals by the neurosurgeons to Defendant UPMC. 42 U.S.C. § 1320a-7b(b)(1).

159.   Defendant UPMC and Defendant UPP are separate and distinct legal entities. The remuneration paid by Defendant UPMC indirectly through Defendant UPP to the neurosurgeons in the form of incentive payments not qualified for the statutory exclusion or regulatory safe harbor from the kickback referral prohibition for amounts paid to an employee because the neurosurgeons were not employees of Defendant UPMC.

160.   The incentive payments made indirectly by defendant UPMC to the neurosurgeons did not qualify for any other statutory exception or safe harbor from the Anti-Kickback Statute remuneration prohibition.

## First Assistant Fraud

161.   Given the fact that Defendants UPP and UPMC incentivized their neurosurgery department to generate more and more wRVUs, the individual physicians became "creative" in the manner in which they generated wRVUs,

40

leading to a common system in which they improperly billed for being each other's "first assistant" in surgeries when, in fact, they were not.

162.    Generally speaking, a "First Assistant" in the context of a surgical procedure is a medical practitioner, often a physician, who provides aide in exposure, hemostasis and visualization of anatomic structures during the course of a complex surgical operation.

163.    Medicare, for example, only permits institutions to bill additional amounts for "First Assistant" services for complex procedures when certain criteria are met. See Social Security Act § 1842(b)(7)(D).

164.    First Assistant services are assigned a specific CPT code and corresponding wRVU value. Medicare pays fees for First Assistant services in an amount equal to 16% of the amount paid to the attending surgeon for performing the surgical procedure. In other words, the First Assistant receives as compensation for his/her services an amount equal to 16% of the total surgical fees that are paid by Medicare to the attending or primary surgeon. See Medicare Claims Processing Manual, 20.4.3 (B3-15044) / Rev. 1, 10-01-03.

165.    In order to validly bill Medicare for First Assistant services, the following two requirements must be met: (1) no qualified resident is available to perform the services; and (2) the first assistant was "actively assisting" the primary physician in charge of the surgery. See Social Security Act § 1842(b)(7)(D)(ii).

166.    It was or is common for certain of the individual physicians, specifically, Dr. Pedro J. Aguilar, Dr. Arlan H. Mintz, Dr. Dave Atteberry, Dr. Joseph Maroon, and Dr. Hikmat El-Kadi to routinely violate the second

41

requirement so as to fraudulently inflate their individual wRVU production. As set forth previously, higher wRVU numbers translates into increased base and incentive compensation for the individual physician.

167.     The federal regulations are consistent with the language of the Social Security Act and require that the First Assistant must "actively assist" the primary physician in performing a complex medical procedure in order to validly bill Medicare. See 42 CFR § 415.190.

168.     The Medicare Claims Processing Manual is also consistent with the language of the Social Security Act and similarly requires the First Assistant to have "actively assisted" the primary physician in performing the surgical procedure. See MCPM § 100.1.7.

169.     In order for a physician to be "actively assisting," he or she must be involved in the actual performance of the procedure, not simply providing ancillary services.     See DHHS Program memorandum, transmittal B-0065, 11/21/2000.

170.     Further, the First Assistant is not able to perform (and thus cannot bill for) another surgical procedure during the same time period.     See DHHS Program memorandum, transmittal B-0065, 11/21/2000.

171.     The individual neurosurgeons, UPP and UPMC are knowingly engaged in a pervasive pattern of fraudulently billing Medicare, Medicaid and other federal health benefit programs for "First Assistant" services that are not performed.  This is a clear violation of the False Claims Act.

42

172.    At UPMC/Shadyside Hospital and UPMC/Passavant Hospital where there are no neurosurgical residents available, the individual physician routinely "double book" themselves as each other's First Assistant in simultaneous overlapping surgeries.  The physicians who are billed as performing First Assistant services often spend only a very short time in the operating room.  Thus, these physicians are "First Assistant phantoms" and this practice is the equivalent of a "No Show" job in the labor arena (*i.e.*, a person, in this case a physician, gets paid for work that he or she never in fact performed).

173.    Such practices are a blatant violation of, *inter alia*, Medicare and Medicaid statutes, regulations and administrative directives that require a First Assistant to "actively assist" in the actual performance of the procedure.

174.    Upon information and belief, First Assistant fraud is a common and pervasive occurrence among the individual physicians at UPMC/Shadyside and UPMC/Passavant Hospitals.

175.    Thus, in each instance where the individual physicians engage in illegal "double booking," they fraudulently receive Medicare, Medicaid and other federal health benefit program dollars in the amount of 16% of the physician fees for both surgeries.  The First Assistant dollars are paid in addition to the attending physician fees.  Therefore, for each "double booking" violation, Medicare and/or Medicaid is defrauded a total of 32% of the total amount paid for the attending physician fees in the procedures.

43

**Teaching Physician Fraud**

176. UPMC/Presbyterian Hospital, where a number of the individual Neurosurgeons (specifically, Dr. Richard M. Spiro, Dr. David O. Okonkwo, Dr. Michael B. Horowitz, Dr. Peter C. Gerszten, Dr. Amin Kassam, Dr. Adam Kantor, Dr. Pedro J. Aguilar, and Dr. Arlan H. Mintz) previously performed and/or currently perform neurosurgical procedures, is a teaching hospital that has a graduate medical education program for training neurosurgical residents/interns. As a result of being a teaching hospital, Defendant UPMC is paid by Medicare under the Medicare Part A Program for the salaries of the residents and interns and for the teaching activities of the clinical faculty associated with its teaching program.

177. Under the Medicare Part B Program, Medicare pays Defendant UPMC additional amounts for professional services provided directly by the clinical faculty or by residents and interns who perform professional services under the clinical faculty members' direct, personal and identifiable supervision and control.

178. Specifically, Defendant UPMC may validly receive reimbursement under the Part B Program for certain services performed in a teaching setting only if the services are: (1) personally furnished by a physician who is not a resident/intern; (2) furnished by a resident/intern when a teaching physician is physically present during the critical or key portions of the service and

44

immediately available to furnish services during the entire service; or (3) furnished by residents/interns under a primary care exception within an approved Graduate Medical Education Program. See CMS Teaching Physician Guidelines (DHHS); 42 CFR § 415.172; CMS Manual System Pub 100-04 (Trans. 811, 1/13/06) – Section 100.1.

179.    A condition to payment by Medicare under Part B is that a teaching physician directly supervises the resident/intern during the provision of the service. Specifically, a teaching physician must be physically present during all critical or key portions of the procedure and immediately available to furnish services during the entire service. See CMS Teaching Physician Guidelines.

180.    A "teaching physician" is a physician, other than a resident/intern, who involves residents/interns in the care of his or her patients.   See CMS Teaching Physician Guidelines.

181.    "Physically present" means that the teaching physician is located in the same room as the patient (or a room that is subdivided with partition or curtained areas to accommodate multiple patients) and/or performs a face-to-face service.   See CMS Teaching Physician Guidelines; DHHS Medicare Carriers Manual (Trans. 1780, 11/22/02) and CMS Pub-100-04 (Trans. 811, 1/13/06).

182.    "Critical or key portions" means the part or parts of a service that a teaching physician determines are a critical or key portion.   See CMS Teaching Physician Guidelines; DHHS Medicare Carriers Manual, Trans. 1780, 11/22/02 and CMS Pub-100-04 (Trans. 811, 1/13/06).

183.   "Immediately available" during the entire service means that the teaching physician cannot be performing another procedure.  See CMS Manual System Pub 100-04 (Trans. 811, 1/13/06); DHHS Medicare Carriers Manual (Trans. 1780, 11/22/02).

184.   In the case of overlapping surgeries, the teaching surgeon must be present during the critical or key portions of both surgeries.  Therefore, the critical or key portions may not take place at the same time. See CMS Manual System Pub 100-04 (Trans. 811, 1/13/06); DHHS Medicare Carriers Manual (Trans. 1780, 11/22/02).

185.   When all of the key portions of the initial procedure have been completed, the teaching physician may begin to become involved in a second procedure. The teaching physician must personally document in the medical record that he or she was physically present during the critical or key portion(s) of both procedures.  See CMS Manual System Pub 100-04 (Trans. 811, 1/13/06); DHHS Medicare Carriers Manual (Trans. 1780, 11/22/02).

186.   When a teaching physician is not present during non-critical or non-key portions of the procedure and is participating in another surgical procedure, he or she must arrange for another qualified surgeon to immediately assist the resident/intern in the other case should the need arise.  See CMS Manual System Pub 100-04 (Trans. 811, 1/13/06); DHHS Medicare Carriers Manual (Trans. 1780, 11/22/02).

187.    To the extent that any confusion existed concerning the Medicare requirements to validly bill for teaching physician services, any such confusion was eliminated with OIG's PATH audit and investigation in the late 1990's.

188.    As indicated previously in this Complaint, Defendants UPMC's and UPP's predecessor in interest, UPMC's 18 separate Critical Practice Plans ("CPP") (which included the Department of Neurosurgery) entered into a Settlement Agreement in 1998 whereby they paid $17 million dollars in response to OIG's PATH audit.

189.    The PATH settlement was predicated upon UPMC's and UPP's (1) inadequate documentation and violations of billing requirements for services of attending physicians who involve residents and interns in the care of their patients (*i.e.*, the "teaching physician" scenario); and (2) errors in billing concerning the level of "evaluation and management" services provided by attending physicians.

190.    With regard to the teaching physician, after the PATH investigation, it became clear that the physician was required to stand "elbow to elbow" with the resident during the course of surgery.

191.    As part of the PATH settlement, UPP's predecessor in interest, CPP, agreed to implement a plan to assure compliance with billing and documentation requirements to prevent future submissions of claims for services that were not provided as claimed.

192.    Despite its payment of $17 million in 1998 in settlement of OIG's PATH audit, the certain of the individual neurosurgeon physicians continue to engage in a pervasive pattern of fraudulently billing Medicare for services

performed by residents/interns where a teaching physician is not physically present during the critical or key portions of the service and/or not immediately available to furnish services during the entire service.

193.     In essence, UPMC is a repeat offender with regard to its billing Medicare, Medicaid (and other federal health benefit programs) for surgeries performed by non-teaching physicians as it has re-instituted a business model (or billing practice) that it knows to be in violation of the Medicare "teaching physician" billing requirements despite getting caught once before and paying a $17 million dollar fine.

194.     Residents (and in certain situations Physician Assistants) perform complicated neurosurgical procedures without the supervision, involvement or physical presence of an attending/teaching physician.

195.     The attending/teaching physician never entered the operating room during surgeries performed on their patients, instead leaving the surgery to be performed entirely by the fellow, resident and/or Physician Assistant.

196.     Specifically, after UPMC's entry into the 1998 Settlement Agreement with the United States, residents regularly performed complicated endovascular neurosurgical procedures without the required supervision and/or involvement of a teaching physician.

197.     Specifically, patients of Dr. Spiro, Dr. Maroon and Dr. Gertszen have undergone complicated neurosurgical procedures that were performed by either a resident or a Physician Assistant without involvement by and totally outside the presence of Dr. Spiro, Dr. Maroon or Dr. Gertszen.

48

198.    Similarly, Dr. Okonkwo and Dr. Kantor regularly have residents perform complicated surgical procedures on their patients without involvement or supervision of a teaching physician.

199.    Indeed, as late as May 2015, patients have undergone spinal surgeries that were performed by a physician assistant without the supervising physician present in the operating room.

200.    It is common knowledge and accepted practice at UPMC and within UPP that by the time neurosurgery residents reach their fourth year, they are performing surgeries entirely by themselves with no teaching physician in the operating room.

201.    Defendants UPMC, UPP and the individual neurosurgical physicians then fraudulently certify that the purported "teaching physician' was physically present (when they know he was not) so as to be reimbursed under part B of the program.

202.    From the teaching physician's standpoint (and in light of the prohibited incentivized financial relationship established by UPP and UPMC with its neurosurgery department physicians), this fraudulent activity presents an wRVU windfall as the teaching physician obtains full credit for the wRVUs generated by the resident's and/or physician assistant's activities in performing the surgery.

203.    However, this conduct in addition to being fraudulent is clearly inconsistent with patient expectations and poses potential catastrophic danger to the patient.

**Billing for Services Not Rendered**

204.     Yet another "creative" practice for driving wRVUs by at least one physician is simply billing Medicare, Medicaid and other federal health benefit programs for portions of surgeries simply not done.

205.     Dr. Bejjani would simply state in his operative report that he performed additional levels of decompression when, in fact he had not.  Those additional levels reported but not done resulted in higher wRVUs and, therefore, benefitted him financially under UPP and UPMC's incentive compensation structure.

206.     Dr. Bejjani's practice of "upcoding" or phantom coding was documented repeatedly.  For example, Relator Bookwalter reviewed one of Dr. Bejjani's patients, following a prior spinal procedure in which Dr. Bejjani's operative note (from which bills, including to Medicare and Medicaid, are generated) stated that he performed a six-level laminectomy from L1-S1.  When Relator Bookwalter received the radiologist's report from the myelogram that he ordered, it showed that the laminectomy was performed only from L1-L4, two levels less than dictated on his prior operative note.  The patient was a Medicare patient.

207. On a separate occasion, Relator Bookwalter reviewed a patient of Dr. Bejjani who underwent two separate procedures for laminectomies – both performed by Dr. Bejjani. Dr. Bejjani's operative note from the first surgery stated that he performed laminectomies from L3-S1. In the second surgery, Dr. Bejjani's operative note stated that he performed a complete laminectomy at L3-L4. Based on the prior operative note, this was not possible as there was nothing left to remove at L3-L4.

208. This practice was documented at least two other times by a separate neurosurgeon from the Department of Neurosurgery. Both instances were reported directly to the Chair of the Department of Neurosurgery and to the UPMC Shadyside Surgical Chair. Specifically, Dr. Bejjani documented a four-level laminectomy in his surgical note, but when that patient was seen by a separate the physician four years later, he discovered that, at most, a two-level laminectomy (not four) was performed. As stated previously, this instance was reported directly to the Department Chair.

209. Less than two months later, the same physician discovered the exact same occurrence on a different patient, *i.e.*, that a four-level laminectomy had been reported in the operative report, but that only two levels were performed. The physician expressly raised his concerns to the Neurosurgery Department Chair and UPMC Shadyside Surgical Chair that this physician was engaging in "a systematic attempt to "upcharge" or overbill for multi-level spinal procedures." In fact, this physician went even further in his concern that he was uncovering a systematic problem:

51

> I certainly don't review all of Dr. Bejjani's cases, but occasionally see someone as a second opinion. If only a fraction of his patients see me for a second opinion, and only a fraction of those had a post-operative myelogram to definitely show what was done intraoperatively, and within a short period of time the two people that fit this description were BOTH over-billed for their procedures, it certainly would make one wonder. I can no longer remain silent to such activities going on within our profession, our community, and our hospital.

210.    Dr. El-Kadi established a computer-based billing "shortcut" that automatically billed for an exam in the consult that was consistent with the radiologic pathology even when the exam was not performed by Dr. El-Kadi. Again, such practice would have had an impact on his compensation under the incentivized structure established by Defendants UPP and UPMC. Dr. El-Kadi reported the highest wRVUs in 2009 in the neurosurgery department, approximately 60,000.

## SUBMISSION OF CLAIMS

211.    The majority of all claims submitted by UPMC from 2006 through present were submitted to federal health insurance programs such as Medicare and Medicaid.

212.    Relators have personal knowledge that, from 2006 through present, UPMC routinely submitted claims to Medicare and Medicaid for patients referred by UPP and its physicians as a result of the kickbacks and improper financial relationships discussed above. Relators do not have reasonable pre-discovery access to the specific billing records for such claims.

52

## THE UNITED STATES HAS BEEN DAMAGED

213.     As more particularly described above, defendants have profited and the United States has been damaged monetarily by the practices used by Defendants to make false claims to federal health care programs for payment and reimbursement.  Defendants have submitted many false claims for excessive and unauthorized payments and reimbursements and have obtained excessive compensation from the United States as a result.

## COUNT ONE
### Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)

214.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 213 of this complaint.

215.     This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

216.     By means of the acts described above, defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

217.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

218.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT TWO
### Federal False Claims Act 31 U.S.C. § 3729(a)(1)(B)

219.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 218 of this complaint.

220.     This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

221.     By means of the acts described above, defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).   The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

222.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

223.     Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.


## COUNT THREE
### Federal False Claims Act 31 U.S.C. § 3729(a)(1)(G)

224.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 223 of this complaint.

225. This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

226. By means of the acts described above, defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

227. By reason of these false records or statements, the United States has been damaged, and continues to be damaged, in a substantial amount.

228. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

WHEREFORE, Relators respectfully request this Honorable Court to enter judgment against Defendants, as follows:

    a.    That the United States be awarded damages in the amount of three (3) time the actual damages suffered by the United States Government as a result of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 et seq., provides;

    b.    Civil penalties against the Defendant equal to $11,000 for each violation of 31 U.S.C. § 3729;

    c.    *Qui tam* Relators/Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

    d.    *Qui tam* Relators/Plaintiffs be awarded all costs and expenses of this litigation, including attorney's fees and costs of court;

    e.    *Qui tam* Relators/Plaintiffs be awarded all other allowable damages, and;

    f.    All other relief on behalf of the Relators/Plaintiffs or the United States Government to which they may be entitled and that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial

on all claims alleged herein.


Dated:  May 29, 2015

DEL SOLE CAVANAUGH STROYD LLC

/s/ Stephen J. Del Sole
Stephen J. Del Sole (Pa. No. 73460)
Patrick K. Cavanaugh (Pa. No. 72960)
200 1st Avenue, Suite 300
Pittsburgh, PA 15222
Tel: 412-261-2393
Fax: 412-261-2110
sdelsole@dscslaw.com

STONE LAW FIRM, LLC

_____
Andrew M. Stone (Pa. No. 35176)
STONE LAW FIRM, LLC
The Frick Building, Suite 1806
437 Grant Street
Pittsburgh, PA 15219
Tel: 412-391-2005
Fax: 412-391-0853
astone@stone-law-firm.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 1st day of June 2015, the foregoing

Amended Complaint was served on the United States of America via Hand Delivery, as

follows:

> Michael A. Comber
> Assistant United States Attorney
> U.S. Post Office and Courthouse
> 700 Grant Street, Suite 4000
> Pittsburgh, PA 15219

> STONE LAW FIRM, LLC

> By:_____
> Andrew M. Stone, Esquire
> Pa. ID No. 35176
> astone@stone-law-firm.com
> 437 Grant Street, Suite 1806
> Pittsburgh, PA 15219
> Phone:  412-391-2005
> Fax:  412-391-0853

> Attorneys for Relators