# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GANESH ELANGOVAN, M.D.; STATE OF WISCONSIN, *ex rel.* GANESH ELANGOVAN, M.D.; and GANESH ELANGOVAN, M.D. | ) ) ) ) ) ) ) | |
| | ) | Filed Under Seal and In Camera |
| Plaintiffs-Relator, | ) ) | Case No. 2:12-cv-00358-RTR |
| v. | ) ) | |
| | ) | Jury Trial Demanded |
| THE MEDICAL COLLEGE OF WISCONSIN, INC.; MEDICAL COLLEGE OF WISCONSIN AFFILIATED HOSPITALS, INC.; FROEDTERT MEMORIAL LUTHERAN HOSPITAL, INC.; CHILDREN'S HOSPITAL OF WISCONSIN, INC.; DENNIS MAIMAN, M.D.; SHEKAR KURPAD, M.D.; and BRUCE KAUFMAN, M.D. | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

AMENDED COMPLAINT

Now come the United States of America and the State of Wisconsin, on

the relation of Ganesh Elangovan, M.D., and Dr. Elangovan directly as a

plaintiff, and complaining of Defendants The Medical College of Wisconsin,

Inc., Medical College of Wisconsin Affiliated Hospitals, Inc., Froedtert

Memorial Lutheran Hospital, Inc., Children's Hospital of Wisconsin, Inc.,

Dennis Maiman, M.D., Shekar Kurpad, M.D., and Bruce Kaufman, M.D.,

state as follows:

<u>Introduction and Nature of Case</u>

1.      This action seeks damages and civil penalties arising from violations of the federal False Claims Act, 31 U.S.C. §§ 3729, et seq. and the Wisconsin False Claims Act, Wis. Stat. § 20.931.

2.      The Defendants, among other things, regularly billed Medicare and Medicaid for surgeries they did not perform. The relator in this case, Dr. Elangovan, directly experienced this fraud because he, like other medical residents, actually performed the surgeries for which Defendants billed the government as if they had been performed by qualified teaching physicians.

3.      A group of certain neurosurgeons – Drs. Maiman, Kurpad, and Kaufman (the "Doctor Defendants") – regularly scheduled simultaneous surgeries to be performed by one individual teaching physician without arranging for a back-up teaching physician.  The Doctor Defendants did so for the plainly improper purpose of billing Medicare for more surgeries than the law would otherwise permit them to perform.

4.      The Medical College of Wisconsin, Inc. (the "College") and Medical College of Wisconsin Affiliated Hospitals, Inc. ("MCWAH") knowingly assisted the Doctor Defendants in their illegal Medicare and Medicaid billing by permitting doctors to schedule simultaneously occurring surgeries without the required back-up, directly participated in the fraud by creating false and misleading documentation to justify the illegal billing, and

2

directly benefitted from the fraud by collecting enormous fees that they would not have been able to collect without the illegal simultaneous surgery scheme.

5. This practice was highly profitable for MCWAH and the Doctor Defendants, but it violated clear Medicare billing rules. The Medicare billing rules are unequivocal: one qualified teaching physician is prohibited from being responsible for two surgeries occurring at the same time. Yet that is precisely what was happening in the MCWAH operating rooms every single day.

6. Additionally, the College, MCWAH, and the Doctor Defendants short-changed the medical education they were providing their residents by locking the residents out of surgeries to permit physician assistants or nurse practitioners (collectively, "PAs") to conduct and participate in surgeries without resident involvement. MCWAH, the College, and the Doctor Defendants did not hide why they did so -- frequently explaining to the residents that they could not be involved in surgeries in which PAs were assisting so that the PAs time could be billed and reimbursed by Medicare or Medicaid.

7. This practice is in contrast to Medicare billing rules requiring that if a resident is available to assist in a surgery, the resident must be included in the surgery. After all, that is the entire purpose of the medical education experience that the government is paying for. When MCWAH

3

billed the government for PA fees when residents were available to assist in the surgery, it circumvented Medicare billing rules and falsely certified that no residents were available.

8.      Finally, further sacrificing the medical education of its residents, as well as patient safety, MCWAH and the College required its residents to violate work hour requirements.  Indeed, at one point, MCWAH and the College demanded that its residents revise answers to an anonymous questionnaire, apparently necessitated by the fact that the truthful answers of the residents had raised red flags at the Accreditation Council of Graduate Medical Education ("ACGME") regarding work hours.  The false revisions were false statements used by MCWAH and the College to obtain and maintain funding for its graduate education.

9.      These false statements are not merely academic. The rules and regulations violated by the Defendants are all designed to ensure patient safety and proper training of residents. The patients who received these surgeries rightly expected that their neurosurgeries would be performed by experienced, board-certified attending physicians. Instead, the Doctor Defendants shuttled between simultaneously scheduled surgeries, by definition unable to supervise both at the same time. This money grab put patients' lives at risks.

<u>Parties</u>

10.      The College is a Wisconsin corporation with its principal place of

business in Milwaukee, Wisconsin. The College operates a graduate medical school in Milwaukee and cares for patients through the operations of MCWAH. The College also provides services and operates graduate medical programs at the Clement J Zablocki VA Medical Center ("Zablocki VA") in Milwaukee.

11.    MCWAH is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. MCWAH is comprised of several hospital facilities, including Froedtert Memorial Lutheran Hospital, Inc. and Children's Hospital of Wisconsin, Inc. (collectively, "MCWAH").

12.    The College and MCWAH are privately held entities that operate an accredited neurosurgical residency program. MCWAH offers 102 residency programs and has approximately 700 resident physicians in those programs.

13.    Dr. Maiman is a Wisconsin resident. He is a neurosurgeon practicing at MCWAH and Zablocki VA. He is also a faculty member of the College.

14.    Dr. Kurpad is a Wisconsin resident. He is a neurosurgeon practicing at MCWAH and Zablocki VA. He is also a faculty member of the College.

15.    Dr. Kaufman is a Wisconsin resident. He is a neurosurgeon practicing at MCWAH and a faculty member of the College.

16.    Dr. Elangovan is a neurosurgery resident who worked at

5

MCWAH from 2008-10. Dr. Elangovan graduated from the University of Wisconsin - Madison with degrees in molecular biology and computer science. He then graduated from Duke University Medical School.

17.     Dr. Elangovan personally experienced and witnessed the frauds described in this Complaint. He is an original source of the allegations in this Complaint. Among other things, he personally witnessed the routine occurrence of simultaneous surgeries and was forced to participate in the fraud – frequently performing one of those surgeries without any back-up.

<u>Jurisdiction and Venue</u>

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq.* There has been no public disclosure of the fraud alleged herein.  Moreover, Dr. Elangovan is an original source of the information because he has direct and independent knowledge of the fraud through his work at MCWAH and the College and he voluntarily reported it to the government before filing suit.  This Court has jurisdiction over Dr. Elangovan's state claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

19.     Venue is proper in the Eastern District of Wisconsin because a substantial portion of the events giving rise to this action occurred in this judicial district.

<u>Additional Facts</u>

I.      Simultaneous Surgeries

20.     In the context of teaching hospitals, the government compensates doctors and hospitals, in effect, for educating future generations of doctors.  The primary focus of this education is to provide residents experience in conducting surgery under the supervision and direction of qualified physicians.  Thus, even in cases where some elements of a surgery are performed by a medical resident, Medicare allows the teaching physician and hospital to bill for the surgery as if the teaching physician actually performed the entire surgery, provided that the teaching physician and hospital meet certain conditions.

21.     These conditions reflect that the drafters of the Medicare laws were well aware of the fact that financial incentives could lead a teaching physician to provide limited or even no supervision of a resident, in order to maximize the number of surgeries and billing.  For that reason, Medicare rules were drafted to prohibit improper supervision of surgical residents while billing Medicare.

22.     The Medicare rules and regulations make clear that in surgical procedures like those performed by the Doctor Defendants in this case, the billing surgeon must be both "present during all critical portions of the procedure" and "immediately available to furnish services during the entire service or procedure."  In effect, the Medicare rule and regulations set an

7

upper limit on the amount of surgeries that any individual teaching physician may schedule and conduct on their own – only as many surgeries as can occur without any overlap.

23.     Similarly, Medicare and Medicaid will only pay MCWAH's procedure fee (also sometimes known as a "surgical fee," "facility fee," or "DRG") if the qualified attending physician was also "immediately available" to assist the resident at all times and performed the "key and critical" parts of the procedure or directly supervised those key and critical parts while present in the operating room.

24.     In short, the rules governing Medicare billing for teaching physicians set forth a bright line rule, in plain and unmistakable language: a single teaching physician cannot be responsible for two simultaneous surgeries. MCWAH, the College, and the Doctor Defendants routinely violated these rules.

25.     The Defendants regularly scheduled multiple patients for neurosurgery at the same time and then billed Medicare and Medicaid as if the attending physicians themselves performed the surgeries and despite the fact that the rules and regulations expressly prohibited that practice.  By definition, the attending physicians were not "immediately available" for each of these multiple surgeries, as the Medicare rules and regulations expressly provide that being immediately available means that "he or she cannot be performing another procedure."

26.     It was regular practice at MCWAH for the Doctor Defendants to schedule and conduct two and even three simultaneous surgeries.  As a resident at MCWAH, Relator was a first-hand witness to these practices -- which occurred on a daily basis.  He saw it with his own eyes and performed the surgeries without proper supervision with his own hands.

27.     The two physicians who most regularly engaged in this scheme were Dr. Dennis Maiman and Dr. Shekar Kurpad, who practiced at Froedtert Hospital and Zablocki VA.

28.     Based on Dr. Elangovan's experience, each of both Dr. Maiman and Dr. Kurpad would virtually always have multiple surgeries occurring simultaneously in two different operating rooms, leaving residents in one of the two rooms unsupervised and without any immediately available assistance.  Dr. Elangovan was one of the doctors operating without the supervision required by Medicare nearly every time he conducted a surgery with Drs. Maiman and Kurpad.

29.     Additionally, just as Drs. Maiman and Kurpad perpetrated this fraud on Medicare, Dr. Elangovan has first-hand knowledge, based on his four-month rotation at Children's Hospital, that Dr. Bruce Kaufman routinely scheduled simultaneous surgeries at Children's Hospital of Wisconsin.

30.     Upon arrival at the hospital in the morning, Dr. Elangovan would review the operating schedule for the day along with the other

9

residents.  Dr. Elangovan would then be assigned by the chief resident to a

particular surgery.  When he was assigned to a surgery involving a patient of

Dr. Maiman or Dr. Kurpad, Dr. Elangovan encountered the same thing

nearly every time. Dr. Maiman or Dr. Kurpad would be physically present in

the operating room only a small fraction of the time, usually to perform one

or two steps in the surgery, such as attaching screws or other hardware to

the spine.

31.     For a typical surgery performed on one of Dr. Maiman's

patients, Dr. Elangovan would page the attending doctor in the morning as

the time for the surgery approached.  Dr. Maiman would often return the

page from his home phone, about a 30-minute drive from the hospital.  Dr.

Maiman would then tell Dr. Elangovan to start the surgery without him.

32.     Of course, Dr. Maiman would not have performed any site-

marking or other critical pre-operative steps – he was not even in the

hospital.  Dr. Elangovan would then perform the surgery on his own, with Dr.

Maiman appearing only for small portions of the surgery.

33.     Most troublingly, Dr. Elangovan knew that his only back-up was

Dr. Maiman and that when Dr. Maiman was not present for his surgery, he

would be occupied in another neurosurgery or not yet present in the hospital.

34.     If Dr. Elangovan had a question about how to proceed or

something unexpected happened, Dr. Elangovan knew that all he could do

was page Dr. Maiman, often leading to substantial delays before Dr. Maiman

would appear to provide assistance.  Dr. Elangovan's experiences with Dr.

Kurpad were similar, nearly always involving multiple operating rooms and

simultaneous surgeries.

35.     These are 10 examples of when Dr. Maiman or Dr. Kurpad

scheduled one of themselves to perform multiple surgeries at the same time:

- On a certain day in 2010,[1] Dr. Maiman performed a laminectomy on a 65-year-old Medicare recipient in OR 12 from 12 pm to 2:40 pm. Dr. Maiman performed another laminectomy in OR 8 from 10:00 am to 2:30 pm.

- On a certain day in 2010, Dr. Kurpad performed a spinal fusion on a 73-year-old Medicare recipient in OR 8 from 8:15 am to 12:00 pm. Dr. Kurpad performed another spinal fusion in OR 14 from 8:30 am to 12:15 pm. In fact, Dr. Elangovan performed the surgery on the 73-year-old patient and Dr. Elangovan knew that Dr. Kurpad was who he was supposed to contact in case he needed any supervision.

- On a certain day in 2010, Dr. Maiman performed a laminectomy and spinal fusion on a 69-year-old Medicare recipient in OR 8 from 7:15 am to 12:00 pm. At the same time, Dr. Maiman performed three other operations in two different operating rooms: a hemilaminectomy in OR 7 from 7:15 am to 9:45 am, an anterior cervical discectomy and fusion in in OR 7 from 9:45 am to 1:00 pm, and an anterior cervical discectomy and fusion in OR 12 from 11:45 am to 3:15 pm.

- On a certain day in 2010, Dr. Maiman performed a spinal fusion on a 74-year-old Medicare recipient in OR 14 starting at 7:30 am. Dr. Maiman also performed a discectomy in OR 12 starting at 7:15 am.

- On a certain day in 2010, Dr. Kurpad performed a spinal mass excision on a 78-year-old Medicare recipient in OR 14 starting at 9:30 am. Dr. Kurpad also performed two other spinal fusions that day: one on a 69-

---

[1] This Complaint will refrain from using particular dates of service or identify patients by name so as to follow the broadest possible reading of the privacy requirements of the Health Information Portability and Accountability Act. Dr. Elangovan can provide specific dates of service and patient names to the Court upon receipt of an appropriate subpoena and/or entry of an appropriate protective order by the Court.

year-old Medicare recipient in OR 12 from 8:30 to 12:00 pm, and another on a 66-year-old Medicare recipient in OR 12 starting at 12:00 pm.

- On a certain day in 2010, Dr. Kurpad performed a posterior C1-2 fixation on an 81-year-old Medicare recipient in OR 13 from 12:45 pm to 6:30 pm. Dr. Kurpad also performed a spinal fusion on another patient in OR 12 from 11:45 am to 4:15 pm.

- On a certain day in 2010, Dr. Maiman performed a removal of painful hardware on a 32-year-old Medicare recipient in OR 8 from 11:15 am to 2:30 pm. Dr. Maiman also performed a posterior fusion on another patient in OR 12 from 8:30 am to 5:00 pm.

- On a certain day in 2010, Dr. Kurpad performed a spinal decompression on 68-year-old Medicare recipient in OR 13 from 8:30 am to 2:45 pm.  Dr. Kurpad also performed a laminectomy in OR 14 from 8:15 am to 1:30 pm, and a spinal fusion in OR 14 from 1:30 pm to 6:15 pm.

- On a certain day in 2010, Dr. Maiman performed a spinal fusion on a 79-year-old Medicare recipient in OR 10 starting at 7:30 am. Dr. Maiman also performed two different operations in OR 12: a spinal fusion from 7:15 to 11:00 am, and another spinal fusion starting at 11:00 am.

36.     Based on Dr. Elangovan's experience at MCWAH and the College, the Defendants as a matter of course billed Medicare for every procedure they performed, and undoubtedly did so for each of the procedures in these examples, despite the fact that the surgeries were occurring simultaneously.

37.     By definition, the Doctor Defendants could not be immediately available for each of the simultaneous surgeries they scheduled. Further, the Doctor Defendants often failed to personally perform or directly supervise the "key and critical" parts of a surgery.

38.     While Medicare leaves it to the doctors to determine what constitutes "key and critical" parts of a surgery, at a minimum, the "key and critical" parts of a surgery should include those steps that each teaching physician identifies on his physician billing sheet as those he personally performed. It was Dr. Elangovan's experience that the Doctor Defendants often listed items on their billing sheets that Dr. Elangovan -- or other residents -- performed without supervision.

39.     MCWAH, the College, and the Doctor Defendants were fully aware of the restrictions on billing for simultaneous surgeries.

40.     In fact, all of the residents were trained to include in their operative reports a statement that the teaching physician was present for all key and critical parts of the surgery and otherwise immediately available throughout the surgery.  Indeed, in the event that the operative report did not expressly state the "key and critical" and "immediately available" magic language, a billing specialist who prepares bills for the College and/or MCWAH would send an email to the resident demanding that the language be added.

41.     Dr. Elangovan received such emails on numerous occasions -- on each occasion requiring Dr. Elangovan to include language in the operative report that was false.  Dr. Elangovan and his resident colleagues were required to state falsely that the teaching physicians were present for key and critical parts of the surgery and otherwise immediately available for the

13

express purpose of causing Medicare and Medicaid to provide reimbursement for surgeries that otherwise were not reimbursable under the Medicare rules and regulations.

42.     MCWAH and the College were not only aware of the improper billing, but were direct participants in the fraud. The charges for the Defendant Doctors' fraudulent services were billed and collected by the College, while MCWAH billed and collected the associated procedure fees. In other words, the Defendant Doctors were the instruments that the College and MCWAH used to generate enormous revenue that it never should have received.

43.     Moreover, MCWAH and the College facilitated the fraudulent practices of the Doctor Defendants by permitting them to schedule two and, in many cases, three simultaneous surgeries.  MCWAH and the College could have easily precluded the practice by prohibiting individual teaching physicians from reserving operating rooms for simultaneous surgeries. MCWAH facilitated the Doctor Defendants' illegal practices so that it could reap the financial rewards associated with conducting many more surgeries than its medical staff could safely or legally handle under the applicable Medicare rules and regulations.

II.     Improper Use of Physician Assistants

44.     Because of the focus at teaching hospitals in providing residents surgical experiences, Medicare does not pay for PAs when there is a qualified

resident available to perform those services.  Where the government has already paid for assistance to teaching physicians in the form of residents, it is improper and illegal to make Medicare pay for additional and unnecessary assistance in the form of PAs, assistance that also undermines the educational experience of the residents.  Indeed, before permitting a PA to bill his or her time, Medicare requires that the teaching physician certify to the lack of availability of a qualified resident.

45.     It was common practice at MCWAH for attending physicians to use PAs when residents were available. In fact, MCWAH physicians spoke openly about this.  On more than one occasion, Dr. Kaufman explicitly told Dr. Elangovan that MCWAH had to use PAs and bill their time in order to justify their salaries.  Dr. Kaufman's statement was in response to complaints from Dr. Elangovan and other residents that PAs were usurping the residents' opportunities to learn and grown as physicians.

46.     On most days, MCWAH and the College had more residents available than there were surgeries.  Yet there were surgeries occurring every day in which teaching physicians used PAs rather than residents. Therefore, on most days, MCWAH and the College used PAs when residents were available.  In such situations, the government should not have been paying PA fees to MCWAH or the College, and only did so as a result of their fraudulent practices.

III.     MCWAH And The College Lied to Their Accrediting Body

47.     MCWAH's and the College's neurosurgical residency program, like all graduate medical programs in the United States, is accredited by the ACGME.  MCWAH and the College regularly violated ACGME's requirements, and, at least in one instance, modified data provided to ACGME for accrediting purposes.

48.     One of ACGME's key requirements is that residents work no more than 80 hours per week and no more than 30 hours per shift, and always receive at least 10 hours of rest between shifts. In fact, ACGME requires program directors and other teaching physicians to proactively monitor residents' hours and intervene where they see those hours limits being exceeded.

49.     MCWAH's neurosurgical residents regularly worked beyond these limits. This problem was particularly acute at Children's Hospital. There, neurosurgical residents would be on call for an entire week, during which time they would literally live at and never leave the hospital.  ACGME standards make clear that all in-house on-call hours count toward the work-hour limits. Dr. Elangovan himself was forced to endure this experience.

50.     At Froedtert Hospital, approximately once every four weeks, Dr. Elangovan was required either to work a shift more than 30 hours long or work more than 80 hours in a week.

51.     For example, during the week of June 8-14, 2009, Dr. Elangovan

16

worked 111.5 hours at Children's Hospital, including two shifts of 36 hours. As another example, Dr. Elangovan served a 38.5-hour shift at Froedtert Hospital on May 25-26, 2010, including performing two complex surgeries after he had already been on duty for 26 hours. Similarly, on June 2-3, 2010, Dr. Elangovan served a 32-hour shift at Froedtert Hospital, again performing a complex procedure after he had already been on duty for 25 hours.

52.     Perhaps most troubling, MCWAH and the College were aware of these problems, tried to cover them up, and lied to ACGME about the extent of these problems.  In April 2009, the neurosurgical residents completed anonymous surveys on ACGME's website. The surveys asked the residents to rate how often the hospital adhered to the ACGME hours rules and other ACGME program requirements.

53.     Shortly after these supposedly anonymous surveys had been submitted to ACGME, Dr. Sinson, who oversaw the neurosurgical residency program at the time, called a meeting of all residents. At that meeting, Dr. Sinson told the residents (including Dr. Elangovan) that he had received the results from the ACGME survey and that they were troubling. Dr. Sinson informed the residents that they "must have misunderstood" the questions, because the answers indicated that the College and MCWAH regularly deviated from the ACGME hours limits.

54.     Dr. Sinson then passed around the results of the original survey, which had highlighted the results that raised concerns about violating

17

ACGME rules.  Dr. Sinson then told the residents it was not in their interest to draw attention to these issues, and he instructed the residents to submit new survey responses saying the College was compliant with ACGME rules.

55.    Dr. Elangovan learned from the other residents that they all modified their answers to indicate that MCWAH and the College complied with the ACGME hours requirements, a statement that was not true.

56.    By providing a false statement to ACGME in order to obtain and/or maintain its accreditation, MCWAH and the College are liable under the False Claims Act for the government's financial support of the neurosurgical program. These false statements caused the government to pay the salaries of the College's and MCWAH's neurosurgical residents and other costs associated with the program.

57.    It should be noted that this fraud has real-world consequences. Several studies have concluded that overworked residents are significantly more prone to making medical errors. See, e.g., "Association of Resident Fatigue and Distress With Perceived Medical Errors," Journal of American Medical Association (Sept. 23/30, 2009). The overworking of residents would be troubling in its own right, but it is especially so when one considers that many of those excessive hours were spent performing surgeries without the appropriate involvement of attending physicians, solely so that MCWAH, the College and the Doctor Defendants could generate more revenue from the efforts of residents already paid for by the government.

<u>Count I</u>

58.     Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729.

59.     Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729.

<u>Count II</u>

60.     Through the above-described conduct, Defendants knowingly presented or caused to be presented false claims for medical assistance, and/or made, used, or caused to be made or used, a false record or statement material to obtain approval or payment of false claims for medical assistance in violation of Wisconsin Statutes § 20.931(2).

<u>Count III</u>

61.     In or around May 2009, Dr. Elangovan raised concerns about the above-described conduct to his supervisors at MCWAH and the College. He raised these concerns repeatedly thereafter, including several times in June and July 2010, shortly before he was fired.

62.     In July 2010, in retaliation for Dr. Elangovan raising these concerns, MCWAH and the College terminated Dr. Elangovan. MCWAH and the College thereafter denied Dr. Elangovan's internal appeal of his termination.

63.     Through the above-described conduct, MCWAH and the College discharged Dr. Elangovan and otherwise discriminated against him because of lawful acts that Dr. Elangovan undertook in furtherance of this action, including alerting Defendants to the fraud they were committing against the United States and Wisconsin, all in violation of 31 U.S.C. § 3730(h).

Count IV

64.     In or around May 2009, Dr. Elangovan raised concerns about the above-described conduct to his supervisors at MCWAH and the College. He raised these concerns repeatedly thereafter, including several times in June and July 2010, shortly before he was fired.

65.     In July 2010, in retaliation for Dr. Elangovan raising these concerns, MCWAH and the College terminated Dr. Elangovan. MCWAH and the College thereafter denied Dr. Elangovan's internal appeal of his termination.

66.     Through the above-described conduct, MCWAH and the College discharged Dr. Elangovan and otherwise discriminated against him because of lawful acts that Dr. Elangovan undertook in furtherance of this action, including alerting Defendants to the fraud they were committing against the United States and Wisconsin, all in violation of in violation of Wisconsin Statutes § 20.931(14).

Count V

67.     Beginning approximately May 18, 2010, MCWAH and the

20

College discriminated against Dr. Elangovan on the basis of Dr. Elangovan's race and/or national origin in violation of 42 U.S.C. § 1981.

68.    Dr. Elangovan is an Indian-American whose parents were both born in India.

69.    Starting approximately May 18, 2010, and continuing through Dr. Elangovan's termination, MCWAH and the College intentionally discriminated against Dr. Elangovan's right to make and enforce contracts.

70.    In particular, MCWAH and the College discriminated against Dr. Elangovan's contractual right to work no more than  80 hours per week and no more than 30 hours per shift, and always receive at least 10 hours of rest between shifts. MCWAH and the College allowed white residents the benefit of these contractual rights but denied them to Dr. Elangovan.

71.    Further, in or around July 2010, MCWAH and the College intentionally discriminated against Dr. Elangovan by terminating his contract without cause.

72.    Dr. Elangovan suffered substantial damages as a result of the above-described conduct, including the effective end of his career as a physician.

Count VI

73.    In or around June 2010, MCWAH and Dr. Elangovan entered into a contract calling for Dr. Elangovan to continue as a resident in MCWAH's neurosurgery program until June 30, 2011.

21

74.    This contract was supported by consideration and mutuality.

75.    Dr. Elangovan performed his obligations under this contract and was never at any point in breach of the contract.

76.    In or around July 2010, MCWAH terminated Dr. Elangovan without cause and in violation of the parties' contract, including any implied duty of good faith and fair dealing.

77.    After terminating Dr. Elangovan, MCWAH denied Dr. Elangovan any meaningful internal review of his termination and eventually internally affirmed the termination.

78.    Dr. Elangovan suffered damages as a result of these breaches of contract, including the effective end of his career as a physician.

<u>Count VII</u>

79.    After the Defendants wrongfully terminated Dr. Elangovan and derailed his medical career, Dr. Elangovan attempted to move forward with his career.

80.    In late 2011, Dr. Elangovan applied for a residency position in a program at a hospital in Wisconsin.

81.    Sometime in early 2012, MCWAH and the College provided a letter to the hospital that defamed Dr. Elangovan. The letter described Dr. Elangovan's conduct while a MCWAH resident in a knowingly false way and reported falsely that Dr. Elangovan was terminated with good cause.

82.    As a result of this defamation, Dr. Elangovan's application was

rejected.

83.    Dr. Elangovan's reputation and career have been severely

damaged by these defamatory comments.

<u>Jury Trial Demanded</u>

84.    The United States of America and the State of Wisconsin, on

relation of Dr. Elangovan, hereby demand trial by jury on all issues so

triable.


WHEREFORE, Ganesh Elangovan respectfully requests that the

Court:

a.      in regard to Counts I and II, enter judgment in his favor and in

favor of the United States of America and the State of Wisconsin against

Defendants, awarding treble damages and penalties for violations of 31

U.S.C. § 3729 and Wisconsin Statutes §20.931 and awarding Dr. Elangovan

thirty percent of the government's recovery as well as his costs and attorney

fees;

b.      in regard to Counts III and IV, enter judgment in Dr.

Elangovan's favor, order his reinstatement, and award him double damages

(including for consequential and emotional harm) and costs and attorney fees

relating to his claims under 31 U.S.C. § 3730(h) and Wisconsin Statutes §

20.931(14);

c.      in regard to Count V, enter judgment in Dr. Elangovan's favor and award him compensatory and punitive damages and costs and attorney fees relating to his claims under 42 U.S.C. § 1981; and

d.      in regard to Counts VI and VII, enter judgment in Dr. Elangovan's favor and award him compensatory and punitive damages.


Respectfully submitted,

__/s/ Jon Loevy _____
By One of Relator's Attorneys

Daniel M. Twetten
Loevy & Loevy
2060 Broadway, Suite 460
Boulder, CO 80304
Phone: (720) 583-6514

Mike Kanovitz
Jon Loevy
Anand Swaminathan
Loevy & Loevy
312 N. May Street, Suite 100
Chicago, IL 60607
Phone: (312) 243-5900

A. Colin Wexler
Goldberg Kohn Ltd.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
Phone: (312) 201-3967

<u>Certificate of Service</u>

I, Daniel Twetten, certify that on May 16, 2014, I served the foregoing Amended Complaint by United States Mail and electronic mail upon the following counsel of record:

Matthew Krueger
Assistant United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202

 /s/ Daniel Twetten_____
Daniel Twetten