# EXHIBIT G

**United States General Accounting Office**

# GAO

Report to the Chairman, Subcommittee on Health, Committee on Ways and Means, House of Representatives

July 1998

# MEDICARE

# Concerns With Physicians at Teaching Hospitals (PATH) Audits





**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**Health, Education, and**
**Human Services Division**

B-278015

July 23, 1998

The Honorable Bill Thomas
Chairman, Subcommittee on Health
Committee on Ways and Means
House of Representatives

Dear Mr. Chairman:

About 1,200 hospitals in the United States have graduate medical
education programs for training physicians in medical specialties after
they have completed medical school. These hospitals are known as
teaching hospitals; the physicians in training are known as residents.
Residents receive specialized training in a particular area of medicine and
provide patient care under the supervision of a teaching physician.
Teaching physicians are faculty members who train and supervise
residents. Their functions may include classroom instruction, making
rounds with residents, examining specific patients, and discussing courses
of treatment.

In December 1995, the University of Pennsylvania, without admitting
wrongdoing, entered into a voluntary settlement with the Department of
Justice (DOJ), agreeing to pay about $30 million in disputed billings and
damages for Medicare billings by teaching physicians. This settlement
resulted from an audit performed by the Office of Inspector General (OIG)
in the Department of Health and Human Services (HHS). In the audit, the
OIG concluded that some of the university's teaching physicians had
inappropriately billed Medicare because medical records did not
adequately document their involvement in services provided by residents.
The audit also determined that some teaching physicians had "upcoded"
their claims—that is, billed for more complex and, therefore, more
expensive services than may have been provided.

Concerned that such problems might be widespread, HHS' OIG, in
cooperation with DOJ, instituted a nationwide initiative—now commonly
known as Physicians at Teaching Hospitals (PATH) audits—to review
teaching physician compliance with Medicare billing rules.[1] As of April 30,
1998, five additional PATH audits have been resolved. (See table 1.) In three
of these cases, the institutions reached settlements with DOJ totaling more

---

[1]When we refer to a specific PATH audit in this report, we will use the name of the teaching institution.
PATH actually involves an audit of the entities that submit teaching physician billings to
Medicare—typically physician group practice plans that are components or affiliates of the teaching
institution.

B-278015

than $37 million. In the two other cases, no significant errors were found; consequently, no enforcement action was taken. Currently, PATH audits are either planned or under way at 37 other institutions.

**Table 1: Resolved PATH Audits as of April 30, 1998**

| Institution | Date resolved | Settlement amount (millions) |
|---|---|---|
| University of Pennsylvania | December 1995 | $30.0 |
| Thomas Jefferson University | August 1996 | 12.0 |
| Dartmouth-Hitchcock Medical Center | April 1997 | None |
| Yale University | October 1997 | None |
| University of Virginia | November 1997 | 8.6 |
| University of Pittsburgh | March 1998 | 17.0 |
| **Total** | | **$67.6** |

The PATH initiative has generated considerable controversy. The academic medical community disagrees with HHS' OIG regarding the billing and documentation standards that were in effect during the time periods under review. The medical community also contends that DOJ is coercing settlements from teaching institutions through threats of federal lawsuits. On October 29, 1997, the Association of American Medical Colleges (AAMC) and other medical associations, specialty societies, and medical schools filed a complaint with the U.S. District Court for the Central District of California, seeking to end the PATH initiative. In addition, the Greater New York Hospital Association, along with several New York medical schools and teaching hospitals, filed a similar lawsuit in federal court on April 16, 1998. AAMC's lawsuit was dismissed on April 27, 1998, for lack of jurisdiction because no actual enforcement action was being challenged.[2] The other lawsuit is pending.

This letter responds to your July 14, 1997, letter and subsequent discussions with your staff requesting that we examine the PATH initiative. Specifically, you asked us to determine (1) whether HHS' OIG has a legal basis for conducting PATH audits, (2) whether the OIG has followed an acceptable approach and methodology in conducting the audits, and (3) the significance of the billing problems identified in selected audits.

To address your questions, we examined the laws, regulations, and guidance related to teaching physician billing for Medicare services. To understand the OIG's approach and methodology and the nature and extent of billing errors it found, we examined the OIG's workpapers related to the

[2]AAMC appealed the dismissal on June 23, 1998.

B-278015

audits conducted at the University of Pennsylvania (Penn), Thomas Jefferson University (Jefferson), and the Dartmouth-Hitchcock Medical Center (Dartmouth), the first three resolved PATH audits. We discussed the PATH initiative with staff from OIG headquarters and field offices as well as with the Medicare carriers who worked on these audits.[3] We also met with representatives from the three audited institutions to obtain their perspectives on the PATH initiative. DOJ would not permit us to interview key officials who negotiated the financial settlements with Penn and Jefferson because it said certain matters related to these institutions were still pending. DOJ, however, did respond in writing to questions we posed about its role in the PATH initiative and the Penn and Jefferson settlements. In addition, we met with representatives from AAMC and the American Hospital Association.

In addition to this letter, we are sending you a separate, complete report on this subject, which we designated as "limited official use" and which should not be further distributed. The complete report contains information about specific audit findings at Penn and Jefferson that DOJ has identified as being subject to confidentiality agreements with the audited institutions. This letter does not contain such information and is therefore publicly available. Our work was performed between August 1997 and June 1998 in accordance with generally accepted government auditing standards. Our scope and methodology are discussed in more detail in appendix I.

## Results in Brief

HHS' OIG, in our opinion, does have a legal basis for applying the specific criteria used in the PATH initiative. Our analysis indicates that the need for a teaching physician to be physically present to bill for services performed by residents is a longstanding requirement of the Medicare program. The fact that a physical presence requirement has not always been consistently communicated or enforced does not obviate the need for teaching physicians to document their personal involvement in services to legitimately bill Medicare. Furthermore, although detailed guidance for documenting evaluation and management codes—the codes physicians use to bill Medicare for certain services—was not effective until 1996, the definitions of these codes and instructions for their use have been available since the codes were implemented in 1992 and provided the standard for the PATH initiative.

[3]Carriers are insurance companies that contract with the government to process and pay Medicare claims.

B-278015

We also found that the ᴏɪɢ's methodology on the three audits we reviewed was reasonable. The criteria the ᴏɪɢ used to assess teaching physicians' involvement in services performed by residents were consistent with statutory and regulatory requirements. Moreover, the criteria used by the ᴏɪɢ were no different from the information already provided to the three teaching hospitals by their carriers. Similarly, we saw no evidence that the ᴏɪɢ or the medical reviewers who assisted them retroactively applied documentation guidance when assessing the level of teaching physician care billed to Medicare during the prior periods covered by the audits.

However, the results of one of the audits we examined—the audit of the Dartmouth-Hitchcock Medical Center—raises questions about the ᴏɪɢ's original intent to audit all major teaching hospitals. Auditing every major teaching hospital would be time-consuming and expensive for the ᴏɪɢ, the carrier, and the institutions involved. We believe that a risk-based approach focusing on the most problem-prone institutions would be a more efficient use of these resources. The ᴏɪɢ reduced the number of institutions to be audited, due to competing demands and other factors, but neither its original intent to audit all major teaching institutions nor its recent decision to reduce the number of audits used a risk-based approach. The Dartmouth audit was initiated with little indication that the institution was improperly billing Medicare. The audit—which took 10 months and, according to Dartmouth, cost the institution about $1.7 million in direct and indirect costs—identified billing errors totaling $778.

While the billing errors found at Dartmouth were immaterial, the errors found by the ᴏɪɢ for the other two audits we reviewed—the audits at the University of Pennsylvania and Thomas Jefferson University—were more significant and resulted in referrals to ᴅᴏᴊ. A substantial difference existed between the billing errors identified by the ᴏɪɢ and the amounts the institutions ultimately agreed to repay. These amounts, however, were the outcome of negotiations between the institutions and ᴅᴏᴊ in an effort to avoid litigation. In essence, ᴅᴏᴊ used the ᴏɪɢ's audit results related to inpatient services for a single year to estimate potential false claims for all Medicare part B services for multiple years. While the medical community has criticized this multiyear extrapolation, it is not improper in the context of settlement negotiations. Although the institutions and ᴅᴏᴊ did not discuss these negotiations in detail, ᴅᴏᴊ said it could have asked the ᴏɪɢ to expand the audit to other time periods. Representatives from the two institutions told us that the applicable damages and penalties—if the institutions were found liable by a court for submitting false claims—were

B-278015

of great concern and influenced their decisions to agree to a settlement with DOJ.

The OIG found that Penn and Jefferson teaching physicians had not always complied with Medicare billing requirements. Based on our review of the OIG's workpapers, however, these problems did not appear to be as serious as the OIG has categorized them in public statements since the settlements were reached. The OIG has implied that these audits found instances of billing by teaching physicians on days they were not working and has also said that most upcoding errors were multilevel. The workpapers for the Penn and Jefferson audits do not support these statements.

## Background

Medicare covers almost all people aged 65 and over and certain disabled people.[4] Administered by the Health Care Financing Administration (HCFA) within HHS, the program has two components—hospital insurance (part A) and supplementary medical insurance (part B). Inpatient hospital services, home health services, and certain other institutionally based services are covered by part A of the program. Part B covers physician services, outpatient services, and various other medical and health services.

Medicare pays teaching hospitals for part of the costs of graduate medical education under part A of the program. These payments are intended to cover a portion of teaching physicians' salaries, related to the time they spend teaching residents. Medicare part A also pays a portion of the residents' salaries. In total, Medicare paid teaching hospitals about $8 billion in 1996 for costs associated with the training of residents.

Teaching physicians can also receive Medicare funds from part B of the program when they personally provide services to Medicare beneficiaries and, in certain circumstances, when a resident provides services under the personal supervision of the teaching physician. Physicians claim part B reimbursement using five-digit codes, developed by the American Medical Association, which indicate the level of care provided. For example, initial inpatient consultations can be billed at five different levels ranging from 99251 to 99255. Generally, the higher the code, the higher the degree and complexity of the service or level of care and the higher the Medicare reimbursement.

These two methods of paying teaching physicians have been a longstanding concern because of the danger that Medicare will pay twice

---

[4]Medicare is authorized by title XVIII of the Social Security Act (42 U.S.C. sections 1395 et seq.).

B-278015

for the same service—once as a hospital payment under part A and again as a separately billed service under part B. Twice previously—in November 1971 and again in January 1986—we reported problems with part B claims for services provided by teaching physicians.[5] Both times we found that a significant number of the claims we reviewed—67 percent in 1971 and 49 percent in 1986—did not adequately document the teaching physicians' presence in services performed by residents, raising the possibility that duplicate payments had been made by Medicare.

The OIG's PATH initiative stems from the continuing concern over part B billings by physicians in a teaching setting. Institutions selected for a PATH audit are given the option of conducting self-audits at their own expense, using independent external auditors or consultants approved and supervised by the OIG. Audits conducted by the OIG are called PATH I, while self-audits are referred to as PATH II. All of the audits completed or under way since the initial OIG audit at Penn have been PATH II reviews.

PATH audits focus on two major areas of concern. The first concern is whether teaching physicians who billed part B for services furnished by residents provided sufficient "personal direction" in the delivery of the service. The OIG considers that the requirement for sufficient personal direction is met if the physician was physically present while the service was delivered. If the medical records do not show evidence of the teaching physician's presence, the OIG considers the service to be part of the teaching physician's supervisory functions already paid under part A. The second concern is whether teaching physicians have inflated their part B claims by "upcoding," that is, billing using a code that is one or more levels higher than the level of service that was actually performed. Level-of-service determinations are made by carrier medical reviewers on PATH I audits or by independent medical reviewers on PATH II reviews. Carrier medical review staff also assist the OIG in monitoring the work of the external reviewers on PATH II audits.

The cornerstone of a PATH audit is an examination of the medical records and other documentation related to a random sample of inpatient admissions for a 12-month period. The results are shared with the local U.S. Attorney's Office, which evaluates the OIG's findings and considers whether criminal or civil action is warranted, including the filing of a civil

---

[5]See Problems in Paying for Services of Supervisory and Teaching Physicians in Hospitals Under Medicare (B-164031(4), Nov. 17, 1971) and Medicare: Documenting Teaching Physician Services Still a Problem (GAO/HRD-86-36, Jan. 21, 1986).

lawsuit under the False Claims Act.[6] Every audit is started with the intention of reviewing the entire sample for billing errors so as to estimate a total overpayment for the 12-month period. However, the audit may be terminated earlier if, for example, the OIG concludes the errors being identified are immaterial or if the institution decides it wants to stop the audit and discuss a possible settlement with DOJ in an effort to limit its False Claims Act liability. The OIG told us that the only resolved audit in which all sampled services were reviewed was the Penn audit.

With the increased attention to health care fraud and abuse in recent years, the government may now invoke the penalties and damages prescribed in the False Claims Act for practices that in the past might have been dealt with by seeking repayment. The False Claims Act has become one of the government's primary enforcement tools because of its deterrent effect. The act provides that anyone who knowingly submits false claims to the government is liable for three times the amount of damages plus a mandatory penalty of $5,000 to $10,000 for each false claim. The term "knowingly" is broadly defined to mean that a person (1) has actual knowledge of the false claim, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information. In the health care setting, where providers submit thousands of claims each year, the potential damages and penalties provided under the False Claims Act can add up quickly.

## OIG Has Legal Basis for Applying the Criteria Used in PATH Audits

Despite the concerns raised by representatives of the academic medical community, HHS' OIG has legal authority to apply the physician presence and coding criteria it is using in the PATH initiative. Although HCFA guidance has created some confusion, federal Medicare law has long required that physician services be rendered or supervised by the physician in person. Similarly, despite recognition that evaluation and management coding guidance needed clarification, physicians have always been required to bill only for services performed and to comply with billing guidance in effect at the time.

In our 1986 report, we found that a teaching physician's claim for reimbursement required documentation in the patient's medical records that the teaching physician either personally provided the service or was present when the service was provided by a resident. After considering additional legislative activity and materials as well as subsequent

---

[6]31 U.S.C. sections 3729 et seq.

B-278015

communications with HCFA, we continue to hold this view. Our report also indicated that carriers varied in their requirements for the documentation of physician presence and that Medicare's statement of this policy needed to be clarified. Recognizing these problems, the OIG has limited PATH audits to teaching hospitals that received clear guidance from their Medicare carriers on documenting physician presence.

The OIG also has authority to audit the claims of physicians for evaluation and management services from 1992 to 1995. During these years, Medicare required physicians to accurately code their services in order to receive reimbursement. Guidance in effect during that period provided the relevant definitions for determining the appropriateness of such coding. The OIG has indicated that, in its reviews, it applies only the code documentation guidance in effect for the period being audited.

## Teaching Physicians Must Be Physically Present to Bill Medicare

In 1966, within months of the Medicare program's inception, the Medicare agency promulgated rules establishing principles of reimbursement for services by hospital-based physicians. One such principle was that these services may be reimbursed under Medicare part B if the physician provides "an identifiable service requiring performance by a physician in person" (emphasis added).[7] The following year, the agency promulgated rules specifically pertaining to the reimbursement of attending physicians' services rendered in a teaching setting. These rules provided for payment where the "physician provides personal and identifiable direction to interns or residents who are participating in the care of his patient" (emphasis added).[8]

In 1969, Medicare issued specific guidance establishing conditions for part B payments to supervising physicians in a teaching setting. This guidance—Bureau of Health Insurance, Intermediary Letter No. 372 (IL-372)—has been central to analyses of the supervising physician payment issue and the subject of much controversy. Under IL-372, to be reimbursed under part B, a teaching physician must be the patient's "attending physician."[9] To be recognized as such, the physician must "render sufficient personal and identifiable medical services to the Medicare beneficiary to exercise full, personal control over the management of the portion of the case for which a charge can be

---

[7]20 C.F.R. section 405.483(a) (1966).

[8]20 C.F.R. section 405.521 (1967).

[9]IL-372 (1969), p. 1.

B-278015

recognized."[10] To exercise such control, the teaching physician must, among other things, either actually perform the services required by the patient or supervise the treatment provided by others so as to ensure that appropriate services and quality care are provided.[11] The provision of personal and identifiable services must be substantiated by recordings entered by the physician in the patient's chart.[12] In 1970, further guidance was provided in Intermediary Letter No. 70-2, indicating that a physician's status as "attending" is important where medical or surgical services are performed in his presence.[13]

In 1980, the Congress enacted a statute governing carrier documentation requirements for part B payments for teaching physician services. In language similar to IL-372, it states that a carrier shall not pay for physicians' services provided to patients under an approved teaching program unless the physician "renders sufficient personal and identifiable physicians' services to the patient to exercise full, personal control over the management of the portion of the case for which the payment is sought."[14] This provision was in effect during the PATH initiative.

The conference committee for this law explicitly endorsed the IL-372 guidance for documenting payment by teaching physicians.[15] Also, the House Budget Committee (whose provision establishing criteria for payment of teaching physicians was adopted in conference) stated that it "strongly believes teaching physicians should personally perform or personally supervise patient services in order to qualify for fee-for-service payment" (emphasis added).[16]

Two years later, the Congress enacted a law directing the Medicare agency to promulgate regulations to distinguish between professional medical services that are reimbursable under part B and those that are not.[17] The

---

[10]IL-372, p. 1.

[11]IL-372, p. 1.

[12]IL-372, p. 6.

[13]IL-70-2 (1970), p. B-1.

[14]P.L. 96-499, section 9, Dec. 5, 1980; classified to 42 U.S.C. section 1395u(b)(7)(A)(i).

[15]H.R. No. 96-1479 (1980), pp. 145-46.

[16]H.R. No. 96-1167 (1980), pp. 69-70.

[17]P.L. 97-248, section 109(a), Sept. 3, 1982; classified to 42 U.S.C. section 1395xx(a).

B-278015

Senate Finance Committee (whose provision calling for regulations was subsequently adopted in conference) stated

Under current law and regulations, services furnished by a physician to hospital inpatients are reimbursed on the basis of reasonable charges under part B only if such services are identifiable professional services to patients that require performance by physicians in person and which contribute to the diagnosis or treatment of individual patients.[18] (Emphasis added.)

The Committee's language underscores its understanding that part B payment occurs only as a result of physicians rendering professional services in person.

On the basis of a review of applicable law and guidance, our 1986 report concluded that a teaching physician's claim for part B reimbursement required documentation in a patient's medical records that the teaching physician either personally provided the service or was present when the service was provided by a resident.[19] However, our 1986 report found that HCFA had failed to adequately communicate these and other documentation requirements to providers and that the documentation actually required by carriers varied substantially. At the time, we recommended that HCFA promulgate rules to clarify the matter. No such national rules were finalized until December 8, 1995—about 10 years after the issuance of our report.

During those 10 years, a number of agency communications appear to have contributed to confusion over Medicare's enforcement policy. For example, on December 30, 1992, the Director of HCFA's Office of Payment Policy distributed a memorandum to HCFA regional offices clarifying that teaching physicians must be physically present during all procedures in order to receive part B reimbursement. In response to negative provider reactions to this memo, HCFA distributed an internal memo in July 1994 stating that the instructions on the physical presence requirement in IL-372 are "admittedly ambiguous and have not been vigorously enforced." In April 1995, the Director of HCFA's Bureau of Policy Development wrote to an attorney representing Medicare providers that carriers that did not apply a "physician presence" requirement prior to the December 1992 memo should not institute such a policy until HCFA could issue a final rule on the subject. And on December 8, 1995, in the preamble to the new rules pertaining to Medicare reimbursement in a teaching setting, HCFA noted

---

[18]S.R. No. 97-494 (1982), pp. 21-22.

[19]GAO/HRD-86-36, Jan. 21, 1986.

B-278015

that while IL-372 and related issuances specifically stated "that the attending physician had to be present when a major surgical procedure or a complex or dangerous medical procedure was performed," the guidance was "vague, perhaps necessarily, on the matter of the presence of the physician during other occasions of inpatient service."

We view these communications as illustrating what we had concluded in our 1986 report: HCFA enforcement policy for reimbursing teaching physicians under part B was not clearly communicated or consistently enforced. However, notwithstanding poor communication and inconsistency in enforcement, Medicare law required documentation of physical presence by a teaching physician for part B reimbursement. Accordingly, HCFA made clear in the preamble to its 1995 rules that, despite misunderstandings resulting from IL-372, prior agency policy had been to require teaching physician presence for all part B billings.[20] A substantial number of carriers have correctly enforced this requirement.

In recognition of this confusion and its potential effect on teaching physician compliance with Medicare billing rules, the General Counsel of HHS sent a letter to representatives of the academic medical community responding to concerns raised over the ongoing PATH audits. The July 11, 1997, letter indicated that HHS' policy for enforcing the physician presence standard in the PATH audits would be determined by evidence of communications between Medicare carriers and providers, such that the OIG "will undertake PATH audits only where carriers, before December 30, 1992, issued clear explanations of the rules regarding reimbursement for the services of teaching physicians."

## OIG May Audit Evaluation and Management Codes to Determine Program Compliance

To maintain consistency in billing for physicians' services, HCFA uses a national uniform procedure coding system known as the HCFA Common Procedure Coding System. Since 1983, this system has incorporated the American Medical Association's Current Procedural Terminology, commonly referred to as the CPT, a list of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians.

In 1992, the CPT was significantly affected by the scheduled implementation of the Omnibus Budget Reconciliation Act of 1989, which required the imposition of a Medicare fee schedule for physicians' services based on the lesser of the actual charge for the service or an amount

---

[20]60 Fed. Reg. 236 (Dec. 8, 1995), p. 63139.

B-278015

determined under a resource-based relative-value fee schedule.[21] This resulted in a complete revision of CPT codes for evaluation and management services.[22] The 1992 CPT provided definitions or explanations of the various levels of evaluation and management services; ultimately, more clarity was provided by the publication of guidelines, effective August 1995, on how to use and interpret the codes in order to document services.

Notwithstanding the subsequent publication of clarifying guidance, from 1992 to 1995, Medicare required physicians to code their services in order to receive reimbursement, and the CPTs for 1992 through 1995 provided definitions for determining the appropriateness of such coding. HHS' OIG has indicated that it applies code definitions appropriate for the period being audited and provides institutions an opportunity to review and contest findings of suspected upcoding.

## Selection of Institutions for PATH Audits May Be Questionable

HHS' OIG told us that when it began PATH, the intention was to audit the major teaching hospital or faculty practice plan associated with each of the nation's 125 medical schools. The OIG selected these institutions because, of the nation's 1,200 teaching hospitals, these institutions had the greatest number of residents and received the most Medicare revenue. The OIG and the Medicare carriers, however, lacked the resources to conduct all PATH audits; thus, the OIG has offered the teaching institutions the option of hiring at their own expense external auditors to conduct the audits.[23] Nevertheless, the OIG and Medicare carrier staff remain involved by actively monitoring the external auditor's work. In July 1997, 1 year after the PATH initiative was announced, audits were under way or planned at 49 institutions.

This blanket approach to auditing teaching physician billing practices may not be the most efficient use of OIG, carrier, or teaching hospital resources. Because audits are time-consuming and expensive, the number of audits that can realistically be done is limited. While targeting the largest teaching institutions in the country was a reasonable first step, a

---

[21]P.L. No. 101-239, section 6102, 103 Stat. 2106, 2169-2189 (1989); classified to 42 U.S.C. section 1395w-4.

[22]The 1992 CPT provides codes for six different types of services: evaluation and management, anesthesia, surgery, radiology, pathology, and laboratory and medicine. Evaluation and management services typically involve obtaining the patient's relevant medical history, a physical examination, and medical decisionmaking and counseling.

[23]In return for volunteering for a PATH II audit, the OIG advises DOJ of the institution's level of cooperation. DOJ may take this cooperation into account when resolving losses the government sustains from any claims determined to be false.

B-278015

risk-based approach to prioritizing PATH audits could have enabled the OIG to target institutions most likely in violation of teaching physician billing rules and concentrate its efforts on these institutions.[24]

The OIG recently told us it intends to reduce the number of teaching institutions that will be audited but plans to complete ongoing audits. The OIG attributed the reduction to competing demands for its resources and determinations that some carriers did not provide clear communications regarding teaching physician physical presence rules. Nevertheless, as the selection of the remaining ongoing audits was not based on the risk of noncompliance with teaching physician billing rules, the likelihood of unproductive audits, such as the one that occurred at Dartmouth, remains.

The OIG initiated the audit at Dartmouth with little indication that teaching physicians at the institution were improperly billing Medicare. OIG field office staff told us that since they intended to audit every major teaching institution in their region, it made little difference to them which ones were done first.[25] Dartmouth was the first institution to be chosen, in part, because the hospital had only two major physician groups, which greatly simplified the sampling of patient services. The workpapers indicate that the OIG told Dartmouth officials that the institution was selected for PATH because an analysis of claims data seemed to indicate what it referred to as "high-end" billing. However, OIG field office staff told us that the suspected high-end billing related only to psychiatric services. We found that these services represented an insignificant number of Medicare inpatient services and were never the focus of the actual PATH audit.

We also found that the DOJ official who is generally regarded as the architect of the PATH initiative previously commented that Dartmouth's billing guidance for teaching physicians was the best he had ever seen and, according to DOJ, had advised the OIG of the quality of this guidance. Quality guidance is no assurance of compliance with Medicare billing rules. However, without indications of significant compliance problems and with the DOJ official's high commendation, Dartmouth would probably not have been a good candidate for a PATH audit under a risk-based approach.

---

[24]The OIG told us that in some instances the selection of institutions was influenced by factors outside its control, such as civil lawsuits and DOJ requests for assistance.

[25]Within 6 months of initiating the Dartmouth audit, the OIG field office started PATH audits at the remaining major institutions in its region.

B-278015

Ten months into the audit—after about one-half of the sampled admissions had been reviewed—the OIG terminated the audit. According to a Dartmouth official, the partial audit cost the institution about $1.7 million: $900,000 in direct costs ($600,000 in audit expenses and $300,000 in legal fees and other costs) and $800,000 in indirect costs attributable to a delay in a bond financing.[26] In the end, the OIG concluded the institution had been overpaid $778—an amount it did not deem worthy of collecting.

While the OIG stated that the amount Dartmouth spent on its PATH audit was far higher than it had anticipated, a Dartmouth official told us it incurred the legal and audit costs in order to be in the best position to defend itself should the outcome of the audit result in litigation. For example, Dartmouth decided to retain outside legal counsel because at the time its audit was initiated, the outcomes of the Penn and Jefferson settlements were well known. Dartmouth said it was widely believed by many in the medical community that the government was using the threat of severe False Claims Act penalties to compel settlements. In addition, Dartmouth also believed that the OIG's interpretation of IL-372 requirements was too narrow. Thus, it retained external auditors to expand the scope of the audit. By doing so, it hoped to demonstrate that it was complying with, in its view, a more appropriate interpretation of the requirements. Dartmouth also wanted to expand the audit scope to ensure that underbilled services were identified. The institution believed that such services would be unfairly ignored by the OIG and thus could result in misleading conclusions about the institution's compliance.

## Methodology Followed in Conducting PATH Audits Appears Reasonable

On the basis of our review of the OIG's workpapers on the Penn, Jefferson, and Dartmouth audits, we believe that the OIG followed a reasonable methodology in these audits in making physical presence and level-of-service determinations—the key components of a PATH audit. The criteria the OIG used to assess teaching physicians' involvement in part B services was, in our opinion, valid and essentially the same as requirements already imposed on the teaching physicians by local Medicare carriers during the time periods covered by the audits. Moreover, the OIG's workpapers show that the three institutions were aware of the rules. Likewise, level-of-service determinations, which require medical background and knowledge, were made by medical reviewers—not auditors. We also found no evidence of retroactive application of level-of-service documentation guidelines.

---

[26]According to Dartmouth, investment banker and credit agency concerns about the possible outcome of the audit delayed the bond financing, ultimately raising the total costs of this financing.

B-278015

## OIG Required Documentation of Physical Presence

The workpapers for all three audits show that in examining sampled services, the OIG required documentation—such as written comments, notes, or reports in the patients' medical records—that demonstrated the teaching physician either provided the service or was physically present while the resident provided the service. Countersignatures by teaching physicians on residents' notes were not considered acceptable evidence by the OIG because, with countersignatures alone, it was not possible to ascertain whether physicians were personally involved in these services or were acknowledging a later review of the residents' notes as part of their routine teaching responsibilities. The OIG did accept a countersignature, however, if other information in the medical record demonstrated that the teaching physician was with the patient when the service was provided. This is essentially the same criterion we used in evaluating teaching physician services in 1986; and, in our judgment, this criterion is compatible with Medicare requirements for reimbursing teaching physicians for their services.

## Carriers Notified Institutions of Physical Presence Requirements

The OIG's workpapers show that Xact Medicare Services—the Medicare carrier that processed part B claims for Penn and Jefferson—had for many years clearly interpreted the personal and identifiable services requirement of IL-372 to mean that a teaching physician had to be physically present to bill. In 1982, for example, the carrier issued a manual to doctors, hospital administrators, and medical records personnel that specified that teaching physicians had to be physically present to bill for services provided by residents. The manual also said that a physician's countersignature of a note entered by a resident or nurse was not evidence that a part B covered service was provided unless the note indicated that the physician was present. In 1988, the carrier distributed a newsletter to providers that reiterated its documentation requirements and emphasized that teaching physicians needed to document their presence in patients' medical records in order to bill part B. For example, the newsletter warned that Medicare considered a part B payment to be an overpayment if a physician was reimbursed for a physical examination performed by a resident but was not present during the examination.

C&S Administrative Services, the carrier that processed part B claims for Dartmouth, had interpreted the physical presence requirement similarly, although its interpretation was not as longstanding.[27] In 1993, the carrier began to publicize its expectation that teaching physicians needed to be

---

[27]National Heritage Insurance Company is the current Medicare carrier for Dartmouth.

B-278015

present to bill for services provided by residents.[28] For example, a May newsletter to providers stated, in part, that a physician's fee was payable in a teaching hospital if (1) the physician personally performed the service or (2) was physically present when the resident performed the service for which payment was sought. This guidance was repeated in a December newsletter. In addition, the carrier's Associate Medical Director for Government Programs wrote to several medical societies in September that the carrier expected each patient's medical record to document the teaching physician's involvement in the service billed.

## Teaching Institutions Were Aware of Physical Presence Requirements

The OIG's workpapers also show that all three of the audited institutions were aware that teaching physicians were required to be present in order to bill Medicare.

- In the 1980s, Xact conducted numerous reviews of physician billings at teaching hospitals in the state of Pennsylvania to ensure the institutions were complying with Medicare physical presence requirements. At least three audits occurred at Jefferson—in 1981, 1986, and 1988—with the carrier reporting rates of noncompliance of 15, 45, and 69 percent, respectively. Feedback to the institution from the carrier, in our view, left no doubt as to what was expected. The carrier's report on the results of its 1986 review, for example, mentioned that emergency room visits were discrepant because supervising physicians had failed to indicate whether they had personally performed services or were present while residents performed the services. In response to these findings, Jefferson attempted to educate its teaching physicians about IL-372 requirements and advised them that to bill Medicare for their services, Jefferson teaching physicians had to either perform the services themselves or supervise treatment "at the elbow" of the resident.

- Although we were unable to determine if Penn had been subject to similar audits by the carrier, evidence obtained by the OIG demonstrated that Penn was also aware of what the carrier required. In a 1986 memorandum to physicians and residents, a department chairman discussed the need for attending physicians to be present in order to bill for services performed by residents. Mentioning our 1986 report, the chairman stated, "Medicare auditors have been instructed to enforce the published guidelines, and refunds will be required for undocumented services." Other evidence in the OIG's workpapers indicated that Penn became concerned about its billing practices in 1992 and took steps—including development of new

---

[28]Prior to 1993, the carrier accepted countersignatures to residents' notes as evidence of a teaching physician's presence and involvement in the billed service. The carrier also only required a notation in patients' medical records once every 3 days in order to bill for daily visits.

B-278015

billing instructions, physician training, and internal review—to improve compliance with IL-372 requirements. The billing guidelines largely mirrored what the carrier already required.

- In 1991, Dartmouth issued a uniform billing policy for its teaching physicians. The institution's guidance stated, in part, that medical records must contain a notation indicating that the attending physician personally performed the service or was physically present while the resident performed the service. A countersignature, the guidance stated, verifies only that the attending physician reviewed the note and does not imply that the attending physician was present or that the attending physician personally rendered a service.

## Medical Reviewers Made Level-of-Service Determinations

Medical reviewers, not auditors, determined whether the codes used by teaching physicians to claim reimbursement accurately reflected the service provided. In our view, this was a reasonable approach. Determining the appropriateness of the level of service billed involves examining related medical records and other information. Such determinations require medical knowledge as well as familiarity with the codes used to bill Medicare. If auditors do not possess such expertise, then auditing standards require that they seek the assistance of specialists who have the appropriate qualifications and experience. The carriers' medical reviewers who assisted the OIG in these PATH audits were registered nurses, most with many years of experience in conducting postpayment medical reviews of Medicare claims.[29] The medical reviewers we interviewed told us that their work on PATH audits was essentially the same as what they had routinely done on other postpayment reviews.

## No Evidence of Retroactive Application of Evaluation and Management Documentation Guidelines

Although some have alleged that the PATH audits involve a retroactive application of evaluation and management documentation guidance, we found no evidence to support such allegations in the audits we reviewed. The carrier medical reviewers we interviewed told us that in evaluating the appropriateness of the levels of service billed, they applied the criteria in effect for the period under audit. We did not have the expertise to evaluate the medical reviewers' determinations and, as a result, did not attempt to do so. Nevertheless, we found no evidence in the workpapers that the medical reviewers had used inappropriate criteria. For example, we observed that when the carrier questioned the appropriateness of the code used for a particular service, the institutions were given the opportunity to

---

[29]Reviews of paid claims, known as postpayment reviews, are routinely performed by Medicare carriers and are the primary means for systematically identifying which providers are inappropriately billing part B.

B-278015

comment and provide additional information, and in some instances, the medical reviewers revised their determinations on the basis of the additional information. Although we saw many instances where the institutions and the carriers' medical reviewers ultimately disagreed on the appropriate code, we found no evidence that the institutions' basis for disagreeing was that the carriers' medical reviewers had applied documentation guidance retroactively. Moreover, the officials we interviewed from the teaching institutions never raised this as an issue. Officials from Penn, for example, told us they did not think the OIG had applied evaluation and management documentation guidance retroactively at their institution. They believed, however, that the guidance for documenting evaluation and management services during the period covered by their PATH audit was vague and, therefore, auditing these services was inappropriate.

## Significance of the PATH Results at the University of Pennsylvania and Thomas Jefferson University

While inpatient billing errors found by HHS' OIG at Dartmouth were immaterial, those identified at both Penn and Jefferson were more significant and were used by DOJ as a basis for negotiating settlements with the institutions. Although we had access to the OIG's workpapers, confidentiality agreements between DOJ and these two institutions preclude us from disclosing the specific details of these findings. The amounts the institutions ultimately agreed to repay were substantially higher than the overpayments found by the auditors. However, these settlement amounts—about $10 million in disputed billings plus about $20 million in damages at Penn and almost $6 million for disputed billings plus an equal amount in damages at Jefferson—were based on DOJ's extrapolation of the OIG's findings. The extrapolations covered time periods and types of services that were not audited by the OIG. While these extrapolations have been criticized by the medical community, they were arrived at during settlement negotiations between the institutions and DOJ in an effort to avoid False Claims Act litigation. Such negotiations are not bound by rules of evidence or methodological constraints.

## Billing Errors at Penn and Jefferson

The workpapers for these audits show evidence that some teaching physicians had not documented their compliance with Medicare billing requirements and, therefore, may not have been entitled to payment. Because it is not practical or efficient to audit all teaching physicians' claims as part of a PATH audit, a random sample of 100 Medicare inpatient admissions, typically involving 1,500 to 2,000 individual physician services for a 1-year period, is selected. All 100 of the 1993 sampled admissions

B-278015

were reviewed during the Penn audit, enabling the OIG to project the results to Medicare inpatient admissions for the year audited. In contrast, only 50 of the 100 1994 sampled admissions were completely reviewed at Jefferson—only one-half of the number the OIG considered the minimum to make an extrapolation.

According to the OIG's Penn workpapers, the auditors found overpayment errors in many of the services they examined. By extrapolating these sample results, the OIG concluded that teaching physicians had been significantly overpaid by Medicare for inpatient part B services in 1993. Similar extrapolations could not be made for the review of 1994 services at Jefferson because the audit was stopped before the entire sample could be reviewed. Nevertheless, the results of this partially completed sample were used to negotiate Jefferson's settlement.

## Audit Results Used to Extrapolate Settlement Amounts

As a result of settlement negotiations with DOJ, the institutions agreed to return millions of dollars for disputed billings plus millions more in damages. Penn agreed to repay about $10 million for disputed billings related to inpatient and outpatient Medicare part B services over a 6-year period—significantly more than what the OIG estimated its teaching physicians had been overpaid in 1993 for inpatient services only. Penn also agreed to pay another $20 million in damages. Jefferson agreed to repay about $6 million for disputed billings covering a 5-year period plus an equal amount in damages. These amounts were based on DOJ's extrapolations of the auditor's findings.

The academic medical community has expressed concern and criticism that the estimates used by DOJ in settlement negotiations were not statistically valid. Indeed, these estimates were not based on statistically valid calculations. We found that DOJ used the results of the Penn and Jefferson audits covering inpatient services for 1 year to estimate potential false claims for both inpatient and outpatient services for multiple, unaudited years: 5 additional years at Penn and 4 additional years at Jefferson. We also found that because the review of services was not completed at Jefferson, the sample was not sufficient to make statistically valid estimates of the total overpayment to the year audited, much less multiple years. In addition, we found that at both institutions, DOJ projected evaluation and management coding errors to time periods that preceded implementation of the current codes.

B-278015

In the context of settlement negotiations, however, such extrapolations are not improper. If this matter had gone to court, DOJ might not have been able to use such extrapolations to establish the existence of False Claims Act violations; the extrapolations could have been challenged on the basis that they were not statistically sound. However, the settlement negotiations were undertaken between DOJ and the institutions in an effort to avoid litigation, and the settlement process is not governed by rules of evidence or methodological constraints.

We are not in a position to know exactly why the parties agreed to the settlements because, consistent with the agreement to treat the settlement negotiations as confidential, the institutions and DOJ did not discuss the negotiations with us in detail. Officials from all three institutions, however, told us that the severe fines and penalties applicable under the False Claims Act were of great concern to them and influenced all of their decisions regarding their PATH audits. Attorneys from both Penn and Jefferson told us that these fines and penalties could have been financially devastating to their institutions had the institutions been found liable in court for submitting even relatively few false claims. Penn told us that during the course of negotiations, DOJ took the position that the institution had submitted 1.4 million claims during the period covered by their settlement. Thus, the institution believed that if a court determined that only 2 percent, or about 28,000, of these claims were false, it would have faced false claims penalties of approximately $280 million even before the calculation and tripling of damages. This possibility, they said, foreclosed any realistic recourse that the institution had to litigate rather than settle this matter. Similarly, Jefferson officials emphasized that they would not have settled with DOJ had the potential damages and penalties been less onerous. Instead, the institution saw itself faced with False Claims Act provisions that had "almost no intent standard"[30] as well as triple damages, severe monetary penalties, and potential exclusion from the Medicare program. Given such a threat, they said, their fiduciary obligations left them no choice other than to settle.

DOJ told us that, instead of relying on the OIG's 1-year results to estimate the overpayments for the other years, it could have asked the OIG to audit the other services and time periods. In fact, DOJ said it offered the institutions such an option. According to DOJ, the institutions declined and

---

[30]Although one must "knowingly" submit a false claim to be liable under the False Claims Act, no proof of specific intent to defraud the government is required. "Knowingly" is defined to include actual knowledge or deliberate ignorance or reckless disregard of the truth or falsity of the information submitted.

B-278015

agreed to accept the settlement to avoid the cost and disruption such additional audit work would have entailed.

# Nature of the Findings May Be Overstated

While the audit results at Penn and Jefferson indicate noncompliance, based on our review of the workpapers, the problems in these two PATH audits do not appear to be as serious as publicly portrayed by HHS' OIG since the settlements. In October 1997 testimony, the OIG reported that both settled and ongoing PATH audits had identified significant instances of noncompliance with the physical presence standard; the four examples cited involved physicians who had billed Medicare for services on days when they were on leave or out of town.[31] In an April 1997 response to a congressional inquiry, HHS' Inspector General said that serious upcoding errors had been identified in the first two PATH reviews and that the huge majority of these errors were related to multilevel upcoding. At the time of these statements, the Penn and Jefferson audits were the only PATH audits that had resulted in settlements with DOJ.

The OIG's workpapers for Penn and Jefferson do not contain convincing evidence that teaching physicians were not working on days they billed Medicare.[32] Rather, the workpapers show that teaching physicians did not always document their presence when services were rendered by a resident. While this lack of documentation may be insufficient to obtain Medicare reimbursement, it does not necessarily mean that the teaching physicians were not at work when the services were rendered. Although the Penn workpapers show that the auditors suspected that a few teaching physicians might have billed Medicare on days they were not working, the auditors told us that a settlement was reached before they could determine if this was the case. Similarly, the Jefferson workpapers show no evidence of such abuses, and the OIG auditors told us there was no time to look for such evidence before the audit was terminated.

Likewise, the OIG's statements that the PATH audits have identified serious upcoding errors—the huge majority of which were related to multilevel upcoding errors—are not, in our opinion, substantiated by the workpapers. Rather, the workpapers show the overwhelming majority of the upcoding errors that were found by the auditors at both institutions

---

[31]The Physicians at Teaching Hospitals (PATH) Audits, OIG testimony before the Senate Committee on Appropriations, Subcommittee on Labor, HHS, Education, and Related Agencies, Oct. 21, 1997.

[32]An OIG official told us that one of the four examples cited in the October 1997 testimony involved a physician from one of these two institutions. The other three examples involved physicians from an institution that was not part of the PATH initiative at the time of the testimony. We did not review the work related to this audit.

B-278015

involved one-level discrepancies. At one of these institutions, not only were few multilevel errors found by the OIG, but one physician accounted for about 70 percent of these multilevel errors.

Assuming medical reviewers examined services for both undercoding and overcoding at Penn and Jefferson, errors that reveal one-level differences consistently favoring teaching physicians may indicate abuse. In fact, the workpapers indicated that carrier medical reviewers found few instances of undercoding errors at Penn and none at Jefferson.[33] Although the medical reviewers who assisted the OIG on these two audits told us that they looked for both undercoded and overcoded services during their reviews, we lacked the expertise to verify their statements.

One-level differences, however, may indicate legitimate differences in judgment. HCFA, OIG, and carrier staff with whom we spoke acknowledged that coding discrepancies can be subjective and do not necessarily reflect fraud or abuse. A HCFA official told us, for example, that because the time periods covered by these two audits predated HCFA's 1996 documentation guidelines, legitimate one-level disagreements could have occurred between providers and payers as to what constituted appropriate documentation. Indeed, the OIG's workpapers show that many one-level discrepancies found at Penn were dropped by DOJ during settlement negotiations.

## Conclusions

The method of paying teaching physicians for their services creates the potential for Medicare to pay for some services twice—once through part A and again through part B. To prevent inappropriate payments, Medicare has issued guidance addressing when teaching physicians may bill part B for their services. Although this guidance was not always clear and, as a result, has been interpreted differently over the years by Medicare carriers, federal law has long required that teaching physicians billing part B either provide the service themselves or be physically present while a resident provides the service. In addition, when teaching physicians submit part B claims, Medicare requires that they accurately code their services in accordance with applicable guidance. For these reasons, the OIG's PATH initiative, which involves auditing teaching physicians' part B claims for compliance with these requirements, is consistent with law.

---

[33]The workpapers showed, however, that some undercoding errors were found at Jefferson by its external auditors.

B-278015

The OIG also followed a reasonable methodology in conducting its work. In assessing compliance, the OIG used the same criteria that the carriers already expected the teaching physicians to follow when submitting part B claims. Furthermore, when medical knowledge was required, the OIG relied on carrier medical reviewers to make these assessments. We are concerned, however, that the OIG's initial intent to audit teaching physicians affiliated with all 125 of the nation's largest medical schools was not sufficiently risk-based, resulting in potentially unproductive audits and an inefficient use of resources, as the Dartmouth audit suggests. Instead, the OIG should have considered a risk-based approach, which may have more clearly identified institutions with suspected billing problems and then targeted its efforts accordingly. Because PATH audits can be time-consuming and expensive for both the government and the institutions, we believe that the OIG should have had a sound basis for asking the institutions to incur these costs.

Penn and Jefferson agreed to repay the federal government amounts that were substantially higher than the errors identified by the OIG. While the medical community has been critical of the use of extrapolations to calculate these amounts, it is important to recognize that these settlement amounts were the outcomes of discussions that occurred between the institutions and DOJ, and such negotiations are not bound by rules of evidence or methodological constraints. The institutions agreed to the settlement amounts rather than subjecting themselves to additional audit work and possibly defending themselves in court against a False Claims Act lawsuit.

Finally, the results of the Penn and Jefferson audits show that the OIG identified instances of teaching physician noncompliance with Medicare billing rules. Regardless of whether the noncompliance is due to a mistake, carelessness, or outright fraud, teaching physicians are not entitled to reimbursement if they fail to comply with Medicare requirements. However, the OIG has characterized the problems found at these institutions as more serious than its workpapers establish.

## Agency Comments and Our Evaluation

We provided a draft of this report to the HHS Inspector General and the Department of Justice. We also provided excerpts of the draft report to the University of Pennsylvania, Thomas Jefferson University, and the Dartmouth-Hitchcock Medical Center. The excerpt each institution received consisted only of factual material pertaining to that institution. We received written responses from all five organizations.

B-278015

The draft we provided to the HHS Inspector General and DOJ and the draft excerpts we provided to Penn, Jefferson, and Dartmouth contained specific details about the audit findings at these institutions. In commenting on our draft, both Penn and Jefferson claimed they had verbal agreements with DOJ to keep the information related to their settlements confidential. DOJ subsequently confirmed that such agreements were made and objected to inclusion of confidential information in our report. DOJ also said that publication of the findings underlying the settlements would have a detrimental effect on its ongoing PATH efforts. In addition, DOJ told us that it is currently involved in litigation to prevent the release of this information pursuant to a Freedom of Information Act request from a major newspaper. Consequently, DOJ asked us to prepare this version of the report, which does not include certain details DOJ identified as subject to its confidentiality agreements. This redacted version will be made available to the public. Other than its concerns about the confidentiality of the Penn and Jefferson audit results, DOJ said that it generally concurred with the substance of our draft report.

We received comments from HHS' Inspector General and the three institutions discussed in this report. Summaries of these comments are provided below. In addition, DOJ, the HHS Inspector General, and the institutions provided technical changes, which we incorporated as appropriate.

## Comments From the HHS Inspector General

The HHS Inspector General's comments revolved around three issues: (1) the overstatement of the findings, (2) the selection of institutions for audit, and (3) the costs of the Dartmouth PATH review.

Concerning the first issue, the Inspector General acknowledged that the OIG had misstated the extent of multilevel upcoding found at Penn and Jefferson. She added that these misstatements were of no consequence in these two, or any other, PATH reviews. As we stated in our report, regardless of the reason, if teaching physicians fail to comply with Medicare requirements, they are not entitled to reimbursement. In our view, however, overstating the seriousness of the findings is unnecessary and unfair to the audited institutions.

The Inspector General also stated that the physical presence problems noted in the OIG's October 1997 testimony pertained to teaching institutions across the country, not just Penn and Jefferson. In addition, she pointed out that at both Penn and Jefferson, physical presence errors

B-278015

found by the OIG were significant. We noted, however, that one of the four examples cited involved a physician from one of these two institutions, while the remaining three examples involved an institution that was not considered by the OIG to be a PATH audit at the time of the testimony. Moreover, the examples, in our opinion, leave the impression that the OIG found many instances in which teaching physicians billed Medicare on days that they were not working or were out of town. While we cannot comment on three of the examples, on the basis of our review of the Penn and Jefferson workpapers, we found that the OIG had no convincing evidence of the type of abuses cited in the testimony.

Concerning the second issue, the Inspector General agreed that a risk-based approach was an excellent method for selecting organizations to audit. However, she said that the OIG could not use a risk-based approach in PATH because it had no techniques for narrowing the selection process to the most problem-prone institutions. Moreover, with regard to our criticism of the OIG's selection of Dartmouth for a PATH audit despite a DOJ official's positive characterization of that institution's billing guidance, the Inspector General pointed out that the billing guidance at both Penn and Jefferson was similar to Dartmouth's.

We recognize that it may be difficult to consistently apply a risk-based approach in auditing, but we are unconvinced that such an approach was not possible for PATH. For instance, while we agree that the billing guidance at the three institutions was similar, we believe indications of improper billing at Dartmouth were weak. In contrast, indications suggesting the possibility of improper billing by Penn and Jefferson teaching physicians were stronger. We believe that these indications, which were available prior to the initiation of these audits, demonstrate that it is possible to target problem-prone institutions. To illustrate, DOJ told us it had received information pertaining to significant violations of teaching physician billing rules by some Penn physicians and that the institution had not taken effective action to address the problem. DOJ then approached the OIG for assistance in its investigation. Similarly, as we noted in our report, carrier audits showed that Jefferson had a history of significant compliance problems with teaching physician billing rules, making it an appropriate target for an audit.

Concerning the third issue, the Inspector General was critical of the amount Dartmouth spent on its PATH audit. For example, she said that while the Dartmouth audit was terminated after a review of about half the sample, the audit costs were significantly higher than what it cost the OIG

B-278015

to do the entire Penn audit. Moreover, she questioned the need for Dartmouth to spend $200,000 in legal fees, given the absence of a formal legal dispute. Our report, while presenting Dartmouth's view of why its costs were so high, does not take a position on the appropriateness of these expenses.

## Comments From Penn and Jefferson

In their written responses, Penn and Jefferson took issue with comments we made in the draft about their carrier's interpretation of IL-372 requirements. The institutions contended that the carrier's interpretation of IL-372 conflicted with the Medicare statute, regulations, and other HCFA correspondence. The institutions, however, were not provided the portion of our draft that discussed our analysis of IL-372 requirements. In this analysis, we recognized that HCFA guidance had created some confusion. However, we concluded that federal Medicare law had long required that physician services be rendered or supervised by the physician in person.

Both Penn and Jefferson also objected to the section of our report where we discussed their audit results collectively. Penn, for example, claimed its audit was unique because, among other things, it predated the PATH initiative and was the only audit that targeted services from 1993, when evaluation and management codes were barely a year old. Penn also contended that its audit was unique because it was the only institution that was not given the opportunity to conduct a self-audit and was the only institution for which the entire audit sample was reviewed. Similarly, Jefferson stated that it believed the two institutions were very different and that conclusions based on information from the Penn audit should not be applied to Jefferson. While we agree that there were many differences between the two audits, we believe our report makes a clear distinction between the audit results that were found at Penn and Jefferson. Moreover, our discussions of the audit results from the two institutions is not intended to compare them to each other but rather to describe the significance and seriousness of the findings found by the OIG. This information is based on our examination of the OIG's workpapers for both audits as well as our discussions with OIG and carrier staff who conducted the work.

Penn also objected to the section of our report that discusses its awareness of the physical presence requirement prior to its audit. Penn emphasized that it had made substantial efforts to improve its billing practices before the audit started and believed these efforts showed that the institution was not involved in a scheme to defraud the government.

B-278015

However, Penn indicated that the OIG did not credit these activities. Instead, Penn believed the OIG penalized the institution by contending that these efforts demonstrated that the institution was aware of the problem but had not taken sufficient corrective action. Our inclusion of this material presents factual information about Penn's awareness of the physical presence requirements prior to its audit. We cannot comment on how the OIG or DOJ may have treated this information in negotiating a settlement with the institution.

Penn suggested we clarify the statement in our report that Penn officials did not believe that the OIG had retroactively applied evaluation and management documentation guidelines in its audit. Penn said that the guidance was retroactively applied in the sense that the OIG and DOJ extrapolated these findings to years which predated the establishment of these evaluation and management codes. Penn also asserted that not only did it view the guidance as inadequate, but the carrier and the OIG did as well. As noted elsewhere in our report, we pointed out that DOJ extrapolated evaluation and management coding errors to time periods that preceded implementation of the codes. Our report also notes that both OIG and carrier staff acknowledged that one-level coding differences could be subjective.

## Comments From Dartmouth

Dartmouth raised objections about the way we addressed it and its carrier's interpretation of IL-372 requirements. While not disputing that its billing guidance requires "physical presence," Dartmouth said it interpreted physical presence to mean that the teaching physician met this requirement by being "on the premises," not necessarily "at the elbow" of the resident, while the service was being provided. It also contended that the newsletters its carrier issued in 1993 interpreted the meaning of physical presence in the same way. However, neither Dartmouth's billing guidance nor the carrier newsletters specify that a teaching physician has met the physical presence requirement merely by being on the premises.

In its comments, Dartmouth also said we did not fully explain its reasons for retaining outside counsel, hiring independent auditors, and expanding the scope of its audit. We have expanded the discussion of this issue. In addition, Dartmouth contended that the aggregate financial impact of its PATH audit exceeded $3 million, not $1.7 million as we have reported. The cost figures we used were given to us by a Dartmouth official when we met with him to discuss PATH and were the same cost figures presented by Dartmouth to Senator Patrick Leahy in an October 1997 briefing

B-278015

document. Finally, Dartmouth said that our statement that it had been overpaid $778 was inaccurate and misleading because the audit results actually showed that overpayments were offset by underpayments. While this is essentially true for the results of the external auditor's work (which determined that the government owed Dartmouth about $5), the OIG's verification of this work determined that, after netting overbilling and underbilling errors, Dartmouth had been overpaid $778, as we noted in our report.

As arranged with your office, unless you announce its contents earlier, we plan no further distribution of this report until 30 days after the date of this letter. At that time, we will send copies of the limited official use version of this report to the Inspector General of HHS and the Attorney General. We will provide this redacted version to officials from the organizations we visited and other interested parties. We also will make copies of the redacted version available to others upon request. Please call me at (202) 512-7114 or Leslie G. Aronovitz at (312) 220-7600 if you or your staff have any questions about this report. Other major contributors to this report include Paul D. Alcocer, Barry R. Bedrick, George H. Bogart, Robert T. Ferschl, and Geraldine Redican-Bigott.

Sincerely yours,

William J. Scanlon

William J. Scanlon
Director, Health Financing and
    Systems Issues



# Contents

**Letter**                                                                              1

**Appendix I**
**Scope and**                                                                          32
**Methodology**

**Appendix II**                                                                         34
**Key Events Related to**
**the PATH Initiative**

Table          Table 1: Resolved PATH Audits as of April 30, 1998                        2

**Abbreviations**

| | |
|---|---|
| AAMC | Association of American Medical Colleges |
| CPT | Current Procedural Terminology |
| DOJ | Department of Justice |
| HCFA | Health Care Financing Administration |
| HHS | Department of Health and Human Services |
| OIG | Office of Inspector General |
| PATH | Physicians at Teaching Hospitals |



Appendix I

# Scope and Methodology

To determine whether HHS' OIG has a legal basis for conducting PATH audits, we examined pertinent laws and regulations and HCFA guidance and correspondence related to teaching physician billing for Medicare part B services. We also examined related guidance issued by the Medicare carriers that processed part B claims for Pennsylvania and New Hampshire teaching physicians. In addition, we reviewed our 1971 and 1986 reports that described problems in documenting teaching physician services. We discussed the PATH initiative and teaching physician billing rules with representatives from the OIG, HCFA, the Association of American Medical Colleges, and the American Hospital Association.

To understand the OIG's approach and methodology in carrying out PATH audits and to determine the nature and significance of the billing problems being identified in the audits, we reviewed the OIG's work related to the first three resolved audits. These were audits of the University of Pennsylvania and Thomas Jefferson University—both located in Philadelphia, Pennsylvania—and the Dartmouth-Hitchcock Medical Center located in Lebanon, New Hampshire. Our review involved examining the OIG's workpapers and discussing our questions and observations with OIG staff from the Philadelphia and Boston field offices who were involved in the work. We also met with medical review staff from the carriers who assisted the OIG on these three audits, and we interviewed representatives from each of the institutions to obtain their perspectives.

We attempted to interview officials from the U.S. Attorney's Office for the Eastern District of Pennsylvania because they played a key role in the development and expansion of the PATH initiative and because they negotiated the Penn and Jefferson settlements. DOJ would not permit these officials to meet with us because it said certain matters related to Penn and Jefferson were still pending. DOJ, however, did respond in writing to our questions regarding its role in PATH in general and the Penn and Jefferson settlements in particular.

Our review of the OIG's workpapers for the three audits focused on understanding how the work was carried out—particularly the work related to physical presence and level-of-service determinations, the key components of PATH. In carrying out this work, we did not attempt to assess the OIG's compliance with auditing standards, nor did we redo the audits to verify the validity of the OIG's findings. Our review was also limited to the workpapers in the OIG's possession. The OIG did not have all of the workpapers prepared by external auditors for the two PATH II audits—Jefferson and Dartmouth. The OIG's workpapers for these audits,

**Appendix I**
**Scope and Methodology**

however, included the results of its verification reviews of the external auditors' work and other information, which, in our judgment, were sufficient to enable us to understand what was done.

We performed our work between August 1997 and June 1998 in accordance with generally accepted government auditing standards.

Appendix II

# Key Events Related to the PATH Initiative



Appendix II
Key Events Related to the PATH Initiative



## Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. VISA and MasterCard credit cards are accepted, also. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 37050
Washington, DC  20013

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000
or by using fax number (202) 512-6061, or TDD (202) 512-2537.

Each day, GAO issues a list of newly available reports and testimony.  To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touchtone phone.  A recorded menu will provide information on how to obtain these lists.

For information on how to access GAO reports on the INTERNET, send an e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov

PRINTED ON ♻ RECYCLED PAPER

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

**Bulk Rate**
**Postage & Fees Paid**
**GAO**
**Permit No. G100**

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**

