# EXHIBIT 2

NOTIFY

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 1784CV02876

NOTICE SENT
05.03.19
H.M.D.R.+S.
B.E.S.
C.F.C.
J.J.R.
M.M.M.+K.
R.E.B.JR
E.F.M.
S.D.A.
C.L.M.
R.F.M.
B.+L.
A.S.W.
E.J.Z.

(HT)

### DENNIS W. BURKE, M.D.

### vs.

### THE GENERAL HOSPITAL CORP., d/b/a MASSACHUSETTS GENERAL HOSPITAL & others[1]

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS RELATING TO DONALD STERN'S INVESTIGATION OF CONCURRENT SURGERY AT MGH

This contentious action arises out of the termination of plaintiff Dennis W. Burke, M.D.'s

("Dr. Burke"), staff privileges and appointment at defendant The General Hospital Corp., d/b/a

Massachusetts General Hospital ("MGH"). Dr. Burke alleges that he was terminated in

retaliation for his whistleblowing about the practice that has come to be referred as "concurrent

surgery" and that is alleged to have been performed at MGH, and thus his termination, he claims,

was in violation of G. L. c. 149, § 187 and public policy. The matter is now before the court on

Dr. Burke's motion to compel the production of documents related to an independent, third party

investigation of the practice of concurrent surgery at MGH commissioned by defendant Partners

Healthcare Systems, Inc. ("Partners"), which resulted in a written report containing the results of

the investigation and recommendations ("Stern Report"). To aid in this decision the court

ordered the defendants to produce a redacted version of the report, redacted as to sections that

the defendants' deem to be attorney client or otherwise privileged, for the court's *in camera*

review. Upon review, and for the following reasons, Dr. Burke's motion to compel is

**ALLOWED IN PART and DENIED IN PART**. The motion is **ALLOWED** as to the redacted

---

[1] The Massachusetts General Physicians Organization and Partners Healthcare System, Inc.

Stern Report, in the redacted format submitted to the court by the defendants for its in *camera* review in connection with this motion and **DENIED** as to plaintiff's request for the unredacted Stern Report.

## BACKGROUND

A.    The Practice of Concurrent Surgery at MGH's Department of Orthopaedics.

According to Dr. Burke's first amended complaint,[2] he is an orthopedic surgeon with a longstanding association with MGH.  He joined MGH's Department of Orthopaedics ("Department") in or around 1983.  Dr. Burke is a highly skilled surgeon and he was devoted to his patients at MGH.

In or around 2000, a new chief took over the Department.  He began permitting certain attending surgeons[3] to schedule more than one surgical procedure, in two different operating rooms, under their name at the same time.  These surgeries involved scheduling the actual procedures at the same or nearly the same time, all with the same surgeon listed as the primary attending physician and as the biller for services provided.  Such scheduling is referred to as "running two rooms" or "concurrent surgery."  Dr. Burke alleges that one of the risks of concurrent surgery is that a patient might be left under anesthesia longer than necessary to accommodate the attending surgeon's other surgical procedure.  As the practice became more common at MGH, according to Dr. Burke's allegations, patients whose surgeries would be performed concurrently with other procedures were often not informed, nor was their express

---

[2] The facts as alleged in Dr. Burke's first amended complaint are accepted as true for purposes of this motion only because they are relevant as to the scope of discovery permitted under Mass. R. Civ. P. 26.

[3] An attending physician is one who is "responsible for the care provided a patient in a hospital . . .; usually on the staff of a hospital and often supervising the house staff, fellows, and students." Am. Jur. Proof of Facts 3d, Attorney's Illustrated Medical Dictionary P36 (2002).

consent obtained.  For many years, MGH did not have a policy requiring that such consent be obtained.

      B.      Dr. Burke's Complaints About the Practice of Concurrent Surgery in the Department.

Dr. Burke alleges that after learning of a 2008 incident where a patient suffered severe complications during a concurrent surgery, he expressed his concerns about the dangers of the practice to the Department's Chairman, but, he claims, the practice continued unabated. Thereafter, between 2010 and 2012, Dr. Burke continued to express his concerns about concurrent surgery to MGH leaders, including its president, Peter Slavin, M.D. ("Dr. Slavin").

      C.      In 2011, Partners Hired Attorney Donald Stern and his Law Firm to Review the Practice of Concurrent Surgery in the Department.

In 2011, defendant Partners[4] hired attorney Donald Stern ("Attorney Stern"), a former U.S. Attorney, to conduct a review of the practice of concurrent surgery in the Department.  He, and his firm, Cooley LLP, issued a report dated December 21, 2011.  A redacted version of the Partner's engagement letter along with a redacted version of the December 21, 2011 Stern Report were provided to the court for an *in camera* review to aid the court in its decision on Dr. Burke's motion to compel production of the report.[5]  In light of this court's order allowing the production of a redacted version of the Stern Report, and to better understand the court's reasoning for its decision, the scope of Attorney Stern's t engagement must be examined.  The engagement letter states that it is for the "Massachusetts General Hospital Orthopedics

_____

[4] On May 24, 2011, Partners, for itself and its affiliates, sent an engagement letter retaining Donald Stern (of Cooley LLP) for the "Massachusetts General Hospital Orthopedics Investigation." It is a two-page engagement letter signed by Partners and Stern. It incorporates by reference Partners' standard Business Associate Agreement for Outside Counsel. The defendants were unable to find the actual signed Business Associate Agreement but submitted to the court a blank form of the sort employed during the relevant time.

[5] As referenced earlier in this decision, the court ordered the defendants to provide the court with a redacted version of the Stern Report, thereby permitting the defendants to specify those portions of the report over which they claim a specific privilege such as attorney client communication, work product or peer review. The resulting redacted Stern Report was then viewed by the court *in camera*.

Investigation" and Stern is asked to "represent Partners' interests . . . in connection with an internal review of certain practices within the orthopedic department at Massachusetts General Hospital." It further states that: "[w]e understand that you will endeavor to collaborate on substantive and strategic decisions regarding the prosecution of the above - referenced matter and otherwise work cooperatively with Partners lawyers in connection with the described project." (The "above – referenced" matter is the Massachusetts General Hospital Orthopedics Investigation.) The engagement letter was executed by Julie C. Chattopadhyay, identified as legal counsel for Partners, and Attorney Stern.

According to the February 12, 2019 affidavit of Partners' former general counsel, Brent Henry ("Henry"), which was submitted in support of the defendants' opposition to Dr. Burke's motion to compel, he avers that he retained Attorney Stern "to investigate the concerns raised by Dr. Burke and to provide legal advice about whether or not the concerns raised by Dr. Burke posed any legal risks to the hospital." Henry further avers that at the time he retained Attorney Stern, "the Nina Shervin litigation[6] was pending and based upon the information conveyed to me about Dr. Burke's concerns, I believed that additional litigation was a real possibility and that a review of Dr. Burke's concerns by outside counsel was necessary."

As outlined above, the engagement letter and the redacted Stern Report clearly addressed Dr. Burke's allegations. Contrary to the suggestion in Henry's affidavit, the engagement letter did not mention anything about legal advice for actual or potential litigation, nor did it reference potential or actual employment litigation alleging gender based discrimination, such as Dr. Nina Shervin had lodged against these defendants. Further, a review of the redacted Stern Report reveals only one passing reference to Nina Shervin and her lawsuit in the context of information

---

[6] Nina Shervin was an orthopedic resident at MGH who unsuccessfully sued several of the present defendants for gender discrimination and retaliation in April 2010. The trial concluded in May 2014.

4

that came to light in this lawsuit. (See redacted Stern Report pg. 17), The redacted Stern Report focused many of its summary findings on Dr. Burke's concerns about concurrent surgery at MGH concluding, *inter alia*, that there was a "paucity of specifics used to buttress [his] claims" and "Dr. Burke's allegations are not supported by our investigation. . .." The thirty-five (35) page Stern Report is a comprehensive review not only of Dr. Burke's specific concerns but also addresses MGH's policy concerning concurrent surgery, and examined  incidents of alleged adverse outcomes , and finally it summarizes various points of views from different doctors regarding the practice.  It also includes recommendations regarding MGH's practices relating to concurrent surgery, though these sections, not surprisingly are redacted in the court's redacted Stern Report as the defendants have asserted privilege for those sections.. What is clear from the redacted report, is that the catalyst for the Stern Report was MGH's desire to investigate Dr. Burke's concerns about the practice of "running two rooms."

MGH has kept the contents of the Stern Report mostly confidential.[8]  To this court's knowledge, the Stern Report has not been ordered produced in any other litigation that involves the concurrent surgery practice or in any medical malpractice cases where it has been alleged that the practice may have caused, in whole or in part, any patient harm.  However, several years after the report was issued, in 2014, MGH's in-house attorneys provided a copy of the Stern Report (or at least a portion of it) to its public relations firm Rasky Baerlein Strategic Communications, Inc. ("Rasky").  Partners and MGH had retained Rasky on April 16, 2014 to provide "Litigation Communications Support with regard to Nina Shervin M.D. litigation and related matters including Sports Medicine Service transitions and Concurrent Surgery policy," according to the agreement retaining Rasky.  MGH also made generalized references to the Stern

---

[8] Each page of the Stern Report provided to the court was stamped "confidential" and is stamped "Attorney client privileged Communication."

Report to a Boston Globe reporter in an undated interview,[9] in an opinion piece published in the Boston Globe on January 10, 2016,[10] and in an open letter to the MGH community from October 2015.[11]

> ### D.   Post-Issuance of the Stern Report, Dr. Burke Brings his Complaints to the Attention of the Massachusetts Board of Registration in Medicine and Department of Public Health.

In or around June 2012, MGH circulated a revised concurrent surgery policy, which, according to several MGH emails in the record, implemented changes based on the findings and recommendations of the Stern Report. Neither side has provided a copy of this policy to the court, but Dr. Burke alleges that it barred attending surgeons from scheduling three concurrent procedures but permitted them to schedule two such procedures. Additionally, Dr. Burke alleges that the policy provides that an attending surgeon could schedule a procedure and not be present in the operating room as long as he or she was present somewhere on the MGH campus. Dr. Burke raised concerns about the new policy to senior MGH leaders.

According to the first amended complaint, in August of 2012, Dr. Burke claims that a patient in what was alleged to have been a concurrent surgery emerged from the procedure as a quadriplegic. The surgeon who performed this procedure had also performed a February 2012 alleged concurrent surgery on a professional baseball pitcher who experienced complications from his surgery. Thereafter, in September 2012, Dr. Burke filed complaints with the Massachusetts Board of Registration in Medicine ("Board") and the Massachusetts Department of Public Health ("DPH") regarding the Department's practice of concurrent surgery. He did not name any specific MGH physicians in those complaints.

---

[9] MGH indicated that the Stern Report found no basis to support Dr. Burke's concerns.
[10] MGH indicated that it had engaged Attorney Stern "to review allegations made by a senior MGH surgeon" and that "Stern reassured us that the allegations were not supported by his findings."
[11] MGH indicated that the Stern Report did not support Dr. Burke's allegations.

Dr. Burke alleges that the Department's practice of concurrent surgery came to the attention of the Boston Globe's Spotlight Team during the pendency of the Nina Shervin litigation. Dr. Burke spoke with reporters from the newspaper, who contacted him. MGH also spoke with the Spotlight team. According to Dr. Burke, MGH made statements to the newspaper indicating that Dr. Burke also commonly engaged in concurrent surgery, the very practice he complained of, a charge that Dr. Burke denies. To rebut the alleged misrepresentation made by MGH to the Spotlight Team, Dr. Burke printed out some of patient operative reports from MGH's electronic medical record system, redacted all patient-identifying information, and provided the redacted records to the newspaper. Dr. Burke maintains that none of the records he disclosed contained any information in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). MGH disagreed.

According to the first amended complaint, MGH's Privacy Officer thereafter initiated an investigation of Dr. Burke for his alleged mishandling of patient records. On August 10, 2015, MGH informed him that, unless he resigned within twenty-four hours, his staff privileges would be terminated. Dr. Burke declined to resign, and by letter dated August 12, 2015, MGH terminated his privileges. That same day, defendant The Massachusetts General Physicians Organization ("MGPO") terminated Dr. Burke's Use, Occupancy and Services Agreement and Participating Clinician Agreement. He was informed that he would have to vacate his office by November 10, 2015. On September 10, 2015, Dr. Slavin informed Dr. Burke that his appointment to MGH's professional staff had been terminated as well.

In a letter to the MGH community published on October 30, 2015, (after the Spotlight Team's report was published on October 25, 2015), Dr. Slavin and MGPO's CEO and chairman indicated that Dr. Burke had been terminated "because of significant, unprecedented breaches of

hospital confidentiality policies," and not because he raised concerns about the practice of concurrent surgery. The letter stated that MGH learned from the Boston Globe that Dr. Burke had provided reporters with 449 hospital medical records and with confidential information from an orthopedic morbidity and mortality conference. It further stated that "[t]his highly intentional breach of our policies represents the most serious and substantial violation of confidentiality at the MGH that we know of."

On September 7, 2017, Dr. Burke filed this action claiming that the defendants retaliated against him on account of his complaints about the practice of concurrent surgery at MGH. In document requests to the defendants, Dr. Burke requested documents relating to Attorney Stern's investigation and the Stern Report. The defendants objected to producing the documents based on the attorney-client privilege and the work product doctrine.[12] The defendants have provided a copy of the Stern Report to the court to review *in camera* in connection with the pending motion. The defendants represent that they have redacted from this copy information they deem privileged as an attorney client communication, and that they have also redacted portions they deem protected by the medical peer review privilege. They also make a general claim of work product privilege for the entire Stern Report. Each claim of privilege is addressed by the court.

## DISCUSSION

The chronology of events is important. According the first amended complaint, Dr. Burke began complaining about the practice of concurrent surgery in 2008, and he continued complaining even after completion of the Stern Report and MGH's enactment of its 2012 revised post-Stern Report policy governing concurrent surgery. In fact, it was after the completion of the Stern Report in 2012 that Dr. Burke brought his concerns outside the hospital, to the Board and

---

[12] Peer Review was also a basis for the redactions in the *in camera* version of the Stern Report examined by the court.

DPH to complain about the practice after two unfavorable surgical outcomes happened during concurrent surgery procedures. The Globe Spotlight article was first published on October 25, 2015, but, according to the complaint, the research for that piece began in 2014. From August – September 2015 the defendants began and completed the process to terminate Dr. Burke's privileges and associations with MGH and MGPO, some four years *after* the Stern Report was completed in December 2011.

### I.   Mass. R. Civ. P. 26

Rule 26(b)(1) of the Massachusetts Rules of Civil Procedure states that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." "Relevance is a broad concept, . . . and any information which tends to establish or at least shed light on an issue is relevant." *Adoption of Carla*, 416 Mass. 510, 513 (1993). Here, Dr. Burke has alleged that he was terminated in violation of G. L. c. 149, § 187 and public policy because he complained about the practice of concurrent surgery at MGH and brought those complaints not only in house at MGH but also to the Board and DPH. The scope of those allegations then sets the stage to determine what is a relevant area of inquiry in discovery.

The defendants' argument that the Stern Report and related documents are not relevant to Dr. Burke's claims ignores the broad scope of permissible discovery under Mass. R. Civ. P. 26. See *Alphas Co. v. Kilduff*, 72 Mass. App. Ct. 104, 116 (2008) (Mass. R. Civ. P. 26[b][1] affords broad latitude in discovery of relevant information). This is especially so here where Dr. Burke questions the defendants' motivation for his termination. He challenges the basis for their denial that his termination was retaliation for his whistleblowing. The defendants deny that Dr. Burke was terminated because of his complaints about the practice of concurrent surgery. Given these

allegations then, the Stern Report—which investigated those complaints—and related documents are relevant to issues in the lawsuit, e.g., pretext and witness credibility.  See *Adoption of Carla*, 416 Mass. at 513.  See also *Cronin v. Strayer*, 392 Mass. 525, 534 (1984) (discovery designed to help define and clarify issues);

Thus, the only basis on which the defendants may withhold the requested documents is privilege, e.g., the attorney-client privilege, the work product doctrine, or the medical peer review privilege, all of which the defendants have raised and the court addresses below. However, the court notes that in the redacted version of the Stern Report the only types of redaction are a blacked-out sections without any label and a blacked-out section that is superimposed with the heading "Peer Review."  For purposes of deciding this motion, the court presumed anything redacted that was not identified as peer review was attorney-client privilege, because the court finds there is no work product privilege attached to the Stern Report. .

## II.    Attorney-Client Privilege

### A.    Application of the Privilege

The attorney-client privilege protects "all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice."  *Suffolk Constr. Co. v. Division of Capital Asset Mgt.*, 449 Mass. 444, 448 (2007).  The party asserting the privilege has the burden of showing it applies and that it has not been waived.  See *Commissioner of Revenue v. Comcast Corp.*, 453 Mass. 293, 304 (2009).  The privilege is to be construed narrowly.  See *id.* The defendants have the burden of proving that there is a privilege and that it has not yet been waived.  The defendants did not fully discharge their burden.  The court concludes that the attorney-client privilege does not protect the redacted version of the Stern Report provided to the court for its *in camera* review.  However, on this record, the court cannot determine if the

redacted sections, not labeled as peer review, contain attorney-client privileged communications, and if so, whether, if this information was provided to Rasky or any other outside party, if so then any privilege may be deemed waived. However, on this record, because the court lacks necessary factual information the court has not decided whether the unlabeled and redacted sections of the Stern Report are privileged. Rather, the court concludes that the redacted version as provided to the court is not privileged and shall be produced in that redacted format.

Henry, Partners's former general counsel, states that he retained Attorney Stern to provide legal advice regarding whether Dr. Burke's concerns posed any legal risks to MGH. Even accepting Henry's statement as true, it is insufficient and does not shield the entire Stern Report from discovery because not every page contains attorney-client privileged material. Indeed, the majority of the report provided to the court has not been redacted by the defendants, and includes sections on background, interviews, and the Department's practices. Henry's conclusory statement is over inclusive at best and is not as persuasive as a review of the redacted versions of the engagement letter and the Stern Report, which reveal far more non-privileged information than Henry's affidavit might suggest.

The contemporaneous evidence, specifically the redacted engagement letter and redacted Stern Report, do not support the conclusion that Attorney Stern was engaged solely to provide legal advice. See *Cavallaro v. United States*, 284 F.3d 236, 248 (1st Cir. 2002) (noting lack of contemporaneous evidence that accountants were assisting in providing legal advice, and that accountant's statement indicating such "was made after the fact, in the midst of litigation, with little support in the contemporaneous record"); *Lynx Sys. Developers, Inc. v. Zebra Enters. Solutions Corp.*, 2018 WL 1532614 at *3 (D. Mass. 2018) (noting lack of "contemporaneous documentation to suggest that these communications were for the purpose of obtaining legal

11

advice from the lawyer"); *Banco do Brasil, S.A. v. 275 Washington St. Corp.*, 2012 WL 1247756 at *3-4, 7-8 (D. Mass. 2012) (conclusory affidavits did not support application of privilege). In fact, the Stern Report looks like it was, as MGH admitted to outside parties (e.g., the public and the DPH), an investigation into the practices complained of by Dr. Burke and review of recommended practices in light of that investigation. The report, according to statements made by MGH at various times before and even during the pendency of this suit, concluded that Dr. Burke's complaints were without a basis in fact and it exonerates MGH's practice of concurrent surgery.

Henry's affidavit is also at odds with prior statements of the defendants' leadership and physicians who were involved in dealing with Dr. Burke's concerns and with how to address those concerns, including engaging an outside entity to review them. See *Dublin Eye Assocs., P.C. v. Massachusetts Mut. Life Ins. Co.*, 2013 WL 653541 at *8 (E.D. Ky. 2013) ("A party should not be able to create a factual issue regarding privilege by filing an affidavit that conflicts with earlier deposition testimony."). Cf. *O'Brien v. Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993) ("a party cannot create a disputed issue of fact by the expedient of contradicting by affidavit statements previously made under oath at a deposition").

For example, contemporaneously with Attorney Stern's review and the Stern Report, (1) Michael Jellinek, M.D., told Dr. Burke that MGH "engaged Attorney Stern to conduct an outside review of the issues you raise, and [is] in the process of implementing changes in policies and procedures based on this review"; and (2) Cathy Minehan, the chair of MGH's board of trustees, told Dr. Burke that MGH "commissioned an outside review to study [his concerns]" and as a result, "changes in various surgical policies and practices have been recommended and will be made." These statements indicate that Attorney Stern was not engaged exclusively to provide

legal advice, but rather, to review MGH's surgical policies and business practices and perhaps also make legal recommendations.

More recently, MGH stated in a January 10, 2016 opinion piece published in the Boston Globe that it had engaged Attorney Stern "to review allegations made by a senior MGH surgeon" and that "Stern reassured us that the allegations were not supported by his findings." David Torchiana, M.D. ("Dr. Torchiana"), testified at his deposition in this matter that MGH decided to address Dr. Burke's concerns with an external review by a third party, that they chose Attorney Stern because he had unimpeachable integrity and could handle a very contentious issue with experience and judgment, and that the purpose of the Stern Report was to understand the validity or lack thereof Dr. Burke's allegations.  He also testified that the Stern Report did not constitute a legal compliance analysis, but rather, an analysis of whether there was fraud (i.e., documents being altered) and intimidation (i.e., whether people were afraid to speak up).  Dr. Slavin, MGH's president, testified at his deposition that the Stern Report would "get to the bottom" of Dr. Burke's concerns, which were inconsistent with what Dr. Slavin was hearing from other people within the operating rooms.  He also testified that the most important issue Attorney Stern addressed was patient safety.  Peter Dunn, M.D., the head of MGH's operating rooms, testified that he did not consider the Stern Report legal advice.

The court recognizes that these statements were, like Henry's affidavit, made several years after the completion of the Stern Report and it is for that reason the court places more weight on the 2011 engagement letter and the 2011 Stern Report that each contradict the defendants' premise in their opposition to this motion that Attorney Stern was hired *because* he was a lawyer solely to provide *legal advice*.  The fact that an attorney was engaged to conduct the review of concurrent surgery in the Department does not automatically render all

communications with him as involving legal advice. Cf. *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 29 (1st Cir. 2009) (attorney-client privilege not triggered merely because material prepared by lawyers or represented legal thinking). Rather, the attorney must be acting in that capacity, i.e., as a legal advisor. See *Commissioner of Revenue*, 453 Mass. at 303.

The court concludes that the defendants have not met their burden of showing that Attorney Stern was engaged solely to provide legal advice. To the extent that portions of the report do address confidential attorney-client communications, i.e., legal advice Attorney Stern provided, those portions may be privileged and have been redacted from the version of the Stern Report that the court orders defendants to produce. The court is ordering production only of those portions of the Stern Report that have not been redacted as attorney-client privileged or as peer review as in the court's redacted version. This decision is without prejudice for any further motion practice challenging the scope of the attorney-client privilege or the waiver argument, which is discussed below.

B.   Waiver of the Privilege

Even if the privilege did protect the portions redacted and identified as legal advice in the court's *in camera* version of the Stern Report, as to those marked communications, the privilege may well have been waived if the defendants provided an unredacted copy of the Stern Report to Rasky, its public relations firm or any other person or entity not within the attorney client relationship. Voluntary disclosure of a privileged communication ordinarily waives the attorney-client privilege. See *Neelon v. Krueger*, 2015 WL 4254017 at *5 (D. Mass. 2015); *Ace Am. Ins. Co.*, 2012 WL 3124620 at *4. On this record, the court does not know whether the

entire report or only segments of the report were provided to Rasky and without those facts this court cannot rule whether the privilege has been waived as to the redacted portions.

Because this issue is likely to be further litigated, the court observes that while the defendants argue that, pursuant to the so-called "functional equivalent" doctrine, they did not waive the attorney-client privilege when they provided the Stern Report to Rasky, on this record, that proposition seems to stretch the doctrine.[13]  The exception to the wavier rule applies when an independent consultant may be treated as the functional equivalent of the client's employee for purposes of the attorney-client privilege.  See *Banco do Brasil*, 2012 WL 1247756 at *6, citing *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994).  "It is not often that the ability arises to treat someone who is not a principal or employee of an entity, as so close to one as to merit the extension of the privilege to communications in which that person participates."[14]  *One Ledgemont LLC v. Lexington Zoning Bd. of Appeals*, 2014 WL 2854788 at *4 (Mass. Land Ct. 2014).  Whether this exception applies is dependent on the particular facts of the case.  See *Banco do Brasil*, 2012 WL 1247756 at *6.

Factors on which courts have relied in finding an independent consultant to be the functional equivalent of an employee include the consultant: holding itself out as the client's agent and/or spokesperson; helping to fit the client's actions into a legal framework; conferring frequently with the client and/or its attorneys; drafting documents incorporating legal advice

---

[13] The defendants also briefly mention the "common interest" doctrine as a basis for why they did not waive the attorney-client privilege, but that doctrine does not apply here where Rasky was not represented by counsel. See *America's Test Kitchen, Inc. v. Kimball*, 2018 WL 2049490 at *3-4 (Mass. Super. 2018).

[14] The Land Court also stated:

> "Where the relationship with the company is one the non-employee has with many other clients or customers; is single-purpose and limited in scope, duration, and responsibility; or does not put the non-employee in a highlevel, trusted decision-making or guiding role, equivalent to that of an employee, the non-employee does not hold the status necessary to keep communications involving him or her privileged."

*One Ledgemont*, 2014 WL 2854788 at *4.

15

received from the client's attorneys; having authority to make decisions and statements on the

client's behalf; having a long involvement with the client's business; being a key decision leader

for the client; and working exclusively or almost exclusively with the client. See *In re Bieter*

*Co.*, 16 F.3d at 933-934, 937-938 (real estate consultant intimately involved with client's

business objective); *In re Copper Market Antitrust Litig.*, 200 F.R.D. 213, 215-216, 218-219

(S.D.N.Y 2001) (public relations firm incorporated into client's staff to perform necessary

corporate function);[15] *One Ledgemont*, 2014 WL 2854788 at *3 (real estate advisor's role was

same as one who was high-level principal or employee of clients).

There remain questions as to whether Rasky's role rose to the level of being the

functional equivalent of the defendants' employee. The Rasky engagement letter states that

MGH hired them to provide: Litigation Communications Support with regard to Nina Shervin

M.D. litigation and related matters including Sports Medicine Service transitions and Concurrent

Surgery policy." The defendants cite the agreement with Rasky, which requires that Rasky hold

in confidence all information it receives from Partners and MGH.  They also claim that MGH's

in-house counsel provided legal advice to members of the team (including Rasky) involved in

responding to the Spotlight inquiries so that MGH's public relations strategy could be consistent

with its legal strategy.  However, the testimony cited to support this assertion merely indicates

that in-house counsel was in frequent communication with the team and recites one occasion in

which MGH employees (but apparently not its in-house counsel) discussed with Rasky

answering questions honestly without violating HIPAA.

---

[15] The defendants rely heavily on *In re Copper Market Antitrust Litigation*—which applied the attorney-client privilege to communications with an outside public relations firm—but another judge of the same court has stated that that decision relied on an "expansive interpretation" of *In re Bieter*.  *In re Currency Conversion Fee*, 2003 WL 22389169 at *2 (S.D.N.Y. 2003).

The defendants have the burden of showing that this exception applies.  The defendants contend that in-house media and public relations persons would be the functional equivalent of Rasky and if the privilege would have encompassed employees on MGH's payroll, in house, then the same should be true for Rasky.  However, on this record it is not so clear.  The context for providing the Stern Report to Rasky appears to have been to assist MGH in responding to the public relations and communication issues that surrounded MGH and its concurrent surgery practice after the practice came to light in the Nina Shervin lawsuit.  In other words, it appears to have been to address a public relations issue, and not necessarily to aid the legal team in addressing any particular legal risk, exposure, or lawsuit.  The Stern Report was issued approximately three years before it was shared with Rasky and by that point, it is not clear whether the report's recommendations would have been implemented and thus be in the public domain at MGH. If the material was not privileged in the first instance or had been waived before being presented to Rasky, the mere act of claiming the privilege now cannot breathe new life into a waived a privilege. Further, as noted above, it is not clear how much or how little of the Stern Report the defendants provided to Rasky.  Therefore, on this record, the court cannot determine whether the privilege for attorney-client communications appearing on those pages of the Stern Report that were redacted and characterized as legal advice by the defendants on the court's *in camera* copy is deemed waived by virtue of sharing the Stern Report with Rasky or other third persons or entities.

### III.    Work Product Doctrine

      A.    <u>Application of the Doctrine</u>

The defendants contend that the entire 2011 Stern Report is shielded from discovery because it consists work product. The court disagrees.  Under Mass. R. Civ. P. 26(b)(3),

documents are protected as work product only if they were prepared "in anticipation of litigation." The Supreme Judicial Court has determined that "in anticipation of" means "because of," such that "a document is within the scope of the rule if, 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared *because of* the prospect of litigation.'" *Commissioner of Revenue*, 453 Mass. at 316-317 (citation omitted; emphasis in original). The purpose of the work product doctrine is "to establish a 'zone of privacy for strategic litigation planning . . . to prevent one party from piggybacking on the adversary's preparation.'" *Id.* at 311-312 (citation omitted). The party seeking protection under the doctrine has the burden of showing that the requested documents were prepared in anticipation of litigation. See *id.* at 315. The defendants have not met this burden here.

The defendants once again rely primarily on Henry's affidavit, which states that when he retained Attorney Stern, "the Nina Shervin litigation was pending and based upon the information conveyed to me about Dr. Burke's concerns, I believed that additional litigation was a real possibility and that a review of Dr. Burke's concerns by outside counsel was necessary." The defendants assert that this statement should be dispositive of the issue, but the court disagrees for the reasons discussed above regarding the affidavit's conclusory assertions, the contrary information in the engagement letter, the Stern Report, and the chronology of the events preceding this litigation. See also *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 50 (E.D.N.Y. 2011) ("the party asserting the work-product doctrine must rely on more than conclusory allegations to discharge its burden"). Further, the court concludes that the preponderance of the evidence in the record does not support the conclusion that the defendants had an objectively reasonable belief in 2011 that they would terminate Dr. Burke in 2015,

resulting in this litigation in 2017, such that this litigation was within the realm of possibility when they engaged Stern. See *In re Grand Jury Subpoena*, 220 F.R.D. 130, 140, 147-148 (D. Mass. 2004) (fair preponderance of evidence must demonstrate applicability of work product doctrine, and subjective belief of real possibility of litigation must be objectively reasonable).

The evidence the defendants cite to support their assertion that the Stern Report was prepared in anticipation of litigation comprises Henry's affidavit and testimony from several MGH physicians (some of it vague) that they believed there may be litigation in the future.[16] However, there are no contemporaneous records indicating that the Stern Report was prepared because of the prospect of litigation. See *Banneker Ventures, LLC v. Graham*, 253 F. Supp. 3d 64, 73 (D.D.C. 2017) (acknowledging attorney's affidavit stating she was aware of possibility of litigation but noting that defendant's contemporaneous statements did not indicate investigation was conducted as result of anticipated litigation). Cf. *Cavallaro*, 284 F.3d at 248. The defendants' concerns are nonspecific. On this record, especially considering MGH's considerable risk exposure with its operations, research, employees and facilities, it could always anticipate some type of litigation.

More importantly, Attorney Stern was retained in May 2011, but Dr. Burke began expressing concerns about concurrent surgery in 2008 and the present lawsuit was not commenced until September 2017, more than six years after Attorney Stern was retained. This temporal remoteness significantly undermines the defendants' assertion that the Stern Report was prepared because of the prospect of litigation. See *Securities & Exch. Comm'n v. Navellier*

---

[16] In response to a question about whether he was worried there may be a legal action "down the road someplace," Dr. Torchiana testified that he was "confident that this was going to continue, yes." Dr. Slavin testified that based on MGH's history with the Nina Shervin litigation, he "thought it was more likely that we might be facing litigation related to" Dr. Burke's concerns and that there was a "possible risk of future litigation." The defendants do not expound on why they believed litigation was possible due to the ongoing Nina Shervin litigation. See *Textron Inc. & Subsidiaries*, 577 F.3d at 29 ("It is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated" [emphasis in original].).

& *Assocs.*, 2018 WL 6727057 at *4 (D. Mass. 2018) (two-year time lapse between dates of

documents sought and government investigation did not make prospect of litigation anticipated);

*Davine v. Golub Corp.*, 2017 WL 517749 at *3-4 (D. Mass. 2017) (four-year lapse between

purported work product and litigation defeated any claim that documents were created in

anticipation of instant litigation), and cases cited.  See also *Banneker Ventures*, 253 F. Supp. 3d

at 72 (two-year lapse between receipt of letter referencing possible litigation and retention of law

firm to investigate defendants' actions did not link investigation to anticipation of litigation).

The defendants have failed to show by a preponderance of the evidence that the Stern

Report was prepared in anticipation of litigation.  Accordingly, the engagement letter, the Stern

Report, and any documents relating to that report are not entitled to work product protection.[17]

### IV.   Medical Peer Review Privilege

Several sections of the redacted Stern Report are labeled as "Peer Review."  General

Laws c. 111, §§ 204(a) and 205(b) "provide weighty protection to a medical peer review

committee's work product and materials."  *Vranos v. Franklin Med. Ctr.*, 448 Mass. 425, 434

(2007).  See also *Board of Registration in Med. v. Hallmark Health Corp.*, 454 Mass. 498, 506

(2009) (§ 204[a] makes "confidential the 'proceedings, reports and records of a medical peer

review committee'" and § 205[b] extends most of § 204[a]'s protections to qualified patient care

assessment materials).  The defendants have redacted various portions of the Stern Report

claiming they are protected by the medical peer review privilege.  In this decision the court does

not disturb or take issue with those redactions.

---

[17] The court does not agree with Dr. Burke's argument that, if the work product doctrine applies, the defendants waived its protection by providing a copy of the report to Rasky or by disclosing in a generalized manner the report's findings with the DPH and the public.  See *United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) (work product protection not as easily waived as attorney-client privilege; waiver requires disclosing material in way that is inconsistent with keeping it from adversary).  Cf. *In re Dayco Corp. Derivative Sec. Litig.*, 99 F.R.D. 616, 619 (S.D. Ohio 1983) (attorney-client privilege waived only if significant portion of privileged matter disclosed).

Because of the court's conclusions regarding the limited application of the attorney-client privilege to only those sections redacted as such in the court's version of the Stern Report, and because the court ruled that the work product doctrine does not apply, the court shall  order the defendants to produce to Dr. Burke a redacted copy of the Stern Report and related documents including the Attorney Stern engagement letter. The redacted Stern Report to be produced will contain only those redactions as they currently appear in the court's *in camera* copy, specifically sections containing attorney client privileged communications and medical peer review materials.

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that Dr. Burke's motion to compel production of documents relating to Donald Stern's investigation of concurrent surgery at MGH is **ALLOWED IN PART AND DENIED IN PART**.

**No later than fourteen (14) days** from the date of this decision and order the defendants shall produce to Dr. Burke a copy of the redacted Stern Report, the Stern engagement letter and related documents, **redacted** just as the court's *in camera* version was, redacted for attorney client privilege and medical peer review:

AND

The court further **ORDERS** that this production is pursuant to the following court Protective Order:

Dr. Burke and his counsel are to keep the redacted Stern Report, engagement letter, and related documents CONFIDENTIAL and they are to be used only in connection with this litigation.  Neither plaintiff nor his counsel, or anyone on his litigation team, are to share these documents beyond the plaintiff, his attorneys, experts, and members of his

counsel's firm involved in this litigation <u>unless and until</u> Dr. Burke and his counsel obtain an order from this court permitting any further distribution or dissemination of these documents.  Anyone who receives a copy of the documents shall expressly acknowledge, in writing, ("written acknowledgements") that they are aware of this confidentiality order and plaintiff's counsel shall be responsible to maintain the written acknowledgments until further order of this court;

Any violation of this protective order by Dr. Burke or his counsel, to maintain the confidentiality of these documents shall immediately be brought to the court's attention for further action as may be warranted.

Rosemary Connolly
Justice of the Superior Court

DATED: May 3, 2019