UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF MASSACHUSETTS, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. |
| *ex rel.* | ) ) | 15-11890-ADB |
| LISA WOLLMAN, M.D. | ) ) | |
| v. | ) ) | |
| MASSACHUSETTS GENERAL HOSPITAL, INC., THE MASSACHUSETTS GENERAL HOSPITAL'S PHYSICIAN'S ORGANIZATION, and PARTNERS HEALTHCARE SYSTEM, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF/RELATOR'S
MOTION TO COMPEL THE PRODUCTION OF THE STERN REPORT AND RELATED DOCUMENTS
AND ON DEFENDANTS' MOTIONS TO QUASH SUPBOENAS TO THIRD-PARTIES**

July 29, 2020

DEIN, U.S.M.J.

## I. INTRODUCTION

Plaintiff/Relator Lisa Wollman, M.D., a former anesthesiologist at Massachusetts

General Hospital ("MGH") has brought a *qui tam* action under the False Claims Act ("FCA"), 31

U.S.C. §§ 3729 *et seq.*, and the Massachusetts False Claims Act ("MFCA"), Mass. Gen. Laws ch.

12, § 5B against MGH, Massachusetts General Physicians Organization ("MGPO"), and Partners

Healthcare System ("Partners") (collectively the "Defendants" or "MGH").  Dr. Wollman alleges

that the Defendants fraudulently billed Medicare and Medicaid for overlapping and concurrent

surgeries that required patients to be under anesthesia at the same time.  See Memorandum and Order on Defendants' Motion to Dismiss (Docket No. 102) ("MTD Order")[1] at 3. Specifically, Dr. Wollman alleges that the "Defendants' widespread use of Concurrent Surgery (1) endangered patients by placing them under 'unnecessarily prolonged administrations of anesthesia' that are not 'reasonable and necessary' and thus not reimbursable; (2) violated informed consent regulations by using a 'relatively non-descript informed consent form and routinely t(aking) other affirmative steps to conceal the practice of concurrent and overlapping surgeries from patients that resulted in a lack of informed consent;' (3) violated record-keeping regulations because 'surgeons falsified or failed to keep accurate records to conceal their practices;' and (4) caused government payors to pay for work that teaching physicians did not do, either because they were not 'immediately available', did not designate qualified backup surgeons, were not present for 'key or critical' parts of surgery, or never appeared in the hospital room at all."  Pl. Mem. (Docket No. 122-1) at 1.[2]

It is undisputed that by no later than 2010, Dr. Dennis Burke, an orthopedic surgeon at MGH, challenged the practice of overlapping surgeries at MGH, and the practice apparently was the subject of considerable discussion.  In 2011, the Defendants retained the services of Donald

---

[1] The MTD Order is published as United States v. Gen. Hosp. Corp., 394 F. Supp. 3d 174 (D. Mass. 2019).

[2] The relevant pleadings addressing the Plaintiff's motion to compel presently before this court include "Plaintiff-Relator's Corrected Memorandum of Law in Support of Motion to Compel Production of Documents Relating to Donald Stern's Investigation of Concurrent Surgery at MGH" (Docket No. 122-1) ("Pl. Mem.") and exhibits filed at Docket No. 121; "Defendants' Opposition to Plaintiff-Relator's Motion to Compel Production of Documents Relating to Donald Stern's Investigation of Concurrent Surgery at MGH" (Docket No. 129) ("Defs. Opp'n") and attached exhibits; and "Plaintiff-Relator's Reply Memorandum in Support of Motion to Compel Production of Documents Relating to Donald Stern's Investigation of Concurrent Surgery at MGH" (Docket No. 142) ("Pl. Reply") and attached exhibits.  The exhibits will be cited as "Pl. Mem. Ex.__", "Pl. Reply Ex.__" and "Defs. Ex. ___."

Stern, Esq., a former U.S. Attorney, and his law firm, Cooley, LLP, to conduct an investigation into Dr. Burke's complaints.[3]  The purpose and scope of the investigation are in dispute, as is the identity of the person/entity who initiated the retention of outside counsel to conduct an investigation.  In any event, Attorney Stern issued a report on December 21, 2011 relating to the practice of concurrent and overlapping surgeries (the "Stern Report" or "Report").  The Plaintiff/Relator has moved to compel the production of the Stern Report and related documents.  (Docket No. 120).  The Defendants have refused to produce any of the material, claiming that it is protected by the attorney-client and work product privileges.

This matter is presently before the court on "Plaintiff-Relator's Motion to Compel Production of Documents" (Docket No. 120) whereby the Plaintiff/Relator is seeking the production of the Stern Report, drafts, and other supporting documents.  Dr. Wollman contends that Attorney Stern was hired to conduct a factual investigation, and not to provide legal advice, so the Stern Report is not privileged.  Moreover, the Plaintiff/Relator contends that any privilege that existed was waived when the Defendants provided a copy of the Stern Report to Rasky Baerlein Strategic Communications, Inc. ("Rasky"), a public relations firm, to help respond to an investigation into the practice of concurrent and overlapping surgeries by the Boston Globe Spotlight Team in 2015, and by sending a copy of the Stern Report to MGH's Chairman of the Board at her email address at Simmons University ("Simmons"), where it was found by counsel for the University when gathering documents to respond to a subpoena.  The

---

[3] There is a dispute as to which of the Defendants actually retained Attorney Stern, and whether that fact is relevant to the issues before this court.  For convenience, this court will refer to the Defendants collectively except where more specificity is required.

Plaintiff/Relator has sought the Stern Report and related documents from Simmons and Rasky as well.  Consequently, this matter is also before this court on the Defendants' "Motion to Quash Subpoena to Simmons University" (Docket No. 133) and the Defendants' "Motion to Quash Subpoena to Rasky Partners, Inc." (Docket No. 134).

By agreement, the court was provided with a copy of the Stern Report for an *in camera* review.  In addition, the court noted that references were made in defense counsel's affidavit and the Defendants' Opposition to "employee interview memoranda created by Attorney Stern and/or members of his law firm[.]"  See Murphy Aff. (Defs. Ex. 9) at ¶ 2 ; Defs. Opp'n at 6.  The court requested and received these documents.

After careful consideration of the extensive written record and arguments of counsel, this court holds that the work-product doctrine has no application here.  The question whether the Stern Report and related documents are protected by the attorney-client privilege is a much closer question.  Nevertheless, this court's review of the entire record, including the summaries of the employee interviews, has convinced the court that the retention of Attorney Stern and his law firm was for the purpose of providing the Defendants with legal advice. Therefore, the Report and related documents are protected by the attorney-client privilege. However, this court further concludes that the Defendants waived any attorney-client privilege that may have existed by producing the Stern Report to Rasky, but not to Simmons.  Therefore, the Stern Report and any related documents provided to Rasky, as well as communications with Rasky regarding the same, shall be produced to Dr. Wollman.  Such documents may be produced subject to a protective order.

## II. <u>SCOPE OF THE RECORD</u>

As an initial matter, this court needs to address the scope of the record to be

considered.  At oral argument on the motion to compel held on April 7, 2020, this court asked

whether there was evidence regarding whether Attorney Stern and his team had met with

MGH's counsel or others apart from delivering the Stern Report.  The question was asked in the

context of trying to determine whether Attorney Stern had been hired to provide legal advice.

Post-Stern Report communications between Attorney Stern and the Defendants had not been

addressed in the papers.  On April 17, 2020, the Defendants filed a motion to supplement their

opposition to the Relator's motion to compel to provide excerpts from billing entries made by

Attorney Stern and his team before and after the date of Attorney Stern's transmittal of the

Report to the Defendants.  Mot. to Suppl. the R. of the Hr'g Conducted on Apr. 7, 2020 (Docket

No. 160).  The Defendants proposed submitted such billing records to the court for an *in*

*camera* review.  <u>Id.</u> at 2.  The Defendants represented that there had been discussions with the

Plaintiff/Relator about providing the time sheets if their production was not considered the

waiver of any privilege, but the discussions were not successful.  <u>Id.</u>  This court summarily

allowed the motion without giving the Plaintiff/Relator an opportunity to respond.  (Docket No.

162).

Dr. Wollman promptly filed a "Motion for Reconsideration of Order Granting

Defendants' Motion to Supplement the Record (Dkt. Nos. 160, 162)" (Docket No. 164) objecting

to the court's consideration of the time sheets.  The Plaintiff/Relator objected to the

Defendants providing only selective entries, and to their failure to produce the documents

earlier, as well as to their production of materials to the court for an in camera inspection

without making any showing as to why the material should be considered by the court.  See id. at 2-3.  The Plaintiff/Relator further argued that she would be prejudiced if not given the opportunity to review the records and to address their relevance, or lack thereof.  Id.  The Defendants opposed the Motion for Reconsideration and argued that they were prepared to produce the time sheet excerpts to the Plaintiff/Relator if she would agree that the production does not constitute a waiver of any privilege that may exist.  Defs. Opp'n to Mo. for Recons. (Docket No. 165) at 2.  The Plaintiff/Relator filed a Reply, continuing to argue that the court should not consider the "cherry picked" entries which were not produced or mentioned in a privilege log before.  Reply in Support of Mo. for Recons. (Docket No. 168) at 2.

After due consideration, the Motion for Reconsideration (Docket No. 164) is ALLOWED and the court will not consider any billing entries.  The court has determined that it would be inappropriate to allow the Defendants to argue that billing entries support their contention that Attorney Stern was hired to provide legal advice without allowing the Plaintiff/Relator the opportunity to examine the records and obtain discovery about their significance.

As noted above, the court requested copies of the employee interview statements prepared by Attorney Stern and his team, and provided to the Defendants.  (Docket No. 174).  While the Plaintiff/Relator agreed that the documents should be produced to the court for an *in camera* inspection, Dr. Wollman further argued that she should receive copies as well, with the agreement that the "production shall not constitute a waiver of privilege and shall be deemed confidential" unless the court ordered otherwise.  Report of the Parties Pertaining to the Ct.'s *In Camera* Review of Employee Interviews (Docket No. 175) at 1.  She wanted the documents so that she could argue about their significance in connection with the motions to compel.  Id. at

1-2.  The production of the documents to the Plaintiff/Relator would defeat the purpose of keeping potentially privileged communications confidential.  Moreover, the Plaintiff/Relator has been able to move to compel the production of the Stern Report as well as the underlying documents without having possession of them.  This court confirms that it will review the statements *in camera* without them being produced to the Plaintiff/Relator.

### III. <u>STATEMENT OF FACTS</u>

Unless otherwise indicated, the following facts are not in dispute.

### <u>Complaints About Concurrent Surgeries</u>

Dr. Wollman is an anesthesiologist who practiced at MGH.  She, along with other physicians, complained about the practice at MGH which permitted "concurrent" or "overlapping" surgeries, in which a teaching physician performs two or three surgical procedures that required patients to be under anesthesia at the same time.  While the parties disagree as to the date the complaints began, with Dr. Wollman contending the complaints began as early as 2008 and the Defendants placing the onset in 2010, it is undisputed that Dr. Dennis Burke, an orthopedic surgeon, was very vocal about his objections to this practice.  <u>See</u> Pl. Mem. at 1; Def. Opp'n at 3.  In 2008, according to the Plaintiff/Relator, Dr. Burke reported to Dr. Harry Rubash, MGH's then Chief of Orthopedic Surgery, about postoperative medical complications that had arisen allegedly due to the teaching surgeon not being present.  Pl. Mem. at 4-5.  In 2010, following a patient's death, again allegedly because the teaching surgeon was not present, Dr. Burke spoke to Dr. Peter Dunn, the then Director of the Perioperative Services, who in turn communicated with Dr. Rubash.  <u>Id.</u> at 5.  In 2011, Dr. Burke also spoke with the president of MGH, Dr. Peter Slavin, and the Chairman and Chief Executive Officer of

MGPO, Dr. David Torchiana.  Def. Opp'n at 3.  He also raised concerns with Ronald Skates, an

MGPO Trustee.  Pl. Mem. at 5.  Defendants contend that the "tone" of Dr. Burke's

communications with Dr. Torchiana in early 2011 became "increasingly hostile and adversarial."

Def. Opp'n at 3-4.  Moreover, according to the Defendants, in an April 2011 meeting between

Dr. Torchiana, Mr. Skates and Dr. Burke, Dr. Burke had a "prepared presentation" about the

dangers of concurrent surgeries that had "an aura of threat," leading Dr. Torchiana to conclude

that the presentation "had been crafted by a legal advisor." Id. at 4.  The Plaintiff/Relator

objects to this characterization of Dr. Burke's communications and points out that Dr. Burke did

not bring litigation against the Defendants in 2011.  See Pl. Reply at 4, 10.  As detailed infra at

17, he brought litigation in 2017, after he was fired by MGH.  Nevertheless, it is undisputed that

in addition to raising patient safety concerns, Dr. Burke raised claims of negligent supervision of

residents, fraudulent billing, insufficient patient consent, and other potential claims of liability

arising from the practices at MGH.  See, e.g., Def. Ex. 3 (on February 17, 2011 Dr. Burke sends

Dr. Torchiana an article entitled "Ghost Surgery: The Ethical and Legal Implications of Who Does

the Operation"); Def. Ex. 1 (in letter of February 2, 2011 Dr. Burke advises Dr. Torchiana of

dangers to patients of overlapping surgeries, ethical concerns, and warns him not to rely on

medical records to determine compliance with regulations); Def. Ex. 2 (in email of February 6,

2011, Dr. Burke advises Dr. Torchiana of an improper standard being used to determine if a

surgeon was "present for the critical parts of the operation" as required by billing regulations);

Def. Ex. 5 at 2 (it is reported that "Dr. Burke made a statement that his colleagues were

negligent in their supervision of residents and oversight of patients having surgery.").

## 2011: The Stern Engagement

It is undisputed that Attorney Stern and his law firm were hired in May 2011 to
investigate the complaints about concurrent surgeries.  Pl. Mem. at 5-6; Def. Opp'n at 4-5.
According to the Plaintiff/Relator, after Dr. Burke's 2011 conversation with Dr. Torchiana, Dr.
Torchiana conferred with Mr. Skates and Cathy E. Minehan, Chair of MGH's Board of Trustees,
and Ms. Minehan recommended that MGH hire an outside consultant to investigate the
situation.  Pl. Mem. at 5.  Relying on, inter alia, excerpts from the deposition of Dr. Torchiana
and Ms. Minehan, Dr. Wollman argues that "Mr. Stern was hired to ascertain the facts on the
ground and ***not*** to provide legal advice."  Id. at 5-6.  The Defendants contend that the decision
to engage Attorney Stern was made by "a group of individuals," including Ms. Minehan, MGH
and MGPO leadership, and General Counsel for Partners, Brent Henry.  Def. Opp'n at 4-5, 21.
As detailed below, the fact that non-lawyers believed that an outside consultant should be
hired to help find out the "facts" underlying Dr. Burke's (and others') complaints is not
inconsistent with such outside consultant being hired to provide legal advice.[4]

According to the Defendants, at this time "MGH was already facing high-profile litigation
filed by a protégé of Dr. Burke, *see Shervin v. Partners Healthcare System, Inc., et al.*, Civ. Action
No. 1:10-cv-10601 (D. Mass) ('Shervin Litigation'), a case where the practice of overlapping
surgery would become an issue."  Defs. Opp'n at 4.  While this court references the Shervin

---

[4] This court finds that the Plaintiff/Relator's characterization of the testimony as confirming that
Attorney Stern was not hired to provide legal advice overstates the testimony.  Fundamentally, the lay
witnesses testified that in light of Dr. Burke's allegations of wrongdoing, which including both surgical
problems as well as fraudulent billing practices and the like, they believed that outside counsel should
be hired.  The testimony cannot be read as being inconsistent with the conclusion that the Stern
Investigation was to provide both factual information and legal advice concerning potential (or actual)
legal problems the Defendants might confront as a result of the policies and practices at the hospital.

Litigation to put other statements by the parties in context, this court concludes that the Shervin Litigation was not a motivating factor in the retention of Attorney Stern or in the issuance of the Stern Report.  This court does acknowledge that in his notes of April 15, 2011 relating primarily to conversations with Dr. Burke, Dr. Torchiana does state: "My current assessment is that this latest set of issues is closely tied to the Shervin litigation and that it needs to be brought to the attention of the lawyers involved in that case.  I discussed this with Peter Slavin and the MGH board Chair Cathy Minehan, who agree."  Def. Ex. 5 at 3.  However, there is no evidence that Attorney Stern communicated in any way with counsel in the Shervin Litigation.  The Stern Report itself makes no substantive mention of the Shervin Litigation[5] and the employee interviews do not make any reference to the Shervin Litigation either.  Moreover, the decisions published in the Shervin Litigation make no mention of concurrent surgeries.[6]  Rather, the Shervin Litigation related to claims of sex discrimination and retaliation brought by a doctor in the orthopedic department of MGH.

Attorney Stern executed an Engagement Letter dated May 24, 2011, which was issued by Julie C. Chattopadhyay, Legal Counsel, Partners HealthCare.  Defs. Ex. 8.  It is labelled a "Privileged and Confidential Communication" and identifies the purpose of the retention as being for "Massachusetts General Hospital Orthopedics Investigation."  Id. at 1.  In the letter it

---

[5] In fact, in the Report it is expressly stated that the Investigation did not review the incident or allegations pending in the Shervin Litigation.  Report at 18, n. 27.

[6] Neither the complaint nor any of the published decisions in the Shervin Litigation make any mention of concurrent surgeries.  See Shervin v. Partners Healthcare Sys., Inc., Civ. Action No. 10-10601-RWZ, 2010 WL 5185384 at *1 (D. Mass. Dec. 15, 2010); Shervin v. Partners Healthcare Sys., Inc., 2 F. Supp. 3d 50 (D. Mass. 2014); Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23 (1st Cir. 2015).  Rather, the Shervin Litigation involved a claim of discrimination (and retaliation) based on sex, and Dr. Burke apparently advocated for Dr. Shervin, who was his mentee.

is explained that Attorney Stern and members of his firm are being hired "to represent

Partners' interests in the above-referenced action in connection with an internal review of

certain practices within the orthopedic department at Massachusetts General Hospital."  Id.  It

goes on to state that Attorney Stern "will endeavor to collaborate on substantive and strategic

decisions regarding the prosecution of the above-referenced matter and otherwise work

cooperatively with Partners lawyers in connection with the described project."  Id.  The letter

references the fact, in the context of billing requirements, that there may be "substantial

research project[s]" for which prior approval would be required.  Id.  Finally, in the context of

discussing HIPAA privacy requirements, it is stated in the letter that Mr. Stern must sign privacy

agreements because he "may require access to individually identifiable health information of

patients and/or research subjects to provide legal representation to Partners and/or its

affiliates for the above-referenced matter[.]"  Id. at 2.  No further contemporaneous description

of the purpose for which Attorney Stern was retained has been provided to the court.[7]

---

[7] In connection with litigation brought by Dr. Burke, discussed infra at 17, Brent Henry, Partner's General
Counsel, filed an affidavit describing the scope of the retention in very generalized terms.  Thus,
Attorney Henry stated in his affidavit dated February 26, 2019 that based on discussions he had in April
2011 "about Dr. Dennis Burke's reported concerns about concurrent surgery" with Ms. Minehan and
senior leadership of MGH and MGPO, he "reached out to Attorney Donald Stern and retained him to
investigate the concerns raised by Dr. Burke and to provide legal advice about whether or not the
concerns raised by Dr. Burke posed any legal risks to the hospital."  Defs. Ex. 6 at ¶¶ 3-4.  He further
attested that at the time, the Shervin Litigation was pending, and that given Dr. Burke's concerns he
"believed that additional litigation was a real possibility and that a review of Dr. Burke's concerns by
outside counsel was necessary."  Id. at ¶ 5.  Attorney Stern filed an affidavit dated February 20, 2020 in
the instant litigation in which he attested that he was hired by Brent Henry "to conduct a review of
certain practices within the Massachusetts General Hospital's orthopedic department – in particular, the
practice of overlapping surgery in that department" and "to gather facts relating to overlapping surgery,
and provide legal advice and recommendations relating to that practice."  Defs. Ex. 7 at ¶ 3.  He further
attested that he "believed that issues relating to the practice of overlapping surgery were likely to be
part of" the Shervin Litigation.  Id. at ¶ 4.  Finally, Attorney Stern attested that he understood that the
work he was doing was protected by the attorney-client privilege, and because it could be relevant to
the Shervin Litigation, was protected by the work product privilege as well.  Id. at ¶ 5.  Given the general

**The Stern Investigation and Report**

During the course of his investigation Attorney Stern and members of his firm

interviewed physicians, nurses and other personnel in the orthopedics department at MGH.  As

detailed above, this court has reviewed the reports of these interviews *in camera*.  Each

interview is reflected in a Memorandum to File.  All but the first one is labeled Confidential and

contain the label of either "attorney-client," "attorney work-product" or "privileged."  They

each begin in the identical fashion with the opening paragraph stating the date of the

interview, the person(s) conducting the interview and the person being interviewed "in

connection with Cooley's review of certain operating room practices within the orthopedic

surgery department."  This is followed with the following phrase:[8]

> This memorandum is not a verbatim accounting of the interview, but instead
> contains our words, mental impressions, personal recollection, creative thought
> process, opinions and discussion of the events described below.  The information
> recounted below does not necessarily track the order that information was
> discussed during the meeting.  This memorandum serves to communicate
> certain facts and mental impressions in connection with the provision of legal
> advice.  I have prepared this memorandum in anticipation of civil litigation and
> proceedings.  Accordingly, this memorandum constitutes confidential attorney
> work product and is also protected by the attorney-client privilege.

The interviews focused on the practices that were challenged by Dr. Burke as detailed in

communications with the Defendants, many of which form the basis of the instant lawsuit.  In

---

language used in these affidavits, the fact that they were created many years after the events, and the
fact that these witnesses were not subject to cross-examination or deposed, this court has not found
the affidavits particularly helpful in determining whether the Stern Report is privileged.

[8] This phrase is referenced in Defs. Opp'n at 6.

short, the interviews focused on the issues raised by Dr. Burke which involved the appropriate

standard of care and the legal, regulatory, and ethical obligations of the Defendants.

The Stern Report, entitled "Report on the Practice of Running Two Operating Rooms in

the Massachusetts General Hospital Department of Orthopaedic Surgery" is dated December

21, 2011.  The version provided to this court for *in camera* review is labeled "Confidential

Attorney Client Privileged Communication" on the first page only.  Plaintiff/Relator and others

who complained about the concurrent surgery practice were not allowed to see the final

Report, for the stated reason that those who had participated had been promised

confidentiality.  Pl. Mem. at 7.[9]  It is undisputed that the Stern Report recommended some

changes.  While the Defendants claim that a new policy for surgical staffing was produced in the

spring of 2012 and approved in the fall of 2012, Plaintiff/Relator contends that the new policies

did not conform to Medicare and Medicaid requirements and did not ensure patient safety.

See Defs. Opp'n at 7; Pl. Mem. at 8-9.

### Government Requests for the Stern Report

According to the Plaintiff/Relator, between 2012 and 2014 patients continued to suffer

serious medical complications because of concurrent surgery practices.  Pl. Mem. at 9.  In or

about 2012, Dr. Burke reported his concerns to the Commonwealth's Board of Registration in

Medicine and the Massachusetts Department of Public Health following two concurring

surgeries which had serious adverse consequences.  Id.  Both entities requested the Stern

Report, but MGH did not produce it, and instead told the agencies about the Report's findings

---

[9] Plaintiff/Relator contends that it is significant that the stated reason initially was not attorney-client privilege, but rather a claim that participants had been promised confidentiality.  Pl. Mem. at 7.

and recommendations.  Id.  Apparently, the agencies did not pursue the Stern Report any

further.  Id. at 9-10.

### Boston Globe Spotlight Team Investigation and Disclosure of the Stern Report to Rasky

Following an investigation that began in or about 2014, the Boston Globe's Spotlight

Team published an article on MGH's concurrent surgery practices on October 25, 2015.  Pl.

Mem. at 10.  In April 2014, MGH had contracted with a public relations firm Rasky Partners, Inc.

f/k/a Rasky Baerlein Strategic Communications, Inc. ("Rasky") to provide "Litigation

Communications Support with regard to Nina Shervin M.D. litigation and related matters

including Sports Medicine Service transitions and Concurrent Surgery policy."  Def. Ex. 11 at § I.

The Shervin Litigation trial began on April 7, 2014, and a jury returned a verdict in favor of the

Defendants on May 16, 2014.  According to the Defendants, "[w]hen MGH became aware that

the Boston Globe's Spotlight Team was investigating MGH's overlapping surgical practices,

OGC's [Office of General Counsel's] work with Rasky expanded to determine how to respond to

the Globe's inquiries without running afoul of privacy obligations under state and federal law."

Defs. Opp'n at 14.  In connection with this work, OCG provided a copy of the Stern Report to

Rasky.  Id. at 15.  The Defendants do not explain what in the Stern Report would assist Rasky

with providing information to the Globe that would not run afoul of HIPAA, and it is not readily

apparent to this court.  OGC knew the Defendants' privacy obligations under state and federal

law and OGC was in a position to advise Rasky regarding the same.  The only reason to give

Rasky a copy of the Stern Report was to provide a full understanding of the facts relating the

concurrent surgeries and of the investigation that the Defendants had conducted.  The Stern

Report could not easily be used by Rasky to ascertain the parameters of the applicable privacy

regulations or to ensure that representations made to the Globe relating to the content of the Report would not run afoul of privacy laws.

OGC provided an unredacted copy of the Stern Report to Justine Griffin, a Managing Director at Rasky who, in turn, gave a copy to her colleague Mark Horan.  Defs. Opp'n at 14. According to the Defendants, "Griffin routinely met with MGH leadership, drafted documents to be provided to the Globe, and communicated directly with the Globe on behalf of MGH." Defs. Opp'n at 15.  While Rasky also met with OGC, it appears that those meetings were to ensure that Rasky did not violate HIPAA in connection with such communications with the Globe.  See Pl. Mem. at 11, n. 25.

Rasky's Master Services Agreement with the Defendants makes it clear that Rasky is an independent contractor, and that "[u]nder no circumstances" was to be "deemed an agent, joint venture, partner or employee of the other[.]"  Pl. Mem. Ex. 24 at § 5.  The specific Agreement governing the Shervin Litigation and Globe Spotlight Team investigation provides that

> [Rasky] agrees to hold in confidence any and all information it receives from CLIENT in connection with the performance of Services hereunder, and to use such information only for the purposes of providing such Services.  Upon the conclusion of this engagement or termination of this Agreement, [Rasky] shall promptly return to CLIENT or destroy, at CLIENT'S direction, all materials, including copies thereof, provided by CLIENT to [Rasky] in connection with this engagement.

> CLIENT may share confidential and privileged materials with [Rasky] in order to facilitate [Rasky's] Services hereunder, and disclosure of such materials to

[Rasky], acting as agent of CLIENT, shall not be considered a waiver of any privilege applicable to such materials.

Defs. Ex. 11 at § II.

MGH and/or Rasky disclosed the existence of the Stern Investigation to the Spotlight team, and apparently there was internal discussion at MGH, and with Rasky, as to how much of the Report to disclose to the newspaper.  See Pl. Reply at 8-10, Exs. C at 3, D at 3-4; Pl. Mem. Ex 28 (Rasky email: "Do we want to provide any information (Stern report summary. . . .").  In virtually all of the draft responses to questions posited by the Globe, MGH took the position that the Report could not be disclosed due to promises of confidentiality made to the witnesses.  Thus, as explained in answers to questions posed by the Globe:

> In 2011, Dr. Dennis Burke complained about what he viewed as patient safety issues in the operating rooms, billing concerns and tension among staff in MGH's Orthopedic Surgery Service.  The hospital's administration responded promptly by hiring former United States Attorney for Massachusetts Donald Stern to investigate Dr. Burke's allegations.  Mr. Stern has a record of conducting serious investigations in an impartial manner.  The investigation involved dozens of confidential interviews with a wide range of doctors, nurses and other MGH staff with direct involvement in the operating rooms and concluded with a confidential report.  As a result, MGH cannot share the report resulting from the investigation.  MGH is confident that there is no sound basis to support any of Dr. Burke's charges.

Pl. Reply Ex. E at Bates 2062.

It was not until the end of the Globe's investigation that the decision not to disclose was couched in terms of privilege.  For example, a draft of a statement to be posted on MGH's website after the anticipated Globe article, dated September 27, 2015 provided in part:

> **Why wouldn't the hospital give the Stern Report to the Globe or to others who have asked for it?**
>
> To ensure that those who were interviewed by the Stern team would feel comfortable sharing whatever information they wanted, the report was

> conducted under attorney-client privilege, and as such remains confidential.  We
> promised those interviewed that the information would be private and we
> strongly [sic] that it is our responsibility to uphold that promise.

Pl. Reply Ex. F at 9.  Despite deciding not to disclose the actual report, MGH assured the public

that the Stern "review resulted in a confidential report that reassured hospital leadership that

there was no sound basis to support Dr. Burke's allegations."  Id.  The Globe article itself

reported that while the conclusions of the Stern "report remains private, its conclusions known

only at the institution's highest levels" MGH's president Dr. Slavin "did say that Stern's findings

affirm his confidence in the soundness of MGH practices."  Pl. Reply Ex. J at ECF 11/46.

### Disclosure to Cathy Minehan

Cathy Minehan was the Chair of the MGH Board of Trustees from 2008 through 2019,

and, during this time, also served as the Dean of Simmons University School of Management

from 2011 to 2016.  Pl. Mem. at 12; Defs. Opp'n at 21.  Ms. Minehan regularly used her

Simmons email account to communicate with MGH leadership about the concurrent surgery

complaints beginning in 2011 and during the events that followed.  Defs. Opp'n at 21.  Ms.

Minehan received a copy of the Stern Report at her Simmons email account in September 2015,

in anticipation of the Globe Spotlight report.  Pl. Mem. at 13.

In 2017, Dr. Burke brought suit against the Defendants in Massachusetts State Court for

alleged retaliation stemming from Dr. Burke's complaints about the concurrent surgery

practice.  Pl. Mem. at 2, n. 1; Defs. Opp'n at 3, n. 3.  The Stern Report was requested by Dr.

Burke in discovery in that case, and the Defendants refused to produce it on the grounds of

privilege.  Pl. Mem. Ex. 3 at 9.  Dr. Burke served a subpoena on Simmons during the course of

that litigation in an attempt to get the Report.  Id.  Counsel for Simmons located the Report

during the search for responsive documents and included it on a privilege log at the

Defendants' request.  See id.; Pl. Mem. Ex. 30 at 17-18, 64.  Plaintiff/Relator asserts, and the

Defendants deny, that Simmons' counsel must have reviewed the Stern Report in order to

include it in the privilege log.  See Pl. Mem. at 13; Defs. Opp'n at 21-22.

    In the course of Dr. Burke's litigation, Plaintiff/Relator brought a motion to compel the

production of the Stern Report.  The Superior Court Judge reviewed the Report *in camera*, but

apparently did not have access to the employee interviews.  Pl. Mem. Ex. 3 at 4-5.  The Judge

eventually ruled that the Report was not privileged, and that its disclosure to Rasky and

Simmons waived any privilege that it may have had.  Pl. Memo Ex. 3 at 7-10.  The

Massachusetts Appeals Court declined to disturb that ruling.  Pl. Memo Ex. 4.  The Burke

Litigation settled before the Report was produced.  Pl. Mem. at 3.

    Additional facts will be provided below where appropriate.

### III.  ANALYSIS

#### A.  Standard of Review

    The parties agree that federal common law governs claims of privilege where this

court's jurisdiction is premised on a federal question.  Pl. Mem. at 14; Defs. Opp'n. at 8.  See

Fed. R. Evid. 501 (stating that federal common law governs a claim of privilege; but in a civil

case, "state law governs privilege regarding a claim or defense for which state law supplies the

rule of decision.").  Plaintiff/Relator argues further that state law may apply to her state law

claims.  Pl. Mem. at 14.  However, this court concludes that where, as here, the privilege is

sought to be applied to both federal and state law claims, federal privilege law governs.  See

Wilcox v. Arpaio, 753 F.3d 872, 876 (9th Cir. 2014).[10]  The distinction is not significant here in any event, because, as the Plaintiff/Relator asserts, "the analyses and elements are very similar under Massachusetts and federal law[.]"  Pl. Mem. at 14.

"In a discovery dispute, the burden to establish an applicable privilege rests with the party resisting discovery."  FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000).  "If the privilege is established and the question becomes whether an exception to it obtains, the devoir of persuasion shifts to the proponent of the exception."  Id.  For the reasons detailed herein, the Defendants have failed to establish that the attorney work product privilege applies to the Stern Report.  While they have established that the attorney-client privilege applies to the Report, the Plaintiff/Relator has established that the privilege has been waived as to the materials provided to Rasky.

### B.  Attorney Work Product Doctrine

The Defendants contend that the Stern Report and related documents are protected by the work product doctrine because the Investigation was undertaken, in part, to support the Shervin Litigation, and because there was a concern that Dr. Burke was going to bring suit against them.  As detailed above, there is no indication in the engagement letter, the Report itself, or the employee interviews that the Investigation was intended to relate to the Shervin Litigation.  The belated references in the affidavits submitted are not persuasive.  Moreover,

---

[10] Motorola, Inc. v. Lemko Corp., No. 08 C 5427, 2010 WL 2179170 (N.D. Ill. June 1, 2010) relied on by the Plaintiff/Relator, is not to the contrary.  There the court expressly held that state privilege law applied in a case with both federal and state law claims because the privilege issue related only to the plaintiff's state law claims.  Id. at *2.  In the instant case, the claim of privilege relates to federal claims as well.

the fact that the Defendants were concerned that Dr. Burke might bring litigation sometime in the future is not sufficient to qualify for attorney work product protection.

The work product doctrine, first articulated by the United States Supreme Court in Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947) is partially codified in Fed. R. Civ. P. 26(b)(3).  It shields from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).  The core purpose of the privilege "is to protect the adversary trial process itself." Maine v. U.S. Dep't of Interior, 298 F.3d 60, 66 (1st Cir. 2002) (internal quotation marks omitted).

The First Circuit has taken a narrow view of the attorney work product doctrine in the leading case of U.S. v. Textron Inc. & Subsidiaries, 577 F.3d 21 (1st Cir. 2009).  As the First Circuit has explained, "[f]rom the outset, the focus of work product protection has been on materials prepared for use in litigation, whether the litigation was underway or merely anticipated."  Id. at 29.  "The phrase used in the codified rule – 'prepared in anticipation of litigation or for trial' did not, in the reference to anticipation, mean prepared for some purpose other than litigation: it meant only that the work might be done *for* litigation but *in advance of* its institution."  Id.  Thus, as the First Circuit explained further:

> It is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated. Rather, as the Supreme Court explained, "the literal language of [Rule 26(b)(3)] protects materials *prepared for* any litigation or trial as long as they were prepared by or for a party to the subsequent litigation." *Federal Trade Commission v. Grolier Inc.,* 462 U.S. 19, 25, 103 S. Ct. 2209, 76 L. Ed. 2d 387 (1983) (emphasis added). This distinction is well established in the case law. *See, e.g., NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 138, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975).

Nor is it enough that the materials were prepared by lawyers or represent legal thinking. Much corporate material prepared in law offices or reviewed by lawyers falls in that vast category. It is only work done in anticipation of or for trial that is protected. Even if prepared by lawyers and reflecting legal thinking, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." Fed. R. Civ. P. 26 advisory committee's note (1970). *Accord Hickman v. Taylor,* 329 U.S. at 510 n.9 (quoting English precedent that "[r]eports . . . if made in the ordinary course of routine, are not privileged").

Id. at 29-30 (footnote omitted).

In the instant case, the Defendants have not established that the Stern Report was prepared in anticipation of litigation – for example there is no evidence that Attorney Stern "would not have created the document in essentially the same way had the prospect of litigation not existed, much less a showing that such a subjective belief was objectively reasonable." Zagklara v. Sprague Energy Corp., No. 2:10-cv-445-JAW, 2011 WL 13209818, at *2 (D. Me. June 22, 2011) (citation omitted).[11]  More significantly, the Defendants have not established that the Report was prepared for *use* in possible litigation.  The absence of this fact precludes a finding that the Report is protected as attorney work product.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 386 F. Supp. 3d 175, 187 (D.P.R. 2019) (holding that an expectation of litigation is insufficient grounds to establish work product protection: "documents that were not prepared for use in litigation are not protected.").

---

[11] The court agrees with the Plaintiff/Relator that Dr. Burke's emails do not objectively indicate that litigation was imminent.

C. __Attorney-Client Privilege__

### __State Court Decision__

This court is aware that the Superior Court Judge ruled that the Stern Report was not protected by the attorney-client privilege.  It is undisputed that this ruling is not binding on this court.  Nevertheless, this court has carefully considered the State Court's decisions.  Pl. Mem. Exs. 2, 3.  The issues arose in the State Court in a different case, in a different procedural posture, and the Judge did not have access to the employee interview statements.  For the reasons detailed herein, this court reaches a contrary conclusion.

While the Superior Court Judge found that "Attorney Stern was hired to investigate the practice of 'concurrent' or overlapping surgeries raised by the Plaintiff [Dr. Burke], pre-2011, and to make recommendations for policy and procedural changes[,]" she further concluded that that the investigation was not done for the purpose of rendering legal advice.  Pl. Mem. Ex. 3 at 6.  However, in this court's view, Attorney Stern was hired to provide recommendations for policy and procedural changes in the context of the Defendants' legal obligations, both regulatory (*i.e.* billing) and common law (*i.e.* potential tort claims).  The fact that the Report itself may not contain legal advice does not prevent it from being protected by the attorney-client privilege, since it was prepared in the context of advising MGH whether any of the facts, practices and procedures that were discovered during the Investigation exposed the Defendants to potential legal liability.  A lawyer's expertise helped define the scope of the inquiry and which avenues were appropriate to pursue.

While the question is admittedly a close one, it was brought into clearer focus by the employee interview summaries, which were not available to the State Court Judge.  These

interviews establish that the Stern Investigation was designed to determine the facts, practices and policies relating to concurrent surgeries which had been challenged by Dr. Burke as being both against sound medical practices as well as exposing the Defendants to legal liability. Significantly, in this court's view, the Stern Investigation was not led by medical personnel, who are the ones who could make recommendations from the point of view of medical efficiency and safety.

Of final note, the Superior Court was initially provided with a copy of the Stern Report that was "redacted as to sections that the defendants' deem to be attorney client or otherwise privileged[.]" Pl. Mem. Ex. 2 at 1. No such redacted copy was provided to this court. In light of this court's ruling, *infra*, that the attorney-client privilege vis-à-vis the Report itself has been waived, this court will not address whether certain factual aspects of the Report should be produced despite the privileged nature of the Investigation. See Upjohn Co. v. United States, 449 U.S. 383, 395, 101 S. Ct. 677, 685, 66 L. Ed. 2d 584 (1981) (The attorney-client "privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]").

**Standard of Review**

The elements of the attorney-client privilege have been long established and while easy to recite, are often hard to apply. Thus, the attorney-client privilege applies:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently

protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002) (quoting 8 J.H. Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961)).  The privilege "protects 'only those communications that are confidential and are made for the purpose of seeking or receiving legal advice.'" Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 24 (1st Cir. 2011) (quoting In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003)).  "By safeguarding communications between attorney and client, the privilege encourages disclosures that facilitate the client's compliance with law and better enable him to present legitimate arguments when litigation arises."  Id. at 23 (citing United States v. Mass. Inst. Of Tech., 129 F.3d 681, 684 (1st Cir. 1997)).  "Still, the privilege is not limitless, and courts must take care to apply it only to the extent necessary to achieve its underlying goals."  In re Keeper of Records, 348 F.3d at 22 (citing In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.), 274 F.3d 563, 571 (1st Cir. 2001)).  Thus, "the attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth."  Id. (citing United States v. Nixon, 418 U.S. 683, 709-10, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974)).

In the instant case, Dr. Wollman argues that Attorney Stern was hired just to investigate the facts, and not to provide legal advice.  However, "factual investigations performed by attorneys as *attorneys* fall comfortably within the protection of the attorney-client privilege." Sandra T.E. v. S. Berwyn Sch. Dist. 100, 600 F.3d 612, 619 (7th Cir. 2010) (finding attorneys' investigation of allegation of sexual abuse of students protected by the attorney-client privilege).  That is because "[t]he first step in the resolution of any legal problem is ascertaining

the factual background and sifting through the facts with an eye to the legally relevant."

Upjohn, 449 U.S. at 390-91, 101 S. Ct. at 683.  "[C]lients often do retain lawyers to perform

investigative work because they want the benefit of a lawyer's expertise and judgment[,]" and

"if a client retains an attorney to use her legal expertise to conduct an investigation, that lawyer

is indeed performing legal work."  In re Allen, 106 F.3d 582, 604 (4th Cir. 1997) (finding

attorney's investigation of facts in connection with claim of document mismanagement and

confidentiality/security breaches protected by attorney client privilege).

     "In the context of an organization's internal investigation, if one of the significant

purposes of the internal investigation was to obtain or provide legal advice, the privilege will

apply."  In re Kellogg Brown & Root, Inc., 756 F.3d 754, 760 (D.C. Cir. 2014) (finding in house

counsel's investigation of company's questionable billing protected by attorney-client

privilege); see also United States v. Windsor Capital Corp., 524 F. Supp. 2d 74, 81 (D. Mass.

2007) ("[S]o long as the communication is primarily or predominately of a legal character, the

privilege is not merely lost by reason of the fact that it also dealt with nonlegal matters."

(internal quotation omitted)).  That the attorney is engaged in a factual investigation does not

per se preclude the application of the attorney-client privilege since "[t]he lawyer-client

privilege rests on the need for the advocate and counselor to know all that relates to the

client's reasons for seeking representation if the professional mission is to be carried out."

Upjohn, 449 U.S. at 389, 101 S. Ct. at 682 (finding in house counsel's internal investigation of

possible illegal payments to foreign government officials protected by the attorney-client

privilege).  As the Upjohn court recognized:

     A lawyer should be fully informed of all the facts of the matter he is handling in
     order for his client to obtain the full advantage of our legal system. It is for the

lawyer in the exercise of his independent professional judgment to separate the
relevant and important from the irrelevant and unimportant. The observance of
the ethical obligation of a lawyer to hold inviolate the confidences and secrets of
his client not only facilitates the full development of facts essential to proper
representation of the client but also encourages laymen to seek early legal
assistance.

Id. at 391, 101 S. Ct. at 683 (quoting ABA Code of Professional Responsibility, Ethical

Consideration 4-1).  Moreover,

[i]n the corporate context, however, it will frequently be employees beyond the
control group as defined by the court below – "officers and agents . . .
responsible for directing [the company's] actions in response to legal advice" –
who will possess the information needed by the corporation's lawyers. Middle–
level — and indeed lower–level — employees can, by actions within the scope of
their employment, embroil the corporation in serious legal difficulties, and it is
only natural that these employees would have the relevant information needed
by corporate counsel if he is adequately to advise the client with respect to such
actual or potential difficulties.

Id.  Applying these principles compels the conclusion that the attorney-client privilege applies.

**The Investigation Was for the Purpose of Providing Legal Advice**

Contemporaneous evidence is the most compelling in determining the purpose for

retention of counsel.  See Cavallaro, 284 F.3d at 248 (giving little weight to after-the-fact

statements).  Here, the engagement letter provides that in connection with the Investigation,

Attorney Stern "will endeavor to collaborate on substantive and strategic decisions regarding

the prosecution of the above-referenced matter and otherwise work cooperatively with

Partners lawyers in connection with the described project."  Def. Ex. 8.  In this court's view,

working with in-house lawyers on "substantive and strategic decisions" means that Attorney

Stern was being hired as a lawyer to work with in-house counsel and address legal issues in

connection with the investigation as to practices and policies in the orthopedic department.

The engagement letter further references that Attorney Stern would be providing "legal

representation" and would be compensated for undertaking research.  Def. Ex. 8.  It seems only

logical that the results of the Investigation into wide-ranging allegations of wrongdoing would

dictate the further involvement of the investigating team.  Recognizing that the Superior Court

Judge read the engagement letter differently, this court concludes that the engagement letter

supports the conclusion that Attorney Stern was being hired to serve as an attorney, and not

just to conduct a factual analysis.  See Sandra T.E., 600 F.3d at 619 (finding attorney's

investigation into allegations of sexual abuse protected by the attorney-client privilege where

engagement letter provided that the firm was being hired to "'investigate the response of the

school administration to allegations of sexual abuse of students' and to 'provide legal services

in connection with' the investigation"); In re Allen, 106 F.3d at 604 (finding attorney's

investigation protected by attorney-client privilege where engagement letter provided that she

was retained "as an independent consultant to investigation a situation of possible document

mismanagement and confidentiality/security breaches" even without subsequent letter adding

that she was being hired in her "capacity as a lawyer").

The Report itself is labelled "Confidential Attorney Client Privileged Communication."  It

acknowledges that the Investigation related to concerns raised by Dr. Burke, which, as

described above, included concerns about potential violations of billing regulations, as well as

exposure to liability due to alleged negligence and fraud.  The client interviews focused on

areas of concern raised by Dr. Burke, all of which raised issues of potential liability for the

Defendants. The memoranda relating to the interviews are all labelled confidential and

privileged in some form or another.  The Plaintiff/Relator argues that an attorney was hired to

conduct the interviews just so that they could be kept confidential as attorney-client

communications.  As detailed above, hiring a lawyer to conduct non-legal work does not render

a communication privileged.  See Windsor Capital Corp., 524 F. Supp. 2d at 81 ("[T]he [attorney-

client] privilege does not apply when in-house counsel is engaged in "nonlegal work.").  On the

other hand, it is because granting the protection of confidentiality is likely to result in a fuller

disclosure of facts that a communication with a lawyer is privileged even if it involves gathering

facts as part of rendering legal advice.  Upjohn, 449 U.S. at 389, 101 S. Ct. at 682.

Finally, this court has reviewed the deposition testimony that the parties have cited.  In

sum, it appears clear that those involved in the decision to hire outside counsel did so with the

understanding that Attorney Stern would be investigating Dr. Burke's claims, and that these

claims included charges of legal wrongdoing.  As Dr. Torchiana testified, Attorney Stern was not

hired to do a legal analysis of compliance – rather "this was an analysis of is there fraud

intimidation, people afraid to speak up, documents being altered, etcetera[.]"  Def. Ex. 4 at 247.

The fact that Attorney Stern reported to OGC, which seemingly would have ultimate

responsibility for determining the response to the charges of wrongdoing, does not preclude

the Stern Investigation from being for the purpose of providing legal advice.  See Diversified

Indus. Inc. v. Meredith, 572 F.2d 596, 610 (8th Cir. 1977) (en banc) (holding that employee

interviews conducted by outside firm relating to claim that corporation had a "slush" fund used

to bribe purchasing agents were confidential communications and were protected by attorney-

client privilege: while interviews could have been conducted by lay investigators, and

accountants could have done audit, "neither would have had the training, skills and background

necessary to make the independent analysis and recommendations which the Board felt

essential to the future welfare of the corporation.").  For these reasons, this court concludes

that the Stern Investigation was for the purpose of providing legal advice, and was protected by

the attorney-client privilege.

### D. **Waiver of the Attorney-Client Privilege**

#### 1. **Production to Rasky**

As detailed above, in 2014 the Stern Report was provided to Rasky to assist in

responding to an investigation by the Boston Globe Spotlight Team into the practice of

overlapping surgeries.  Thus, "Justine Griffin, a Managing Director at Rasky, and her colleague

Mark Horan, were primarily responsible for navigating how MGH would respond to the Globe's

inquiries, something MGH's communication's team was not equipped to do."  Defs. Opp'n at

14.  Rasky, in turn, worked with OGC to insure that MGH did not violate HIPAA or any other

legal obligations in providing information to the Globe.  Id. at 14-15.  The Defendants contend

that the disclosure to Rasky did not result in a waiver of the attorney-client privilege because

"Rasky played an integral and strategic role in facilitating communication between OGC and

MGH leadership in order to respond to [the Globe's] inquiries" and because Rasky "served as

functional equivalent of an MGH employee[.]"  Id. at 16.  The Defendants rely on the "Kovel

Doctrine," first enunciated by the Second Circuit in United States v. Kovel, 296 F.2d 918 (2d Cir.

1961).[12]  Dr. Wollman argues that the disclosure to Rasky several years after the Investigation

---

[12] The First Circuit has "never actually adopted Kovel, despite its pedigree and wide acceptance, but [has] assumed for the sake of argument that [it] would do so in the right case." Lluberes, 663 F.3d at 24 n.20 (citing Cavallaro, 284 F.3d at 247 n.6).  See also SEC v. Navellier & Assocs., Inc., CIVIL ACTION NO. 17-11633-DJC, 2019 WL 285957, at *3 (D. Mass. Jan. 22, 2019) (noting that while the First Circuit has never actually adopted Kovel, the First Circuit has indicated that it would do so in the right case).

was concluded does not fit within the <u>Kovel</u> doctrine, and that the disclosure of the Report

constituted a waiver of the attorney-client privilege.  Dr. Wollman's arguments are persuasive.

**The *Kovel* Doctrine Does Not Apply**

"Generally, disclosing attorney-client communications to a third party undermines the

privilege.  An exception to this general rule exists for third parties employed to assist a lawyer in

rendering legal advice." <u>Cavallaro</u>, 284 F.3d at 246-47 (citations omitted).  As the Second Circuit

held in <u>Kovel</u>, "because 'the complexities of modern existence prevent attorneys from

effectively handling clients' affairs without the help of others,' the attorney-client 'privilege

must include all the persons who act as the attorney's agents.'" <u>Id.</u> at 247 (quoting <u>Kovel</u>, 296

F.3d at 921 (additional citation omitted)).  Significantly, in assisting the lawyer, the third party's

presence must be "necessary, or at least highly useful, for the effective consultation between

the client and the lawyer which the privilege is designed to permit" and the communication

"must be made 'for the purpose of obtaining legal advice from the lawyer.'" <u>Id.</u> (quoting <u>Kovel</u>,

296 F.3d at 922).   The fact that "an attorney's ability to represent a client is merely improved

by the assistance of the third party" is not enough to avoid the waiver of the privilege.  <u>Dahl v.</u>

<u>Bain Capital Partners, LLC</u>, 714 F. Supp. 2d 225, 227-28 (D. Mass. 2010).  The Defendants'

disclosure of the Report to Rasky does not satisfy any of the requirements of <u>Kovel</u>.  Rasky did

not assist in consultations between the client (presumably MGH) and the lawyer (presumably

OGC), nor was Rasky's involvement relating to obtaining legal advice.  Where, as here, "what is

sought is not legal advice but only [the third party's services]" and "the advice sought is the

[third party's] rather than the lawyer's, no privilege exists." <u>Cavallaro</u>, 284 F.3d at 247 (quoting

<u>Kovel</u>, 296 F.2d at 922).

[30]

To avoid this conclusion, the Defendants seek to equate Rasky's retention to the situation "where the lawyers of the client actually hire the PR firm to manage publicity for the litigation or the case that the lawyers are trying because the lawyers 'need(ed) outside help' as they presumably are not skilled at public relations." Stardock Systems, Inc. v. Reiche, Civil No. 17-07025-SBA, 2018 WL 6259536, at *3 (N.D. Cal. Nov. 30, 2018) (citing In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 326 (S.D.N.Y. 2003)). See Defs. Opp'n at 16-18. Under this theory,[13] the public relations firm is deemed to "'come within the attorney-client privilege . . . as they have a close nexus to the attorney's role in advocating the client's cause before a court.'" Stardock Systems, Inc., 2018 WL 6259536, at *3 (quoting In re Grand Jury Subpoenas, 265 F. Supp. 2d at 326). The firm's involvement must be related to and assist the lawyer in providing legal advice. In re Grand Jury Subpoenas, 265 F. Supp. 2d at 326. This theory has no application to the instant case.

In In re Grand Jury Subpoenas "communications between and among a prospective defendant in a criminal case, her lawyers, and a public relations firm hired by the lawyers to aid in avoiding an indictment" were found to be protected by the attorney-client privilege. Id. at 321-22. As the court explained:

> Target, like any investigatory target or criminal defendant, is confronted with the broad power of the government. Without suggesting any impropriety, the Court is well aware that the media, prosecutors, and law enforcement personnel in cases like this often engage in activities that color public opinion, certainly to the detriment of the subject's general reputation but also, in the most extreme cases, to the detriment of his or her ability to obtain a fair trial. Moreover, it would be unreasonable to suppose that no prosecutor ever is influenced by an assessment of public opinion in deciding whether to bring criminal charges, as opposed to declining prosecution or leaving matters to civil enforcement

---

[13] Neither party has cited First Circuit cases applying this theory.

proceedings, or in deciding what particular offenses to charge, decisions often of great consequence in this Sentencing Guidelines era. *Thus, in some circumstances, the advocacy of a client's case in the public forum will be important to the client's ability to achieve a fair and just result in pending or threatened litigation.*

Id. at 330 (emphasis added).  See also Stardock Systems, Inc., 2018 WL 6259536, at *6 (where public relations firm hired to provide litigation strategy, attorney-client privilege applied).  In the instant case, however, once the Shervin Litigation concluded, Rasky was not retained to assist in any existing or objectively imminent litigation.  Moreover, the Stern Investigation was conducted in 2011, and the Globe Spotlight team's investigation was taking place in 2014-2015.  Where, as here, the public relations firm was "far from serving the kind of 'translator' function served by the accountant in *Kovel*," and "is, at most, simply providing ordinary public relations advice[,]" the communication of privileged information to the PR firm waives the attorney-client privilege.  Calvin Klein Trademark Trust v. Wachner, 198 F.R.D. 53, 54 (S.D.N.Y. 2000).  See also In re Prograf Antitrust Litig., No. 11-md-02242-RWZ, 2013 WL 1868227, at *3 (D. Mass. May 3, 2013) (communications with public relations firm are not privileged or protected by attorney work product doctrine where firm merely provided "standard public relations services related to the filing and outcome of the citizens petition and any subsequent business or media fallout.").

### The "Functional Equivalent" Doctrine

Finally, the Defendants argue that "[t]he attorney-client privilege extends to Rasky because it served as a 'functional equivalent' of an employee of MGH."  Defs. Opp'n at 19.  This court disagrees.

Another potential qualification [of the attorney-client privilege] is the "functional equivalent" doctrine, which provides that certain third-party agents of corporate

entities, such as consultants, can be considered the "functional equivalent" of corporate employees by virtue of their close connection to the corporate entity. In re Bieter Co., 16 F.3d 929, 938 (8th Cir. 1994). Categorizing certain third party agents as functionally equivalent to employees, in turn, allows communications between such agents and corporate counsel to fall within the scope of Upjohn, which protects communications between corporate employees and corporate counsel. United States v. Graf, 610 F.3d 1148, 1158–59 (9th Cir. 2010) (adopting the functional equivalent doctrine articulated in Bieter) (citing Upjohn, 449 U.S. at 390–94). In Bieter, where the Eighth Circuit established this doctrine, the court considered that the consultant had a longstanding relationship with the company, interacted with the principals on a daily basis, was intimately involved in the single objective for which the company was created, worked from the company office, was paid a monthly wage, and appeared at public meetings as its sole representative, leading to the court's ultimate conclusion that "[t]here was no principled basis to distinguish [the consultant's] role from that of an employee." Bieter, 16 F.3d at 934, 938

Lynx Sys. Developers, Inc. v. Zebra Enter. Sols. Corp., Civil Action No. 15-12297-GAO, 2018 WL 1532614, at *2 (D. Mass. Mar. 28, 2018).

As an initial matter, the functional equivalent doctrine has not been adopted by the First Circuit or applied in the District of Massachusetts. Id. at *4. Moreover, the relationship between MGH and Rasky does not meet the criteria for the PR firm to be considered the "functional equivalent" of an MGH employee. Unlike the facts in Bieter, Rasky was hired for specific projects, was a consultant to and not an agent of MGH, worked out of its own offices, and worked for clients other than MGH. Moreover, Rasky was not the only source of information to the Globe – MGH officers were quoted in the article as responding to Globe inquiries. The Defendants have not alleged anything special about the relationship between MGH and Rasky that would take it out of a consulting/contractual relationship to become the

functional equivalent of an MGH employee.  Thus, the production of the Report to Rasky

waived the attorney-client privilege.[14]

### Scope of the Waiver

The next issue which must be addressed is the scope of the waiver caused by the

disclosure of the Stern Report to Rasky.  The Plaintiff/Relator is seeking the Report as well as all

"investigative materials" including drafts of the Report, notes and communications relating to

the Report.  Pl. Mem. at 2.  For the reasons detailed herein, this court concludes that the waiver

is limited to the Report, any additional materials provided to Rasky related to the Report (such

as drafts, the employee interviews, notes or the like), and any communications with Rasky

referring or relating to the Report.

The First Circuit has addressed the appropriate scope of a waiver in In re Keeper of

Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16 (1st Cir. 2003).  There, a

call between XYZ Corp. and its co-venturer Smallco, took place where the parties discussed

XYZ's decision to pull a medical device from the market.  Id. at 19.  XYZ's attorney participated

in the call, which Smallco secretly recorded and provided to government investigators.  Id. at

19-20.  The court rejected XYZ's claim that the conversation was privileged since counsel's

communications to Smallco were not confidential.  Id. at 23.  While it was "crystal clear that any

previously privileged information actually revealed during the call lost any veneer of privilege"

the issue before the court was "whether that waiver had a ripple effect, i.e., whether it reached

anything beyond that which was actually disclosed."  Id.  As the court held:

---

[14] In light of this court's ruling that the attorney-work product doctrine does not apply to the Stern
Report, this court will not address whether the production to Rasky waived that protection.

It is well accepted that waivers by implication can sometimes extend beyond the matter actually revealed. *See, e.g., In re Grand Jury Proceedings,* 219 F.3d at 182–83; *Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.1982). Such waivers are almost invariably premised on fairness concerns. *See von Bulow [v. von Bulow],* 828 F.2d 94, 101–03 (2d Cir. 1987). As one respected treatise explains, "[t]he courts have identified a common denominator in waiver by implication: in each case, the party asserting the privilege placed protected information in issue for personal benefit through some affirmative act, and the court found that to allow the privilege to protect against disclosure of that information" would have been unfair to the opposing party. 3 Weinstein, *supra* § 503.41[1].

Id. at 23-24.  Applying these principles, the court held that "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter."  Id. at 24.  However, "if confidential information is revealed in an extrajudicial contest and later reused in judicial setting, the circumstances of the initial disclosure will not immunize the client against a claim of waiver."  Id. at 25.

In the instant case, the Defendants have not sought to use the Stern Report in any fashion, much less to gain an adversarial advantage.  While an argument can be made that they used the Report as a "sword and shield" in their dealings with the press, the distinction between use in a judicial and nonjudicial setting is significant.  See In re PolyMedica Corp. Securities Lit., 235 F.R.D. 28, 32 (D. Mass. 2006) ("The distinction between judicial and extrajudicial proceedings is premised on 'fairness concerns': A party cannot use 'the attorney-client privilege as both a sword and a shield.'" (quoting In re Keeper of Records (XYZ Corp.), 348 F.3d at 24)).  The disclosure to Rasky was for a limited purpose, and it appears that Rasky and MGH just used the existence of the Investigation and Report, and not the details contained therein, in their dealings with the press.  Therefore, there is no need to disclose materials beyond which was disclosed to Rasky.  Since the Defendants do not intend to use the Stern

Report in this litigation, "there is no danger that what has not been disclosed is 'enmeshed' with what has been disclosed so as to create any unfairness or prejudice to the defendants." Mass. Mut. Life. Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 293 F.R.D. 244, 253 (D. Mass. 2013).  Consequently, the disclosure of the Report to Rasky resulted only in the waiver of the attorney-client privilege as to any material provided to Rasky, and any communications with Rasky referring or relating to such material.

### 2. Alleged Disclosure to Simmons

Finally, the Plaintiff/Relator argues, and the Superior Court Judge found, that the attorney client privilege covering the Report was waived when the Report sent to Cathy Minehan was located by counsel for Simmons when searching for documents responsive to a subpoena in the Burke litigation.  The Superior Court found waiver based on the fact that Simmons claimed an attorney-client privilege, although there was no attorney client relationship between MGH and Simmons College.  The Judge also assumed that Simmons' counsel had read the Report before claiming a privilege.  Finally, the Judge objected to the fact that MGH appeared to oppose the Plaintiff's motion to compel compliance with the Simmons' subpoena, but did not seek to quash the subpoena or seek a protective order in the intervening 4 months.  See Pl. Mem. Ex. 3 at 9-10 & n.12; Pl. Reply at 20-21.  This court recognizes that the issue of waiver arose in a different context in the Superior Court than in this court.  For the reasons detailed herein, this court concludes that there was no waiver due to the fact that a copy of the Report was located by Simmons.

The facts are fairly straightforward.  In 2015, lawyers in OGC sent a copy of the Stern Report to Cathy Minehan, then Chair of MGH's Board of Trustees at her Simmons email

[36]

account.  <u>See</u> Pl. Mem. Ex. 31.  The transmittal email was labelled "Confidential and privileged

Attorney-client communication."  <u>Id.</u>  Simmons was served with a subpoena in the Burke

litigation.  When the subpoena was issued, Defendants' counsel contacted counsel for Simmons

to discuss privilege concerns.  <u>See</u> Tr. of Mot. to Compel, Pl. Mem. Ex. 30 at 17.  As a result of

these conversations, Simmons' counsel withheld several documents on the grounds of

privilege, including a copy of the Stern Report, and listed the documents on a privilege log.  <u>See</u>

Defs. Opp'n at 22.  While the Defendants' counsel informed the Superior Court that to the best

of his knowledge he did not believe counsel for Simmons ever reviewed the Stern Report, the

Superior Court Judge assumed that Simmons' counsel must have reviewed it in order to put it

on the privilege log.  <u>See generally</u> Defs. Opp'n at 21-22.  MGH apparently did nothing further

to "retrieve" the copy of the Stern Report from Simmons but opposed Dr. Burke's motion to

compel the production of Simmons' documents on Simmons' behalf.  <u>Id.</u>

 The Plaintiff/Relator does not contend that it was improper for OGC to send the Report

to Ms. Minehan, or to do so at her email address at Simmons.  The dispute focuses on what

happened after the Report was found by Simmons' counsel.  Given the fact that the transmittal

email, and presumably the Report, were clearly labeled "privileged," and the fact that MGH's

counsel was working with Simmons' counsel to prevent the disclosure of confidential

information that had been provided to Ms. Minehan in her status as Chair of the Board of

Trustees of MGH, it is not clear to this court that counsel for Simmons had to review the

contents of the Stern Report to include it in its privilege log.  Absent such a review, there would

be no disclosure of privileged information to counsel for Simmons.

Even assuming such a disclosure, however, this court concludes that the inadvertent disclosure to counsel for Simmons did not constitute a waiver of the attorney-client privilege. To determine whether an inadvertent disclosure constitutes waiver, courts examine "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice." Amgen Inc. v. Hoechst Marion Roussel, Inc., 190 F.R.D. 287, 292 (D. Mass. 2000).  While this criteria does not fit the instant situation precisely, a consideration of these types of elements leads to the conclusion that no waiver occurred.  Here, the Report was sent to the Chair of the Board under an email clearly marked privileged and the Report is clearly marked privileged. There is no evidence or allegation that Ms. Minehan inappropriately disseminated the confidential Report.  Promptly after the subpoena was served on Simmons, MGH contacted Simmons' counsel to ensure that privileged material would not be produced, and apparently obtained counsel's cooperation in working to ensure that materials that MGH believed were confidential remained so.  The Report was appropriately listed on a Simmons' privilege log with sufficient clarity that the Plaintiff could move to compel its production.  In this court's view, destruction of the Report after listing it on a privilege log, without court authority to do so, could have led to serious consequences if the court did not agree that the Report was privileged.  In short, this court agrees with the Defendants that "[t]he interests of fairness and justice require that any alleged viewing of the Stern Report by counsel for Simmons in responding to a subpoena in the Burke litigation does not constitute a waiver of the attorney-client privilege."  Defs. Opp'n at 23.

### E.  Defendants' Motions to Quash

Plaintiff/Relator has served subpoenas on Rasky and Simmons to obtain the Report and other documents for which the Defendants have claimed a privilege.  The Defendants have moved to quash those subpoenas.  The parties agree that the ruling on Plaintiff/Relator's motion to compel governs these motions to quash.  Therefore, Rasky shall comply with the subpoena and produce the material this court has ordered to be produced.  Simmons need not produce any documents in response to the subpoena.

### IV.  CONCLUSION

For all the reasons detailed herein, "Plaintiff-Relator's Motion to Compel Production of Documents" (Docket No. 120) is **ALLOWED IN PART** and **DENIED IN PART**.  The Defendants shall produce the Stern Report and all materials related to the Report that they provided to Rasky, and all communications with Rasky referring or relating to such material.  The Motion to Compel is otherwise denied.

Defendants' "Motion to Quash Subpoena to Simmons University" (Docket No. 133) is **ALLOWED**.

"Defendants' Motion to Quash Subpoena to Rasky Partners, Inc."  (Docket No. 134) is **DENIED**.  Rasky shall produce the Report and all materials related to the Report that it obtained from the Defendants, and all communications with the Defendants referring or relating to such material in accordance with this Order.

Plaintiff/Relator's "Motion for Reconsideration" (Docket No. 164) is **ALLOWED**.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge