UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and the ) <br> COMMONWEALTH OF MASSACHUSETTS, ) <br> ) <br> Plaintiffs, ) <br> *ex rel.* ) <br> ) <br> LISA WOLLMAN, M.D. ) <br> ) <br> v. ) <br> ) <br> MASSACHUSETTS GENERAL HOSPITAL, INC., ) <br> THE MASSACHUSETTS GENERAL HOSPITAL'S ) <br> PHYSICIAN'S ORGANIZATION, and ) <br> PARTNERS HEALTHCARE SYSTEM, INC., ) <br> ) <br> Defendants. ) | CIVIL ACTION NO. <br> 15-11890-ADB |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF/RELATOR'S
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS WITHHELD
<u>ON THE BASIS OF THE MASSACHUSETTS PEER REVIEW PRIVILEGE</u>**

November 3, 2020

DEIN, U.S.M.J.

**I. <u>INTRODUCTION</u>**

Plaintiff/Relator Lisa Wollman, M.D., a former anesthesiologist at Massachusetts General Hospital ("MGH") has brought a *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the Massachusetts False Claims Act ("MFCA"), Mass. Gen. Laws ch. 12, § 5B against MGH, Massachusetts General Physicians Organization ("MGPO"), and Partners Healthcare System ("Partners") (collectively the "Defendants" or "MGH"). Dr. Wollman alleges that the Defendants fraudulently billed Medicare and Medicaid for overlapping and concurrent

surgeries that required two patients to be under anesthesia at the same time.  (See Memorandum and Order on Defendants' Motion to Dismiss (Docket No. 102) ("MTD Order")[1] at 3).  Specifically, Dr. Wollman alleges that the "Defendants' widespread use of Concurrent Surgery (1) endangered patients by placing them under 'unnecessarily prolonged administrations of anesthesia' that are not 'reasonable and necessary' and thus not reimbursable; (2) violated informed consent regulations by using a 'relatively non-descript informed consent form and routinely t(aking) other affirmative steps to conceal the practice of concurrent and overlapping surgeries from patients that resulted in a lack of informed consent;' (3) violated record-keeping regulations because 'surgeons falsified or failed to keep accurate records to conceal their practices;' and (4) caused government payors to pay for work that teaching physicians did not do, either because they were not 'immediately available', did not designate qualified backup surgeons, were not present for 'key or critical' parts of surgery, or never appeared in the hospital room at all."  (Pl. Mem. re Stern Report (Docket No. 122-1) at 1).[2]

This matter is presently before the court on "Plaintiff-Relator's Motion to Compel Production of Certain Withheld Documents" (Docket No. 203) pursuant to which the Relator is seeking to compel the production of documents withheld on the basis of a peer review

---

[1] The MTD Order is published as United States v. Gen. Hosp. Corp., 394 F. Supp. 3d 174 (D. Mass. 2019).

[2] The relevant pleadings addressing the Plaintiff's motion to compel presently before this court include "Relator's Memorandum of Law Supporting Her Motion to Compel Production of Certain Withheld Documents" (Docket No. 204) ("Rel. PR Mem."); "Defendants' Opposition to Plaintiff-Relator's Motion to Compel Production of Documents Withheld on the Basis of the Massachusetts Peer Review Privilege" (Docket No. 210) ("Def. PR Opp.") and "Relator's Reply Memorandum in Further Support of Her Motion to Compel Production of Certain Withheld Documents" (Docket No. 211) ("Rel. PR Reply").

privilege. For purposes of this motion, it is undisputed that the documents at issue would be protected from production in state court by the Massachusetts peer review privilege as set forth in Mass. Gen. Laws ch. 111, § 204. (Rel. PR Mem. at 2-3; Def. PR Opp. at 6-7). The issue presently before the court is whether this court will apply a peer review privilege in the instant federal proceedings.

After careful consideration of the written and oral arguments of the parties, this court holds that the peer review privilege does not apply in the instant case alleging health care billing fraud. Nothing herein, however, constitutes a ruling on whether the requested documents are relevant, or whether any other privileges apply. The Defendants shall modify their privilege log, if necessary, to reflect which documents on the log are still being withheld following this Order.[3]

## II. ANALYSIS

The peer review privilege, under Massachusetts law, "protects from disclosure any proceedings, reports, and records of a medical peer review committee, as well as any additional documents or information prepared in order to comply with risk management or quality assurance programs established by the state." Tep v. Southcoast Hosps. Grp., Inc., Civil Action No. 13-11887-LTS, 2014 WL 6873137, *2 (D. Mass. Dec. 4, 2014) (citing Mass. Gen. Laws ch. 111, §§ 204, 205). "[T]he fundamental purpose of the peer review privilege statute is to

---

[3] The Defendants contend that they have claimed the privilege for four categories of documents: (1) "communications regarding specific cases for medical peer review"; (2) "safety reporting documents"; (3) "overarching analyses of surgical quality and safety outcomes"; and (4) "meeting minutes and records of committee meetings for peer review purposes." (Def. PR Opp. at 3-4). While the Defendants contend that the documents requested are not relevant, at oral argument they asked that the court rule on the application of the peer review privilege to the instant case, and not on the issue of the relevancy of the documents.

promote quality health care." Krolikowski v. Univ. of Mass., 150 F. Supp. 2d 246, 249 (D. Mass. 2001).  Thus, the medical privilege is intended "to promote candor and confidentiality . . . and to foster aggressive critiquing of medical care by the providers peers." Gargiulo v. Baystate Health, Inc., 826 F. Supp. 2d 323, 324 (D. Mass. 2011), objections overruled, 279 F.R.D. 62 (D. Mass. 2012) (internal punctuation and citation omitted).  The privilege stems from "'a perceived medical malpractice crisis and doubts about the efficacy of self-regulation by the medical profession.'" Id. (quoting Carr v. Howard, 426 Mass. 514, 517, 689 N.E.2d 1304, 1306 (1998)).

"No peer review privilege exists in the Federal Rules of Evidence[.]" Tep, 2014 WL 6873137, at *2.  Where, as here, a case presents a federal question, "federal common law" applies to both federal and state law claims.  Id. (citation omitted).  The First Circuit has determined that two questions must be answered in the affirmative in order to recognize a state evidentiary privilege in the federal common law.  First, would Massachusetts courts recognize such a privilege? In re Hampers, 651 F.2d 19, 22 (1st Cir. 1981).  Here, it is undisputed that Massachusetts law has a medical peer review privilege, and for the purposes of this motion the parties agree that the privilege would apply to the documents being withheld on the basis of the privilege.  See Mass. Gen. Laws ch. 111, §§ 204, 205; (Rel. PR Mem. at 2-3; Def. PR Opp. at 6-7).

The second question which must be answered is whether the privilege is "intrinsically meritorious?" In re Hampers, 651 F.2d at 22 (internal punctuation and citation omitted).  To make this determination, a court must answer four inquiries favorably to the party seeking to invoke the privilege: 1) "whether the communications originate in a confidence that they will

[4]

not be disclosed"; 2) "whether this element of confidentiality is essential to "the full and satisfactory maintenance of the relation between the parties"; 3) whether the relationship "is a vital one, which ought to be sedulously fostered"; and 4) whether "the injury that would inure to the relation by the disclosure of the communications (would be) greater than the benefit thereby gained for the correct disposal of litigation." Id. at 23 (internal punctuation and citations omitted); Tep, 2014 WL 6873137, at *4.

The first three inquiries favor applying the privilege in this case. In Massachusetts, medical peer review committee proceedings, reports, and records "shall be confidential." Mass. Gen. Laws ch. 111 § 204(a). This confidentially is essential as "[p]hysicians would be far less willing candidly to report, testify about, and investigate concerns of patient safety if their actions would be subject to later scrutiny and possible litigation." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 396, 822 N.E.2d 667, 691 (2005). Finally, it is common sense that relationships that effectively promote patient safety ought to be "sedulously fostered." In re Hampers, 651 F.3d at 23 (internal quotation omitted); Tep, 2014 WL 6873137, at *4.

The final inquiry prevents this court from recognizing the peer review privilege in the instant case. It "essentially weighs the federal interest generally favoring disclosure against the state interest in the asserted privilege." Tep, 2014 WL 6873137, at *4 (internal punctuation and citation omitted). "It makes a difference whether the federal interest in seeking full disclosure is a weak or strong one." In re Hampers, 651 F.2d at 22. In this case, the nature of the FCA claim and relevant federal laws leads to the conclusion that the important federal interest in prosecuting health care billing fraud weighs strongly in favor of disclosure.

[5]

**Nature of the Claim**

The nature of the claim analysis highlights the federal interest at stake in the claim and compares it to the state interest in the privilege. Courts have applied the medical peer review privilege to claims where malpractice and patient care decisions were the essence of the federal claim, since the privilege "exists primarily to address concerns arising from anticipated malpractice litigation." See Tep, 2014 WL 6873137, at *4-5 (recognizing the privilege in a wrongful death/negligence case which included a claim under EMTALA – a federal statute which restricts when hospitals may transfer individuals presenting with emergency medical conditions); Francis v. United States, Civil No. 09-4004-GBD-KNF, 2011 WL 2224509, at *6-7 (S.D.N.Y. May 31, 2011) (recognizing the privilege in malpractice/wrongful death action brought under the Federal Torts Claims Act). In arriving at the decision to apply the privilege, the courts have recognized that the state's goal in applying a privilege to improve the quality of medical care coincided with the goal of the federal statute at issue. See, e.g., Tep, 2014 WL 6873137, at *5 (finding that the privilege would "promote important federal interests in ensuring patient safety and preventing 'patient dumping' by encouraging full and fair peer review of adverse events that arise as a result of potential EMTALA violations[.]"); Francis, 2011 WL 2224509, at *5 ("The Court is persuaded that a privilege protecting peer review records from disclosure in medical or dental malpractice actions would promote the interests of health care practitioners, health care facilities and the public, by encouraging self-evaluation and improving the quality of care."). See also United States v. Aurora Health Care, Inc., 91 F. Supp. 3d 1066, 1068 (E.D. Wis. 2015) (noting that "a few district courts have recognized a peer-review privilege in cases

involving federal claims that were analogous to state medical-malpractice claims") and cases cited.

However, courts have declined to recognize the medical peer review privilege in cases with claims not directly connected to malpractice.  See Wisconsin Province of Soc'y of Jesus v. Cassem, No. 3:19-mc-00130 (VLB), 2020 WL 3470454, at *5 (D. Conn. 2020) (declining to recognize the medical peer review privilege in a dispute regarding a deceased doctor's capacity to designate a beneficiary); Gargiulo, 826 F. Supp. 2d at 327-28 (declining to recognize the peer review privilege in an employment discrimination case implicating civil rights); KD ex rel. Dieffenbach v. United States, 715 F. Supp. 2d 587, 597 (D. Del. 2010) (noting that claims alleging malpractice do not have the same important federal interest at stake as claims "alleging violation of federal civil rights (which implicate the strong federal policy of rooting out invidious discrimination) or anti-trust laws (which involve the equally vital purpose of eradicating anticompetitive business practices"); Krolikowski, 150 F. Supp. 2d at 248-49 (declining to apply peer review privilege to sex discrimination claim).

The instant case involves a closer question.  Despite her present challenge to the application of the peer review privilege, the Plaintiff/Relator has consistently argued that her motivation in challenging the practice of overlapping surgeries was patient safety, and that the billing requirements were designed to improve the quality of medical care.  Equally incongruous, despite their present assertion that the peer review privilege should apply, the Defendants have consistently presented this case as a billing dispute, unrelated to the quality of care.  While these divergent positions may eventually be important in determining the admissibility of evidence at trial, this court concludes that the present dispute is sufficiently far

removed from the purpose of the peer review privilege that the privilege should not apply in the instant case.

"The [FCA] imposes civil liability on 'any person' who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' to the Government or to certain third parties acting on the Government's behalf." Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S. Ct. 1507, 1510, 203 L. Ed. 2d 791 (2019) (citing 31 U.S.C. §§ 3729(a), (b)(2)).  The patient care attached to the allegedly fraudulent bills is not directly at issue in this case.  The challenged surgeries may all have had very successful outcomes, yet the billing may have been inappropriate under Medicare and Medicaid regulations.  Similarly, a negative outcome could, nevertheless, have been billed in compliance with the regulations.  Moreover, while a potential malpractice suit might inhibit the medical profession from analyzing medical treatment (and hence warrant the application of a peer review privilege), there is nothing in the record which would support a conclusion that a potential billing challenge in the future would inhibit such self-analysis.  Thus, the goal of the peer review privilege would not be thwarted if it was not applied in this case.  On the other hand, the application of the privilege may deny the Relator access to information which the Relator believes may establish, among other things, that the Defendants knew about fraudulent billing practices.  "Thus, recognizing the privilege in this case would come with a high cost: preventing the government from gaining access to evidence that might reveal that federal healthcare programs have been defrauded." Aurora Health Care, Inc., 91 F. Supp. 3d at 1069 (declining to recognize a peer review privilege in the context of civil investigation of allegedly faulty health care billing)

The parties have not identified any cases where a peer review privilege has been applied to claims of fraudulent billing and none have been found.  Rather, other courts have consistently refused to recognize a medical peer review privilege in cases involving allegations of health care billing fraud.  See United States ex rel. Polukoff v. Sorensen, No. 2:16-cv-00304-TS-DAO, 2020 WL 5645319, at *3 (D. Utah 2020) (declining to apply peer review privilege in the context of discovery sought in a FCA case where peer review documents might help the Relator establish scienter); In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc., 400 F. Supp. 2d 386, 392 (D. Mass. 2005)("[T]he federal interest in this investigation is to enforce laws against health care fraud, an interest other federal courts have found sufficiently strong to refuse to recognize a federal medical peer review privilege.") and cases cited.  This case offers no differentiating factors which would cause this court to diverge from the precedent set by other courts.

### Federal Statutes

Courts also look to relevant federal law to determine if Congress's goals in enacting the relevant laws would be furthered by recognizing the privilege.  In reviewing federal law, courts must be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." Univ. of Pa. v. EEOC, 493 U.S. 182, 189, 110 S. Ct. 577, 582, 107 L. Ed. 2d 571 (1990) (declining to the extend the peer review privilege to educational institutions when Congress could have included the privilege in Title VII but did not).

As it pertains to the peer review privilege two federal statutes are relevant, the Health Care Quality Improvement Act of 1986 ("HCQIA") and the Patient Safety Quality Improvement

Act of 2005 ("PSQIA").  The HCQIA promotes physician engagement in the peer review process by extending qualified immunity to those conducting peer reviews.  42 U.S.C. §§ 11101(5), 11111 (a)(2) (1986).  "Significantly, Congress did not also create a federal evidentiary privilege for most documents produced during such a review, indicating that it 'not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting such confidentiality with other important federal interests.'"  In re BCBS, 400 F. Supp. 2d at 390 (quoting Teasdale v. Marin Gen. Hosp., 138 F.R.D. 691, 694 (N.D. Cal. 1991)).  In doing so, Congress chose not to include a medical peer review privilege covering all peer review materials in the HCQIA.  See id.

The more recent PSQIA has been construed to "signal[]a 'shift in congressional policy' aimed at providing broad protection for peer review work product in an effort to improve patient safety and quality of care."  Tep, 2014 WL 6873137, at *5; see generally 42 U.S.C. § 299b-1 *et seq.*.  It "'tackled the larger problem of systemic weaknesses in the delivery of health care resulting in preventable adverse events.'"  Id. at *2 (quoting KD, 715 F. Supp. 2d at 595).  To do so, the PSQIA provides evidentiary protection to materials used in the medical peer review process that were "gathered or generated in connection with reports to specified 'patient safety organizations.'"  Id.

Congress's silence is telling.  Congress expanded protections over the medical peer review process but notably limited the expansion to documents related to reports for "patient safety organizations."  Congress did not extend the privilege to include all medical peer review evidence from medical care providers.  Further, unlike in cases where patient care was a central

issue, the purpose of the PSQIA will not be advanced by recognizing the medical peer review privilege in the instant case, where the quality of patient care is not directly at issue.

In sum, both the nature of the claims being brought and Congress's decision not to create a broad medical peer review privilege dictate that this court decline to recognize the medical peer review privilege in this case.  The federal interest in preventing billing fraud outweighs the state interest at issue.  Finally, given "that the production of documents would be subject to a protective order to preserve confidentiality, any concerns about discouraging rigorous and honest evaluation of physician conduct by public disclosure have been minimized."  In re BCBS, 400 F. Supp. 2d at 391.

### III.  CONCLUSION

For the reasons detailed herein, "Plaintiff-Relator's Motion to Compel Production of Certain Withheld Documents" (Docket No. 203) is **ALLOWED**.  The peer review privilege does not apply in the instant case alleging health care billing fraud.  Nothing herein, however, constitutes a ruling on whether the requested documents are relevant, or whether any other privileges apply.  The Defendants shall modify their privilege log, if necessary, to reflect which documents on the log are still being withheld following this Order.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge