# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA and the    :
COMMONWEALTH OF    :
MASSACHUSETTS    :
   :
                      Plaintiffs,    :    **Civil Action 15-11890-ADB**
                      *ex rel.*    :
   :
LISA WOLLMAN, M.D.    :
   :
              Plaintiff-Relator,    :
   :
            v.    :
   :
MASSACHUSETTS GENERAL HOSPITAL    :
INC., THE MASSACHUSETTS GENERAL    :
HOSPITAL'S PHYSICIAN'S    :
ORGANIZATION and PARTNERS    :
HEALTHCARE SYSTEM, INC.    :
   :
                   Defendants.    :

## DECLARATION OF GEORGE SCHUSSEL

Pursuant to 28 U.S.C. § 1746, I, George Schussel declare as follows:

1.      My name is George Schussel. I am 80 years old and I have been enrolled in Medicare since I became eligible when I was 65. My wife, Sandra, and I are currently residents of Florida, but we have offices for our real estate business in Florida, New Hampshire and Massachusetts and we reside and work in all three states.

2.      Sandra is a registered nurse (RN) and graduate of the Brigham Hospital (Boston) School of Nursing. I received a bachelor's degree in physics and mathematics in 1961 from the University of California, UCLA.  In 1962, I received a master's degree in applied mathematics from Harvard University.  In 1966, I received a doctorate from the Harvard Business School,

1

with a specialization in technology and computer science. I am now retired from my former profession of technology analyst and work in the financial and real estate fields.

3.       I make this declaration with the hope that it will inform Massachusetts General Hospital's ("MGH") surgical and informed consent practices so that individuals like me do not suffer the same treatment and injury I experienced in 2012.

4.       On January 19, 2012, I checked in as a patient to MGH in Boston, Massachusetts to receive elective shoulder surgery from Dr. J.P. Warner. The purpose of my shoulder surgery was to alleviate pain and restore mobility in my right shoulder. I am right-handed. Beginning around 2000, I was no longer able to raise my right hand above the level of my ear. (Still am not able.) For my entire life I have depended on playing racquet sports for cardio and pulmonary exercise. A growing and intense pain from my right shoulder had caused me to have to discontinue sports like racquetball, but for some reason I was able to continue to play tennis and deal with the pain with ibuprofen and oxycodone. Both medications have undesirable side effects, and neither is a good long-term strategy for dealing with intense after exercise pain.

5.       On August 23, 2011, I met Dr. Warner who reviewed the X-ray scan that had been taken and he explained that I was suffering from "old fashioned arthritis." He said that a total shoulder replacement could alleviate my pain and restore mobility. The doctor's business card indicated his position was "Head of the Harvard Shoulder Project." I thought there's no better person in the world to do this surgery. It was an easy decision to ask him to schedule my surgery.

6.       Nine days before my shoulder surgery was scheduled, on January 10, 2012, my wife Sandra and I met with Dr. Warner. Sandra was (and still is) an RN with extensive medical

experience and she recalls asking Dr. Warner whether he would be present during the entire surgery and he assured her that he would.

7.      At that pre-operative visit on January 10, 2012, I signed various forms which were explained to me as standard procedure, one of which is a "Patient Consent to Procedure" form that is attached to my Declaration as Exhibit A (G. Schussel Medical Records) at MGH-W-000039614.

8.      Nothing in my meetings nor any mention was ever made that would imply the surgeon might be performing my shoulder surgery at the same time he was performing another surgery on another patient in another room.  Moreover, he never told me or my wife Sandra that this is how he intended to operate on me. Had he told me that, I never would have agreed to the surgery.  Indeed, this is why my wife specifically asked him about whether he would be in the room during the entirety of my surgery. Subsequently at my first meeting with Dr. Warner, after the failed surgery (February 14, 2012), my angry wife confronted the doctor and quizzed him about whether he had been present when my arm had been raised into traction and the artery had ruptured. He assured us he had been. He then proceeded to describe what had happened before the traction error -- the ligament/tendons holding my shoulder together had been dissected in preparation for the shoulder joint replacement. This had to be undone as the decision was taken to terminate the surgery. So, the meeting then ended with my receiving the script for physical therapy, which I desperately needed.

9.      On the day of my surgery, January 19, 2012, I carefully checked the wall clocks and remember being anesthetized and falling asleep at 10 a.m. and waking at 6 p.m.  When I woke up in recovery my wife and two daughters were there, and my right arm was all bandaged up and immobilized in a sling. My first comment was "wow, that operation took a long time,"

seeing that I had been out for 8 hours. Sandra immediately said that they had not done the operation! I was thinking "are you kidding me, my arm is totally immobilized and what could possibly have taken so long???" But I knew from her demeanor that nobody was kidding. She told me that my shoulder surgery had been aborted because an artery ruptured when my arm was put in traction.  The doctor had never come to the waiting room to tell them this but had phoned the waiting room to talk to Sandra around maybe 4 p.m. His message was very memorable "the operation did not go as planned." Since the doctor did not say (initially) I was OK, Sandra's immediate thought was that I had succumbed, and she became distraught. A nurse was called who suggested that Sandra be admitted to the hospital as her blood pressure was intolerably high. Admission was not necessary as our daughters settled Sandra down.

10.    As I awoke at around 6 p.m. my family proceeded to explain to me that I had lost a large quantity of blood; that I was put on a machine to re-circulate my own blood and then given multiple transfusions of blood to save my life before leaving the operating room. In a later meeting with Dr. Warner weeks after the surgery debacle he explained that by being at MGH they had been able to summon a vascular surgeon within a couple of minutes. Dr. Warner stated that the situation could/would have turned much worse in a smaller hospital.

11.    After the aborted shoulder surgery and loss of blood, I spent over a week (9 days) in the hospital at MGH convalescing.  Almost immediately after the failed surgery I came down with a vicious pneumonia and became very ill.  My wife, thank goodness, slept in the room with me every night and was very helpful in directing and assisting the nursing staff. To my recollection I did not see or communicate with Dr. Warner while I was recovering at MGH. And he definitely did not visit with me or my family after I woke up from the failed surgery.

4

12.     After the aborted surgery, my shoulder was in very bad condition and I spent considerable time participating in physical therapy. For a long time (9-12 months), my right arm and hand (which is my dominate side) was minimally usable because it was affixed close to my body to prevent further injury.  In retrospect, I remember it as a long and painful process.

13.     I have reviewed documents in this case, including the deposition testimony of Dr. Warner, indicating that Dr. Warner had another shoulder surgery in another room progressing during my surgery and that he had scheduled numerous meetings in his office, one of which was scheduled to overlap my surgery by fifteen minutes.  Exhibit B (Depo. of J.P. Warner) at p. 267-273 and Exhibit C (Calendar Excerpt of J.P. Warner January 19, 2012), attached hereto.

14.     For example, Dr. Warner's calendar shows that both my surgery and another surgery were scheduled to begin at 10 a.m.  *See* Exhibit C.  I was wheeled into the operating room (room 67) at 9:35 a.m. and was anesthetized and ready for surgery at 9:54 a.m. *See* Exhibit A at p. (MGH-W-000029616). According to the deposition of Dr. Warner, the other patient (in room 66) was wheeled into the operating room at the same time I was (9:35 a.m.) and ready for surgery three minutes after me, at 9:57 a.m.  *See* Exhibit B, p. 279.  The patient in room 66's surgery was over around 2:05 p.m. and mine ended at 1:14p.m., but I was not wheeled out of the operating room for another hour (i.e., at 2:07 p.m.).  *Id.* at p. 279 (lines 9-22), Exhibit A at MGH-W-000039616.  It is my (not medically trained) opinion that the extensive time that I was intubated for anesthesia purposes directly caused my pneumonia. What excuse could MGH have had to keep me out so long for a failed surgery?

15.     Prior to reviewing these documents, I was never informed by Dr. Warner or anyone else at MGH or otherwise that he had planned (and carried out) my surgery while

performing surgery on another patient in another operating room.  As said, I would not have agreed to this.

16.     My medical bills for the aborted surgery and care given afterward at MGH were submitted for payment to my medical insurance carriers, Medicare and United Health, through AARP.

17.     No one at MGH (or otherwise) ever told me what I learned reviewing documents from this case.

18.     When I booked the surgery, I also booked a concierge room, which was an additional cost not covered by Medicare.  I had agreed to pay for the concierge room out of pocket because it was described to me as a single person room with better amenities than a standard room.  Notwithstanding, after the aborted surgery, I noticed that MGH did not bill me for the concierge room, on its own accord.  Knowledgeable individuals at MGH assured me that the hospital understood that a botched surgery had happened and that I would never receive a bill for the room upgrade.  That MGH did this to quell any complaints from me was smart on their part. Various friends had suggested that I should file a malpractice claim in the circumstance. I thought about it and decided against it as I was in precarious health and certainly didn't need anything to direct my attention away from recovery. But as the months passed with a damaged limb and life, I knew that had an invoice come for payment it would have been the last straw to incite me to file for damages. By lying to us about the dual booking the doctor had saved himself a lawsuit. Silly me believing him.

19.     After my first post-surgery visit with the doctor during which Sandra had verbally confronted Dr. Warner, I never brought Sandra to another post-operative meeting with him because I was totally dependent on the doctor to continue writing scripts for physical therapy. I

6

felt I had to remain in his good graces. Not knowing the truth of what had happened, I assumed my injuries were just an unfortunate occurrence. In one of our meetings, I asked Dr. Warner if the artery tear upon elevation into traction had occurred to him before. He said, yes, but it's not common. I thought but did not say "OMG, once in a lifetime is enough! You're talking life threatening here." I couldn't imagine with an artery tear happening more than once that special caution to preventing that wouldn't be part of standard procedure. Surely there must be a better way.

20.     My two daughters and their spouses ganged up on me one day about a month post-surgery and insisted that I never perform another voluntary surgery of the Dr. Warner type (shoulder surgery) as they were unprepared for an outcome that involved my losing life. Dr. Warner had asked me when I would be ready for him to reschedule the procedure. He said they would proceed with a vascular surgeon in the room. When I told that to the family my son-in-law commented that in addition to the vascular surgeon, I should request the presence of a priest. The family group pressed me to see that "all my affairs were in order." My thought on the Mulligan was "Fool me once, shame on you, twice? Shame on me." Yes, Dr. Warner had managed to throw a real scare into our family.

21.     Stories later published in the Boston Globe caused me to seek out more information about the possibility that my aborted shoulder surgery was at least partially caused by a non-present doctor whose attention was not fully focused on my surgery. No one from MGH nor Dr. Warner were ever in communication with me about the fact that Dr. Warner was performing my surgery and another at the same time.  But for the Boston Globe I would not have thought to even consider that my injury occurred during a concurrent surgery.

22.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May **24**, 2021

_____
George Schussel

# EXHIBIT A

# FILED UNDER SEAL

**EXHIBIT B**

**FILED UNDER SEAL**

**EXHIBIT C**

**FILED UNDER SEAL**